Appeal No. 24-1187

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

WILDEARTH GUARDIANS, et al., Petitioners-Appellants,

v.

U.S. FOREST SERVICE, Respondent-Appellee,

and

JERRY BROWN, WAYNE BROWN, COLORADO WOOLGROWERS
ASSOCIATION, COLORADO FARM BUREAU FEDERATION, and J. PAUL
BROWN, Respondent-Intervenors-Appellees

---

On Appeal from the United States District Court for the District of Colorado
The Honorable Daniel D. Domenico, Civil Action No. 1:19-cv-00208-DDD

---

### APPENDIX OF APPELLANTS
### WILDEARTH GUARDIANS, et al.
### Volume I, Pages 1 to 272

---

Lauren M. Rule (OR Bar 015174)
Advocates for the West
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

Elizabeth H. Potter (OR Bar 105482)
Advocates for the West
P.O. Box 1682
Bend, OR 97709
(503) 954-2721
epotter@advocateswest.org

**APPENDIX INDEX**
**VOLUME I**

| Date | Document Name | ECF No./AR[1] Page Nos. | Vol. Page Nos. |
|---|---|---|---|
| | Docket Sheet Case No. 1:19-cv-00208-DDD | | 2–12 |
| 1/24/19 | Petition for Review of Agency Action | ECF No. 1 | 13–45 |
| 5/31/19 | Memorandum in Support of Motion to Intervene by Colorado Farm Bureau Federation and J. Paul Brown | ECF No. 13-1 | 46–57 |
| 7/3/19 | Reply to Plaintiffs' and Defendant's Response in Opposition to Motion to Intervene by Colorado Farm Bureau Federation and J. Paul Brown | ECF No. 19 | 58–68 |
| 5/20/20 | Opening Brief in Support of Petition for Review of Agency Action | ECF No. 33 | 69–109 |
| 5/20/20 | Declaration of Gregory J. Dyson | ECF No. 34 | 110–120 |
| 5/20/20 | Declaration of Jonathan Ratner | ECF No. 35 | 121–135 |
| 6/22/20 | Federal Respondent's Opposition to Petitioners' Petition for Review of Agency Action | ECF No. 36 | 136–185 |
| 6/29/20 | Opening Brief of Respondent-Intervenors Wayne Brown, et al. in Opposition to Petition for Review of Agency Action | ECF No. 37 | 186–211 |
| 6/29/20 | Respondent-Intervenors J. Paul Brown and the Colorado Farm Bureau Federation's Response Brief | ECF No. 38 | 212–236 |
| 7/20/20 | Reply Brief in Support of Petition for Review of Agency Action | ECF No. 39 | 237–271 |
| 8/22/24 | Certificate of Digital Submission | | 272 |

---

[1] AR refers to the page numbers of documents in the administrative record.

ADMAPP,APPEAL,JD1,TERMED

# U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:19-cv-00208-DDD

| | |
|---|---|
| WildEarth Guardians et al v. U.S. Forest Service | Date Filed: 01/24/2019 |
| Assigned to: Judge Daniel D. Domenico | Date Terminated: 03/07/2024 |
| Case in other court: USCA-10th Circuit, 24-01187 | Jury Demand: None |
| Cause: 05:0706 - Judicial Review of Agency Action | Nature of Suit: 893 Environmental Matters |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**WildEarth Guardians**                    represented by    **Maya L. Kane**
Southwest Water and Property Law LLC
10 Town Square
Suite 422
Durango, CO 81301
970-946-5419
Email: mkane@swpropertylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren M. Rule**
Advocates for the West
3701 SE Milwaukie Avenue
Suite B
Portland, OR 97202
503-914-6388
Email: lrule@advocateswest.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Western Watersheds Project**            represented by    **Maya L. Kane**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren M. Rule**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

I-App-3

| | | |
|---|---|---|
| **U.S. Forest Service**<br>*a federal agency of the*<br>*other*<br>United States Department of Agriculture | represented by | **Krystal-Rose Perez**<br>U.S. Department of Justice<br>Environment & Natural Resources<br>Division<br>Natural Resources Section<br>150 M Street, NE<br>Washington, DC 20009<br>202-305-0486<br>Email: krystal-rose.perez@usdoj.gov<br>*ATTORNEY TO BE NOTICED* |

V.

**Intervenor Defendant**

| | | |
|---|---|---|
| **Wayne Brown** | represented by | **Aaron E. Bruner**<br>Western Resources Legal Center<br>9220 Barbur Boulevard S.W.<br>Suite 119, No 327<br>Portland, OR 97219<br>503-768-8505<br>Email: abruner@wrlegal.org<br>*ATTORNEY TO BE NOTICED* |
| | | **Caroline C. Lobdell**<br>Western Resources Legal Center<br>9220 Barbur Boulevard S.W.<br>Suite 119, No 327<br>Portland, OR 97219<br>503-768-8500<br>Fax: 503-222-3255<br>Email: clobdell@WRLEGAL.ORG<br>*TERMINATED: 06/27/2023* |
| | | **Tate Frederick Justesen**<br>Western Resources Legal Center<br>9220 Barbur Boulevard S.W.<br>Suite 119, No 327<br>Portland, OR 97219<br>503-768-8500<br>Email: tjustesen@wrlegal.org<br>*TERMINATED: 04/16/2022*<br>*ATTORNEY TO BE NOTICED* |

**Intervenor Defendant**

| | | |
|---|---|---|
| **Jerry Brown** | represented by | **Aaron E. Bruner**<br>(See above for address) |

**I-App-4**

*ATTORNEY TO BE NOTICED*

**Caroline C. Lobdell**
(See above for address)
*TERMINATED: 06/27/2023*

**Tate Frederick Justesen**
(See above for address)
*TERMINATED: 04/16/2022*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Colorado Wool Growers Association**          represented by          **Aaron E. Bruner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline C. Lobdell**
(See above for address)
*TERMINATED: 06/27/2023*

**Tate Frederick Justesen**
(See above for address)
*TERMINATED: 04/16/2022*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Colorado Farm Bureau Federation**          represented by          **Brian Earnshaw Gregg**
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
303-292-2021
Fax: 303-292-1980
Email: brian@mslegal.org
*ATTORNEY TO BE NOTICED*

**Ivan Laurence London**
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
303-292-2021
Fax: 877-349-7074
Email: ilondon@mslegal.org
*ATTORNEY TO BE NOTICED*

**Joseph A. Bingham**
Mountain States Legal Foundation
2596 South Lewis Way

Lakewood, CO 80227
919-649-7403
Fax: 303-292-1980
Email: jbingham@mslegal.org
*TERMINATED: 05/08/2023*

**Intervenor Defendant**

| | | |
|---|---|---|
| **J. Paul Brown** | represented by | **Brian Earnshaw Gregg**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Ivan Laurence London**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Joseph A. Bingham**<br>(See above for address)<br>*TERMINATED: 05/08/2023* |

| Date Filed | # | Docket Text |
|---|---|---|
| 01/24/2019 | 1 | COMPLAINT *Petition for review of agency action* against U.S. Forest Service (Filing fee $ 400,Receipt Number 1082-6498712)Attorney Lauren Marie Rule added to party Western Watersheds Project(pty:pla), Attorney Lauren Marie Rule added to party WildEarth Guardians(pty:pla), filed by WildEarth Guardians, Western Watersheds Project. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Rule, Lauren) (Entered: 01/24/2019) |
| 01/24/2019 | 2 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES re: 1 Complaint filed by attorney Maya Leonard Kane. **DO NOT REFILE THE DOCUMENT. Action to take -** counsel must submit a change of contact request through the Attorney Services Portal Account pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Civil cases). (Text Only Entry) (rvill, ) (Entered: 01/24/2019) |
| 01/24/2019 | 3 | Case assigned to Judge Robert E. Blackburn. Text Only Entry. (rvill, ) (Entered: 01/24/2019) |
| 01/24/2019 | 4 | SUMMONS issued by Clerk. (Attachments: # 1 Magistrate Judge Consent Form) (rvill, ) (Entered: 01/24/2019) |
| 01/24/2019 | 5 | ORDER REGARDING INSTRUCTIONS FOR JOINT CASE MANAGEMENT PLAN. By Judge Robert E. Blackburn on 01/24/2019. (athom, ) (Entered: 01/24/2019) |
| 02/06/2019 | 6 | NOTICE of Entry of Appearance by Krystal-Rose Perez on behalf of U.S. Forest ServiceAttorney Krystal-Rose Perez added to party U.S. Forest Service(pty:dft) (Perez, Krystal-Rose) (Entered: 02/06/2019) |
| 04/22/2019 | 7 | **STRICKEN** - Proposed Joint Case Management Plan by Plaintiffs Western Watersheds |

**I-App-6**

| | | |
|---|---|---|
| | | Project, WildEarth Guardians. (Kane, Maya) Modified on 4/23/2019 to correct event text (athom, ). Modified on 4/23/2019 to strike pursuant to 9 Minute Order (athom, ). (Entered: 04/22/2019) |
| 04/22/2019 | 8 | ANSWER to 1 Complaint, by U.S. Forest Service.(Perez, Krystal-Rose) (Entered: 04/22/2019) |
| 04/23/2019 | 9 | MINUTE ORDER by Judge Robert E. Blackburn on 04/23/2019. The proposed Joint Case Management Plan [# 7 ] is stricken. On or before 4/29/2019, the parties shall file a proposed JCMP which is signed by counsel for both parties. (athom, ) (Entered: 04/23/2019) |
| 04/23/2019 | 10 | Proposed Joint Case Management Plan by Plaintiffs WildEarth Guardians, Western Watersheds Project. (Kane, Maya) (Entered: 04/23/2019) |
| 04/23/2019 | 11 | JOINT CASE MANAGEMENT PLAN ORDER: Adm Plaintiffs Brief due by 9/6/2019. Adm Defendants Brief due by 10/8/2019. Adm Plaintiff Reply Brief due by 10/22/2019. By Judge Robert E. Blackburn on 04/23/2019. (athom, ) (Entered: 04/23/2019) |
| 05/31/2019 | 12 | MOTION to Intervene by Interested Parties Wayne Brown, Jerry Brown, Colorado Wool Growers Association. (Attachments: # 1 Memorandum in Support of Motion to Intervene, # 2 Affidavit Declaration of Wayne Brown, # 3 Affidavit Declaration of Jerry Brown, # 4 Affidavit Declaration of Ernie Etchart, # 5 Proposed Answer, # 6 Corporate Disclosure Statement, # 7 Proposed Order (PDF Only) Proposed Order Granting Motion to Intervene)(Justesen, Tate) Modified on 6/2/2019 to correct filer text (athom, ). (Entered: 05/31/2019) |
| 05/31/2019 | 13 | MOTION to Intervene by Interested Parties Colorado Farm Bureau Federation, J. Paul Brown. (Attachments: # 1 Memorandum in Support of Motion to Intervene, # 2 Exhibit A, # 3 Exhibit B)(Sheldon, Brian) Modified on 6/2/2019 to correct filer text (athom, ). (Entered: 05/31/2019) |
| 06/18/2019 | 14 | Unopposed MOTION for Leave to *Lodge the Administrative Record in Electronic Format* by Defendant U.S. Forest Service. (Perez, Krystal-Rose) (Entered: 06/18/2019) |
| 06/18/2019 | 15 | NOTICE of *Lodging the Administrative Record* by Defendant U.S. Forest Service (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Perez, Krystal-Rose) Modified on 6/24/2019 to note that the thumb drives were delivered and received by the court through FedEx on 06/20/2019 (athom, ). (Entered: 06/18/2019) |
| 06/21/2019 | 16 | MOTION/STIPULATION re 12 MOTION to Intervene by Defendant U.S. Forest Service. (Perez, Krystal-Rose) Modified on 6/21/2019 to correct event (athom, ). (Entered: 06/21/2019) |
| 06/21/2019 | 17 | RESPONSE to 13 MOTION to Intervene filed by Plaintiffs Western Watersheds Project, WildEarth Guardians. (Kane, Maya) (Entered: 06/21/2019) |
| 06/21/2019 | 18 | RESPONSE to 13 MOTION to Intervene filed by Defendant U.S. Forest Service. (Perez, Krystal-Rose) (Entered: 06/21/2019) |
| 07/03/2019 | 19 | REPLY to Response to 13 MOTION to Intervene filed by Interested Parties J. Paul |

| | | Brown, Colorado Farm Bureau Federation. (Sheldon, Brian) (Entered: 07/03/2019) |
|---|---|---|
| 07/15/2019 | 20 | NOTICE of Change of Address/Contact Information by Krystal-Rose Perez (Perez, Krystal-Rose) (Entered: 07/15/2019) |
| 08/02/2019 | 21 | ORDER. The Unopposed Motion for Leave To Lodge the Administrative Record in Electronic Format [# 14 ] is denied. By 8/23/2019, the respondent shall file the administrative record via the CM/ECF system of the court in the manner required by the Electronic Case Filing Procedures for the District of Colorado (Civil Cases). By Judge Robert E. Blackburn on 08/02/2019. (athom, ) (Entered: 08/02/2019) |
| 08/20/2019 | 22 | ADMINISTRATIVE RECORD Part 1 of 2 by Defendant U.S. Forest Service. (Attachments: # 1 Pages WA00001, # 2 Pages WA00558, # 3 Pages WA00657, # 4 Pages WA00702, # 5 Pages WA00745, # 6 Pages WA00785, # 7 Pages WA00828, # 8 Pages WA00942, # 9 Pages WA01154, # 10 Pages WA01495, # 11 Pages WA01700, # 12 Pages WA01950, # 13 Pages WA02094, # 14 Pages WA02274, # 15 Pages WA02498, # 16 Pages WA02805, # 17 Pages WA03212, # 18 Pages WA03356, # 19 Pages WA03536, # 20 Pages WA03684, # 21 Pages WA03758, # 22 Pages WA03962, # 23 Pages WA04129, # 24 Pages WA04248, # 25 Pages WA04347, # 26 Pages WA04681, # 27 Pages WA05048, # 28 Pages WA05517)(Perez, Krystal-Rose) Modified on 8/22/2019 to add and correct text (athom, ). (Entered: 08/20/2019) |
| 08/20/2019 | 23 | ADMINISTRATIVE RECORD Part 2 of 2 by Defendant U.S. Forest Service. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Pages WA05696, # 4 Pages WA05780, # 5 Pages WA05792, # 6 Pages WA05827, # 7 Pages WA05832, # 8 Pages WA05838, # 9 Pages WA05892, # 10 Pages WA05911, # 11 Pages WA05920, # 12 Pages WA05934, # 13 Pages WA06060, # 14 Pages WA06067, # 15 Pages WA06074, # 16 Pages WA06082, # 17 Pages WA06100, # 18 Pages WA06112, # 19 Pages WA06128, # 20 Pages WA06135, # 21 Pages WA06144, # 22 Pages WA06153, # 23 Pages WA06157, # 24 Pages WA06160, # 25 Pages WA06164, # 26 Pages WA06168, # 27 Pages WA06173, # 28 Pages WA06177, # 29 Pages WA06181, # 30 Pages WA06184, # 31 Pages WA06187, # 32 Pages WA06190, # 33 Pages WA06193, # 34 Pages WA06197, # 35 Pages WA06210.7, # 36 Pages WA06210.8, # 37 Pages WA06213, # 38 Pages WA06217, # 39 Pages WA06221, # 40 Pages WA06225, # 41 Pages WA06230, # 42 Pages WA06237, # 43 Pages WA06244, # 44 Pages WA06262, # 45 Pages WA06283, # 46 Pages WA06310)(Perez, Krystal-Rose) Modified on 8/22/2019 to correct and add text (athom, ). (Entered: 08/20/2019) |
| 08/29/2019 | 24 | MOTION to Strike 23 ADMINISTRATIVE RECORD by Plaintiffs Western Watersheds Project, WildEarth Guardians. (Attachments: # 1 Proposed Order (PDF Only))(Rule, Lauren) Modified on 9/20/2019 to correct text (athom, ). (Entered: 08/29/2019) |
| 08/30/2019 | 25 | Conventionally Submitted Material : 1 USB Drive Supplemental to the ADMINISTRATIVE RECORD 22 , ADMINISTRATIVE RECORD 23 by Defendant U.S. Forest Service. (Filed in the Clerk's Office) Text Only Entry (evana, ) Material placed in Clerk's Office Oversized Area A-3-5. Modified to specify storage location on 3/25/2021 (jtorr, ). (Entered: 09/03/2019) |
| 09/17/2019 | 26 | Supplemental ADMINISTRATIVE RECORD by Defendant U.S. Forest Service. |

|  |  |  |
|---|---|---|
|  |  | (Attachments: # 1 Declaration, # 2 Revised AR supp Index, # 3 WA06317)(Perez, Krystal-Rose) Modified on 10/3/2019 to add text (athom, ). (Entered: 09/17/2019) |
| 09/19/2019 | 27 | BRIEF in Opposition to 24 MOTION to Strike 23 ADMINISTRATIVE RECORD filed by Defendant U.S. Forest Service. (Perez, Krystal-Rose) Modified on 9/20/2019 to correct text (athom, ). (Entered: 09/19/2019) |
| 10/03/2019 | 28 | REPLY to Response to 24 MOTION to Strike 23 ADMINISTRATIVE RECORD filed by Plaintiffs Western Watersheds Project, WildEarth Guardians. (Attachments: # 1 Exhibit Western Watersheds Project Comments on SIR, # 2 Exhibit WildEarth Guardians Comments on SIR)(Kane, Maya) (Entered: 10/03/2019) |
| 10/17/2019 | 29 | NOTICE re 28 Reply to Response to Motion, by Plaintiffs Western Watersheds Project, WildEarth Guardians (Attachments: # 1 Woolever comments, # 2 Rinkes comments, # 3 BHA comments)(Rule, Lauren) (Entered: 10/17/2019) |
| 03/30/2020 | 30 | ORDER. Under Fed. R. Civ. P. 24(a)(2), the Proposed Respondent - Intervenors' Motion to Intervene [# 12 ] is granted and Wayne Brown, Jerry Brown, and The Colorado Wool Growers Association (collectively, the CWGA Intervenors) are permitted to intervene as respondents. Under Fed. R. Civ. P. 24(a)(2), the Motion To Intervene by Colorado Farm Bureau Federation and J. Paul Brown [# 13 ] is granted and J. Paul Brown and The Colorado Farm Bureau (collectively, the CFB Intervenors) are permitted to intervene as respondents. The Stipulation on Motion To Intervene [# 16 ] is approved and the relief sought there is granted. Adm Plaintiffs Brief due by 5/20/2020. Adm Defendants Brief due by 6/22/2020. The response briefs of the CWGA Intervenors and of the CFB Intervenors due by 06/29/2020. Adm Plaintiff Reply Brief due by 7/20/2020. By Judge Robert E. Blackburn on 03/30/2020. (athom, ) (Entered: 03/30/2020) |
| 04/20/2020 | 31 | MINUTE ORDER by Judge Robert E. Blackburn on 04/20/2020. It is ORDERED that the clerk shall file the Respondent-Intervenors' Answer [#12-5] as a separate docket entry and the answer [#12-5] shall be considered to be timely filed. (athom, ) (Entered: 04/20/2020) |
| 04/20/2020 | 32 | Respondent-Intervenors' ANSWER to 1 Complaint, by Jerry Brown, Wayne Brown, Colorado Wool Growers Association pursuant to 31 Minute Order. (athom, ) (Entered: 04/20/2020) |
| 05/20/2020 | 33 | PLAINTIFF'S OPENING BRIEF re 26 Administrative Record, 22 Administrative Record,,, 23 Administrative Record,,,, by Plaintiffs Western Watersheds Project, WildEarth Guardians. (Rule, Lauren) (Entered: 05/20/2020) |
| 05/20/2020 | 34 | DECLARATION of *Gregory Dyson* regarding Administrative Record - Plaintiffs Opening Brief 33 by Plaintiffs Western Watersheds Project, WildEarth Guardians. (Rule, Lauren) (Entered: 05/20/2020) |
| 05/20/2020 | 35 | DECLARATION of *Jonathan Ratner* regarding Administrative Record - Plaintiffs Opening Brief 33 by Plaintiffs Western Watersheds Project, WildEarth Guardians. (Rule, Lauren) (Entered: 05/20/2020) |
| 06/22/2020 | 36 | DEFENDANT'S RESPONSE BRIEF re 26 Administrative Record, 22 Administrative |

I-App-9

| | | |
|---|---|---|
| | | Record,,, 23 Administrative Record,,,, by Defendant U.S. Forest Service. (Perez, Krystal-Rose) (Entered: 06/22/2020) |
| 06/29/2020 | 37 | Intervenor DEFENDANT'S RESPONSE BRIEF re 26 Administrative Record, 22 Administrative Record, 23 Administrative Record, by Intervenor Defendants Jerry Brown, Wayne Brown, Colorado Wool Growers Association. (Justesen, Tate) Modified on 7/16/2020 to add text and to correct linkage (athom, ). (Entered: 06/29/2020) |
| 06/29/2020 | 38 | Intervenor DEFENDANT'S RESPONSE BRIEF re 26 Administrative Record, 22 Administrative Record, 23 Administrative Record, by Intervenor Defendants J. Paul Brown, Colorado Farm Bureau Federation. (Gregg, Brian) Modified on 7/16/2020 to correct event text and filers (athom, ). (Entered: 06/29/2020) |
| 07/20/2020 | 39 | PLAINTIFF'S REPLY BRIEF re 26 Administrative Record, 22 Administrative Record,,, 23 Administrative Record,,,, by Plaintiffs Western Watersheds Project, WildEarth Guardians. (Rule, Lauren) (Entered: 07/20/2020) |
| 07/30/2020 | 40 | ORDER DIRECTING REASSIGNMENT. IT IS ORDERED that the clerk of the court shall assign this case to a judge for resolution on the merits under the random assignment procedure of D.C.COLO.LCiv.R 40.1. By Judge Robert E. Blackburn on 07/30/2020. This case is randomly reassigned to Judge Daniel D. Domenico. All future pleadings should be designated as 19-cv-00208-DDD. (athom, ) (Entered: 07/31/2020) |
| 04/28/2021 | 41 | ADVISORY NOTICE TO ATTORNEY AND COURT: Under D.C.COLO.LAttyR 3(a), Lauren Marie Rule under CM/ECF for failing to pay the 2020 Biennial Fee. Counsel must complete a Bar/ECF application through counsel's existing Attorney Services Portal account and pay the full application fee to be restored to the attorney roll and CM/ECF. Upon reinstatement, counsel must file a Notice of Entry of Appearance in this case. (Text Only Entry) (tnguy) (Entered: 04/28/2021) |
| 05/10/2021 | 42 | NOTICE of Entry of Appearance by Lauren Marie Rule on behalf of All Plaintiffs (Rule, Lauren) (Entered: 05/10/2021) |
| 05/12/2021 | 43 | ADVISORY NOTICE TO ATTORNEY AND COURT: Under D.C.COLO.LAttyR 3(a), Maya Leonard Kane was administratively removed from the court's attorney roll and barred from filing electronically under CM/ECF for failing to pay the 2020 Biennial Fee. Counsel must complete a Bar/ECF application through counsel's existing Attorney Services Portal account and pay the full application fee to be restored to the attorney roll and CM/ECF. Counsel, however, need not pay any delinquent biennial fees. Upon reinstatement, counsel must file a Notice of Entry of Appearance in this case. (Text Only Entry) (tnguy) (Entered: 05/12/2021) |
| 05/12/2021 | 44 | NOTICE of Entry of Appearance by Maya Leonard Kane on behalf of All Plaintiffs (Kane, Maya) (Entered: 05/12/2021) |
| 11/30/2021 | 45 | NOTICE of Entry of Appearance by Joseph A. Bingham on behalf of J. Paul Brown, Colorado Farm Bureau FederationAttorney Joseph A. Bingham added to party J. Paul Brown(pty:intvd), Attorney Joseph A. Bingham added to party Colorado Farm Bureau Federation(pty:intvd) (Bingham, Joseph) (Entered: 11/30/2021) |
| 04/15/2022 | 46 | MOTION to Withdraw as Attorney : *Tate F. Justesen* by Intervenor Defendants Jerry |

|  |  |  |
|---|---|---|
|  |  | Brown, Wayne Brown, Colorado Wool Growers Association. (Justesen, Tate) (Entered: 04/15/2022) |
| 04/16/2022 | 47 | ORDER GRANTING 46 Motion to Withdraw as Attorney. The Clerk of Court is instructed to terminate attorney Tate Frederick Justesen as counsel of record, and to remove this name from the electronic certificate of mailing. Respondent-Intervenors Wayne Brown, Jerry Brown, and Colorado Wool Growers Association will continue to be represented by attorney Caroline Lobdell. SO ORDERED by Judge Daniel D. Domenico on 4/16/2022. Text Only Entry(dddlc4) (Entered: 04/16/2022) |
| 04/27/2023 | 48 | NOTICE of Entry of Appearance by Ivan Laurence London on behalf of J. Paul Brown, Colorado Farm Bureau FederationAttorney Ivan Laurence London added to party J. Paul Brown(pty:intvd), Attorney Ivan Laurence London added to party Colorado Farm Bureau Federation(pty:intvd) (London, Ivan) (Entered: 04/27/2023) |
| 05/05/2023 | 49 | MOTION to Withdraw *AS COUNSEL* by Intervenor Defendants J. Paul Brown, Colorado Farm Bureau Federation. (London, Ivan) (Entered: 05/05/2023) |
| 05/08/2023 | 50 | ORDER granting 49 *MOTION to Withdraw as Counsel*. The Clerk of Court is directed to terminate Joseph A. Bingham as counsel of record. Respondent-Intervenors Colorado Farm Bureau Federation and J. Paul Brown will continue to be represented by Ivan L. London. SO ORDERED by Judge Daniel D. Domenico on 5/8/2023. Text Only Entry(dddlc5, ) (Entered: 05/08/2023) |
| 06/13/2023 | 51 | NOTICE of Entry of Appearance by Aaron E. Bruner on behalf of Jerry Brown, Wayne Brown, Colorado Wool Growers AssociationAttorney Aaron E. Bruner added to party Jerry Brown(pty:intvd), Attorney Aaron E. Bruner added to party Wayne Brown(pty:intvd), Attorney Aaron E. Bruner added to party Colorado Wool Growers Association(pty:intvd) (Bruner, Aaron) (Entered: 06/13/2023) |
| 06/26/2023 | 52 | MOTION to Withdraw as Attorney *Caroline Lobdell* by Intervenor Defendants Jerry Brown, Wayne Brown, Colorado Wool Growers Association. (Lobdell, Caroline) (Entered: 06/26/2023) |
| 06/27/2023 | 53 | ORDER granting 52 Motion to Withdraw as Attorney. The Clerk of Court is directed to terminate Attorney Caroline C. Lobdell as counsel of record. Respondent-Intervenors Wayne Brown, Jerry Brown, and Colorado Wool Growers Association will continue to be represented by Aaron Bruner. SO ORDERED by Judge Daniel D. Domenico on 6/27/2023. Text Only Entry(dddlc5, ) (Entered: 06/27/2023) |
| 03/07/2024 | 54 | ORDER denying 24 MOTION to Strike 23 ADMINISTRATIVE RECORD filed by Western Watersheds Project, WildEarth Guardians. The Court finds that the Services actions were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and that the Service did not violate NEPA or the APA. The court therefore AFFIRMS the Services actions. SO ORDERED by Judge Daniel D. Domenico on 3/7/2024. (rkeec) (Entered: 03/07/2024) |
| 03/07/2024 | 55 | FINAL JUDGMENT by Clerk on 3/7/2024 in favor of Western Watersheds Project, WildEarth Guardians against U.S. Forest Service re 54 Order entered by Judge Daniel D. Domenico on 3/7/2024. (rkeec) (Entered: 03/07/2024) |

| 05/02/2024 | 56 | NOTICE OF APPEAL as to 54 Order,, Terminate Motions, 55 Clerk's Judgment by Plaintiffs Western Watersheds Project, WildEarth Guardians (Filing fee $ 605, Receipt Number ACODC-9666954) (Kane, Maya) (Entered: 05/02/2024) |
| 05/03/2024 | 57 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 56 Notice of Appeal filed by Western Watersheds Project, WildEarth Guardians to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Preliminary Record)(cmadr, ) (Entered: 05/03/2024) |
| 05/03/2024 | 58 | USCA Case Number 24-1187 for 56 Notice of Appeal filed by Western Watersheds Project, WildEarth Guardians. (cmadr, ) (Entered: 05/03/2024) |
| 05/15/2024 | 59 | TRANSCRIPT ORDER FORM re 56 Notice of Appeal by Plaintiffs Western Watersheds Project, WildEarth Guardians (Potter, Elizabeth) (Entered: 05/15/2024) |
| 05/16/2024 | 60 | LETTER TO USCA and all counsel certifying the record is complete as to 56 Notice of Appeal filed by Western Watersheds Project, WildEarth Guardians. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 24-1187) Text Only Entry (cmadr, ) (Entered: 05/16/2024) |

<table>
<tr><td colspan="4" align="center">**PACER Service Center**</td></tr>
<tr><td colspan="4" align="center">**Transaction Receipt**</td></tr>
<tr><td colspan="4" align="center">08/06/2024 11:18:11</td></tr>
<tr><td>**PACER Login:**</td><td>laurierule</td><td>**Client Code:**</td><td></td></tr>
<tr><td>**Description:**</td><td>Docket Report</td><td>**Search Criteria:**</td><td>1:19-cv-00208-DDD</td></tr>
<tr><td>**Billable Pages:**</td><td>8</td><td>**Cost:**</td><td>0.80</td></tr>
</table>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-208

WILDEARTH GUARDIANS and WESTERN WATERSHEDS PROJECT,

     Petitioners,

v.

U.S. FOREST SERVICE, a federal agency of the United States Department of Agriculture,

     Respondent.

---

## PETITION FOR REVIEW OF AGENCY ACTION

---

### INTRODUCTION

1.     Petitioners WildEarth Guardians and Western Watersheds Project challenge Respondent U.S. Forest Service's Environmental Assessment (EA) and Decision Notice and Finding of No Significant Impact (DN/FONSI) analyzing and authorizing use of the newly formed Wishbone grazing allotment within the Rio Grande National Forest. This new allotment is authorized for use by domestic sheep, which pose a high risk of transmitting disease to near-by bighorn sheep populations.

2.     The Forest Service acknowledged the overwhelming scientific evidence that domestic sheep transmit pathogens to bighorn sheep when the species come in contact, which often leads to deadly pneumonia in bighorn populations. These pneumonic events cause large-scale die-offs in bighorn populations as well as high mortality of lambs for many years after a disease episode. Bighorn numbers throughout the West are a small percentage of their historic

size due primarily to disease from domestic sheep.

3.      Federal agency land management policy—including Federal Respondent U.S. Forest Service policy—is to keep the species separate to avoid disease transmission to bighorns. This task becomes difficult when domestic and bighorn sheep graze near each other on public land.  Not only do bighorn sheep frequently travel outside of their normal home range, domestic sheep also frequently stray from their large bands and can remain unattended on public land for weeks or even months.  Due to their close relation to each other and gregarious natures, bighorn sheep and domestic sheep are attracted to each other and will seek each other out, making contact on the open range even more likely.

4.      Recognizing the risk of disease transmission, the Forest Service and Bureau of Land Management have closed grazing allotments to domestic sheep use (sometimes in response to court orders) where the allotments posed a danger to bighorn sheep.  The Rio Grande National Forest closed three allotments to domestic sheep when it determined the allotments posed a high risk to near-by bighorn sheep herds.  It then created a new allotment, called the Wishbone allotment, to allow those same domestic sheep to continue grazing on the forest.

5.      Although the agency initially determined the Wishbone allotment also posed a high risk of disease transmission to the same bighorn herds, it lowered the risk rating to moderate based on a number of flawed assumptions about habitat use and movements of these bighorn sheep and the ability to prevent stray domestic sheep.  The Forest Service then authorized domestic sheep to graze the Wishbone allotment in a 2018 Decision Notice.

6.      The Forest Service's assumptions used to lower the risk posed by the Wishbone allotment were flawed because they were not supported by science and information in the record,

and ignored important new telemetry data from the near-by bighorn herds.  In fact, the limited

information in the record discussing the recent telemetry data contradicted many of the Forest

Service's assertions about these bighorn herds.  Yet the agency did not obtain and analyze the

data on these herds that Colorado Parks and Wildlife ("CPW") had collected since early 2016,

despite being aware of its existence.  Thus, the Forest Service ignored the best available

information about location and movement of the bighorn sheep populations in the area.

7.      The Forest Service had authorized use of the Wishbone allotment on a trial basis

in 2016 and 2017, and substantial domestic sheep straying occurred in 2017 that resulted in stray

sheep remaining behind for weeks after the grazing season ended.  The Forest Service had

documented additional instances of stray sheep and other noncompliance issues in previous years

related to the same grazing permittees.  Despite these known problems, the Forest Service

claimed that the permittees would be able to prevent stray domestic sheep when grazing the

Wishbone allotment.

8.      The Forest Service's unsupported assumptions and flawed analysis about the risk

to bighorns from grazing domestic sheep on the Wishbone allotment undercut its EA and FONSI

and violated the National Environmental Policy Act (NEPA).  Those flaws also undermined the

Forest Service's conclusion that grazing the Wishbone allotment will not impair the viability of

bighorn populations on the forest, as required under the Rio Grande Forest Plan.  By acting

inconsistently with the Forest Plan, the Forest Service violated the National Forest Management

Act (NFMA).

9.      Accordingly, Petitioners challenge the Wishbone EA and DN/FONSI as being

arbitrary, capricious, an abuse of discretion, and contrary to NEPA and NFMA, and therefore

request the Court set them aside pursuant to the Administrative Procedure Act (APA).

**JURISDICTION AND VENUE**

10.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action

arises under the laws of the United States, including the APA, 5 U.S.C. § 701 *et seq*.; NEPA, 42

U.S.C. § 4321 *et seq*.; NFMA, 16 U.S.C. § 1600 *et seq*.; the Declaratory Judgment Act, 28

U.S.C. § 2201 *et seq*.; and the Equal Access to Justice Act, 28 U.S.C. § 2214 *et seq*.  An actual,

justiciable controversy now exists between Petitioners and Respondent, and the requested relief

is therefore proper under 5 U.S.C. §§ 701-706 and 28 U.S.C. §§ 2201-02.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all or a

substantial part of the events or omissions giving rise to the claims herein occurred within this

judicial district, and the public lands and resources in question are located in this district.

12.     The Federal Government has waived sovereign immunity in this action pursuant

to 5 U.S.C. § 702.

13.     Petitioners have exhausted their administrative remedies.

**PARTIES**

14.     Petitioner WILDEARTH GUARDIANS is a non-profit organization dedicated to

protecting and restoring the wildlife, wild places, wild rivers, and health of the American West.

Guardians has over 223,000 members and supporters, many of whom have particular interests in

bighorn sheep.  Headquartered in Santa Fe, New Mexico, Guardians maintains several other

offices around the West, including in Denver, and has many members who live and regularly

recreate throughout Colorado.

15.     Petitioner WESTERN WATERSHEDS PROJECT is a non-profit organization

headquartered in Hailey, Idaho with over 6,000 members and supporters, which is dedicated to

protecting and conserving the public lands and natural resources of watersheds in the American

West.  WWP, as an organization and on behalf of its members, is concerned with and active in

seeking to protect and restore wildlife, fisheries, and other natural resources and ecological

values of watersheds throughout the West, including in Colorado.

16.    Petitioners, and their staff and members, have deep and long-standing interests in

the preservation and protection of bighorn sheep, which interests are directly harmed by

Respondent's action challenged herein.  Petitioners' staff and members use and enjoy public

lands on the Rio Grande National Forest, including areas on or near the Wishbone allotment, in

order to observe, photograph, study, and enjoy bighorn sheep and other wildlife species.

Petitioners and their staff and members derive recreational, scientific, aesthetic, spiritual, and

commercial benefits from the existence in the wild of bighorn sheep through observation, study,

photography, and other pursuits.  Petitioners will continue to use public lands in and around the

Wishbone allotment in 2019 and beyond for these purposes, and their enjoyment will be reduced

if the bighorn populations in the area are adversely affected by disease.

17.    Petitioners have been advocates for bighorn sheep in many parts of Colorado and

elsewhere, and have long-standing concerns about the threat to bighorn populations from

domestic sheep grazing on public lands.  Petitioners have engaged in public outreach and

education, advocacy with agencies, agency administrative processes, and litigation to promote

the protection of bighorn sheep from domestic sheep grazing on public lands.  Petitioners have

engaged with the Forest Service over the Wishbone allotment and other allotments on the Rio

Grande National Forest, including by submitting comments and objecting to the Wishbone

decision, expressing concerns about domestic sheep grazing on this allotment due to the high risk

to bighorn sheep populations on and off the forest.  Petitioners have an interest in ensuring that

the Forest Service's grazing management complies with all applicable federal statutes and

regulations.

18.     Petitioners' interests in protecting and enjoying bighorn sheep on the Rio Grande

National Forest, particularly those herds near the Wishbone allotment, are being directly harmed

by Respondent's action.  Petitioners' above-described interests have been, are being, and unless

the relief prayed for is granted, will continue to be adversely affected by Respondent's violations

of law.

19.     Respondent U.S. FOREST SERVICE is an agency or instrumentality of the

United States, and is charged with managing the public lands and resources of the Rio Grande

National Forest in accordance and compliance with federal laws and regulations.

## LEGAL BACKGROUND

**National Environmental Policy Act**

20.     NEPA requires federal agencies to undertake a thorough and public analysis of

the environmental consequences of a proposed federal action by taking a "hard look" at the

action's consequences.  The statute's twin objectives are to (1) ensure that agencies consider

every significant aspect of the environmental impact of a proposed action, and (2) guarantee that

relevant information is available to the public to promote well-informed public participation.

21.     To accomplish NEPA's purpose, Federal agencies must prepare a detailed

environmental impact statement (EIS) for all major Federal actions significantly affecting the

quality of the human environment.  42 U.S.C. § 4332(2)(C)(i).  Environmental information must

be available to public officials and citizens before decisions are made and before actions are

taken.  40 C.F.R. § 1500.1(b).

22.     Agencies may prepare an environmental assessment (EA) to assist them in

determining whether an action will have significant effects that require preparation of an EIS.

*Id.* § 1508.9.  An agency can avoid doing an EIS if it issues a Finding Of No Significant Impact

(FONSI).  *Id.* §§ 1501.4(e), 1508.13.  An agency must do an EIS if the action *may* have any

significant effect on the environment.

23.     NEPA regulations define significance in terms of context and intensity.  *Id.* §

1508.27.  Context refers to the scope of the proposed action, while intensity refers to the severity

of the impacts.  *Id.*  Ten "intensity" factors help determine whether an agency action may cause

significant impacts.  *Id.* § 1508.27(b).  These factors include: the degree to which possible effects

are likely to be highly controversial; the degree to which possible effects are highly uncertain or

involve unique or unknown risks; the degree to which the action may establish a precedent for

future actions with significant effects; and whether an action may have cumulatively significant

effects when added to other related actions.  *Id.* § 1508.27(b)(4), (5), (6), (7).

24.     Both EAs and EISs must discuss a proposed action's direct, indirect, and

cumulative effects.  Direct effects are caused by the action and occur at the same time and place,

whereas indirect effects are caused by the action and are later in time or farther removed in

distance, but are still reasonably foreseeable.  *Id.* § 1508.8.  Cumulative impacts are the impact

on the environment which results from the incremental impact of the action when added to other

past, present, and reasonably foreseeable future actions.  *Id.* § 1508.7.

25.     NEPA documents must contain high-quality information and accurate scientific

analysis; they must identify the methodology and scientific sources relied upon for the agency's

conclusions; their discussion and analysis must be based on professional and scientific integrity;

and they must reveal any incomplete or unavailable information and explain the relevance of the

missing information to evaluating reasonably foreseeable significant adverse effects.  *Id.* §§

1500.1(b), 1502.22, 1502.24.  Agencies must use the "best available scientific information"

when assessing environmental impacts under NEPA.  *Lee v. U.S. Air Force,* 354 F.3d 1229, 1244

(10th Cir. 2004).

26.     An agency must prepare a supplemental NEPA analysis when significant new

circumstances or information relevant to environmental concerns and bearing on the proposed

action or its impacts emerge, or when the agency determines that the purposes of NEPA will be

furthered by doing so.  *Id.* § 1502.9(c)(1)(ii), (c)(2).  Supplemental NEPA is warranted when

new information shows that the remaining action may affect the environment in a significant

manner or to a significant extent not already considered.  The agency must take a hard look at the

new information and provide a reasoned explanation for the information's significance or lack of

significance when deciding whether to prepare a supplemental EA or EIS.

**National Forest Management Act**

27.     NFMA governs the Forest Service's management of the National Forests.  16

U.S.C. § 1600 *et seq*.  The statute established a two-step process for forest planning.  First, the

Forest Service must develop, maintain, and revise Land and Resource Management Plans

("Forest Plans") for each national forest.  *Id.* § 1604(a).  The Forest Plan guides natural resource

management activities forest-wide, setting desired conditions, objectives, and standards and

guidelines for various forest resources, including wildlife.  Forest Plans must provide for

"diversity of plant and animal communities."  *Id.* § 1604(g)(3)(B).

28.     Once a Forest Plan is in place, site-specific actions are planned and evaluated by
the Forest Service.  All site-specific decisions must be consistent with the broader Forest Plan.
16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.

29.     The Rio Grande Forest Plan was adopted in 1996 under the 1982 NFMA
regulations.  These regulations implemented NFMA's wildlife diversity provision by requiring
that:

> Fish and wildlife habitat shall be managed to maintain viable populations of
> existing native and desired non-native vertebrate species in the planning area.  For
> planning purposes, a viable population shall be regarded as one which has the
> estimated numbers and distribution of reproductive individuals to insure its
> continued existence is well distributed in the planning area.  In order to insure that
> viable populations will be maintained, habitat must be provided to support, at
> least, a minimum number of reproductive individuals and that habitat must be
> well distributed so that those individuals can interact with others in the planning
> area.

36 C.F.R. § 219.19 (1999).

30.     The Rio Grande Forest Plan contains direction to fulfill these requirements.  The
Plan has Forestwide desired conditions, objectives, and standards and guidelines that direct the
agency to sustain viable populations of native wildlife species; assure that species whose
viability is a concern survive throughout their range; protect, restore, and enhance habitat of
Forest Service Sensitive species, which include bighorn sheep; manage habitat to allow species
to disperse over large areas; and avoid disturbance of Sensitive species that might result in loss
of population viability.

31.     The Plan also contains appendices that incorporated National and Regional
direction from the Forest Service Manual related to population viability and Sensitive species.

This direction requires the agency to maintain viable populations of all native wildlife species in habitats distributed throughout their geographic range on National Forest lands.

## STATEMENT OF FACTS

### I.    Disease Transmission from Domestic Sheep to Bighorn Sheep

32.    No dispute exists among scientists and wildlife biologists that domestic sheep can transmit a pathogen (*Mycoplasma ovipneumoniae*) to bighorn sheep that facilitates the onset of deadly pneumonia in most bighorns.  Domestic sheep are immune to this pathogen but bighorns lack such immunity.  Large die-offs within bighorn populations occur when the pathogen is transmitted from a domestic sheep to a bighorn sheep, and then that bighorn transmits it to other members of its herd.  Most bighorn die-offs from pneumonia reduce herd sizes by 75-100%.

33.    For those female bighorns that are exposed to disease but do not die, they continue to carry the pathogen and transmit it to their lambs during pregnancy, causing the lambs to die within months of birth.  Herds that have experienced die-offs often have low lamb recruitment for years following the disease outbreak.  This keeps bighorn populations at low numbers, which makes them susceptible to extirpation from stochastic events (i.e., unpredictable events such as drought, flood, avalanche), inbreeding, or further disease impacts.

34.    Different strains of the *M. ovipneumoniae* pathogen exist, and bighorn herds that have experienced a die-off due to one strain may succumb to further disease if a different strain is transmitted to them.  Repeatedly infected bighorn populations often fail to recover and grow to a viable size because high lamb mortality continues for decades even if some adults in the population persist.  Most domestic sheep flocks carry the *M. ovipneumoniae* pathogen, particularly large flocks, and usually carry multiple strains of it.  Other species may carry the

pathogen, such as goats or other ungulates, but it is not as prevalent as in domestic sheep.

35.     Scientists originally thought that transmission of the pathogen from domestic sheep to bighorns required direct physical contact between the species, but recent research indicates the pathogen can be transmitted through the air.  The risk of contact between these species is high when they are using the same range because they are closely related—within the same genus—and both species are gregarious.  Therefore, they seek each other out when in the same vicinity.  The danger of bighorns contracting the pathogen from domestic sheep is much greater than them contracting it from other species because of the attraction and similarity between the two sheep species.

36.     Although bighorn herds have home ranges where they spend most of their time, individual rams and ewes make forays outside of their home ranges when looking for mates or seeking out new or additional habitat.  Forays can occur miles away from the home range, with some bighorns travelling more than 20 miles.  It is common for young rams to make forays during the rut in the fall to look for mates, but forays can occur in other seasons as well.  These forays increase the risk of disease transmission if a bighorn contracts the *M. ovipneumoniae* pathogen from a domestic sheep during its travels and then returns to its herd or contacts another bighorn herd and passes on a new strain of the pathogen.

37.     Interactions between bighorn herds are even more common in meta-populations, which consist of multiple herds that are connected through frequent movement of bighorns between them.  This meta-population structure increases gene flow and genetic diversity among bighorn herds, but also increases the risk of disease transmission between herds.

38.     It is common for domestic sheep to stray from their band while on an allotment,

and they can survive on their own for weeks or months at a time.  Stray domestic sheep have been documented miles away from their allotment or remaining on an allotment for several months after the rest of the band had been removed.  It is common for domestic sheep to stray from their band when they are trailing to or from an allotment or between pastures within an allotment.  Sheep also scatter and stray when predators or storms startle them.  Stray domestic sheep pose a significant risk of disease transmission to bighorn sheep.

39.     Bighorn sheep experts have repeatedly stated that, because it is difficult to see foraying bighorn sheep or to prevent domestic sheep from straying, and these species will seek each other out, "best management practices" such as using extra herders and guard dogs, periodically counting domestic sheep, or hazing bighorn sheep away from domestic bands have not been effective at keeping the species separated on the range.  Experts agree that the only way to protect bighorn sheep is to provide many miles of spatial separation between the species.

**II.     Closures of Domestic Sheep Allotments to Protect Bighorn Sheep.**

40.     Due to the danger domestic sheep pose to bighorn sheep, numerous Forest Service allotments have been closed to protect nearby bighorn sheep populations, often as a result of court litigation.  After several groups filed a lawsuit in Idaho in 2007, the Forest Service closed domestic sheep allotments in Hells Canyon and along the Salmon River due to their threat to bighorn sheep populations.  When the livestock permittees challenged some of the closures, the U.S. District Court upheld them, finding that the decisions were well-supported by the science and bighorn sheep experts.  *Western Watersheds Project et al. v. U.S. Forest Serv.,* 2007 WL 1729734, No. 4:07-cv-151-BLW (D. Idaho, June 13, 2007); *Western Watersheds Project et al. v. U.S. Forest Serv.,* 2007 WL 3407679, No. 4:07-cv-151-BLW (D. Idaho, Nov. 13, 2007).

41.     After doing an in-depth analysis about the risk of disease transmission to bighorn

sheep, the agency closed more allotments on the Payette National Forest in Idaho that were

determined to present a very high, high, or moderate risk to bighorn sheep.  The Forest Service

had developed a "risk of contact" model for the analysis that assessed the risk of the two species

coming into contact based on habitat, the location of bighorn home ranges, and the potential for

bighorn sheep forays onto allotments.  The livestock industry challenged the Payette's analysis

and decision but the U.S. District Court and the Ninth Circuit Court of Appeals both upheld

them.  *Idaho Wool Growers Ass'n et al. v. Vilsack et al.,* 7 F. Supp. 3d 1085 (D. Idaho 2014),

*aff'd* 816 F.3d 1095 (9th Cir. 2016).

42.     In a recent Idaho case, the petitioners here brought a lawsuit in 2017 over two

Forest Service allotments in southeast Idaho that the agency's risk of contact model had shown

were very high risk to bighorn sheep because of their proximity to the South Beaverhead

Mountains bighorn population.  After a court injunction temporarily closed the allotments, the

Forest Service extended that closure and it remains in effect.  *Western Watersheds Project et al.*

*v. U.S. Forest Serv.,* 2017 WL 5571574, No. 1:17-cv-434-CWD (D. Idaho Nov. 20, 2017).

43.     The Bureau of Land Management (BLM) in Idaho has also closed grazing

allotments to domestic sheep due to threats to bighorn sheep populations.  Initially, BLM refused

to close an allotment that was adjacent to some of the high risk allotments on the Payette

National Forest.  A court injunction in 2009 temporarily closed the allotment, and BLM extended

that closure while it conducted a thorough analysis.  *Western Watersheds Project v. BLM,* 2009

WL 3335365, No. 4:09-cv-507-BLW (D. Idaho, Oct. 14, 2009).  The agency finished its analysis

in 2017, which resulted in the permanent closure of that allotment and two others that BLM

determined were high or moderate risk to bighorn sheep in central Idaho.

44.    BLM has also closed three allotments in southeast Idaho near bighorn sheep populations, one in 2012 and two more in 2018, while it conducts an analysis of long-term management options.

45.    In Colorado, the Rio Grande National Forest and San Juan National Forest conducted risk assessments in 2010 for multiple domestic sheep allotments and closed areas that were assessed as high risk to bighorn sheep due to the threat of disease transmission.  Once the Forest Service's risk of contact model was available, the Rio Grande National Forest used that model to assess the risk of the Fisher-Ivy/Goose ("FIG") allotment near one of the Weminuche bighorn herds.  The FIG allotment consisted of multiple pastures, some of which overlapped the bighorn herd's core home range.  The Forest Service determined that use of each pasture—even pastures that did not overlap bighorn core home range—was a high risk to that bighorn herd and it closed the entire allotment in 2013.

46.    In 2015, the Rio Grande National Forest conducted a similar risk assessment for the Snow Mesa allotments, which were near the Central San Juan bighorn meta-population.   The Forest Service analyzed this group of three allotments using the risk of contact model, and rated each allotment as high risk.  The agency proposed to close the three Snow Mesa allotments due to their threat to the Central San Juan bighorn herds and instead, as described below, create a new allotment—called the Wishbone allotment—that would allow the same permittees to continue grazing their domestic sheep nearby.  The agency prohibited use of the Snow Mesa allotments after 2015.

47.    Federal grazing allotments in other states around the West have likewise been

closed to domestic sheep to protect bighorn populations.  Forest Service allotments in California,

New Mexico, and Wyoming have been closed to domestic sheep to protect bighorn sheep, either

through Forest Service actions or permittees voluntarily waiving their permits back to the agency

(in exchange for compensation).  These allotment closures have reduced the threat of disease for

numerous bighorn sheep populations across the West.

### III.    Central San Juan Bighorn Herd

48.    Bighorn sheep are a native species to Colorado but many herds in the state were

fully or nearly extirpated years ago due primarily to disease, overhunting, and habitat

fragmentation.  In order to save or increase herds, CPW transplanted bighorns into numerous

areas throughout the State.  The number of bighorns in the state has increased but it is still a

small percentage of historic levels.

49.    For management purposes, CPW has identified individual bighorn sheep herds as

well as larger herd complexes (or meta-populations) consisting of multiple herds that frequently

interact.  The Central San Juan bighorn meta-population (RBS-22) occurs on the Rio Grande

National Forest around the town of Creede, Colorado.  It consists of four individual herds:  the

San Luis Peak herd (S22), the Bellows Creek herd (S36), the Bristol Head herd (S53), and the

Rock Creek herd (S52).

50.    CPW has designated the largest, highest priority meta-populations as Tier 1 or

Tier 2 Core Populations, where Tier 1 populations are large populations (>100 animals)

consisting of one or more interconnected herds that have received few, if any, transplanted

bighorns, and Tier 2 populations are slightly smaller (>75 animals) with interconnected herds

that may have received transplanted animals.  CPW designated the Central San Juan meta-

population as a Tier 2 Core Population because, although it had about 260 animals, three of its four herds had received numerous transplanted animals.

51.     Other populations surround the Central San Juan bighorn herds, such as the Weminuche population to the south (RBS-20), the Natural Arch/Carnero population to the east (RBS-26), and the San Juan West population to the west (RBS-21).  Most of these populations consist of multiple herds that interact.  *See* Figure 1.



Figure 1:  Map showing bighorn meta-populations (i.e. RBS-22) and the individual herds within meta-populations (i.e. S22, S53, S36) in relation to the Wishbone allotment and Rio Grand National Forest.  CPW has not mapped the unit boundary for the Rock Creek herd within RBS-22 but it occurs northwest of the San Luis Peak herd (S22).

52.     Habitat for the Central San Juan meta-population is comprised of 90% federal public land, with much suitable but unoccupied habitat present that would allow the herds to grow in size and expand in geographic range.  Suitable connected habitat between the four herds and between RBS-22 and other adjacent populations creates a high potential for movement and interaction between herds, making it likely that disease impacts to one herd will affect others.

53.     The Central San Juan meta-population had close to 400 animals before disease die-offs occurred in the 1990's.  Each of the four herds experienced die-offs in the 1990's or 2000's and has continued to have low lamb recruitment in recent years. Each remains below its historic size, with the most recent estimates at 90 animals in the San Luis Peak herd, 80 animals in the Bellows Creek and Bristol Head herds, and just 5 animals in the Rock Creek herd.  The San Luis Peak herd is the only one of the four that is indigenous; the rest have been augmented with transplants.

54.     CPW has collected telemetry data on three of the Central San Juan herds since early 2016.  Nine animals in the Bristol Head herd, eight animals in the Bellows Creek herd, and eleven animals in the San Luis Peak herd have data from radio telemetry collars.  CPW also has visual observations of bighorns from these and surrounding herds.  *See* Figure 2.



Figure 2:  2016-2018 bighorn telemetry locations for Central San Juan herds and other bighorn observations in relation to Wishbone pastures.

55.     For the Central San Juan herds, the telemetry data showed more extensive movements both within and outside of their home ranges than previously known.  Bighorns were documented travelling fifteen miles or more.  They moved between herds within RBS-22 and entered ranges of herds from neighboring meta-populations, such as S-33 from the San Juan West meta-population and S-16 from the Weminuche meta-population.

56.     The telemetry data provided further information, including that bighorns made transitory movements through forested areas (which are considered non-suitable habitat for

bighorns) in winter, spring, and summer to move between high alpine areas and lower elevation areas; the San Luis Peak herd uses a much larger wintering area than previously documented; bighorns from the Bristol Head and Bellows Creek herds frequently went down to and sometimes crossed Highway 149 during all times of year; and bighorns from these herds made other unexpected movements to new locations.

57.     Data collection from these telemetry collars is continuing, and CPW stated that a full analysis of results is anticipated in 2019.   Because only a sample of bighorns from each herd was collared (10%-13%), these data do not show the full extent of movements and habitat use by each herd.

58.     CPW has stated that disease is the biggest threat to the Central San Juan herds, and foraying bighorn sheep or stray domestic sheep are the likely path of transmission.  One contact with a domestic sheep could affect RBS-22 for decades due to poor lamb survival and recruitment that follows a disease event.  In fact, CPW tested fifteen of the collared Central San Juan bighorns and ten were positive for *M. ovipneumoniae,* meaning they are carrying at least one strain of the pathogen, which is likely responsible for the poor lamb recruitment in this meta-population.

**IV.     The Forest Service's Wishbone EA and Decision**

59.     Subsequent to the risk assessment that showed the Snow Mesa allotments were high risk to the Central San Juan bighorn meta-population, the Rio Grande National Forest issued a draft EA in 2015 proposing to close the allotments.  After receiving public comments on the draft EA, the forest decided to create a new allotment near-by, called the Wishbone allotment, to allow those same domestic sheep to continue grazing on the forest.  The Forest

Service allowed the Snow Mesa permittees to use the Wishbone allotment during the 2016 and 2017 grazing seasons on a trial basis while it analyzed the new allotment.

60.     The Wishbone allotment consists of seven pastures.  The Crystal and Shallow pastures are the largest and highest elevation pastures, with the Crystal pasture going up to 11,000 feet elevation.  These two high elevation pastures would be grazed during the middle of the June to September grazing season—i.e. mid-summer.  The other five Wishbone pastures are smaller, lower elevation parcels that occur near Highway 149 and are separated by long distances.  The farthest pasture to the east is the Coller pasture, which is within the Coller State Wildlife Area.  The Forest Service coordinated with CPW to incorporate this State land into the Wishbone allotment.  The South River pasture is farthest to the west, and is just ¼ mile from the previously closed FIG allotment.  These five smaller parcels would be grazed at the beginning and end of the grazing season.  The domestic sheep would have to trail close to twenty miles between pastures during the course of the grazing season, including about ten miles between the East Bench and Coller pastures (*See* Figure 3 below).

61.     The Forest Service amended the risk assessment for the Snow Mesa allotments to include the new Wishbone allotment.  Compared to the Snow Mesa allotments, the Wishbone pastures were farther from the core home range of the San Luis Peak bighorn herd, but they were closer to the core home ranges of the Bristol Head and Bellows Creek herds.  *See* Figure 3.



Figure 3: Bighorn core herd home ranges (CHHR), summer range, and overall habitat for the Bristol Head (S53), Bellows Creek (S36) and San Luis Peak (S22) herds in relation to Snow Mesa and Wishbone allotments.

62.     The Forest Service used the risk of contact model to assess the risk of the Wishbone allotment and determined that it was high risk for the Central San Juan bighorn meta-population.  Rather than prohibit use of the allotment due to the high risk rating, as it did with the near-by Snow Mesa and FIG allotments, the Forest Service described six "uncertainties" related to use of the model with the Wishbone allotment, and used these uncertainties and other assumptions to assert that the Wishbone allotment was actually moderate risk to the bighorn population, not high risk.  It stated that moderate risk was "acceptable."

63.     The risk assessment lowered the risk from high to moderate because it claimed

that: (1) no direct overlap existed between the allotment and core home range for any of the

bighorn herds; (2) the herds near the allotment usually move to higher elevations in summer,

away from the Wishbone pastures; (3) the Wishbone allotment has less overlap between bighorn

habitat and domestic sheep range than the Snow Mesa allotments; (4) the bighorn foray rates

used in the risk of contact model are likely higher than what is occurring on the ground because

the model used a longer grazing season; (5) "best management practices" will be more effective

with this allotment because it is easier to monitor and manage than the Snow Mesa allotments

given the accessibility and high visibility of the pastures along Highway 149; (6) habitat

fragmentation such as Highway 149, the Rio Grande River, and subdivisions will keep bighorns

separated from the allotment; and (7) CPW concurred that the Wishbone allotment was lower

risk than the Snow Mesa allotments.

64.     The Forest Service issued a revised draft EA in March 2017 that proposed

closing the Snow Mesa allotments and grazing the Wishbone allotment.  It accepted public

comment on the revised draft, issued a final EA in November 2017 that contained the same

proposed action, and accepted objections on the final EA.  Petitioners as well as the permittees

submitted comments and objections.

65.     Public comments and objections disputed many of the Forest Service's

assumptions used to lower the risk rating for the Wishbone allotment.  They noted the very close

proximity of the bighorn home ranges to the allotment, and that the Forest Service

underestimated the likelihood of contact by ignoring the high potential for stray domestic sheep

and the attraction of the species to each other.  The comments and objections pointed out that

state and federal agency documents and the new telemetry data undercut many of the agency's

assumptions about habitat use and movement of animals in these herds.  They also refuted the

agency's assertions that foray rates used in the risk of contact model were not representative and

that "best management practices" would prevent contact between the species.  Finally, the

objections pointed out that the Forest Service did not consider the potential for disease

transmission to adjacent bighorn herds or the increased risk to the Central San Juan meta-

population if it expanded in size or range.  Most of the comments and objections agreed that the

Wishbone allotment created a very high risk of disease transmission to bighorns, and the Forest

Service's reasons for claiming otherwise were flawed and unsupported.

66.     Nevertheless, the Forest Service signed the Decision Notice and Finding of No

Significant Impact on March 23, 2018.  The decision authorized use of the Wishbone allotment

by 1000 domestic ewes with lambs from June 15 to September 1 each year.

67.     The DN/FONSI laid out five factors, similar to those stated in the risk assessment,

to justify changing the risk rating for the Wishbone allotment from high risk to bighorn sheep to

moderate risk.  These factors were:  (1) the grazing season on the Wishbone allotment is shorter

than the season used in the risk of contact foray modeling; (2) suitable bighorn habitat is

disconnected and fragmented so bighorns are less likely to disperse across the landscape than

what the model portrays; (3) there is limited overlap between summer bighorn habitat and

domestic sheep range on the allotment pastures; (4) most bighorns from these herds move to

higher elevations in summer so away from the Wishbone allotment; and (5) best management

practices will reduce the risk further and mitigate for the gregarious nature of the species.

68.     The Forest Service's statements about habitat use and movement of these

bighorns were based on incorrect and outdated assumptions.  For instance, CPW had sent the

Forest Service reports and emails about the recent telemetry data that showed movements of

these bighorns were much greater than previously known and the animals often travelled outside

of their home ranges.  Long movements—fifteen miles or more—were common and occurred

during all seasons; these animals often moved through non-suitable habitat; and they transitioned

between high elevation and low elevation areas in spring, summer, and fall.  Bighorns moved

between herds and into ranges of other meta-populations such as Weminuche and San Juan West

populations.  Bighorns were found close to the Wishbone pastures and trailing routes more often

than assumed, including during the grazing season.  And they crossed Highway 149 and moved

through subdivisions.  This new information was based on just two years of telemetry data and a

small fraction of the animals in each herd; the full extent of habitat use by these herds is likely

much greater than even this data showed.

69.     In sum, the Forest Service underestimated the movements of these bighorn sheep

within and outside of their home ranges, which led to incorrect assumptions about their use of

habitat near the Wishbone allotment.  Despite knowing that the telemetry data existed and

seemed to undercut many of these assumptions, the agency did not obtain and analyze the data

before signing the DN/FONSI.  By ignoring this data, the agency failed to adequately assess

baseline conditions necessary for its analysis of environmental impacts.

70.     The DN/FONSI also responded to the issues raised by objectors about risk of

disease transmission to neighboring bighorn herds, and the increased risk to the Central San Juan

meta-population if it increased in size and geographic range.  First, the Forest Service claimed

that the risk to bighorn herds to the west, east, and south of the Central San Juan meta-population

was too low to warrant analysis because those herds were far away from the Wishbone allotment

and were unlikely to come into contact with domestic sheep from that allotment.  The agency

failed to consider the risk of Central San Juan bighorns getting disease from domestic sheep

using the Wishbone allotment and then transferring it to neighboring bighorn herds.  Agency

documents and the new telemetry data confirmed that bighorns from the Central San Juan herds

move into ranges of adjacent meta-populations and likely interact with those herds.  Past

observations also showed bighorns from the Weminuche meta-population very close to the South

River pasture of the Wishbone allotment.  These facts show the Wishbone allotment could affect

neighboring bighorn herds from the Weminuche, San Juan West, or Natural Arch populations.

71.     Next, the Forest Service dismissed the issue of the Central San Juan meta-

population increasing in size and range, which would increase the risk of those bighorns

contacting domestic sheep, by stating that CPW would address that circumstance.  CPW's

objective for this meta-population is a larger size and geographic range, and it admitted that the

risk of contact with domestic sheep would increase as the Central San Juan bighorn population

grows.  Instead of considering that in its NEPA analysis, the Forest Service stated that CPW will

be the entity that addresses changes in risk of contact due to bighorn sheep population expansion.

By disregarding the issues of risk of disease transmission to adjacent herds and increased risk of

contact with domestic sheep as the Central San Juan herds grow, the Forest Service failed to

consider reasonably foreseeable effects of grazing the Wishbone allotment.

72.     The Forest Service concluded in its FONSI that there would be no significant

effects from the proposed action because none of the significance factors from the NEPA

regulations applied.  The Forest Service dismissed the substantial controversy about the risk of

contact and disease transmission by stating that the EA and risk assessment discussed the effects

and disclosed the rationale for considering the risk moderate.  It asserted that uncertainties about

the risk of contact model and disease transmission did not rise to the level of highly uncertain

effects or unique or unknown risks.  It also stated that the proposed action was not likely to

establish a precedent for future actions because it applied only to the Wishbone allotment, and

there would be no significant cumulative effects.

73.     Finally, the DN/FONSI contained a section on Forest Plan compliance.  With

regard to the direction in the Plan about sustaining viable populations of wildlife throughout their

range and protecting Sensitive species, the Forest Service claimed that it did not need to maintain

*all* populations of bighorn sheep on the forest and thus the Central San Juan meta-population was

expendable because other herds would persist.  Eleven individual herds occur on the forest but

most have potential for contact with domestic sheep because grazing is authorized in the area.

Because of the interconnectedness of the Central San Juan herds with other herds, disease effects

to Central San Juan herds would likely spread to other meta-populations on the forest.

74.     The DN/FONSI also stated that the proposed action would support continued

existence of the Central San Juan meta-population because it has existed despite grazing the

Snow Mesa allotments, and the Wishbone allotment was lower risk than Snow Mesa.   The

Forest Service concluded that a moderate risk of contact with domestic sheep is acceptable

because it will allow for maintaining a viable population of bighorn sheep.  The Forest Service

did not discuss the definition of or criteria needed for a viable population nor how chronic

disease and long-term poor lamb survival and recruitment affect viability.

### V.     Problems with Stray Domestic Sheep by Wishbone Permittees

75.     The permittees for the Wishbone allotment have a history of management problems with their domestic sheep.  The Forest Service had documented the following problems by these permittees: a notice of noncompliance for management violations in 2011, including stray sheep left on a trailing route used for the Snow Mesa allotments; sheep found grazing outside of the allotment boundary in 2012; 25 stray sheep found near Creede one month after trailing off the Snow Mesa allotment in 2013; a stray sheep seen near Coller State Wildlife Area in November 2013; sheep discovered grazing in an area that had been closed to protect bighorns in 2014; two stray sheep left behind after trailing in 2015; and stray sheep left behind in the Shallow Creek area after the band trailed off the Snow Mesa allotments in multiple years.

76.     As noted above, the Forest Service allowed these permittees to use the Wishbone allotment in 2016 and 2017 on a trial basis.  In 2016, the agency authorized the permittees to use the Wishbone pastures from east to west but trailing young lambs the long distance between the Coller pasture and East Bench pasture proved to be unworkable.  In 2017, the Forest Service authorized use from west to east, which is the same use authorized in the Decision Notice.

77.     Significant problems with stray domestic sheep occurred in 2017.  Fifty-four stray sheep were found between September 15 and October 19, mostly near the trailing route between the East Bench and Coller pastures.  Seven of the sheep discovered were dead while the other 47 were alive.  Stray sheep were discovered on the following dates:  September 15 (6 sheep), September 20 (14 sheep), September 26 (30 sheep), September 26 (1 sheep), September 28 (1 sheep), October 3 (1 sheep), October 19 (1 sheep).   Many of these strays were left behind for a week or more after the remainder of the band trailed off the allotment on September 20 despite

being in areas near Highway 149.

78.    In the permittees' objections to the Final EA for the Wishbone allotment, they expressed concern about their ability to manage domestic sheep on the allotment based on the trial use in 2016 and 2017.  They noted that the allotment does not have enough forage to support the permitted number of sheep, particularly in dry years; using multiple small pastures is harder to manage and increases the risk of straying as well as overuse; and terrain on the South River, Shallow and Crystal pastures makes it harder to control and manage the sheep in those areas.

79.    The Colorado Wool Growers Association (CWGA) also objected to the Wishbone Final EA, reiterating the difficulty of managing sheep on the allotment.  CWGA stated that the problems in the 2017 season make it "apparent that the allotment is not a workable option for the permittees."  The new grazing patterns, difficult terrain, and poor forage quality conditions "greatly increase the management responsibilities for the permittees, and significantly contribute to problems such as increased strays, and difficulty in locating and herding strays."

80.    The significant problems with sheep straying from the Wishbone pastures in 2017 and the warnings of the permittees and CWGA about the difficulty managing this allotment did not deter the Forest Service from relying heavily on "best management practices" to support reducing the risk of the Wishbone allotment to bighorn sheep from high to moderate and signing the Decision Notice and Finding of No Significant Impact.

**FIRST CLAIM FOR RELIEF**
**VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT**

81.    Petitioners reallege and incorporate by reference the preceding paragraphs.

82.    This first claim for relief challenges the Forest Service's violations of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and its implementing regulations, in failing

to prepare an EIS prior to issuing the Decision Notice authorizing the Wishbone sheep allotment, and failing to undertake a thorough and objective assessment under NEPA of the direct, indirect, and cumulative effects of grazing the Wishbone allotment that incorporates all relevant data.

83.   First, the Forest Service violated NEPA by failing to prepare an EIS before authorizing the Wishbone allotment because grazing domestic sheep on the allotment may have significant effects.  The Forest Service's decision to create the allotment and authorize domestic sheep use on it has the potential to cause disease in multiple bighorn sheep herds, and implicates various "intensity" factors under NEPA.

84.   The action's effects are highly controversial because a significant dispute exists about the size and extent of the risk to bighorn sheep from grazing the Wishbone allotment.  40 C.F.R. § 1508.27(b)(4).  The effects of the action are also highly uncertain due to the various uncertainties about the risk of contact with domestic sheep and risk of disease transmission to bighorn sheep; and the risk of disease transmission is a unique risk.  *Id.* § 1508.27(b)(5).   The action may establish a precedent for future actions with significant effects if the Forest Service continues to use similar assumptions to lower the risk rating of allotments and authorize their use when they present a danger to bighorn sheep.  *Id.* § 1508.27(b)(6).  And the action may have cumulatively significant effects when added to other domestic sheep grazing on or near the Rio Grande National Forest that threatens additional bighorn populations.  *Id.* § 1508.27(b)(7).

85.   Second, the Forest Service's analysis in the EA and DN/FONSI regarding the threat to bighorn sheep was flawed in numerous ways, including by: (1) failing to consider telemetry data on the Central San Juan bighorn herds and other near-by herds collected prior to the DN/FONSI, which was the best available scientific information on movement and habitat use

of these bighorn sheep herds; (2) making assumptions in the EA and DN/FONSI about the risk of contact between domestic sheep grazing the Wishbone allotment and the Central San Juan bighorn herds that were unsupported by scientific and factual evidence; and (3) inadequately analyzing the risk of the Wishbone allotment to bighorn herds adjacent to the Central San Juan meta-population, and dismissing the need to consider effects of the Wishbone allotment if the Central San Juan meta-population increases in size or geographic range.

86.     These flaws in the EA violated NEPA in the following ways:

a.     Failing to take a "hard look" at all direct, indirect, and cumulative impacts of the proposed action along with other past, present, and future actions.

b.     Failing to insure that environmental information was available to the public before the decision was made, that the information was of high quality, and that the scientific analysis was accurate.

c.     Failing to insure the professional integrity, including the scientific integrity, of the discussions and analyses in the EA and reveal incomplete or unavailable data.

d.     Making assumptions and conclusions that were not supported by the best available scientific and factual information.

e.     Failing to adequately and accurately assess baseline environmental conditions critical for analyzing the impacts of the proposed action.

87.     These flaws violate NEPA and its implementing regulations.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.1(b), 1502.22, 1502.24, 1508.7, 1508.8.

88.     Third, the Forest Service is violating NEPA by failing to complete a supplemental

NEPA analysis that considers telemetry data and analysis for the Central San Juan bighorn herds that post-dates the DN/FONSI.  The telemetry data is significant new information that is very relevant to assessing the impacts of grazing the Wishbone allotment, and analyzing this data would further the purposes of NEPA.  40 C.F.R. § 1502.9(c)(1)(ii), (c)(2).

89.     Accordingly, the Wishbone EA and DN/FONSI are arbitrary, capricious, an abuse of discretion, not in accordance with NEPA, and issued without observance of procedure required by law, and therefore are actionable pursuant to the APA, 5 U.S.C. § 706(2)(A), (D). The agency's decision not to prepare supplemental NEPA that incorporates telemetry data collected since the DN is also arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A).

**SECOND CLAIM FOR RELIEF**
**VIOLATIONS OF THE NATIONAL FOREST MANAGEMENT ACT**

90.     Petitioners reallege and incorporate by reference the preceding paragraphs.

91.     This second claim for relief challenges the Forest Service's violations of the National Forest Management Act, 16 U.S.C. § 1600 *et seq*., and NMFA's implementing regulations, in authorizing domestic sheep grazing on the Wishbone allotment that threatens the viability of bighorn sheep populations on the Rio Grande National Forest.

92.     Under NFMA, the Forest Service must act consistently with direction in the applicable land management plan when authorizing any project or activity.  16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.  The Forest Service has violated NFMA by acting inconsistently with direction in the Rio Grande Forest Plan regarding protecting Sensitive species and sustaining viable populations of wildlife on the forest.  It first improperly concluded it does not need to maintain the Central San Juan bighorn meta-population to comply with this direction.  Then, it improperly concluded that grazing the Wishbone allotment would allow for viability of the

Central San Juan meta-population because the risk to that population was only moderate.

93.     Accordingly, the Decision Notice authorizing the Wishbone sheep allotment is arbitrary, capricious, an abuse of discretion, and not in accordance with NFMA, and therefore is actionable pursuant to the APA, 5 U.S.C. § 706(2)(A).

### PRAYER FOR RELIEF

A.     Adjudge and declare that the Wishbone sheep allotment EA and DN/FONSI were arbitrary, capricious, an abuse of discretion, contrary to law, and/or issued without observance of procedure required by law under the judicial review standards of the APA, 5 U.S.C. § 706(2).

B.     Reverse and set aside the Wishbone sheep allotment EA and DN/FONSI, as required by 5 U.S.C. § 706(2), and order the Forest Service to comply with the requirements of NEPA and NFMA before authorizing grazing on the Wishbone sheep allotment.

C.     Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Petitioners.

D.     Award Petitioners their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.* and/or all other applicable authorities.

E.     Grant such further relief as the Court deems just and proper in order to provide Petitioners with relief and protect the public interest.

Dated:  January 24, 2019

Respectfully submitted,

s/ Lauren M. Rule
Lauren M. Rule
Advocates for the West
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

s/ Maya L. Kane
Maya L. Kane
Kane Law, LLC
10 Town Square, #422
Durango, CO 81301
(970) 946-5419
mayakanelaw@gmail.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 1:19-cv-00208-REB

WILDEARTH GUARDIANS; and
WESTERN WATERSHEDS PROJECT,

      Plaintiffs,

v.

U.S. FOREST SERVICE, a federal agency of the United States Department of Agriculture,

      Defendant,

and

COLORADO FARM BUREAU FEDERATION, a nonprofit corporation; and
J. PAUL BROWN,

      Defendant-Intervenor-Applicants.

---

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE
BY COLORADO FARM BUREAU FEDERATION
AND J. PAUL BROWN**

---

Applicants in Intervention, Colorado Farm Bureau Federation ("CFB") and J. Paul Brown (collectively, "Applicants"), by and through their undersigned counsel, respectfully submit the following memorandum in support of their Motion to Intervene in the above-captioned case. The Applicants have substantial, constitutionally protected economic and property interests that may be materially affected by the outcome of this litigation. Thus, as demonstrated below, Applicants

are entitled to intervene as a matter of right under Rule 24(a) of the Federal Rules of Civil Procedure.  In the alternative, Applicants seek permissive intervention pursuant to Rule 24(b).

This memorandum is supported by the *Declaration of Shawn Martini* ("Martini Decl.") (attached hereto as "Exhibit A") and the *Declaration of J. Paul Brown* ("Brown Decl.") (attached hereto as "Exhibit B"), filed concurrently herewith.

## INTRODUCTION

Applicants seek to intervene in this action to protect their interests and, in the case of CFB, the interests of its members.  The Plaintiffs' Petition for Review of Agency Action (ECF No. 1) ("Petition for Review") seeks declaratory and injunctive relief reversing and remanding the decision of the U.S. Forest Service authorizing the grazing of sheep on the Wishbone Allotment in the Rio Grande National Forest.  If the Plaintiffs' relief is granted, it will jeopardize the interests of the Applicants and the livestock industry of Colorado which they represent.   Therefore, Applicants seek to intervene in all phases of this action to protect their interests, efficiently resolve the issues, prevent future litigation, and broaden access to the courts.

## FACTUAL AND PROCEDURAL BACKGROUND

Applicant CFB is the largest agricultural non-profit membership organization in the State of Colorado, representing the interests of nearly 25,000 ranchers, farmers, and other industry professionals in every county in the state.  Martini Decl. ¶ 4.  CFB was founded in 1919 and is dedicated to preserving and protecting the future of Colorado agriculture and rural values and to protect the Colorado way of life.  *Id.* ¶¶ 4, 6, 8, 9.  CFB's operations include assisting rural communities (economically and otherwise), sponsoring education and outreach programs, and influencing policy at the state and local level.  *Id.* ¶ 5.  CFB is devoted to the protection of

agriculture and rural communities, and focuses on issues that are specific to the small towns and individual farmers and ranchers of Colorado. *Id.* ¶¶ 6-7. To that end, CFB has a physical presence in 45 Colorado counties in order to best assist in the day-to-day affairs of its members. *Id.* ¶ 6. CFB members graze their livestock on public lands located within Colorado, including the allotments in the Rio Grande National Forest that are the subject of the 2017 Environmental Assessment and 2018 Final Decision at issue in this case. *Id.* ¶ 8. Preserving the viability of public lands livestock grazing is of paramount importance to the organization. *Id.* ¶¶ 3, 8-9. CFB and its members also operate in the geographic area subject to the Ute Tribe Treaty, which, while not directly at issue in this case, provides the Ute Tribe with a tribal hunting right. Any decision of this Court may be applied to the Ute Tribe Treaty, which would directly affect CFB and its members. *Id.* ¶ 7.

Applicant J. Paul Brown is a member of CFB. Brown Decl. ¶ 5. Mr. Brown is a sheep producer who holds a federal grazing permit on the Tank Creek, Virginia Creek, and Enlich Mesa Allotments in the San Juan National Forest, which are located near the Wishbone Allotment in the Rio Grande National Forest. *Id.* ¶ 6. Mr. Brown is an experienced livestock operator who grew up on a ranch and has been involved in agricultural pursuits his entire life. *Id.* ¶¶ 3-4. He has never received a Notice of Non-Compliance from the Forest Service and is an exemplary steward of the land. *Id.* ¶ 6. Mr. Brown is also an advocate for other ranchers and rural communities, having served as a State legislator and county commissioner; he was also a past president of the Colorado Wool Growers Association and a member of the board of directors of CFB. *Id.* ¶ 4. He is aware of the nature of the Plaintiffs' suit against the Forest Service and is also aware of the agency's conclusion that impacts to bighorn sheep that may be caused by domestic sheep ranching were not major. *Id.* ¶¶ 7-8. While Mr. Brown agrees with the Defendant's decision to not prepare

a full environmental impact statement for the Wishbone Allotment, the agency's other actions –
such as the impossible suggestion that he somehow convert his livestock operation to cattle as
opposed to sheep – made it clear to him that he could not rely on the Forest Service to adequately
represent his interests as a sheep operator in this matter.  *Id.* ¶¶ 8, 11, 13.  Mr. Brown is deeply
concerned that any adverse outcome for the permittee in the Wishbone Allotment will translate to
an adverse outcome for his allotments in the nearby San Juan National Forest given the geographic
and biological contiguity of the area.  *Id.* ¶¶ 9-10.  Indeed, it is likely that the only reason that Mr.
Brown's allotments were not included in this suit was that the Forest Service has not issued a final
decision as to his grazing authorization.  *Id.* ¶ 10.  Therefore, the outcome of the litigation
concerning the Wishbone Allotment is almost certain to determine the future of his livestock
operation.  *Id.* ¶¶ 10, 12.  Mr. Brown's livelihood depends on the viability of his public land
livestock operation.  If he is not allowed to graze his sheep on National Forest land, he will be
forced out of business.  *Id.* ¶ 12.

Intervention is sought in this case because the interests of every livestock operator in
Colorado – including Mr. Brown's livelihood – are directly threatened by the management actions
sought by the Plaintiffs in this case.  The Plaintiffs seek to set aside the Forest Service's decision
to authorize sheep grazing on the Wishbone Allotment in the Rio Grande National Forest because
it contradicts their overarching goal of destroying livestock operations throughout the American
West.

In May 2018, the Forest Service created the Wishbone Allotment in the Rio Grande
National Forest for the purpose of controlling domestic sheep grazing after it conducted a risk
management survey, published an Environmental Assessment ("EA") in November 2017, and

issued a Decision Notice and Finding of No Significant Impact ("DN/FONSI") in March 2018. Petition for Review at ¶¶ 59-66. The Plaintiffs assert that this finding was in error, predominately due to their stated concern that the domestic sheep population might transfer disease to the protected bighorn sheep population that is also present in the Rio Grande National Forest. *Id.* ¶¶ 32-58. The Forest Service, however, determined that there was only a moderate risk to the bighorn sheep population due to the timing and structure of grazing across the allotments and the ability to manage the domestic sheep populations, among other factors. *Id.* ¶ 67 (describing five factors considered in the DN/FONSI). Therefore, the Forest Service approved the creation of the Wishbone Allotment and authorized grazing.

Plaintiffs filed their Petition on January 24, 2019, seeking declaratory and injunctive relief to have the EA and DN/FONSI set aside. The Forest Service filed its Answer (ECF No. 8) on April 22, 2019. A Joint Case Management Plan (ECF No. 11) was entered on April 23, 2019, setting Plaintiffs' opening brief to be filed no later than September 6, 2019, with the response brief to be filed no later than October 8, 2019.

Applicants seek to intervene in this action based on their interests that are protected by NEPA, NFMA, and other federal statutes. Martini Decl. ¶ 9, Brown Decl. ¶ 9. Only through intervention will the Court be able to consider the factual and legal ramifications that are unique to Applicants. If intervention is granted, Applicants will conform to the case management order previously entered in the case.

## ARGUMENT

Intervention as of right and permissive intervention are both governed by Federal Rule of Civil Procedure 24. "The Tenth Circuit generally follows a liberal view in allowing intervention

under Rule 24(a)." *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1103 (10th Cir. 2005) (citing *Nat'l Farm Lines v. ICC*, 564 F.2d 381, 384 (10th Cir. 1977)).  The same is true for permissive intervention under Rule 24(b).  *Am. Ass'n of People With Disabilities v. Herrera*, 257 F.R.D. 236, 248 (D.N.M. 2008).  For the reasons discussed herein, the Applicants are entitled to intervention as of right per Rule 24(a)(2).  Alternatively, the Applicants are entitled to permissive intervention under Rule 24(b).

### I.   The Applicants are entitled to intervention as of right under Rule 24(a)(2).

An applicant may intervene as of right if:  (1) the application is "timely"; (2) "the applicant claims an interest relating to the property or transaction which is the subject of the action"; (3) the applicant's interest "may as a practical matter" be "impair[ed] or impede[d]"; and (4) "the applicant's interest is [not] adequately represented by existing parties."  *Utah Ass'n of Ctys. v. Clinton*, 255 F.3d 1246, 1249 (10th Cir. 2001) (quoting Fed. R. Civ. P. 24(a)(2)).  As discussed below, the Applicants are entitled to intervention as of right because they satisfy each of these elements.

### A.  The application is timely.

The timeliness of a motion to intervene is assessed "in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances."  *Utah Ass'n of Ctys*, 255 F.3d at 1250 (citing *Sanguine, Ltd. v. United States Dep't of Interior,* 736 F.2d 1416, 1418 (10th Cir.1984)).  Intervention in this matter will not prejudice any existing parties. Although Plaintiffs filed their petition on January 24, 2019 and the Defendant filed its Answer on April 22, 2019, the administrative record has not yet been lodged and no summary judgment

briefing has occurred.  Accordingly, Applicants' motion is timely.  *See, e.g.*, *Western Energy Alliance v. Zinke,* 877 F.3d 1157, 1164–65 (10th Cir. 2017) (motion to intervene filed a few months after complaint was filed was timely and did not prejudice other parties).

## B.  The Applicants claim an interest relating to the property or transaction which is the subject of the action.

Whether an applicant has a protectable interest is a highly fact-specific inquiry, but generally speaking a protectable interest "is one that would be impeded by the disposition of the action."  *Id.* at 1165 (internal citations omitted).  Having a "persistent record of advocacy" for a certain cause is also indicative of a protectable interest.  *Coal. of Arizona/New Mexico Ctys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 841 (10th Cir. 1996).  Here, Mr. Brown has a protectable interest because he will presumably suffer whatever fate his neighboring permittees suffer on the Wishbone Allotment.   If the Forest Service decision for the Wishbone Allotment is overturned, it is almost certain that the Forest Service will issue a similarly adverse decision in his own case, meaning he will not be able to graze his sheep in the San Juan National Forest and will face serious economic hardship as a result.  Brown Decl. ¶¶ 10-12.  CFB likewise has a protectable interest in its ongoing advocacy on behalf of Colorado's livestock operators from being put out of business and preventing the destruction of rural communities and traditional livelihoods, and it has a distinguished record of advocacy to this end.  Martini Decl. ¶¶ 8-10.  Further, CFB's members, like Mr. Brown, have a concrete interest in maintaining their grazing permits covering National Forest lands.  Thus, Applicants have a protectable interest.

## C.  Applicants' interests will be impaired as a practical matter.

The test for whether an applicant's interest will be impaired presents only a "minimal burden" because a movant need only show that "it is 'possible' that the interests they identify will

be impaired." *Western Energy Alliance*, 877 F.3dd at 1167 (citing *WildEarth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192 (10th Cir. 2010)).  "This factor is met in environmental cases where the district court's decision would require the federal agency to engage in an additional round of administrative planning and decision-making that itself might harm the movants' interests, even if they could participate in the subsequent decision-making." *Id.*  Here, this is precisely the situation that the Applicants find themselves in.  If the decision at issue here is remanded to the agency, there is distinct possibility that the Forest Service could subsequently issue a new decision that is adverse to the Applicants.  Moreover, if intervention is denied, Mr. Brown's interest will be impaired as a practical matter because he will not be allowed to participate in a lawsuit that will likely determine his ability to run his livestock operation.

### D. The Applicants' interests are not adequately represented by the existing parties.

Demonstrating inadequate representation under Rule 24(a)(2) is a minimal burden because a movant need only show "the *possibility* that representation may be inadequate." *WildEarth Guardians,* 604 F.3d at 1200 (emphasis added).  Here, the existing parties do not adequately represent the Applicants' interests.  Both the overarching goals of the Plaintiffs and the remedy sought in this case are directly antagonistic to the interests and well-being of Applicants since they seek to prohibit sheep grazing on the Wishbone Allotment and, presumably, as many other allotments as possible in Colorado.

The Defendants do not adequately represent the Applicants' interests because their interest in preserving their decision on appeal is distinct from the direct, tangible impact that Mr. Brown's livelihood will suffer, nor is it analogous to CFB's state-wide concern with similarly situated permittees and the rural communities that depend on the use of public lands.  Moreover, the Tenth

Circuit has "repeatedly recognized that it is 'on its face impossible' for a government agency to carry the task of protecting the public's interests and the private interests of a prospective intervenor." *Id.*

Here, because the Forest Service is litigating on behalf of the general public, it is obligated to consider a wide spectrum of views, many of which may conflict with the particular interest of Applicants. *See Utahns for Better Transp. v. U.S. Dep't of Transp.,* 295 F.3d 1111, 1117 (10th Cir. 2002); *see also Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1498 (9th Cir. 1995) (citing *Sierra Club v. Espy*, 18 F.3d 1202, 1208 (5th Cir. 1994)). Indeed, the Forest Service is required to represent a broader view than the narrow, parochial interests of Applicants. *See Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 1000–1001 (8th Cir. 1993) (because the landowner's individual interests were not shared by the general state citizenry, the State of Minnesota would not adequately represent those interests); *Conservation Law Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 44–45 (1st Cir. 1992) (Secretary of Commerce's judgments are necessarily constrained by his view of the public welfare).

Applicants intend to diligently defend the Forest Service's decision. Neither Plaintiffs, who effectively seek to set aside decision, nor the Forest Service, which was ultimately responsible for the issuance of the decision, may be expected to represent Applicants' interests. Furthermore, Applicants' activities are subject to regulation by the Forest Service, which issues grazing permits in the Wishbone Allotment, and other similar allotments. Given that the Forest Service regulates aspects of Applicants' operations, it cannot be expected to vigorously protect Applicant's rights and interests. Nor does the Forest Service, as regulator, have the same stake in the lawsuit, as the

point of the lawsuit is to prevent domestic sheep grazing—a private activity in which the Forest Service has no interest.

Under these circumstances, it is unlikely that the Forest Service will make all of Applicants' arguments in defense of the domestic sheep grazing, or that it would even be willing to do so.  *See Forest Conservation Council*, 66 F.3d at 1499.  When a party has private interests, as opposed to the government's public interests, this difference is sufficient to allow intervention.  *Sierra Club*, 18 F.3d at 1208; *Fresno County*, 622 F.2d at 438–439.

## II.   The Applicants are entitled to permissive intervention under Rule 24(b).

In the alternative, the Applicants are entitled to permissive intervention under Federal Rule of Civil Procedure 24(b).  As with Rule 24(a), permissive intervention under Rule 24(b) is a generous standard.  Under Rule 24(b), "anyone may be permitted to intervene . . . when an applicant's claim or defense and the main action have a question of law or fact in common," provided the intervention will not unduly delay or prejudice the rights of the original parties.  Fed. R. Civ. P. 24(b)(1)(B), (3); *see also City of Stilwell, Okl. v. Ozarks Rural Elec. Co-op. Corp.*, 79 F.3d 1038, 1043 (10th Cir. 1996).  In fact, intervention under Rule 24(b) is so broadly granted that "[t]o permissively intervene, a party need not have a direct personal or pecuniary interest in the subject of the litigation."  *Am. Ass'n of People With Disabilities v. Herrera*, 257 F.R.D. 236, 248 (D.N.M. 2008).  In addition, a district court may consider "whether the intervenors' interests are adequately represented by other parties."  *Tri-State Generation & Transmission Ass'n, Inc. v. New Mexico Pub. Regulation Comm'n*, 787 F.3d 1068, 1075 (10th Cir. 2015).

As discussed above, the Applicants' motion is timely and will not prejudice or unduly delay the original parties.  Both CFB and Mr. Brown, however, will be seriously prejudiced if they are

not allowed to intervene.  Moreover, neither party adequately represents the interests of CFB and

Mr. Brown.  However, both Applicants have a direct personal interest in the outcome of this

lawsuit, which more than meets the liberal standard for permissive intervention.  Therefore,

permissive intervention is appropriate under Rule 24(b).

## CONCLUSION

The Applicants have significant, legally protectable interests that relate to the subject of

this action.  The disposition of this action will, as a practical matter, impair or impede their ability

to protect their interests.  As a matter of law, the Forest Service is presumed to not adequately

represent their interests in contesting Plaintiffs' Petition.  Intervention will prevent or simplify

future litigation involving related issues and at the same time allow an additional interested party

to express its views before the Court.  The motion is timely.  Therefore, the Applicants are entitled

to intervene as of right under Federal Rule of Civil Procedure 24(a)(2).  Alternatively, the

Applicants are entitled to permissive intervention under Rule 24(b).

DATED this the 31st day of May, 2019.

Respectfully Submitted,

*/s/ Brian Gregg Sheldon*
Brian Gregg Sheldon, Esq.
Ronald W. Opsahl, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO  80227
Phone: (303) 292-2021
Facsimile: (303) 292-1980
brian@mslegal.org
ropsahl@mslegal.org

*Attorneys for Defendant-Intervenor-Applicants*
*Colorado Farm Bureau Federation and J. Paul*
*Brown.*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on May 31st, 2019, I electronically filed the foregoing with the Clerk of Court using this Court's CM/ECF system, which will send notification to all counsel of record pursuant to Fed. R. Civ. P. 5 and D.C.COLO.LCivR 5.1(d).

*/s/ Brian Gregg Sheldon*
Brian Gregg Sheldon, Esq.
MOUNTAIN STATES LEGAL FOUNDATION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 1:19-cv-00208-REB

WILDEARTH GUARDIANS; and
WESTERN WATERSHEDS PROJECT,

      Plaintiffs,

v.

U.S. FOREST SERVICE, a federal agency of
the United States Department of Agriculture,

      Defendant,

and

COLORADO FARM BUREAU FEDERATION,
a nonprofit corporation;
and J. PAUL BROWN,

      Defendant-Intervenor-Applicants.

---

**REPLY TO PLAINTIFFS' AND DEFENDANT'S RESPONSE IN OPPOSITION TO MOTION
TO INTERVENE BY COLORADO FARM BUREAU FEDERATION
AND J. PAUL BROWN**

---

In an attempt to prevent the intervention of the Colorado Farm Bureau Federation ("CFB") and J. Paul Brown (collectively, "Applicants") in this case, both the Plaintiffs and the Defendant attempt to sweep the decades-long war against the American sheep industry under the rug.  Both the *Response to Proposed Respondent-Intervenor's J. Paul Brown et al. Motion to Intervene*, ECF No. 17 ("Pls' Opp'n") and the *Federal Respondent's*

*Opposition to Colorado Farm Bureau Federation and J. Paul Brown's Motion to Intervene*, ECF No. 18 ("Def's Opp'n), incorrectly portray this case as being exclusively concerned with a single grazing allotment in the southern Rockies.  In reality, this case is just the latest in a series of lawsuits that have embroiled the Mountain West for many years. Consequently, Applicants have a significant interest relating to the subject matter of this case which will be impeded as a practical matter if they are denied intervention, and the Applicants' interests are not adequately represented by existing parties.  Applicants are therefore entitled to intervene as a matter of right under Rule 24(a) of the Federal Rules of Civil Procedure or permissively pursuant to Rule 24(b). Alternatively, if intervention is denied, leave should be granted to file an amicus brief given the far-reaching regional concerns this case implicates.

**ARGUMENT**

Plaintiffs' and Defendant's briefs raise largely similar arguments and, for the sake of brevity, can therefore be addressed simultaneously.  Neither party disputes that the Applicants' motion is timely.[1]  Instead, they take issue with the remaining three elements of Rule 24(a)(2), asserting that Applicants do not have a substantial interest that may be impeded and which is not adequately represented by the existing parties.  Fed. R. Civ. P. 24(a)(2)).  However, neither party demonstrates why the Court should deviate from the Tenth Circuit's liberal standard of intervention.  *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1103 (10th Cir. 2005).  Accordingly, intervention should be granted.

---

[1] Defendant has stipulated that Applicants' motion is timely.  *Def's Opp'n*, 5, n.2.  Plaintiffs' response is silent on the issue, and therefore should be deemed to have waived any timeliness argument.

## I.   THE APPLICANTS MAY INTERVENE AS OF RIGHT UNDER RULE 24(A).

### A.   Applicants have a Substantial Interest in this Case.

Plaintiffs and Defendant both fail to demonstrate that Applicants do not have a substantial interest in this case.  To being with, Plaintiffs' claim that "[t]his litigation is narrowly focused on a single allotment" is belied by the very next sentence in their brief, which claims that "[i]ncontrovertible, overwhelming scientific evidence demonstrates that domestic sheep transmit pathogens to bighorn sheep when the species come into contact."  *Pls' Opp'n* at 2.  Both statements cannot be true.  If the latter statement about disease transmissibility is correct, then there is no way that this litigation is limited to a single allotment in Colorado since it would necessarily be true in any situation.[2]

More to the point, it is disingenuous to portray this case as an isolated dispute over a single grazing allotment because it is actually just the latest case in a series of lawsuits brought largely by the same group of plaintiffs in their large-scale effort to dismantle the domestic sheep industry throughout the Mountain West.  This case in the Rio Grande National Forest is the beginning of these groups' attempt to extend their region-wide litigation from the Northern Rockies to the Southern Rockies.  The obviousness of this strategy is borne out by numerous cases in Idaho, Montana, and Wyoming.  *See, e.g.,*

---

[2] Relatedly, Plaintiffs claim that "[t]he NEPA process involved facts and analyses specific to the Wishbone Allotment and the near-by bighorn sheep populations, which do not apply to other allotments such as those grazed by Farm Bureau intervenors."  *Pl.'s Opp'n* at 3.  This is not entirely correct.  For instance, the NEPA analysis for the Wishbone Allotment cites to Clifford et al. (2009) for studies of bighorn populations in the Sierra Nevada mountains in California.  *See* Environmental Assessment–Snow Mesa Sheep Allotments, Vol. II, at 91 (References Cited), *available at* https://www.fs.usda.gov/nfs/11558/www/ nepa/97139_FSPLT3_4106051.pdf (last visited July 3, 2019).  Moreover, many of the references contained therein apply to Colorado and the West as a whole.  *Id.* at 90-93.  As such, most, if not all, of the Forest Service's citations and related analyses are relevant to J. Paul Brown's allotments as well.

*W. Watersheds Project v. U.S. Forest Serv.*, 2017 WL 5571574, No. 1:17-CV-434-CWD (D. Idaho Nov. 20, 2017), *Biodiversity Conservation All. v. Jiron*, 2017 WL 3238279, No. 12-CV-73-ABJ (D. Wyo. July 31, 2017), *Gallatin Wildlife Ass'n, v. U.S. Forest Serv.*, 2016 WL 3282047, No. CV-15-27-BU-BMM (D. Mont. June 14, 2016) (declining to enjoin domestic sheep grazing pending additional NEPA analysis by Forest Service on impact on domestic sheep).  Moreover, these cases are beginning to form a line of precedent within the Ninth Circuit.  *See Gallatin Wildlife Ass'n*, 2016 WL 3282047 at *6 (citing *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1108 (9th Cir. 2016)).

To understand the strategic context of this lawsuit – and the Applicants' reason for seeking intervention – the Court need only look to the Plaintiffs' previous victories in Idaho.  The decision from the U.S. District of Idaho cited above references a decade's worth of case law surrounding bighorn sheep litigation in Idaho spearheaded by Plaintiff Western Watersheds Project.  *See W. Watersheds Project*, 2017 WL 5571574 at n.4: (citing *Western Watersheds Project et al. v U.S. Forest Serv.*, 2007 WL 1729734, No. 4:07-cv-151-BLW (D. Idaho, June 13, 2007) (approving closure of Smith Mountain allotment); *Western Watersheds Project v. U.S. Forest Serv.*, 2007 WL 3407679, No. 4:07-cv-151-BLW (D. Idaho, Nov. 13, 2007) (approving closure of Allison-Berg allotment); *Western Watersheds Project v. BLM*, 2009 WL 3335365, No. 4:09-cv-507-BLW (D. Idaho, October 14, 2009) (ordering closure of Partridge Creek allotment); *Western Watersheds Project v. U.S. Forest Serv.*, 2012 WL 2254206, No. 1:12-cv-286-BLW (D. Idaho, June 15, 2012) (ordering Forest Service to withdraw grazing authorizations and implement direction closing allotments on Payette National Forest); *Idaho Wool Growers Ass'n v.*

*Vilsack et al.*, 7 F. Supp. 3d 1085 (D. Idaho 2014) (approving Forest Service decision to close allotments on Payette National Forest), *aff'd* 816 F.3d 1095 (9th Cir. 2016)).  The sweeping closures of sheep allotments in these cases belie Plaintiffs' claim that the Forest Service has only "closed a handful of active allotments in Colorado," *Pls' Opp'n* at 9.  This likewise undercuts the Defendant's claim that the Wishbone decision is "distinct" from J. Paul Brown's ongoing decision-making process and would involve "completely different considerations."  *Def's Opp'n* at 7.  On the contrary, Colorado is simply the newest front in an old war waged against sheep grazing.

Not surprisingly, litigation over bighorn sheep and the resulting consequences on the domestic sheep industry have been the subject of considerable public interest across the West.  In fact, the issue of disease transmissibility to bighorn sheep is not limited to domestic sheep but may well be extended to include all manner of livestock (including cattle) as well.[3]  Consequently, Plaintiffs' claim that the geographic proximity of the Wishbone Allotment to J. Paul Brown's allotments is insufficient to warrant intervention is refuted by this broader context.  *Pls' Opp'n* at 7.  Moreover, the 10th Circuit specifically recognizes that establishing a "geographical nexus" between the actions undertaken in a case and the harm alleged is sufficient to create standing.  *Comm. to Save the Rio Hondo*

---

[3] For both ends of the political spectrum, *compare* Jim Petersen, Range Magazine, *Of Spotted Owls & Bighorn Sheep* (Spring 2019), *available at* http://rangemagazine.com/features/spring-19/range-sp19-contents.htm (describing the impacts of bighorn sheep litigation in Montana with a subtitle reading, "Watch out cattlemen, you're next") *with* Paige Blankenbuehler, High Country News, *Agricultural Interests Steer Colorado's Wildlife Management* (August 31, 2018), *available at* https://www.hcn.org/issues/50.15/ wildlife-agricultural-interests-steer-colorados-wildlife-management (describing Applicant J. Paul Brown's livestock operation as "the biggest threat to the Weminuche bighorns").

*v. Lucero*, 102 F.3d 445, 449 (10th Cir. 1996).  In light of the region-wide scope of bighorn sheep litigation, such a nexus is readily apparent here.

### B.      Applicants Interest would be impeded as a practical matter.

The Applicants' interests hinge on more than mere geographical proximity.  CFB has an inherent interest on litigating on behalf of its members, including the Wishbone permittees.  If the final decision in this case is remanded or vacated, then members of CFB – Wayne and Jerry Brown – will not be allowed to graze.  This is a direct connection to the issue at hand.  *See Martini Decl.* ¶ 8, ECF No. 13-2 ("CFB members graze their livestock on public lands located within the State of Colorado, including the allotments in the Rio Grande National Forest that are the subject of the 2017 Environmental Assessment and 2018 Final Decision at issue in this case. Preserving the viability of public lands livestock grazing is of paramount importance to CFB.").  Given that Plaintiffs and Defendant have already recognized that these CFB members have an interest in the litigation, *see* ECF No. 16, the standing enjoyed by the CFB members who graze the Wishbone Allotment grants organizational standing to CFB itself.  *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009); *see also Utah Ass'n of Ctys. v. Clinton*, 255 F.3d 1246, 1252 (10th Cir. 2001) ("We [have] cited numerous cases in which environmental organizations *and other special interest groups* have been held to have a sufficient interest for purposes of intervention as of right in cases in which their particular interests were threatened.") (emphasis added).

J. Paul Brown's interest in this case is likewise direct.  Although a remand of the final decision and associated NEPA document here would not automatically prohibit Mr.

Brown from grazing, the basis for intervention is not as narrow as Plaintiffs describe. "The interest of the intervenor is not measured by the particular issue before the court but is instead measured by whether the interest the intervenor claims is *related to the property that is the subject of the action.*" *Utah Ass'n of Ctys.*, 255 F.3d at 1252 (emphasis in original). While Plaintiffs dismiss Mr. Brown's concerns as "speculative," *Pls' Opp'n* at 9, the broader context of this lawsuit makes clear that the future of Mr. Brown's livestock operation is at stake. As the extensive list of cases cited above demonstrates, similar arguments (both technical and legal) have been made for over a decade to close sheep allotments throughout the West. Moreover, considering that there is a nationally-read media piece describing the threat of bighorn sheep litigation to J. Paul Brown's livelihood, *see* n.3, *supra*, it cannot be claimed that his interest in this case is "wholly remote and speculative" as suggested by the Forest Service. *Def's Opp'n* at 7. Therefore, the outcome of this lawsuit will, as a practical matter, determine the future of his grazing authorization on the public lands adjacent to the Wishbone Allotment.

### C. Applicants are not adequately represented by the existing parties.

Defendant claims that the Forest Service somehow adequately represents the Applicants' interests. *Def's Opp'n* at 8 (asserting that the Forest Service will "diligently defend" its decision to authorize grazing on the Wishbone Allotment). This statement ignores the clear precedent cited by Applicants which states that the Tenth Circuit presumes as a matter of law that is "'on its face impossible' for a government agency to carry the task of protecting the public's interests and the private interests of a prospective intervenor." ECF No. 13-1 (citing *WildEarth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192,

1200 (10th Cir. 2010).   Given the competing interests that an agency must attempt to satisfy, there is no question that an agency is incapable of properly defending an individual or private organization's rights in a meaningful manner.   Moreover, the fact that the Forest Service has made strange, unworkable proposals to J. Paul Brown – such as suggesting he somehow "switch" to grazing cattle instead of sheep – shows how disconnected the agency is from the reality of his livestock operation.   *Brown Decl.* ¶ 11, ECF No. 13-3.

Separately, Plaintiffs argue that Applicants are adequately represented by the other Intervenors in this case, the Colorado Wool Growers Association ("CWGA") and the Wishbone allotment permittees, Wayne and Jerry Brown.   *Pls' Opp'n* at 11-12. Concerning the organizations, Plaintiffs fail to note that CWGA will not adequately represent CFB's interests because CWGA's interest is focused exclusively on the welfare of Colorado's sheep industry, while CFB advocates for a much broader range of private interests and multiple-use concerns.   CWGA's interest in this lawsuit is based on "leading the Colorado sheep industry's policy and communication efforts regarding public lands issues, domestic and wild sheep conflicts, predator control, and *general promotion of the domestic sheep industry in Colorado.*"   *Etchart Decl.* ¶ 3, ECF No. 12-4 (emphasis added). CWGA "represents the interests of Colorado's lamb and wool producers and lamb feeders in Colorado. [] Most of CWGA's membership are individual producers/operators, but CWGA's membership also includes local sheep associations."   *Id.* ¶ 4.   In contrast, CFB "[represents] the interests of numerous ranchers, *farmers*, and *other industry professionals* in every county in the state," not just sheep producers.   *Martini Decl.* ¶ 3,

ECF No. 13-2 (emphasis added).  Unlike CWGA's exclusive concern with domestic sheep production, CFB advocates for *every* type of agricultural interest in Colorado and is dedicated to a wider multiple-use focus, including conservation efforts.

Concerning the different sheep permittees, Applicant J. Paul Brown is likewise not adequately represented by Wayne and Jerry Brown.  It is mere chance that the Wishbone Allotment is the subject this petition for judicial review.  The decision-making process actually began earlier on J. Paul Brown's allotments than it did for the Wishbone Allotment (in 2012 compared to 2017).  However, the Forest Service reversed its initial plan of issuing a Finding of No Significant Impact for J. Paul Brown's allotments and instead stated they would prepare a full Environmental Impact Statement.[4]  Thus, in addition to facing a similar outcome to the Wishbone Allotment, J. Paul Brown will have to contend with a far more complex NEPA document if he must appeal a decision from the San Juan National Forest.  Moreover, there is the possibility that the Wishbone permittees would be willing to reach a settlement with the Plaintiffs that J. Paul Brown would be unwilling to enter into of his own accord, thus precluding him an adequate remedy.  This proves the real "possibility that representation may be inadequate," which is all that is required by the liberal standards for intervention.  *WildEarth Guardians*, 604 F.3d at 1200.

## II.      PERMISSIVE INTERVENTION UNDER RULE 24(B) IS ALSO APPROPRIATE.

Plaintiffs' and Defendant's arguments against permissive intervention substantively mirror their arguments against intervention as of right.  The only additional

---

[4] The documents involved in the decision-making process for J. Paul Brown's allotments are available at: https://www.fs.usda.gov/project/?project=37578.

argument made in the context of permissive intervention is that it will unduly prejudice Plaintiffs by forcing them to respond to additional briefing and potentially delaying the proceedings. *See, e.g.*, *Pls' Opp'n* at 13-14. However, this claim is overstated. If intervention were granted, Applicants would agree to abide by the same conditions that the other Intervenor-Defendants have stipulated to. The Defendant's brief anticipated this and specifically requested such an outcome, *Def's Opp'n* at 12, therefore demonstrating that intervention will not impose an undue burden on the existing parties.

## CONCLUSION

For the reasons stated herein, the Applicants are entitled to intervention as of right under Federal Rule of Civil Procedure 24(a)(2) or, alternatively, permissive intervention under Rule 24(b). Should intervention be denied, Applicants respectfully request leave to file an *amicus curiae* brief given the far-reaching consequences of this case.

DATED this the 3rd day of July, 2019.

Respectfully Submitted,

*/s/ Brian Gregg Sheldon*
Brian Gregg Sheldon, Esq.
Ronald W. Opsahl, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
Facsimile: (303) 292-1980
brian@mslegal.org
ropsahl@mslegal.org

*Attorneys for Defendant-Intervenor-Applicants*
*Colorado Farm Bureau Federation and J. Paul Brown.*
**CERTIFICATE OF SERVICE**

I hereby certify that, on July 3rd, 2019, I electronically filed the foregoing with the Clerk of Court using this Court's CM/ECF system, which will send notification to all counsel of record pursuant to Fed. R. Civ. P. 5 and D.C.COLO.LCivR 5.1(d).

*/s/ Brian Gregg Sheldon*
Brian Gregg Sheldon, Esq.
MOUNTAIN STATES LEGAL FOUNDATION

Lauren M. Rule
Advocates for the West
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

Maya L. Kane
Southwest Water and Property Law LLC
10 Town Plaza, #422
Durango, CO 81301
(970) 946-5419
mkane@swpropertylaw.com

Attorneys for Petitioners

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00208-REB

WILDEARTH GUARDIANS and
WESTERN WATERSHEDS PROJECT,

      Petitioners,

v.

U.S. FOREST SERVICE, a federal agency of the U.S. Department of Agriculture,

      Respondent,

and

WAYNE BROWN,
JERRY BROWN,
THE COLORADO WOOL GROWERS ASSOCIATION,
J. PAUL BROWN, and
THE COLORADO FARM BUREAU FEDERATION,

      Respondent-Intervenors.

---

## OPENING BRIEF IN SUPPORT OF PETITION FOR REVIEW OF AGENCY ACTION

---

**TABLE OF CONTENTS**

**INTRODUCTION** ................................................................................ **1**

**FACTUAL BACKGROUND** .............................................................. **2**

**I.**    **The Threat Domestic Sheep Pose to Bighorn Sheep** .................... **2**

**II.**   **Bighorn Sheep Populations Near the Wishbone Allotment** ........... **5**

**III.**  **Creation of the Wishbone Allotment** ............................................ **8**

**IV.**  **Supplemental Information Report** ................................................ **12**

**ARGUMENT** ................................................................................... **14**

**I.**    **The Forest Service should have prepared an EIS** .......................... **15**

**II.**   **The Wishbone EA and DN/FONSI were arbitrary and capricious** ............... **20**

     **A.**  **The Forest Service Relied on Unsupported Assumptions** .................... **21**

     **B.**  **The Forest Service Failed to Examine and Disclose Relevant Data** ....... **27**

     **C.**  **The Forest Service Failed to Consider All Effects of the Action** ............. **30**

**III.**  **The Forest Service must prepare a supplemental NEPA analysis to consider the telemetry data and other recent bighorn sightings** ................. **31**

**CONCLUSION** .............................................................................. **35**

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004) .......................................................... 19

*Citizens for a Healthy Community v. U.S. Bureau of Land Mgt.*,
377 F. Supp. 3d 1223 (D. Colo. 2019) .............................................................. 31

*Forest Guardians v. U.S. Fish and Wildlife Serv.*, 611 F.3d 692
(10th Cir. 2010) ....................................................................................... 21, 27

*Friends of the Bow v. Thompson*, 124 F.3d 1210 (10th Cir. 1997) ................................ 34

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000) ........................... 13

*Friends of the Clearwater v. McAllister*, 214 F. Supp. 2d 1083
(D. Mont. 2002), *aff'd* 58 Fed. Appx. 686 (9th Cir. 2003) ............................... 33

*High Country Conservation Adv. v. U.S. Forest Serv.*,
52 F. Supp. 3d 1174 (D. Colo. 2014) ................................................... 27, 29, 31

*Humane Soc'y of United States v. Dep't of Commerce*,
432 F. Supp. 2d 4 (D.D.C. 2006) ................................................................... 20

*Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562 (9th Cir. 2000) ............. 32, 33, 34

*Idaho Wool Growers Ass'n et al. v. Vilsack et al.,* 7 F. Supp. 3d 1085
(D. Idaho 2014), *aff'd* 816 F.3d 1095 (9th Cir. 2016) ................................. 3, 4, 5, 19, 24

*Lee v. U.S. Air Force,* 354 F.3d 1229 (10th Cir. 2004) ........................................... 27, 29

*Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220
(10th Cir. 2002) ..................................................................................... 16, 17, 20

*Nat'l Law Ctr. on Homelessness and Poverty v. U.S. Dep't of Veterans Affairs*,
842 F. Supp. 2d 127 (D.D.C. 2012) ................................................................ 13

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001) ....... 17, 19, 20

*New Mexico ex rel. Richardson v. Bureau of Land Management*,
565 F.3d 683 (10th Cir. 2009) ...................................... 15, 20, 21, 26, 27, 29

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994) ......................... 12

*Olympic Forest Coalition v. U.S. Forest Serv.,* 556 F. Supp. 2d 1198
(W.D. Wash. 2008) ................................................................................. 33, 34

*Oregon Natural Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) .................... 21, 27

*Pennaco Energy, Inc. v. U.S. Dept. of Interior*, 377 F.3d 1147
(10th Cir. 2004) .................................................................................... 32, 34

*Price Rd. Neighbor. Ass'n v. United States Dept. of Transp.*, 113 F.3d 1505
(9th Cir. 1997) ........................................................................................... 34

*Rock Creek Alliance v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152
(D. Mont. 2010) ........................................................................................... 33

*Rocky Mountain Wild v. Vilsack,* 843 F. Supp. 2d 1188 (D. Colo. 2012) ...................... 27

*San Luis Valley Ecosystem Counsel v. U.S. Fish and Wildlife Serv.*,
657 F. Supp. 2d 1233 (D. Colo. 2009) ....................................................... 18, 19

*San Luis Valley Ecosystem Counsel v. U.S. Forest Serv.*,
2007 WL 1463855, No. 04-cv-1071-MSK (D. Colo. May 17, 2007) ............. 15, 16, 18, 20

*Sierra Club v. Fed. Hwy. Administration*, No. 17-cv-01661,
2019 WL 1695402, (D. Colo. Apr. 6, 2018) ...................................................... 13

*Western Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267
(D. Utah 2017) ........................................................................................... 13

*Western Watersheds Proj. et al. v. BLM*, 2009 WL 3335365,
No. 4:09-cv-507-BLW (D. Idaho, Oct. 14, 2009) .................................. 3, 4, 24, 25, 29, 30

*Western Watersheds Proj. et al. v. U.S. Forest Serv.*,
2007 WL 1729734, No. 4:07-cv-151-BLW (D. Idaho, June 13, 2007) ............. 3, 4, 24, 25

*Western Watersheds Proj. et al. v. U.S. Forest Serv.*,
2007 WL 3407679, No. 4:07-cv-151-BLW (D. Idaho, Nov. 13, 2007) ............................. 3

*Western Watersheds Proj. et al. v. U.S. Forest Serv.*,
2017 WL 5571574, No. 1:17-cv-434-CWD (D. Idaho Nov. 20, 2017) ............. 3, 4, 26, 29

*WildEarth Guardians v. U.S. Bureau of Land Management,*
870 F.3d 1222 (10th Cir. 2017) ............................................... 20, 21, 27, 29, 30

*WildEarth Guardians v. U.S. Office of Surface Mining, Reclamation and
Enforcement,* 104 F. Supp. 3d 1208 (D. Colo. 2015) ...................................... 31

*Wilderness Workshop v. U.S. Bureau of Land Mgt.,* 342 F. Supp. 3d 1145
(D. Colo. 2018)................................................................................................ 29

## REGULATIONS

40 C.F.R. § 1502.9(c)(1) ................................................................................. 32

40 C.F.R. § 1502.9(c)(4) ................................................................................. 32

40 C.F.R. § 1508.25(c) ................................................................................... 30

40 C.F.R. § 1508.27 ........................................................................................ 15

40 C.F.R. § 1508.27(a) ................................................................................... 16

40 C.F.R. § 1508.27(b)(4) ........................................................................ 16, 20

40 C.F.R. § 1508.27(b)(5) ........................................................................ 16, 20

40 C.F.R. § 1508.27(b)(6) ........................................................................ 16, 20

40 C.F.R. § 1508.27(b)(7) ........................................................................ 16, 20

## INTRODUCTION

Bighorn sheep are an iconic species across the western United States, valued by hunters, wildlife enthusiasts, Native Americans, and many others.  This native species has plummeted from historic numbers, largely due to disease transferred from domestic sheep.  Public land agencies and courts have recognized the serious threat domestic sheep pose to bighorn sheep across the West, and have taken actions to separate the species on public lands, including by closing domestic sheep grazing allotments that are in close proximity to bighorn sheep populations.  While the Rio Grande National Forest in southwest Colorado has taken similar actions in the past, it recently approved a new domestic sheep grazing allotment that is in very close proximity to several bighorn sheep herds, creating a high risk of disease transmission to these herds.

The Forest Service's own analysis found the allotment, called the Wishbone Allotment, to be high risk to bighorn sheep.  Rather than rejecting use of this allotment, as the agency had done for other high-risk allotments, it instead relied on a number of unsupported assumptions to claim the allotment's risk to bighorns was actually moderate rather than high—the first time the Forest Service had ever used this approach.  Importantly, the Forest Service failed to incorporate into its analysis key scientific data that undercut many of the agency's assumptions.  After Petitioners filed this case, the agency conducted a new analysis with some of that data that showed an *even higher* risk to bighorns from the Wishbone Allotment, but again dismissed that result without ever disclosing the new analysis to the public or soliciting comments, in violation of National Environmental Policy Act (NEPA) requirements.

Accordingly, the Forest Service's analyses and decision authorizing use of the

1

Wishbone Allotment are arbitrary, capricious, an abuse of discretion, and contrary to

NEPA, and must be set aside pursuant to the Administrative Procedure Act (APA).

## FACTUAL BACKGROUND

### I.      The Threat Domestic Sheep Pose to Bighorn Sheep.

Native bighorn sheep populations declined dramatically with settlement of the

West, and are currently estimated at less than 10 percent of historic numbers.

WA01201.  Their current distribution is fragmented across their historic range, and

many populations are small and isolated.  *Id.*  Numbers have rebounded slightly in

Colorado due to recovery efforts and translocations.  *Id.*  Transmission of disease from

domestic sheep to bighorn sheep is the primary factor limiting bighorn populations in

Colorado, including on the Rio Grande National Forest.  WA01206, 03963-64.

For many years, federal agencies have been grappling with the substantial threat

that domestic sheep grazing poses to bighorn sheep populations.  If the two species

come in contact, the domestic sheep can transfer a pathogen to the bighorn sheep that

leads to respiratory disease in the bighorn.  WA03964.  The bighorn can then transfer

the pathogen to other bighorn sheep in the herd, resulting in large pneumonia die-offs

within bighorn populations.  *Id.*  Female bighorns that survive pass the pathogen to their

lambs, resulting in poor lamb survival for years or even decades after the initial die-off.

*Id.*  Surviving bighorns also can infect other bighorn herds, causing die-offs in near-by

bighorn populations.  *Id.*  One domestic sheep can trigger widespread pneumonia die-

offs within multiple bighorn sheep populations, as documented in Colorado.  WA01207,

04433.  Consensus exists among scientists that domestic sheep pose a significant

threat to bighorn sheep.  WA02600-02, 02646-47, 03964, 04646-49, 04671-72.

2

Due to this threat, federal agencies have ended domestic sheep grazing in areas that pose a moderate or high risk of disease transmission to bighorn sheep, particularly in the Hells Canyon and Salmon River Canyon areas of Oregon and Idaho, and courts have upheld those decisions.  WA02636 ¶ 7; *W. Watersheds Proj. et al. v. U.S. Forest Serv.,* 2007 WL 1729734, No. 4:07-cv-151-BLW (D. Idaho, June 13, 2007) ("*WWP I")*; *W. Watersheds Proj. et al. v. U.S. Forest Serv.,* 2007 WL 3407679, No. 4:07-cv-151-BLW (D. Idaho, Nov. 13, 2007) ("*WWP II*"); *Idaho Wool Growers Ass'n et al. v. Vilsack et al.,* 7 F. Supp. 3d 1085 (D. Idaho 2014), *aff'd* 816 F.3d 1095 (9th Cir. 2016).  When the Forest Service or Bureau of Land Management (BLM) failed to take action over high risk grazing allotments, courts enjoined use of those allotments.  *W. Watersheds Proj. et al. v. BLM,* 2009 WL 3335365, No. 4:09-cv-507-BLW (D. Idaho, Oct. 14, 2009) ("*WWP III*") (at WA02608-24); *W. Watersheds Proj. et al. v. U.S. Forest Serv.,* 2017 WL 5571574, No. 1:17-cv-434-CWD (D. Idaho, Nov. 20, 2017) ("*WWP IV*") (at WA05575-605); *see also* WA05505 (BLM decision on allotment at issue in *WWP III*).  These cases noted controversy about the science of disease transmission, but that evidence strongly supported the need to keep the species separated.  *WWP II,* 2007 WL 3407679, at *2-4; *Vilsack,* 7 F. Supp. 3d at 1090-93; *Vilsack,* 816 F.3d at 1100, 1104-05.

Separation of the species on public lands is difficult for a variety of reasons.  For one, bighorn sheep frequently move outside of their normal home range to disperse, find a mate, or move between habitat areas—movements called "forays."  WA03964-65.  Forays can be 15 miles or more, and can lead to contact with a domestic sheep or interaction with a bighorn from a different herd.  WA02617, 02620, 02637-38, 03863, 03873, 04045, 04246, 04467, 04470, 05590.  Second, domestic sheep frequently stray

3

from their band and can remain on their own for weeks or months at a time.  WA02618, 02620, 02628-29, 02867, 03823, 04044, 04169.  Even when it is known that domestic sheep have strayed, it can be difficult to find and remove them from public lands. WA02629-30.  Finally, these two species are attracted to each other, so will seek each other out when in the same vicinity, increasing the risk of contact.  WA01206-07, 02619, 02629, 02833, 02863, 02873, 02909, 03946, 04044, 04169.  Courts have recognized the risks of contact presented by foraying bighorn sheep and stray domestic sheep, particularly in light of the attraction between the species.  *WWP I,* 2007 WL 1729734, at *3; *WWP III,* 2009 WL 3335365, at *5; *WWP IV,* 2017 WL 5571574, at *7, 9, 13.

Due to the unpredictable nature of bighorn forays, the frequent straying of domestic sheep, and the attraction between the species, bighorn experts agree that management practices such as using herders and guard dogs are not effective at keeping the species separated if there is not substantial spatial separation between bighorn home ranges and domestic sheep grazing allotments.  WA02618-19, 02627-32, 02647-48, 02863-65.  Courts have agreed that "best management practices" have not been proven effective at keeping the species separate and thus agencies could not rely on them when bighorn populations were in close proximity to domestic sheep allotments.  *WWP I,* 2007 WL 1729734, at *3; *WWP III,* 2009 WL 3335365, at *5, 7; *WWP IV,* 2017 WL 5571574, at *13-14.

In 2010, the Payette National Forest in Idaho decided to close almost 70% of the forest to domestic sheep grazing to protect bighorn sheep populations on the forest. *Vilsack,* 816 F.3d 1095.  The Payette relied upon models developed by outside experts that quantified the risk of a bighorn sheep moving onto a Payette allotment, contracting

4

disease from a domestic sheep, and transmitting disease to the rest of its herd.  *Id.* at 1100; WA04099, 04467, 05955-83.  The Ninth Circuit Court of Appeals upheld the Payette's use of these risk models.  *Vilsack,* 816 F.3d at 1108, 1110.  The Forest Service then adapted one of these models, called the Risk of Contact Model, for use on other forests.  WA03872.  This model analyzes the risk of a bighorn sheep contacting a domestic sheep based on the location of bighorn sheep home ranges and the potential for bighorn forays onto allotments.  *Id.*  The model did not account for stray domestic sheep or attraction between the species.  WA03942, 03948.  Forest Service guidance states that bighorns need decades to recover from disease so a 50-year disease-free interval is a good benchmark to ensure bighorn population persistence, which corresponds to a risk of .08 contacts per year.  WA03952.[1]

In Colorado, before the new Risk of Contact Model, the Forest Service conducted qualitative risk assessments for a number of allotments to assess their risk to bighorn sheep, and prohibited domestic sheep grazing in areas that were rated as high risk. WA01328, 01552, 01717.  Once the Risk of Contact Model was available, forests—including the Rio Grande National Forest—began using the model to quantify the risk of domestic sheep allotments to bighorn sheep populations.  WA01802-11, 02410-35.

## II.    Bighorn Sheep Populations Near the Wishbone Allotment.

Colorado Parks and Wildlife (CPW) has identified bighorn "meta-populations", and the Central San Juan meta-population is near the new Wishbone Allotment at issue here.  WA03978.  A bighorn meta-population consists of multiple bighorn herds that are

---

[1] Disease interval is how frequently a disease event occurs in a bighorn herd.  Contacts per year are the number of times per year a bighorn sheep from a particular herd makes contact with a domestic sheep allotment.

5

connected through frequent movement of bighorns between them.  WA04353-54.  This meta-population structure increases genetic diversity among bighorn herds, but also increases the risk of disease transmission.  WA01208, 02617-18, 02638, 04353.  The Central San Juan meta-population consists of four bighorn herds: San Luis Peak, Bellows Creek, Rock Creek, and Bristol Head.  WA04138, 03963.

CPW's objective is to manage for an increasing size and distribution of the Central San Juan meta-population, but CPW recognizes that if the population increases, the risk of contact with domestic sheep also increases.  WA04138-39.  A large amount of suitable habitat exists within the range of the Central San Juan meta-population that would allow for herd expansion as well as for connectivity between herds.  WA04140, 04167.  Each of the herds had more than 100 animals in the 1970's or 1980's but subsequently experienced declines, with significant disease die-offs occurring in the Rock Creek and Bellows Creek herds and poor lamb survival observed in all four herds.  WA03981, 03984, 03986, 04147-48, 04154-59, 04168.  At the time of the Wishbone analysis in 2017, the San Luis Peak, Bellows Creek, and Bristol Head herds were each estimated at 80 animals while the Rock Creek herd was at 20 animals.  WA03977.

In its management plan for the Central San Juan meta-population, CPW stated that surveys can only detect a small sample of animals during a few days per year and were not sufficient to fully assess overall range and habitat use throughout the year.  WA04167.  Telemetry data collected from collars placed on individual bighorns would be "highly beneficial" to "develop a more robust understanding of habitat use and timing

6

**I-App-79**

of use" across the range of this meta-population.  *Id.*[2]  Therefore, CPW began collaring bighorns from these herds in January 2016, and collected data from nine animals in the Bristol Head herd, eight animals in the Bellows Creek herd, eleven animals in the San Luis Peak herd, and three animals in the Rock Creek herd.  WA04245.

Preliminary analysis of the data by CPW in 2017 and early 2018, which it shared with the Forest Service, disclosed that bighorns from these herds made more extensive movements than previously thought, and moved within close proximity of several Wishbone Allotment grazing pastures.  WA04246-48, 03779-85, 05724-25.  These movements were documented based on a small sample of bighorns and just two years of data and thus did not represent the full extent of habitat use by these herds.  WA04247-48.  Of the 15 collared bighorns that had been tested for disease, 10 were positive for a pathogen that comes from domestic sheep.  WA04245.  CPW noted that the study was ongoing and a full analysis of results was anticipated in 2019.  WA04245.

Bighorn meta-populations adjacent to the Central San Juan meta-population consist of the Weminuche, San Juan West, and Natural Arch meta-populations.  *See* ECF #1 ¶ 51, Fig. 1; WA03830-31, 03986.  It is suspected that historically bighorns from the Central San Juan herds interacted with bighorns from these other meta-populations, and the preliminary telemetry data showed Bristol Head bighorns moving into the range of Weminuche and San Juan West herds.  WA03830-32, 03981, 03984, 03986.

---

[2] Telemetry data is gathered by putting collars on a sample of animals within a population to record the animals' locations.  GPS collars automatically record locations multiple times a day while VHF collars only document locations when biologists track them in the field, usually every 1-2 weeks.

### III.    Creation of the Wishbone Allotment.

In 2012, the Rio Grande National Forest began a process to analyze the risk to bighorns from several allotments: the Fisher-Ivy/Goose Lake ("FIG") Allotment and a set of three allotments called the Snow Mesa allotments.  WA01686.  Before long, the agency decided to split up that analysis and first analyze the FIG Allotment.  It completed a risk assessment using the Risk of Contact Model in 2013.  WA01784.

The FIG Allotment consisted of seven pastures, and the core home range of a bighorn herd in the Weminuche meta-population overlapped four of the pastures while the other pastures were 1, 1.5, and 2.5 miles away from the home range.  WA01798, 01801.  Using the Risk of Contact Model, the Forest Service found all seven pastures were high risk, with each creating a risk that a disease event could occur every 22 years or less.  WA01806-09, 01811, 01818.  Thus, the Forest Service decided to convert the entire allotment to vacant status.  WA02094. The agency rejected the alternative of relying on management practices to keep the species separated.  WA02099, 02104-05.

The Forest Service then reinitiated its analysis of the Snow Mesa allotments in 2014.  WA02116.  Observations of bighorns and domestic sheep using the same range in 2010-2013 led the Forest Service to temporarily prohibit grazing in northern portions of the Snow Mesa allotments to create a buffer between the species, and added use on part of an allotment just to the south, called the Ouray allotment.  WA03715-18, 03982-83, 03542, 03547, 03552, 06027, 06149.

Like with FIG, the Forest Service completed a risk assessment using the Risk of Contact Model.  WA02387.  It looked at the risk for three alternative actions: (1) converting the Snow Mesa allotments to vacant status, (2) continuing to allow grazing

with no changes to allotment boundaries, and (3) allowing grazing but changing the allotment boundaries to exclude the areas that had been off-limits to grazing since 2013 and adding part of the Ouray allotment.  WA02168, 02394.  Both alternatives 2 and 3 included best management practices to keep the species separated.  *Id.*  Although the overall risk was lower under Alternative 3, each allotment was still rated as high risk, with the potential to cause a disease event every 6.8 to 8.4 years.  WA02435.

The Forest Service initially proposed to select Alternative 3 but its final draft EA chose Alternative 1 to eliminate domestic sheep grazing on the Snow Mesa allotments. WA02172, 02280, 02284.  The agency recognized that, although Alternative 3 would eliminate overlap between bighorn core home range and the allotments, grazing the allotments still presented a high risk due to their close proximity to bighorn use areas and potential for bighorn forays onto the allotments.  WA02299, 02325, 02330.  The Forest Service acknowledged that best management practices were not a reliable method to keep the species separate, especially given past compliance problems by these permittees.  WA02287, 02300, 02330.

Rather than issue a final EA and decision, however, the Forest Service in early 2017 initiated a new proposed action to create a new allotment, called the Wishbone Allotment, to the south of the Snow Mesa allotments to replace those allotments. WA02675.  The agency revised its Snow Mesa risk assessment to include an assessment of the new Wishbone Allotment.  WA02693.  It released a draft risk assessment for public comment in March 2017, and a final risk assessment and EA in November 2017.  WA02693, 05211, 05340.  Despite receiving objections to the EA from numerous parties, including the permittees themselves, the Forest Service issued a final

9

Decision Notice and Finding of No Significant Impact ("DN/FONSI") in March 2018

converting the Snow Mesa allotments to vacant status and authorizing use of the new

Wishbone Allotment.  WA005448-611 (objections); 05660 (DN/FONSI).

   The Wishbone Allotment consists of seven pastures, many of which are

separated by long distances.  WA03970.  The Crystal pasture, which was carved out of

the Ouray Allotment, is the largest and highest elevation pasture.  *Id.*; WA03997-98.

The Shallow pasture borders the Crystal pasture to the south.  WA03973.  The

remaining five pastures are parcels spread along Highway 149 and other roads in a

horseshoe shape, with South River pasture on the southwest end and Coller pasture on

the southeast end.  *Id*. Herders must move sheep for miles to move between pastures.

*Id.*; WA03998.  The Coller pasture is partly a state wildlife area that required

authorization from CPW to use.  WA03995.

   The Risk of Contact Model determined the Wishbone Allotment was high risk to

bighorn sheep due to its proximity to the Central San Juan bighorn herds.  WA04032.

Based on the model results, bighorns from one or more of the herds are expected to

contact one or more of the Wishbone pastures each year, resulting in a disease

transmission event every four years.  *Id.*  The risk assessment stated that the potential

for a disease event every 32 years or less would result in a low probability of bighorn

population persistence and viability.  WA04001.  The assessment did not explain why it

did not use the 50-year disease interval from agency guidance. *Id.*; WA03952; *see also*

*infra* n. 8 (noting Payette National Forest used 46-year disease interval).

   Instead of rejecting the Wishbone Allotment due to its high risk, as it had done

with other allotments, the Forest Service claimed that the model result was inaccurate

and created new factors in the risk assessment to alter that result to "moderate" risk. WA04038-39.  The agency claimed the risk was only moderate because: (1)  there was no direct overlap between the Wishbone Allotment and bighorn core home ranges, (2) bighorns in these herds move higher in elevation, away from the Wishbone Allotment, during the grazing season, (3) there is less overlap between bighorn habitat and domestic sheep range on the Wishbone Allotment than with the other alternatives, (4) the risk of contact from bighorn forays is less than what the model predicted due to a shorter grazing season, and (5) barriers such as the Rio Grande River, Highway 149 and subdivisions will maintain separation between the species.  *Id.*  The agency also claimed that use of best management practices to keep the species separate would be more effective on the Wishbone Allotment than on the Snow Mesa allotments because Wishbone pastures were more accessible and easier to monitor.  *Id.*

Notably, the risk assessment did not include any maps or analysis of the telemetry data collected to that point.  WA03961-4063.  The assessment stated that recent telemetry data supported the delineation of core home ranges for the Central San Juan bighorn herds, but it did not discuss whether the data supported the assumptions concerning habitat use and movements of these animals.  WA04038-39.

The Forest Service further described these factors in the DN/FONSI to conclude the allotment was moderate risk,[3] again without discussing whether the telemetry data supported the agency's assumptions.  WA05668-71.  It dismissed concerns raised by objectors that the assumptions were flawed and contradicted by the recent telemetry

---

[3] The DN/FONSI dropped the factor about lack of overlap between the allotment and bighorn core home ranges.  WA04038, 05668-71.

11

**I-App-84**

data; that if the Central San Juan bighorn herds expanded, risk of contact with domestic sheep from the Wishbone Allotment would increase; and that the allotment was also a risk to neighboring bighorn meta-populations due to interactions between herds. WA05668-76.  The DN/FONSI concluded that use of the Wishbone Allotment would not have any significant environmental effects and therefore no need existed for an Environmental Impact Statement (EIS).  WA05681.

Before completing the Wishbone risk assessment and EA, the Forest Service authorized the Snow Mesa permittees to use the Wishbone Allotment in 2016 and 2017 on a trial basis.  WA03558, 03563.  Documented instances of noncompliance with permit conditions occurred each year, including in 2017 when 56 stray domestic sheep remained on or near Wishbone pastures after the grazing season and it took six weeks to remove them.  WA02798-99, 05567 (2016); WA03595-97, 06208-09, 06316-19 (2017).  These permittees also had noncompliance problems in 2011-2015.  WA03536-38, 03983, 06030, 06032-35.  Based on the trial use of the Wishbone Allotment, the permittees and Colorado Wool Growers Association both stated that controlling and managing domestic sheep on the Wishbone Allotment is difficult due to the use of multiple pastures, rough terrain, and poor forage quality, which increases the chance of stray sheep and difficulty locating and removing them.  WA05461, 05468-69.

IV.   **Supplemental Information Report.**[4]

_____

[4] Petitioners filed a motion to strike this report and other supplemental documents the Forest Service added to the record in August 2019, or in the alternative requested the Court allow Petitioners to use their own supplemental documents as well.  *See* ECF Nos. 24, 28, 29.  The Court has not ruled on that motion.  Therefore, in line with legal authority, Petitioners will not cite to any of the supplemental documents for purposes of their challenges to the 2017 EA and 2018 DN/FONSI because they post-date those decisions.  *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1575 (10th Cir. 1994);

Petitioners' lawsuit includes a claim that the Forest Service has failed to complete a supplemental NEPA analysis incorporating all of the telemetry data. ECF No. 1 ¶ 88. After the lawsuit was filed, the Forest Service obtained telemetry data from CPW and re-ran the Risk of Contact Model using data collected through July 4, 2018 as well as 2018 population estimates for the bighorn herds. WA05880-82. Using these data, the Forest Service first updated the core herd home range boundaries, which expanded the home ranges of three herds in certain areas. WA05888. The most notable change was that the Bristol Head core home range expanded north and now bordered the Crystal and Shallow pastures. WA05900. When the agency re-ran the risk model, the risk of contact increased from the 2017 figure of .98 contacts per year to 1.26 contacts per year—a 27% increase. WA05889. The Forest Service did not identify the disease interval that would result from that higher risk of contact. *Id.*

The Forest Service included the model results in a Supplemental Information Report ("SIR"), which then used the same five factors listed in the DN/FONSI to dismiss the even-higher risk rating and claim once again that the risk of the allotment to Central San Juan bighorns was "moderate" in spite of quantifiable information to the contrary. *Id.* The SIR also described the risk of contact with other bighorn meta-populations as still "acceptable." WA05894-95. Finally, the report discussed and dismissed a sighting

---

*Sierra Club v. Fed. Hwy. Administration,* No. 17-cv-01661, 2019 WL 1695402, at *3 (D. Colo. Apr. 6, 2018). However, they will cite the supplemental documents for their claim that the Forest Service has failed to complete a Supplemental NEPA analysis because review of APA failure to act claims is not limited to an administrative record as there is no "action" to demarcate the limits of the record. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000); *Western Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1272 n.4 (D. Utah 2017); *Nat'l Law Ctr. on Homelessness and Poverty v. U.S. Dep't of Veterans Affairs,* 842 F. Supp. 2d 127, 130 (D.D.C. 2012).

13

of two bighorn sheep on the Wishbone South River pasture in early July 2019 (during the grazing season), claiming that sighting was "not significant."  WA05895-96, 05929-30, 05798.  The SIR contained an Appendix that included numerous maps of the telemetry data.  WA05899-932.  After analyzing the new data, the Forest Service concluded that the new information was "within the scope of effects" considered in the EA and DN/FONSI and therefore did not warrant supplemental NEPA analysis. WA05896-97.  Accordingly, the agency did not disclose the SIR analysis to the public.

Once Petitioners learned of this SIR when it was filed as a supplement to the administrative record in August 2019, they sent comments to the Forest Service describing many flaws in the SIR analysis and that the agency needed to do a full Supplemental EIS that included telemetry data beyond July 2018.  ECF Nos. 28-1, 28-2. Petitioners also sent comments on the SIR from two retired bighorn sheep experts— previous Forest Service and BLM national experts—which also pointed out numerous problems with the analysis and conclusions in the SIR, and highlighted the high risk to bighorn sheep from the Wishbone Allotment. ECF Nos. 29-1, 29-2.  Despite all of this, the Forest Service has not committed to complete a supplemental NEPA analysis.

## ARGUMENT[5]

The Forest Service has violated NEPA with its Wishbone Allotment analysis and decision in three ways.  First, the agency was required to prepare an EIS rather than an

---

[5] Petitioners are submitting two declarations to establish their standing in this case. These declarations describe Petitioners' interests in the bighorn sheep herds near the Wishbone Allotment, their injuries from the Forest Service's flawed decision-making that created a high risk of disease transmission to these bighorn sheep, and how those injuries would be redressed by reversal of the Wishbone decision and an order for the Forest Service to re-do its NEPA analysis before further authorizing use of that allotment.  Declaration of Greg Dyson; Declaration of Jonathan Ratner (filed herewith).

EA because of the significant effects use of the allotment will likely have on bighorn sheep herds.  Second, the EA and DN/FONSI were arbitrary and capricious and violated NEPA because the agency relied on unsupported and irrational assumptions, failed to incorporate relevant data, and failed to consider all indirect effects of the action. Finally, the Forest Service's SIR does not satisfy its duty to complete a supplemental NEPA analysis that fully analyzes and publicly discloses significant new information.

Review of an agency decision falls under the arbitrary and capricious standard of the APA, which requires reversal of the decision if the agency failed to consider an important aspect of the problem, offered an explanation for its decision that is counter to the evidence in the record, failed to base its decision on consideration of the relevant factors, or made a clear error of judgment.  *New Mexico ex rel. Richardson v. Bureau of Land Management,* 565 F.3d 683, 704 (10th Cir. 2009).  Under this standard, an agency must examine the relevant data and articulate a rational connection between the facts found and the decision made.  *Id.* at 713.

I.      **The Forest Service should have prepared an EIS.**

Under NEPA, an EIS is required if a federal action *may* have a significant effect on the environment.  *San Luis Valley Ecosystem Counsel v. U.S. Forest Serv.,* 2007 WL 1463855, at *1, No. 04-cv-1071-MSK (D. Colo., May 17, 2007).  A court's review of an agency's decision to issue a FONSI rather than prepare an EIS is both substantive (whether the agency made a clear error in judgment) and procedural (whether the agency followed proper procedures).  *Id.* at *8.

To assess the significance of an action, an agency should consider the "context" and "intensity" of the proposed action.  *Id.* at *8-9 (citing 40 C.F.R. § 1508.27).  The

context of the action includes the affected region, the affected interests, and the locality, as well as short and long-term effects.  40 C.F.R. § 1508.27(a).  The intensity factors relate to the severity of any impact, and include (1) the degree to which the effects on the environment are likely to be highly controversial; (2) the degree to which the possible effects on the environment are highly uncertain or involve unique or unknown risks; (3) the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; and (4) whether the action is related to other actions with individually insignificant but cumulatively significant impacts.  *Id.* § 1508.27(b)(4)-(7).  All of these factors apply here.

The "highly controversial" factor applies if a substantial dispute exists as to the size, nature, or effect of the action.  *Middle Rio Grande Conservancy Dist. v. Norton,* 294 F.3d 1220, 1229 (10th Cir. 2002).  Although public opposition alone does not denote controversy, if public comments raise substantial questions concerning the agency's conclusions about the effects of the project, the effects are highly controversial.  *Id.*; *San Luis Valley Ecosystem Counsel,* 2007 WL 1463855, at *10.

The record shows that creating the Wishbone Allotment was highly controversial due to substantial disputes about the impacts to bighorn sheep.  Commenters on both sides of the issue heavily disputed the Forest Service's risk assessment, with industry proponents attacking the Risk of Contact Model and bighorn advocates challenging the agency's conclusion that the allotment posed only a moderate risk to bighorn sheep after the model showed a high risk.  WA02544-48, 02585, 02691, 02810-25, 02832-37, 02870-71, 02917-20, 02944-47, 02949-52, 02956-63, 05448-50, 05476-85, 05565-70. In particular, bighorn advocates criticized the artificial assumptions the Forest Service

applied to the model result to lower the risk from high to moderate—the first time the agency had used this tactic—because the assumptions were not supported by science. WA02810-25, 02832-37, 05448-50, 05476-85, 05565-70. Commenters also argued that the agency did not properly analyze the risk the allotment would pose to bighorn populations adjacent to the Central San Juan herds. WA05630, 05632-33, 05639-40.

These points show a substantial dispute existed about the effects of authorizing domestic sheep use on the Wishbone Allotment. In its FONSI, the Forest Service acknowledged these controversies but simply stated that the EA discussed effects and disclosed the rationale for finding a moderate risk. WA05680. It failed to explain why the significant disputes about that rationale and the level of risk to bighorns did not suffice to trigger an EIS. *Id.* Given that risk of contact between domestic and bighorn sheep was one of just two "key issues" analyzed in the EA, and the decision hinged on finding moderate rather than high risk, the significant controversy about the agencies' analysis and conclusion on the risk to bighorn populations warranted an EIS. WA02294-95,[6] 05236-37, 05662-64; *Middle Rio Grande Conservancy Dist.,* 294 F.3d at 1229 (finding wide disparity in the estimates of the action's impact was a substantial dispute about effects); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736-37 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 157 (2010) (controversy existed when comments noted agency analysis was incomplete and mitigation uncertain because they "cast substantial doubt

---

[6] The Snow Mesa draft EA noted that "issues" are points of discussion, debate, or dispute about the effects of a proposed action, and some are considered "key" because of the geographic extent, duration of effects, or intensity of interest or resource conflict. WA02294. This language was excluded from the Wishbone EA. WA05236.

17

on the adequacy of the [agency's] methodology and data."); San *Luis Valley Ecosystem Counsel,* 2007 WL 1463855, at *10 (effects highly controversial based on public comments that pointed out impacts the agency failed to consider).

Second, authorizing the Wishbone Allotment created a "unique risk"—disease transmission to bighorn sheep.  The result of this risk is "highly uncertain" given the dispute about how often and how far disease would spread through bighorn populations due to use of the allotment.  The risk assessment itself included more than ten pages discussing numerous uncertainties in the analysis.  WA03965-66, 03988-95, 04041-45. Other evidence establishes that effectiveness of best management practices to keep the species separated is highly uncertain, and the movements and habitat use of these bighorn sheep is also uncertain.  WA02623, 02627-32, 02647-48, 02863-65, 02867-68, 02904, 03595-97 (uncertainty of best management practices); WA04167 (need for more data on bighorn movements); WA03779-85, 04246-48 (early analysis of telemetry data showed more extensive movements by these animals than previously believed).

The FONSI stated uncertainties exist in the Risk of Contact Model, but asserted, without any explanation or support, that those uncertainties do not translate into highly uncertain effects or unique risks.  WA05680-81. Disease transmission to bighorn sheep is certainly a unique risk attached to domestic sheep grazing; and the Forest Service's novel use of "local factors" to claim moderate risk when the standard parameters showed the allotment is high risk establishes that the extent of effects is highly uncertain, warranting an EIS.  *See San Luis Valley Ecosystem Counsel,* 2007 WL 1463855, at *10 (uncertainty about extent of effects on scenic integrity of the area met significance factor); *San Luis Valley Ecosystem Counsel v. U.S. Fish and Wildlife Serv.,*

18

657 F. Supp. 2d 1233, 1246 (D. Colo. 2009) (failure to evaluate efficacy of proposed safeguards and mitigation measures showed impacts of action were uncertain or involved unique or unknown risks); *Nat'l Parks & Conservation Ass'n,* 241 F.3d at 728-29 (9th Cir. 2001) (uncertainty about effects showed potential for significant impacts); *Anderson v. Evans*, 371 F.3d 475, 489-92 (9th Cir. 2004) (impact of whale hunt on local whale population and local ecosystem was highly uncertain, requiring EIS).

Third, this action may establish a precedent for future actions because the Forest Service may use similar unsupported assumptions to lower risk ratings for other allotments, thereby authorizing domestic sheep use in other high risk areas.  Prior to the Wishbone Allotment, the Forest Service had eliminated domestic sheep grazing in areas that the Risk of Contact Model rated as high risk.  *See Vilsack,* 816 F.3d at 1101 (Payette allotments); WA02094 (FIG allotment); WA02280, 02284 (Snow Mesa allotments).  The Wishbone decision is the first time since the Risk of Contact Model was adopted by the Forest Service as the best available science that the agency artificially attenuated the Model's results to justify using a high risk allotment. The FONSI stated that the Wishbone decision will not set a precedent because it is specific to that allotment and future actions would have their own site-specific analysis. WA05680.  However, the approach used by the Forest Service to downgrade risk to bighorn sheep from high to moderate based on a variety of assumptions lacking scientific support will set a precedent for the agency to use a similar approach with other allotments, creating a significant risk to bighorn populations. In fact, a permittee with allotments to the south of Wishbone sought intervention in this case, and this Court found it "reasonably possible" that analyses and decisions related to the Wishbone

Allotment would be applied to other domestic sheep allotments. ECF No. 30 at 9.

Finally, the cumulative risk to bighorn sheep on the Rio Grande National Forest from grazing other domestic sheep allotments, combined with grazing the Wishbone Allotment, could be significant.  The Wishbone decision stated that multiple bighorn herds on the forest have potential for contact with domestic sheep.  WA05677.  Given the connectivity that is known or likely occurs between bighorn herds, the potential risk from the Wishbone Allotment combined with the risk from other allotments might have a cumulatively significant effect on one or more bighorn sheep populations, but the Forest Service failed to assess this.  WA03828-32 (showing connectivity between Central San Juan, Weminuche, and San Juan West bighorn meta-populations); WA05286, 05322-23, 05681 (cumulative effects discussion).

Because the "intensity" factors of controversy, uncertainty, precedence, and cumulative effects apply here, the Forest Service must prepare an EIS.  40 C.F.R. § 1508.27(b)(4)-(7); *Middle Rio Grande Conservancy Dist.,* 294 F.3d at 1229-30; *San Luis Valley Ecosystem Counsel,* 2007 WL 1463855, at *11; *Nat'l Parks & Conservation Ass'n,* 241 F.3d at 737; *Humane Soc'y of United States v. Dep't of Commerce,* 432 F. Supp. 2d 4, 23 (D.D.C. 2006) (all ordering preparation of EIS due to these factors).

## II.  The Wishbone EA and DN/FONSI were arbitrary and capricious.

Under NEPA, an agency must take a "hard look" at the environmental effects of proposed actions and all information relevant to its decision to fulfill NEPA's twin goals of informed decision-making and public involvement.  *Richardson,* 565 F.3d at 703, 704; *WildEarth Guardians v. U.S. Bureau of Land Management,* 870 F.3d 1222, 1233 (10th Cir. 2017).  This hard look "must be timely, and it must be taken objectively and in good

20

faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Forest Guardians v. U.S. Fish and Wildlife Serv.,* 611 F.3d 692, 712 (10th Cir. 2010) (internal quotation omitted).

### A.   The Forest Service Relied on Unsupported Assumptions.

An agency violates NEPA if it relies on inaccurate information or unsupported assumptions to justify its decision. *Richardson*, 565 F.3d at 713-15; *WildEarth Guardians,* 870 F.3d at 1235-37; *Oregon Natural Desert Ass'n v. Jewell,* 840 F.3d 562, 569-70 (9th Cir. 2016).  Here, the Forest Service created the Wishbone Allotment and authorized the permittees to use it in 2016 before the agency had completed even a draft risk assessment.  WA02656, 02693.  When the Risk of Contact Model showed the allotment was high risk to bighorn sheep, the agency attempted to rationalize use of the allotment by making various assertions to claim the allotment was only moderate risk— an approach the agency had never used before—despite increasing evidence that its assumptions were unsupported and irrational.  WA04038-39.  It then incorporated the risk assessment into the EA and relied on those same flawed assumptions there and in the DN/FONSI.  WA05273-75, 05282-84, 05340, 05668-71.

The Wishbone risk assessment identified the parameters used to determine whether an allotment is high, moderate, or low risk.  WA04002.  An allotment is *high risk* if bighorn core home range is less than ten miles from the allotment, the rate of a bighorn contacting the allotment is once every eight years or less, and the potential disease interval is less than 32 years.  *Id.*  A *moderate risk* occurs if core home range is 10-15 miles from an allotment, the contact rate is once every 8-10 years, and the potential disease interval is 32-40 years.  *Id.*  The Forest Service acted consistently with

21

these criteria for the FIG and Snow Mesa allotments, designating them as high risk even where there was no overlap between bighorn core home ranges and allotment pastures.  WA01801, 01818 (FIG pastures high risk, including one with 22-year disease interval); WA04036 (Snow Mesa allotments under Alternative 3 high risk, each having 6 to 8-year disease interval).  The Wishbone Allotment was even higher risk, with a bighorn predicted to contact the allotment *every year*, and a disease interval of just *four* years.  WA04038.[7]  This disease interval is eight times riskier than the 32-year interval the Forest Service stated would "result in a High Risk to bighorn sheep long-term viability and a Low Probability of Population Persistence and Viability."  WA04060.[8]

Yet, instead of acting in accordance with that rating by not allowing domestic sheep to use the allotment, as it did with FIG and Snow Mesa, the agency asserted that other local "factors" supported disregarding the model results to find moderate risk for the Wishbone Allotment.  WA04038-39, 05668-71.  The agency relied on this novel approach even though the early telemetry data and other facts undercut many of the Forest Service's assertions.

For instance, the Forest Service initially relied on the fact that there was no "direct overlap" between the allotment and bighorn core herd home ranges.  WA04038. This reasoning is contrary to the agency's high-risk rating for FIG pastures and Snow Mesa allotments that also did not overlap bighorn core home range.  WA01801, 01818, 04036. Indeed, the one-mile distance between the Wishbone Allotment and bighorn

---

[7] The Forest Service did not analyze the risk of each Wishbone pasture as it did for FIG, instead rating the entire allotment as whole.  *Cf.* WA04038 *with* WA01818.

[8] The Payette National Forest determined a 46-year disease interval was the appropriate risk level to insure bighorn viability.  Payette ROD at 10, 14, found at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5238683.pdf.

core home range is a far cry from the 10-15 mile separation required for a moderate risk rating as identified in the Wishbone risk assessment. WA04002, 04038. The natural attraction between the species means there is a high risk the species will seek each other out when they are in such close proximity. WA03763, 05566.

The Forest Service also asserted that these bighorns move to higher elevations away from the Wishbone pastures during the summer grazing season. WA04038, 05670. Yet the biggest Wishbone pastures—Crystal and Shallow—are located at higher elevations in close proximity to Bristol Head bighorn herd summer range, and contain substantial suitable summer habitat. WA03970-71. These two pastures account for more than 40% of the grazing season and are used in July and August. WA03563. Bighorns have been documented near Shallow Creek, which is the southern border of the Shallow pasture, and in July 2017 a collared ram from the Bristol Head herd moved within a half mile of that pasture. WA03494, 03729, 03779-81, 04148, 05566. These two pastures are clearly high risk to bighorn sheep.

Furthermore, CPW's preliminary findings from the telemetry data noted that bighorns were making transitory movements between high alpine and lower elevation areas in winter, spring, and summer, with some bighorns using higher elevation areas in winter. WA04247, 03785. These findings were from just a small sample of bighorns during a 1.5-year period, but even this small data set undermined the Forest Service's generalization about seasonal movements.

Likewise, the Forest Service claimed that the probability of a bighorn foraying onto the allotment during the grazing season is lower than what the Risk of Contact Model assumed because these bighorns typically foray in October, after the grazing

23

season.  WA04038, 05668-69.  Yet, the limited telemetry data showed bighorns making unpredictable and extensive movements in spring and summer, traveling 15 miles or more and moving between herds.  WA03757, 03779-83, 04246-47.  Given the attraction between domestic and bighorn sheep, a short movement of one mile or less from core home range to a pasture with domestic sheep is highly probable.

The Forest Service's reliance on habitat fragmentation and obstacles such as rivers, roads, and subdivisions to reduce the risk to moderate is also unsupported. WA04039, 05669.  Ample evidence in the record shows that Highway 149, subdivisions, and the Rio Grande River do not limit bighorn movement.  WA03726, 03750, 03756, 03781, 03985, 04017, 04137, 06063, 06079, 06187, 06245-48 (all documenting bighorns on or crossing Highway 149 or other roads); WA03781 (map showing bighorn passing through subdivision near Wishbone pastures); WA04247 (bighorns moving from S53 to S16, which required crossing Rio Grande River); *see also WWP I,* 2007 WL 1729734, at *2; *WWP III,* 2009 WL 3335365, at *4; *Vilsack,* 816 F.3d at 1108 (all noting that Snake and Salmon Rivers in Idaho were not barriers to bighorn sheep movement).

Habitat fragmentation does not preclude bighorn movement either.  While bighorns may not spend significant time within "non-habitat," such as forested areas, they routinely move through such areas when travelling between suitable habitats, as confirmed by the limited telemetry data.  WA04247 (noting that data showed bighorns using a high amount of forest habitat during transitory movements).  Furthermore, the Risk of Contact Model accounted for the quality of bighorn habitat in determining the likelihood of a bighorn foraying onto an allotment, and thus it was inappropriate for the Forest Service to then lower the risk rating for the allotment based on that very same

24

factor.  WA03942, 04058-59, 04061-62 (model designated habitat around bighorn core home ranges as suitable habitat, connectivity areas, or non-habitat and used that to assess probability of bighorn contacting allotment).

Finally, reliance on "project design features," or best management practices, to lower the risk rating was also irrational. WA04038-39, 05670-71.  These permittees have repeatedly failed to comply with terms and conditions of their authorizations on both the Snow Mesa and Wishbone allotments.  WA02798-99, 03536-38, 03983, 03595-97, 05567, 06208-09, 06030, 06032-35, 06316.  Incidents of noncompliance include unattended domestic sheep, grazing in unauthorized areas, and multiple instances of stray domestic sheep.  *Id.*  Even during the trial period for the Wishbone Allotment, when the permittees knew compliance was very important, violations occurred each year—including 56 stray sheep in 2017 that took six weeks to locate and remove.  WA02798-99, 03595-97, 05567.  The permittees even admitted the allotment is hard to manage because of the small pastures, lack of forage, and terrain, increasing the risk of "a few to large numbers of" domestic sheep straying.  WA05461. The Colorado Wool Growers Association echoed that warning, stating that "[n]ew grazing patterns, difficult terrain, and poor forage conditions greatly increase the management responsibilities of the permittee, and significantly contribute to problems such as increased strays, and difficulty in locating and herding strays."  WA05469.

In addition to the permittees' track record of repeated violations, including on the Wishbone pastures, bighorn sheep experts and courts alike have rejected use of best management practices as a method to maintain spatial separation between the species. *See WWP I,* 2007 WL 1729734, at *3; *WWP III,* 2009 WL 3335365, at *5, 7; *WWP IV,*

25

2017 WL 5571574, at *13-14 (all holding that agency could not rely on unproven best management practices when bighorn populations were in close proximity to allotments). The Forest Service's reliance on these same practices to lower the risk rating from high to moderate was unreasonable given the lack of evidence they would be successful.

In sum, the record does not support use of these assumptions to dismiss the result of the Risk of Contact Model and conclude the Wishbone Allotment was only moderate risk to bighorn sheep.  Notably, the Forest Service claimed the telemetry data supported its assertion that bighorn home ranges did not overlap the Wishbone Allotment, but it did not assess the data for any of the other factors it used to lower the risk rating.  WA04038-39.  To meet the criteria for "moderate" risk set forth in the Wishbone risk assessment, predicted bighorn contact with the allotment would have to change from every year to once in 8-10 years, and the disease interval would have to change from 4 years to 32-40 years.  WA04002, 04038.  The moderate risk criteria also showed distance from bighorn core home range to an allotment as more than ten miles, whereas the Wishbone Allotment was listed as only one mile away; and the telemetry data showed bighorns moving closer than that.  *Id.*; WA03779-81, 04247.  Given the drastic difference between the Risk of Contact Model results for the Wishbone Allotment and the criteria for "moderate" risk, the record does not show that the Forest Service's assumptions would bridge this gap.

Because the Forest Service relied on unsupported and irrational assumptions when assessing the effects of its proposed action, its NEPA analysis was arbitrary and capricious.  *Richardson,* 565 F.3d at 715 (holding that record did not support BLM's conclusion that impacts to aquifer from gas wells would be minimal); *WildEarth*

26

*Guardians,* 870 F.3d at 1235-37 (lack of data in record to support assumption about coal supply made assumption irrational, and EIS that relied on assumption arbitrary and capricious); *High Country Conservation Adv. v. U.S. Forest Serv.,* 52 F. Supp. 3d 1174, 1196-99 (D. Colo. 2014) (finding NEPA violations where agency's explanations and assumptions about emissions were unsupported by the record, and statement about recreation impacts was contradicted by facts in the record); *Rocky Mountain Wild v. Vilsack,* 843 F. Supp. 2d 1188, 1200 (D. Colo. 2012) (vague statements and lack of data did not support conclusions about impact of logging); *Oregon Natural Desert Ass'n,* 840 F.3d at 569-70 (reliance on inaccurate data and unsupported assumptions in EIS violated NEPA).  The Forest Service put form over substance by using these invalid assumptions to rationalize a pre-made decision.   *Forest Guardians,* 611 F.3d at 712.

### B.  The Forest Service Failed to Examine and Disclose Relevant Data.

Agencies that fail to use the "best available scientific information" or "examine the relevant data" when assessing environmental impacts in an EA or EIS have violated NEPA.  *Lee v. U.S. Air Force,* 354 F.3d 1229, 1244 (10th Cir. 2004); *Richardson,* 565 F.3d at 714-716.  Bighorn sheep conflicts were one of two key issues addressed by the Wishbone EA, but the Forest Service failed to examine and use key data related to that issue: telemetry data on the Central San Juan bighorn herds.  The Forest Service knew CPW began collecting this telemetry data in January 2016 and it received information on the data from state biologists.  WA03779-85, 04245-48, 06315.  This data is the best available science on movements and habitat use of animals within these herds because

27

it provides exact locations of individual bighorns with frequency and regularity.[9]

The CPW management plan for the Central San Juan bighorn population specifically noted that telemetry data would be *highly beneficial* to get a more robust understanding of bighorn habitat use and timing of use across the landscape because ground surveys only detect a small sample of animals in a few locations—particularly during summer when bighorn are scattered across summer ranges.  WA04167.  In fact, a few months before the Wishbone risk assessment was completed, the Forest Service postponed its EIS for neighboring allotments affecting the Weminuche bighorn population to wait for completion of the telemetry study on that population.  Dyson Decl. ¶ 24; https://www.fs.usda.gov/project/?project=37578a.

By contrast, the Forest Service proceeded with the Wishbone decision and, despite stating repeatedly that its analysis would be based on the best available science and most current information, failed to include maps or analysis of all existing telemetry data in the Wishbone risk assessment or EA.  WA02117, 02286, 02373, 02377, 02535, 02845, 02852, 02854, 05211-447.  The agency noted the data and claimed it was used to verify bighorn core home ranges, but it never discussed whether the data supported its assumptions about bighorn movements and habitat use within these herds. WA03964, 03967, 03978, 03989-91, 04009, 04031-33, 04038-39.

CPW sent the Forest Service several emails and a brief report discussing early findings from the telemetry data, which indicated these bighorns make less predictable and more extensive movements than what was previously known.  WA03779-85,

---

[9] Most of the telemetry collars were GPS collars that detected locations of the bighorn every 4 hours.  WA04245; Ratner Decl. ¶ 29.

04246-48.  Indeed, telemetry data on other bighorn populations have revealed more extensive movements than what was known previously.  *See WWP III,* 2009 WL 3335365, at *4-5 (bighorns moving over 25 miles and interacting with other herds); *WWP IV,* 2017 WL 5571574, at *8, 11 (10-12 mile bighorn forays near and onto allotment).  But rather than fully analyze existing data or wait for completion of the study, the Forest Service forged ahead and simply stated in the risk assessment that more data was needed and analysis of habitat use would occur in the future.  WA03989. Thus, the agency did not analyze or disclose to the public the most current and useful data that existed and whether that data undermined its assumptions about bighorn movements used to lower the risk of the allotment to moderate.

Given that early findings from telemetry data undercut many of the Forest Service's assumptions in the risk assessment, the failure to analyze all of the data constituted a failure to use the best available science and to examine relevant data, in violation of NEPA.  *Lee,* 354 F.3d at 1244 (agencies must use best available scientific information when assessing environmental impacts); *Richardson,* 565 F.3d at 714-716 (NEPA violation where agency did not examine relevant data before concluding that impacts would be minimal); *Wilderness Workshop v. U.S. Bureau of Land Mgt.,* 342 F. Supp. 3d 1145, 1156 (D. Colo. 2018) (NEPA violation where agency failed to use data to estimate indirect effects when it used data for other purposes in EIS); *High Country Conservation Adv.,* 52 F. Supp. 3d at 1190-93 (NEPA violation where agency ignored scientific tool that was available and would have helped assess effects).  This key omission defeated NEPA's goals of informed decision-making and informed public participation.  *WildEarth Guardians,* 870 F.3d at 1233.

### C. The Forest Service Failed to Consider All Effects of the Action.

The third problem with the Wishbone analysis was that it did not take a hard look at all effects of authorizing the allotment. It improperly dismissed potential effects to neighboring bighorn populations, as well as the risk from use of the allotment if the Central San Juan herds increase in size. WA05671-76. An agency must consider all direct, indirect, and cumulative impacts of a proposed action. 40 C.F.R. § 1508.25(c).

The Forest Service dismissed risks to the adjacent Weminuche, San Juan West, and Natural Arch bighorn meta-populations because those populations were too far away from the Wishbone Allotment to include them in the analysis. WA05639-40, 05672-75. This argument is unreasonable when the record shows these meta-populations use areas within 12 miles of the allotment, and bighorn forays are often longer than that. WA05639-40 (distances to allotment), 03863, 04246 (data showing Central San Juan and Weminuche bighorns moving 14-15 miles), 04062 (Risk of Contact Model analyzes forays up to 21 miles); *WWP III,* 2009 WL 3335365, at *4-5 (bighorns moving 25 miles); *WWP IV,* 2017 WL 5571574, at *8, 11 (10-12 mile forays).

Moreover, the Forest Service ignored the risk that a bighorn from adjacent meta-populations could interact with a diseased bighorn from a Central San Juan herd. The Wishbone risk assessment noted connections between these meta-populations, which recent telemetry data confirmed. WA03981, 03984, 03986, 03757, 03829-32. The meta-populations near the Wishbone Allotment total 1,150 animals—20% of the state's bighorn population. WA03832. A single contact between a domestic sheep from the Wishbone Allotment and a Central San Juan bighorn could spread disease to the other meta-populations and affect them for decades. WA04167, 04177; *see also* WA01816

30

**I-App-103**

(likely spread of disease from Bellows Creek herd to another herd 15 miles away).

Another effect the Forest Service dismissed without analysis was the increased risk from grazing the Wishbone Allotment if the Central San Juan bighorn herds increase in size and range.  WA05675-76.  Suitable habitat exists for such an expansion, and CPW acknowledged the increased risk of contact with domestic sheep as the bighorn population increases.  WA04139, 04140.  Rather than assess the likelihood of the bighorn population increasing and how that would affect the risk rating of the Wishbone Allotment, the Forest Service simply ignored the issue by stating that CPW would address that circumstance if it arose.  WA05675-76.  Using that excuse to disregard this effect violated NEPA.  *WildEarth Guardians v. U.S. Office of Surface Mining, Reclamation and Enforcement,* 104 F. Supp. 3d 1208, 1227-30 (D. Colo. 2015).

The Forest Service's failure to assess these other reasonably foreseeable risks rendered the EA and DN/FONSI arbitrary and capricious.  *Id*; *High Country Conservation Ass'n,* 52 F. Supp. 3d at 1196-98; *Citizens for a Healthy Community v. U.S. Bureau of Land Mgt.,* 377 F. Supp. 3d 1223, 1237 (D. Colo. 2019) (all finding NEPA violations where agency disregarded foreseeable effects).

**III.    The Forest Service must prepare a supplemental NEPA analysis to consider the telemetry data and other recent bighorn sightings.**

The Forest Service has also violated NEPA by failing to prepare a supplemental NEPA analysis that publicly discloses its consideration and analysis of the telemetry data and allows for public comment on that analysis.  Instead, the Forest Service tried to escape that duty by completing the SIR, which was never revealed to the public.  This tactic flouted the agency's responsibility under NEPA by using the report as a means to correct a deficiency in its prior EA and justify its decision while avoiding public

31

disclosure and public comments.

An agency must supplement its NEPA analysis if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(c)(1). An agency may prepare an SIR "for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." *Pennaco Energy, Inc. v. U.S. Dept. of Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004) (quoting *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000)). As *Pennaco* indicated, the purpose of an SIR is to analyze whether new information is significant, which would trigger the need for supplemental NEPA. *Id.*

*Idaho Sporting Congress* contains a thorough explanation of the limited role of SIRs. 222 F.3d at 566-68. The court stated that "once an agency determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute." *Id.* at 566. And more importantly, SIRs cannot serve to provide an analysis that was missing from the original EA or EIS. *Id.* "It is inconsistent with NEPA for an agency to use an SIR, rather than a supplemental EA or EIS, to correct this type of lapse. . . ." *Id.* If the Forest Service could correct deficiencies in an EA or EIS by means of an SIR or another non-NEPA procedure, it would render regulations and agency rules governing the supplementation of NEPA documents superfluous. *Id.* at 567 (citing 40 C.F.R. § 1502.9(c)(4), Forest Service Handbook 1909.15 Chs. 20, 40).

Many courts have followed *Idaho Sporting Congress* in explaining that an agency may not address a deficiency in an EA by using an SIR to analyze information that the agency knew or should have known at the time it prepared the original EA; rather, it can

use an SIR only to analyze the significance of "truly new" information that did not exist

at the time of the decision. *Rock Creek Alliance v. U.S. Forest Serv.*, 703 F. Supp. 2d

1152, 1180-81 (D. Mont. 2010) (overturning use of SIR that attempted to cure deficiency

in underlying EA); *Friends of the Clearwater v. McAllister*, 214 F. Supp. 2d 1083, 1087-

88 (D. Mont. 2002), *aff'd* 58 Fed. Appx. 686 (9th Cir. 2003) (same); *Olympic Forest*

*Coalition v. U.S. Forest Serv.,* 556 F. Supp. 2d 1198, 1206-08 (W.D. Wash. 2008)

(same). Using an SIR to justify a decision already made averts the decision-making

and public participation procedures that are the heart of NEPA. *Idaho Sporting*

*Congress*, 222 F.3d at 567-68; *Rock Creek Alliance,* 703 F. Supp. 2d at 1181.

The SIR here was used precisely to fix a deficiency in the EA and provide an

impermissible post-hoc justification for the agency's prior decision. The SIR

documented an analysis of bighorn sheep observation data collected between January

2010 and July 4, 2018, including telemetry data on the near-by bighorn herds collected

between January 22, 2016 and July 4, 2018. WA05882, WA05887. The Wishbone

decision was dated March 23, 2018. WA05682. Thus, the vast majority of the data

considered in the SIR pre-dated the Forest Service's Wishbone decision and was not

"truly new" information. The Forest Service was clearly aware of this data and should

have included a full analysis in the EA; it cannot use the SIR to cure this deficiency.

WA04245, 06315; *Idaho Sporting Congress,* 222 F.3d at 566-68. As explained well in

*Friends of the Clearwater v. McAllister*, using an SIR to fix a lapse in the EA "defeats the

purpose and intent of NEPA to allow the public opportunity to participate in the decision-

making process." 214 F. Supp. 2d at 1089.

Moreover, the purpose of an SIR is only to assess the significance of the new

33

information to determine if it warrants supplemental NEPA analysis.  *See Pennaco,* 377 F.3d at 1151; *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218-19 (10th Cir. 1997); *Idaho Sporting Congress,* 222 F.3d at 566.  "[O]nce an agency determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute."  *Olympic Forest Coalition,* 556 F. Supp. 2d at 1206 (citing *Idaho Sporting Congress*, 222 F.3d at 566; *Price Rd. Neighbor. Ass'n v. United States Dept. of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997)).

The SIR here also runs afoul of this limitation.  The Forest Service did not use the SIR simply to determine if the purportedly "new information" was significant.  Indeed, it would be unreasonable to conclude that the telemetry data was insignificant when CPW identified its importance and stated that it showed unexpected and greater movements by these bighorns; and the data is used to determine bighorn core home ranges and the risk of contact for an allotment.  WA04167, 03779-85, 04246-47, 05887. The Forest Service even paused the neighboring Weminuche EIS to complete the telemetry study on those bighorn herds.  *See supra* p. 28.  Additionally, a sighting of two bighorn sheep occurred on the Wishbone South River pasture in July 2019, during the grazing season, which contradicted the agency's prior statement that "[t]here are no known instances of bighorn documented in this pasture."  WA03997, 05895.

Yet, the Forest Service did not stop at the threshold question of whether the new information was significant.  It used the information to re-determine the bighorn core home ranges and re-run the Risk of Contact Model, finding that the core home range of the Bristol Head herd was now directly adjacent to the Crystal and Shallow pastures and the allotment risk of contact was *27% higher* than reported in the EA.  WA05900,

05889.  Even after that, the Forest Service did not conclude that the "new information" was significant.  It went ahead and used the SIR to conduct a new risk assessment to undercut the new modeling results and remarkably conclude that the allotment was still just moderate risk.  WA05888-97.  Notably, the SIR only considered data through July 4, 2018 and therefore still ignored an entire additional year of telemetry data—data that was "truly new" information.  WA05887, 05897 (decision signed July 2019).  And all of this analysis occurred without any public participation.  Thus, rather than just determining if the telemetry data and South River pasture bighorn sighting were significant information—which they undoubtedly were—the Forest Service used the SIR to supplant a supplemental NEPA analysis and thus subverted NEPA's procedures for proper decision-making and public participation.

Despite the Forest Service's attempt to avoid public participation, Petitioners and two national bighorn sheep experts submitted comments on the SIR to the Forest Service anyway, pointing out numerous flaws with the SIR analysis and determination—including many flaws related to the agency's reasons for lowering the risk rating for the allotment.   ECF Nos. 28-1, 28-2, 29-1, 29-2.  These are precisely the type of comments the Forest Service should have considered as part of the NEPA process.  However, the agency still refuses to undertake a proper supplemental NEPA analysis that analyzes *all* of the telemetry data and other new bighorn sightings, in violation of NEPA.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request the Court grant their petition for review, set aside the Wishbone EA and DN/FONSI, and order the Forest Service to complete an EIS before authorizing use of the Wishbone Allotment.

35

Dated:  May 20, 2020                          Respectfully submitted,


                                             /s/ Lauren M. Rule
                                             Lauren M. Rule
                                             Advocates for the West
                                             3701 SE Milwaukie Ave, Suite B
                                             Portland, OR 97202
                                             (503) 914-6388
                                             lrule@advocateswest.org

                                             /s/ Maya L. Kane
                                             Maya L. Kane
                                             Southwest Water and Property Law LLC
                                             10 Town Plaza, #422
                                             Durango, CO 81301
                                             (970) 946-5419
                                             mkane@swpropertylaw.com

                                             Attorneys for Petitioners

Lauren M. Rule
Advocates for the West
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

Maya L. Kane
Southwest Water and Property Law LLC
10 Town Plaza, #422
Durango, CO 81301
(970) 946-5419
mkane@swpropertylaw.com

Attorneys for Petitioners

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00208-REB

WILDEARTH GUARDIANS and
WESTERN WATERSHEDS PROJECT,

      Petitioners,

v.

U.S. FOREST SERVICE, a federal agency of the U.S. Department of Agriculture,

      Respondent,

and

WAYNE BROWN,
JERRY BROWN,
THE COLORADO WOOL GROWERS ASSOCIATION,
J. PAUL BROWN, and
THE COLORADO FARM BUREAU FEDERATION,

      Respondent-Intervenors.

---

## DECLARATION OF GREGORY J. DYSON

---

I, Gregory J. Dyson, declare as follows:

1. The following facts are personally known to me, and if called as a witness I would and could truthfully testify to these facts.

2. I live in Albuquerque, New Mexico.

3. I am a member of WildEarth Guardians because I support the organization's mission to protect and restore the wildlife, wild places, wild rivers, and the health of the American West.  In particular, I support WildEarth Guardians because it takes action like this lawsuit to protect bighorn sheep populations from extirpation.  I have been a member since 2004.

4. I was formerly the Wild Places Program Director at WildEarth Guardians, where one of my projects was bighorn advocacy across the West.  Upon stepping back from that role, I was hired as a contractor for the organization to continue my work advocating for bighorn sheep.  I have been employed or on contract with WildEarth Guardians since 2014.

5. I have been doing environmental advocacy work since 1994 and bighorn sheep advocacy work in particular since 2005.

6. My contract work for WildEarth Guardians includes engaging on National Environmental Policy Act processes for projects that impact bighorn sheep in Colorado, Utah, Washington, Oregon, Montana, Nevada, California, and New Mexico.  It also includes engaging with federal and state agencies, especially the United States Forest Service, on any other projects and actions where there is the potential for serious conflict between bighorn and domestic sheep.  Since 2016, I

have been a member of Colorado's bighorn-domestic sheep working group, which is organized by Colorado Parks and Wildlife ("CPW").

7.  On behalf of WildEarth Guardians, I submitted comments on the draft environmental assessment (EA) for the Snow Mesa domestic sheep grazing allotments in 2015 and on the Wishbone allotment proposed action in 2017.  I also objected to the final EA for the Wishbone allotment in 2017.

8.  Prior to being hired by WildEarth Guardians, I lived in Crested Butte, Colorado where I was Executive Director at the organization High Country Conservation Advocates.  In this capacity, I submitted scoping comments on the proposed action for the Snow Mesa domestic sheep grazing allotments back in 2014.

9.  I was also previously Executive Director at Hells-Canyon Preservation Council and was that group's point person on the Hells Canyon–Payette litigation regarding domestic sheep grazing conflicts with bighorn sheep on the Payette National Forest in Idaho, which led to the current best available science for quantifying bighorn/domestic sheep conflicts: the Risk of Contact Model.

**Interest in Bighorn Sheep**

10.  Bighorn sheep are an iconic species of the West; they are the epitome of charismatic megafauna.  Getting to see bighorn sheep in the wild moves my soul and motivates me professionally.

11.  My knowledge of the history of bighorn sheep is one of my primary motivations for doing bighorn advocacy work.  Historically, there were some 2 million bighorn sheep across the West, but now bighorn populations are a mere fraction of that.  I am

deeply motivated by a desire to see bighorn population numbers return to something akin to their historical numbers.

12. I frequently recreate in Southwest Colorado and spend time hiking specifically to look for bighorn sheep.  In 2017, I hiked across Snow Mesa to look for bighorn sheep.  This past August, I went to Southwest Colorado for my annual hiking and camping trip in the Weminuche Wilderness, with the specific goal of looking for bighorns in this rugged wilderness area. The Weminuche meta-population of bighorns (also known as RBS-20) would be placed at risk if the adjacent Central San Juan bighorn meta-population (RBS-22) were to become infected with disease transmitted by domestic sheep.

13. I have spent extensive time in areas with bighorn sheep, including the Hells Canyon area of Oregon/Idaho and all around the Colorado Rocky Mountains.  Whenever I am out in these areas, my appreciation for bighorn sheep deepens.  Bighorn sheep habitat is rugged and not easy to navigate.  I am amazed by the fact that bighorn sheep can effortlessly move about harsh mountain conditions and swim across water as big as the Snake River.

14. Southwest Colorado provides some of the best bighorn sheep habitat in the West, which is one of the reasons I am so drawn to the area.  The Rio Grande and San Juan National Forests are easy to access from Albuquerque and are some of my most frequented recreation destinations.  I go to these forests often to hike, camp, and look for bighorn sheep.  I am interested in the Central San Juan and Weminuche bighorn meta-populations near the Wishbone allotment in particular, because I wish to observe bighorn sheep when I recreate in that area of Colorado.  I

plan to continue traveling to this area on a regular basis in the future to pursue these recreational activities and am planning another backpacking trip there for August 2020.

15. Furthermore, the health of these two bighorn meta-populations is important to the health of bighorn sheep in Southwest Colorado as a whole. The interconnectedness of bighorn populations is one of the incredible features of the species. There are forays between the Southwest Colorado bighorn herds, and if one herd is impacted by disease, there is a good possibility that the disease will spread to other herds. I care a great deal about and am invested in the continued viability of bighorn sheep in Colorado.

**Harm from the Forest Service's Authorization of Domestic Sheep Grazing on the Wishbone Allotment**

16. Because Southwest Colorado is one of the areas I frequently visit, including National Forest lands surrounding the Wishbone allotment, I am harmed by any action that harms the Central San Juan and Weminuche bighorn populations. My knowledge and experience inform my belief that grazing of domestic sheep in the Wishbone allotment will cause inevitable conflicts and spread of disease within these bighorn herds, especially the Central San Juan meta-population. Because domestic sheep carry pathogens that can easily be transmitted to bighorn sheep, any contact between domestic and bighorn sheep would likely lead to disease in the bighorn herd. Disease in one bighorn herd could also be transferred to other herds, leading to bighorn sheep die-offs within one or more herds. Disease within bighorn sheep herds also results in low lamb survival for years following the disease event, keeping

DECLARATION OF GREGORY J. DYSON                                                                          4

populations at low levels for years.  Reduced bighorn sheep population numbers in
this area would lower my chances of getting to see bighorns next time I visit and
reduce my enjoyment of hiking in areas that I know should have bighorn sheep.

17. The presence of domestic sheep on public lands is also harmful to me in its own
right.  I have been attacked by sheep dogs while out mountain biking and am
worried about being attacked and getting seriously harmed by them in the future.

18. Being in areas where domestic sheep have grazed also takes away the enjoyment I
seek from spending time in wild places.  I have been out backpacking and have
come across recently grazed areas where there was sheep excrement everywhere
and the grass was trammeled down to nothing.  Most recently I witnessed these
conditions in the Weminuche Wilderness this past August.  This type of destruction
hinders my enjoyment of wild areas.  I am less likely to visit an area where domestic
sheep grazing has occurred or is occurring, and on my August trip in the Weminuche
I was stopped and asked by other backpackers if I had seen domestic sheep in the
area because they wished to avoid areas impacted by domestic sheep.

19. Based on its proximity to the Central San Juan bighorn herds, the Wishbone
allotment presents a high risk of disease transmission to these bighorns, as the
Forest Service itself initially determined.  However, it then downplayed that risk in
order to authorize domestic sheep grazing on the allotment based on blanket
assumptions and a sloppy and conclusory analysis.

20. This is unacceptable in its own right but is even more so because the Forest
Service was aware of relevant data, but chose not to use it.  This disregard of
relevant information shocks me.  Telemetry data on the Central San Juan bighorn

DECLARATION OF GREGORY J. DYSON                                                    5

herds collected by Colorado Parks and Wildlife since 2016 is the best, most pertinent science the Forest Service could have relied on, yet it failed to do so for the EA and final decision.  I and WildEarth Guardians are injured by the agency's failure to incorporate this data in its analysis and use it to assess the risks to bighorn sheep posed by the Wishbone allotment, and disclose that information to the public.

21.  After the Forest Service completed its NEPA process and decided to proceed with domestic sheep grazing in the Wishbone allotment, I was able to review two similar sources of telemetry data for the Wishbone allotment: the mapping prepared by Western Watersheds Project after they obtained CPW's telemetry data, and the Supplemental Information Report (SIR) prepared by the Forest Service dated July 25, 2019 which purports to summarize the same CPW telemetry data.

22.  The Forest Service's conclusions in its risk assessment were based in part on its assumption that bighorn sheep would migrate to higher elevations during the domestic sheep grazing season and thus there would not be temporal overlap between the two species.  But in fact, the telemetry data is evidence to the contrary, showing that there were bighorn sheep in the lower elevation areas during the summer months where domestic sheep grazing would occur, and that some higher elevation areas bighorns used were very close to the Crystal and Shallow pastures.

23.  The Forest Service also concluded that bighorn foray rates would be less than the risk of contact model indicated because most forays occurred in October.  Again, this is an assumption that is not backed by evidence.  The telemetry data shows that there were lengthy movements by bighorn sheep during all seasons.  This is another

Appellate Case: 24-1187   Document: 27-1   Date Filed: 08/22/2024   Page: 117

example of how the Forest Service's conclusory analysis is undermined by the best science—which the agency failed to use for the EA and decision.

24. It is particularly disturbing that the Forest Service failed to analyze the telemetry data before issuing its EA and final decision for the Wishbone allotment when, in contrast, it put on hold its NEPA analysis for allotments near the Weminuche bighorn meta-population specifically so it could incorporate telemetry data from those bighorns into its analysis.  In July 2017, the Forest Service announced that it was delaying its EIS and decision for those allotments for at least two years so CPW could finish collecting the data and sampling for disease.  The difference in approaches is stunning and makes the Forest Service's lack of a thorough anaylsis on the Wishbone allotment all the more obvious.

25. The Forest Service's failure to incorporate the best available science into its analysis before authorizing grazing on the Wishbone allotment harms me because it allows for a significant risk of disease transmission to the Central San Juan bighorn herds and other adjacent herds, and will continue to harm me until the agency corrects its flawed analysis and recognizes the high risk this allotment poses to these bighorn sheep.

26.  On July 3, 2019 I was contacted about a bighorn sighting on the South River pasture of the Wishbone allotment, an area the Forest Service claimed bighorns did not use.  A private citizen photographed two animals on the pasture, which biologists identified as bighorn sheep.  This recent sighting is another example that undercuts the Forest Service's conclusion about the risk of this allotment to bighorn sheep, and

it highlights the fact that the agency's analysis is based on false assumptions not backed by data.

27. The SIR that the Forest Service prepared for the Wishbone allotment, dated July 25, 2019, bolsters the conclusion that authorizing domestic sheep grazing in the Wishbone allotment will put bighorn sheep at significant risk.  The Forest Service did not disclose the SIR to the public to seek public comment on their new analysis.  I only learned of it due to this lawsuit.  Despite their failure to seek public input, I provided the following comments to the Forest Service on October 2, 2019: the Forest Service used only a portion of the available telemetry data in the SIR; they failed to follow the best available science, creating a new analysis approach out of thin air; the statistical analysis was sloppy, at best; and, most importantly, even by their own haphazard analysis, the already-high risk rating jumped another 27% higher.  I requested that the agency complete a supplemental EIS that analyzes all of the telemetry data and additional information provided in the comments to fully comply with NEPA.

28. I also submitted expert comments on the SIR to the Forest Service.  These expert comments by Melanie Woolever and Tom Rinkes, both well established bighorn experts, further detail the myriad ways in which the SIR failed to meet the Forest Service's basic standards for scientific review.  The expert comments also document in detail how the Forest Service has failed to account for the very high risk to bighorns caused by domestic sheep grazing in the Wishbone allotment.  Despite these credible comments showing significant flaws with the SIR analysis, the Forest Service has refused to conduct a proper supplemental NEPA analysis.

29. My and WildEarth Guardians' harms would be remedied by vacating the Forest

Service's unlawful decision establishing the Wishbone allotment for domestic sheep

grazing.  Before authorizing any further grazing there, the Forest Service must re-do

its analysis to consider the best science available——including the full CPW telemetry

data and the recent bighorn sheep sighting on the South River pasture, along with

any other new information that has come to light since it completed its analysis.

And, it must seek public input on this updated analysis.  The Forest Service must

reassess whether domestic sheep grazing is appropriate on the Wishbone allotment

in light of the high risk it poses to the Central San Juan bighorn herds.  Only by

completing a proper NEPA analysis that fulfills these requirements and correctly

assesses the risk to bighorn sheep from the Wishbone allotment prior to further use

of that allotment will my and WildEarth Guardians' harms be redressed.


I declare under penalty of perjury that the foregoing is true and correct.


Executed this 18th day of May, 2019, in Albuquerque, New Mexico


_____

Gregory J. Dyson


Respectfully submitted,


DECLARATION OF GREGORY J. DYSON                                             9

I-App-119

/s/ Lauren M. Rule
Lauren M. Rule
Advocates for the West
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org


/s/ Maya L. Kane
Maya L. Kane
Southwest Water and Property Law LLC
10 Town Plaza, #422
Durango, CO 81301
(970) 946-5419
mkane@swpropertylaw.com


Attorneys for Petitioners

Lauren M. Rule
Advocates for the West
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

Maya L. Kane
Southwest Water and Property Law LLC
10 Town Plaza, #422
Durango, CO 81301
(970) 946-5419
mkane@swpropertylaw.com

Attorneys for Petitioners

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00208-REB

WILDEARTH GUARDIANS and
WESTERN WATERSHEDS PROJECT,

      Petitioners,

v.

U.S. FOREST SERVICE, a federal agency of the U.S. Department of Agriculture,

      Respondent,

and

WAYNE BROWN,
JERRY BROWN,
THE COLORADO WOOL GROWERS ASSOCIATION,
J. PAUL BROWN, and
THE COLORADO FARM BUREAU FEDERATION,

      Respondent-Intervenors.

---

### DECLARATION OF JONATHAN RATNER

---

I, Jonathan Ratner, declare as follows:

1.  The following facts are personally known to me, and if called as a witness I would and could truthfully testify to these facts.

2.  I am a member of Western Watersheds Project (WWP), and have been a member since 2002.

3.  I presently live in Pinedale, Wyoming, where I have lived since 2003.  My family has worked and lived in Wyoming for generations.

4.  I am WWP's Director for Colorado, Wyoming, and Utah.

5.  As both staff and a member of WWP, I rely on the organization to represent my personal and professional interests in maintaining, protecting, and restoring the public lands and resources across the West, including in Colorado, Wyoming, and Utah.  I joined WWP and continue to support it because WWP is incredibly effective at protecting western ecosystems and the species that depend upon them.  In my opinion, the harms caused by public lands livestock grazing to soils, native habitats, streams, and fish and wildlife populations would never be addressed in any meaningful fashion were it not for WWP.

6.  Prior to my employment with WWP, I was a professional biologist with four years of experience providing contract services for the BLM, USDA Forest Service, Wyoming Department of Game and Fish, the University of Wyoming, and the Interagency Grizzly Bear Study Team.  My research focused on large forest carnivores, including grizzly bear, wolverine, lynx, and marten.

7.  In my capacity as WWP's Director for Colorado, Wyoming, and Utah, I oversee and implement all of WWP's conservation programs in these three states.  My

DECLARATION OF JONATHAN RATNER                                         1

**I-App-122**

responsibilities include monitoring livestock grazing impacts on Forest Service, National Park Service, and BLM lands, and conducting research on the impacts of land management decisions on wildlife and ecosystem function throughout the states I cover.  This encompasses a variety of tasks, including monitoring the implementation of and agency compliance with Allotment Management Plans, monitoring annual use limits imposed by grazing permit terms and conditions (stubble height, utilization rates for uplands and riparian areas, willow utilization rates, stream-bank alteration, etc.), and conducting aerial surveys and photography to document watershed degradation in the form of erosion, gullying, headcutting, hummocking, excessive bare ground, and vegetation alteration patterns.

8. I collect a large quantity of data each field season by conducting surveys, including sage grouse habitat surveys, range condition surveys, forage production surveys, riparian condition monitoring and assessments, and fisheries habitat surveys.  I also frequently make site visits to specific project areas to assess on-the-ground conditions when agencies are proposing new decisions.

9. In order to perform my duties, I keep up to date with current science in the areas of range management, species conservation, water quality, fisheries biology, soils and erosion processes, hydrology, botany, and other fields.  This includes research on the impacts of land management decisions, such as oil and gas development, habitat fragmentation, road construction, logging, and livestock grazing.

10. I also attend training courses regularly in order to keep up to date with changes in survey protocols as well as to ensure I am refreshed in the procedures.  I regularly

attend training courses conducted by the BLM and Forest Service in the standard monitoring protocols used by the agencies.

11. In addition, I have found the use of Geographical Information System ("GIS") analysis invaluable in carrying out my duties. GIS analyses provide important information and patterns which would not be readily available through other means. Since 2003, I have taken numerous courses sponsored by ESRI to expand my knowledge of GIS, including an 8-hour training course entitled "Creating and Analyzing Surfaces using ArcGIS Spatial Analyst" in June 2009. I use GIS as part of my work on an almost daily basis. I estimate that I have used GIS analysis to create several hundred maps.

12. Due to the vast area I cover each field season, I spend a substantial portion of my time in the field. I spend approximately 100 nights each year camped out on the public lands. I conduct a large amount of fieldwork and spend an enormous amount of time on public lands in Colorado, Wyoming, and Utah each year.

**Experience Specific to Bighorn Sheep and the Wishbone Allotment**

13. I have done work related to bighorn sheep since the beginning of my career with WWP. I am a member of the Wyoming bighorn sheep–domestic sheep working group and have attended numerous meetings of that group. The Wyoming bighorn sheep-domestic sheep working group meets regularly to discuss bighorn sheep conflict issues and make recommendations to the federal and state agencies. And since 2003, I have taken part in the National Environmental Policy Act (NEPA) processes for virtually all domestic sheep grazing decisions taking place in Wyoming.

DECLARATION OF JONATHAN RATNER                                              3

**I-App-124**

14. In Southwest Colorado, near the Wishbone allotment, I have taken part in nearly all domestic sheep grazing NEPA processes that have occurred since around 2008. I have commented extensively on projects in the San Juan and Rio Grande National Forests, such as the Weminuche, North San Juan, Fisher/Ivy, Shallow, Snow Mesa, Silverton and Milk Creek domestic sheep permitting decision processes. In general, I am very familiar with the Wishbone allotment area because of working all around that region for at least the last ten years.

15. Through my work, as well as for personal enjoyment and recreation, I have spent time in many places in Southwest Colorado near the Wishbone allotment. My most recent visit to the Wishbone allotment was on April 18, 2018. During that visit I went through the Snow Mesa group of allotments that have been vacated as well as through the new Wishbone allotment. I plan to visit the Wishbone allotment area again in the fall of 2020.

16. My general observations of the Wishbone allotment are that the pastures are small, discontinuous strips that are generally not suitable for livestock grazing. Because the pastures are very small, they likely can only support the number of permitted domestic sheep for a few days. And some pastures, like the Coller State Wildlife Area, are already severely degraded and have nearly no forage potential. Additionally, the furthest pastures are nearly 12 miles apart. Given these characteristics, there is a high likelihood that domestic sheep would be left within a pasture or would stray while trailing.

17. It is also clear from my recent visit in April 2018 that there is not adequate separation between bighorn populations and the domestic sheep grazing pastures.

While driving into the valley near the western most pastures, I observed a highway sign noting the presence of bighorn sheep only about 2–3 miles from the South River pasture in the Wishbone allotment.  Up until about five years ago, the area between the road and the closest part of the pasture at this location was densely forested, but in the past five years the hillside between the two areas has burned. What was once dense forest that provided at least somewhat of a barrier for bighorn sheep, there is now nothing preventing bighorn herds from easily traveling to the pasture.  Additionally, between the East Bench and Coller pastures I saw a number of bighorn sheep on the road, in the area that domestic sheep would be trailed through.

18.  While the Forest Service claims that the Rio Grande River is a barrier to bighorn sheep movement, when I viewed the river at peak spring runoff it was less than 2 feet deep in many places and I could easily cross it without getting water over my knees.  I attach a photo, Figure 1, that I took at that time just a short distance upstream of the Wishbone allotment.  Additionally, documents I received from my Freedom of Information Act (FOIA) and Colorado Open Records Act (CORA) requests, show bighorn sheep crossing the river.  These observations lead me to conclude that bighorn and domestic sheep interactions in the Wishbone allotment are inevitable.



*Figure 1. Rio Grande River on April 18, 2018, upstream of the Wishbone allotment.*

**Personal and Professional Interests in Bighorn Sheep**

19. My interest in healthy bighorn sheep populations is both personal and professional. The presence of bighorn sheep signifies a well-functioning ecosystem, because healthy bighorn sheep populations can only occur in areas that are relatively unaltered by human activity.  I seek out such areas for opportunities to observe bighorn sheep within natural systems functioning organically.  Being on wild, unaltered lands and seeing bighorn sheep or knowing they exist there is deeply restorative because of the recreational, aesthetic, and spiritual benefits I have received, currently receive, and hope to receive in the future from them.

20. I am interested in the bighorn populations in Southwest Colorado near the Wishbone allotment in particular because of my frequent visits to that area and my desire to observe bighorn sheep when I am there.  It is important to me to know that

DECLARATION OF JONATHAN RATNER                                                          6

**I-App-127**

the Central San Juan meta-population (RBS-22) and Weminuche meta-population (RBS-20) maintain healthy and viable herd numbers such that I will continue to have the opportunity to observe members of those herds when I am in Southwest Colorado in the future. Moreover, the presence of the Central San Juan and Weminuche populations is an important indicator of the overall health of the Rio Grande National Forest and is a driving factor in whether I will continue to spend time in the forest in the future.

**Harms from Livestock Grazing and the Forest Service's Faulty NEPA Analysis**

21. Actions that harm the Central San Juan and Weminuche bighorn populations and reduce their numbers impair my interest in those bighorn sheep and the enjoyment I experience when visiting that part of Colorado. I am well aware of the conflicts between domestic and bighorn sheep and the significant harm domestics can inflict on bighorn populations by transmitting disease. I am well aware that the presence of domestic sheep renders otherwise suitable habitat toxic for bighorn populations due to disease transfer. I understand that a single contact between a domestic sheep and bighorn sheep can lead to die-offs within bighorn populations and many years of low lamb survival following a disease event. It causes me great distress when I learn of or observe declines in bighorn sheep populations due to conflicts with domestic sheep.

22. As I described above, the Wishbone allotment is unsuitable for domestic sheep grazing because the location and configuration of the pastures presents a high risk of contact with bighorn sheep populations.

DECLARATION OF JONATHAN RATNER                                    7

**I-App-128**

23. The Central San Juan bighorn meta-population in particular is at great risk of coming into contact with domestic sheep. The herds in this meta-population are already small with poor lamb recruitment, and they reside in close proximity to the Wishbone allotment pastures. It is very likely that individuals from these bighorn herds will come into contact with domestic sheep if grazing is permitted on the Wishbone allotment. Reduction in number or extirpation of these herds would substantially harm me through loss of enjoyment of the area.

24. The Forest Service downplayed the risks of disease transfer when it decided to establish the new Wishbone allotment for domestic sheep grazing. The agency's reliance on flawed assumptions in its analysis to authorize this allotment harms me because it created a situation that is a high risk for disease transmission to bighorn sheep in the Central San Juan population.

25. Moreover, I and WWP are further injured because, before issuing the EA and decision for the Wishbone allotment, the Forest Service failed to consider recent telemetry data collected by CPW that revealed information about the locations and movements of bighorn sheep within the Central San Juan herds. Telemetry data collected since 2016 constitutes the best available science about movements of these bighorns and their use of habitat. In October of 2018, WWP requested and obtained from CPW the telemetry data collected from 2016 through July 4, 2018 and other observational data. The data revealed that many of the Forest Service's assertions and assumptions about locations and movement of the bighorns within these herds are unsubstantiated.

DECLARATION OF JONATHAN RATNER                                              8

**I-App-129**

26. WWP sent the 2016–2018 telemetry data it obtained from CPW to a GIS specialist with Conservation Geography to create a map. Conservation Geography created a GIS map incorporating the telemetry data and other bighorn sheep observations. This GIS map is included as Figure 2 below.

27. The data provided to WWP by CPW showed a total of 130,111 bighorn sheep observation and telemetry points that occurred within 35 km of the Wishbone allotment. Of those, 129,500 points were from telemetry data, with multiple points per collared animal. There are 49 collared animals represented by the data. The other 611 data points are bighorn observations made during aerial and ground surveys (brown dots on Figure 2 map). The three brown observation locations closest to the South River pasture of the Wishbone allotment represent 17 bighorn sheep from the S15 herd, part of the Weminuche meta-population. The risk to this herd was not analyzed in the Wishbone risk assessment.



*Figure 2.  Bighorn sheep locations near Wishbone Allotment based on 2016-2018 telemetry data and other observations provided by Colorado Parks and Wildlife. Map prepared by Conservation Geography.*

28.  My and WWP's review of the telemetry and observational data revealed that the data should have been used to analyze bighorn sheep locations and movements to verify whether the Forest Service's assumptions were valid, and that information should have been disclosed to the public for review and comment before the agency made its final decision.  My review indicates many of the Forest Service's assumptions were not valid.

29.  The bighorn sheep collars are primarily GPS collars, which collect data points every four hours (the other collars are VHF, which collect data points whenever someone is out in the field). The movements of the collared bighorns can be determined based on where the animals were located during the point collection intervals.  The

DECLARATION OF JONATHAN RATNER                                        10

**I-App-131**

data can also be used to assess the dates of movement and the type of habitat that the bighorns used and travelled through. Thus, the data can be used to assess where and how far the animals moved, and what elevations and types of habitat the bighorns were using and crossing through at different times of year. This data represents only a fraction of the total bighorns in the Central San Juan meta-population, and thus underestimates the full extent and range of movements within these herds.

30. Despite knowing about this data, the Forest Service did not use it in its risk assessment and EA to verify its assumptions about bighorn movements and habitat use. Review of this data would have shown that many of the agency's assumptions were contradicted by the data.

31. In addition to the telemetry and observational data, I and WWP were contacted in early July 2019 about a recent bighorn sighting on the South River pasture of the Wishbone allotment by a public citizen. Following this news, WWP submitted a FOIA request to obtain the Forest Service's report on the sighting and received documents in response to the request on July 31, 2019.

32. Within the FOIA documents was documentation of two bighorn sheep within the South River pasture of the Wishbone allotment on July 3, 2019. The citizen had identified the animals as mountain goats but Forest Service and CPW biologists confirmed they were bighorn sheep and were on the South River pasture based on the photos. The Annual Operating Instructions for the Wishbone allotment authorized domestic sheep use in this pasture from June 29 to July 12, 2019.

33. This recent sighting occurred on a pasture where, according to the Forest Service's flawed assumptions, bighorn sheep did not exist or move through. Thus, this sighting seriously undermines the Forest Service's assumptions about areas the bighorns do or do not use. And this sighting is just one example of an issue that will likely occur in all of the pastures in the Wishbone allotment—this sighting simply occurred when there happened to be a member of the public present to observe and report it.

34. WWP also discovered through this litigation that the Forest Service did finally obtain telemetry data from CPW and completed a Supplemental Information Report ("SIR") in July 2019 that considered January 2016 to July 4, 2018 data. Although this data showed an even higher risk to bighorn sheep from the Wishbone allotment, and that the core home range of one bighorn herd was directly adjacent to the largest Wishbone pastures, the Forest Service claimed the data did not alter its assumptions used to downplay the risk. The Forest Service did not disclose the SIR to the public or ask for public comment.

35. Once WWP learned of the SIR, it sent the Forest Service comments anyway on October 2, 2019, describing in detail the significant scientific flaws with the SIR and its analysis. WWP's comments noted that the SIR failed to consider data collected since July 4, 2018, that the agency's modeling did not follow established methodology, and that the data did not support the agency's assumptions and conclusions concerning the risk of the allotment. Despite these detailed scientifically-based comments showing significant flaws with the SIR analysis, the Forest Service has refused to conduct a proper supplemental NEPA analysis.

36.  Until the Forest Service completes a new analysis that complies with all of NEPA's requirements, including public disclosure and participation, any use of the allotment by domestic sheep will continue to cause me harm because it is the product of a decision by the Forest Service that was not based on accurate information and analysis, which led to a faulty conclusion about the risk posed to bighorns by the allotment.

37.  My and WWP's harms would be remedied by vacating the unlawful decision creating and authorizing use of the Wishbone allotment for domestic sheep grazing. Before authorizing any further grazing there, the Forest Service must re-do its risk assessment and NEPA analysis to fully and fairly consider the best science— including all of the telemetry data and the recent sighting of bighorns on the South River pasture, as well as information in public and expert comments—to reassess whether the Wishbone allotment is suitable for domestic sheep grazing in light of its high risk to bighorn sheep. And it must allow for public participation in that process. Only by completing a proper NEPA analysis that fulfills these requirements and correctly assesses the risk to bighorn sheep from the Wishbone allotment prior to further use of that allotment will my and WWP's harms be redressed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of May, 2020, in Pinedale, Wyoming.

DECLARATION OF JONATHAN RATNER                                              13

I-App-134

_____

Jonathan B. Ratner


Respectfully submitted,


/s/ Lauren M. Rule
Lauren M. Rule
Advocates for the West
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

/s/ Maya L. Kane
Maya L. Kane
Southwest Water and Property Law LLC
10 Town Plaza, #422
Durango, CO 81301
(970) 946-5419
mkane@swpropertylaw.com

Attorneys for Petitioners

DECLARATION OF JONATHAN RATNER                                    14

PRERAK SHAH
Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

KRYSTAL-ROSE PEREZ
Trial Attorney
Natural Resources Division
P.O. Box 7611
Washington, DC 20044
Tel: (202) 305-0486
krystal-rose.perez@usdoj.gov

*Attorney for Federal Respondent*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-208-REB

WILDEARTH GUARDIANS, et al.

       Petitioners,

   v.

UNITED STATES FOREST SERVICE, a federal agency of the United States
Department of Agriculture,

       Federal Respondent,

and

WAYNE BROWN, et al.,

       Respondent-Intervenors.

---

## FEDERAL RESPONDENT'S OPPOSITION TO PETITIONERS' PETITION FOR REVIEW OF AGENCY ACTION

---

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 2

   I.   Bighorn Sheep Herds ........................................................................... 4

     A.   The Central San Juan population........................................................ 5

     B.   The Weminuche Population ................................................................ 6

     C.   The San Juan West Population........................................................... 6

   II.   The Assessment of Risk between Bighorn and Domestic Sheep ......................... 6

   III.   The Forest Service's Coordination with the Colorado Parks and Wildlife ............ 8

   IV.   The Forest Service's Supplemental Information Report ....................................... 9

LEGAL BACKGROUND ...................................................................................... 11

STANDARD OF REVIEW .................................................................................... 12

ARGUMENT......................................................................................................... 13

   I.   The Forest Service's analysis of the grazing allotments was neither arbitrary nor capricious.................................................................................................... 14

     A.   The Forest Service properly considered local factors in its analysis. ............... 14

     B.   The Forest Service used the best available scientific information in its analysis of the Wishbone allotment. ....................................................................... 23

     C.   The Forest Service considered all relevant effects on the relevant bighorn sheep herds........................................................................................... 26

   II.   The Forest Service reasonably determined that an Environmental Impact Statement is not necessary.......................................................................... 28

     A.   The Wishbone allotment's effects are not highly controversial......................... 30

     B.   The Wishbone allotment's effects are not unique or highly uncertain. ............. 34

     C.   The Wishbone allotment will not establish a precedent for future actions. ....... 36

     D.   The Wishbone allotment will not have cumulative significant effects. .............. 38

   III.   The Forest Service reasonably determined that a supplemental NEPA analysis is not required............................................................................................... 39

CONCLUSION ..................................................................................................... 44

## TABLE OF CASES

**Cases**

*Albuquerque v. Marsh*,
   956 F.2d 970 (10th Cir. 1992)............................................................... 29, 30

*Ariz. Pub. Serv. Co. v. U.S. E.P.A.*,
   562 F.3d 1116 (10th Cir. 2009)..................................................................... 44

*Ark Initiative v. U.S. Forest Serv.*,
   660 F.3d 1256 (10th Cir. 2011)..................................................................... 44

*Cal. Communities Against Toxics v. EPA*,
   688 F.3d 989 (9th Cir. 2012)........................................................................ 45

*Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*,
   485 F.3d 1091 (10th Cir. 2007)..................................................................... 45

*Cold Mountain v. Garber*,
   375 F.3d 884 (9th Cir. 2004)........................................................................ 31

*Colo. Envtl. Coal. v. Bureau of Land Mgmt.*,
   932 F. Supp. 1247 (D. Colo. 1996)............................................................... 28

*Colo. Envtl. Coal. v. Dombeck*,
   185 F.3d 1162 (10th Cir. 1999)........................................................... 3, 25, 26

*Envtl. Prot. Info. Ctr. v. United States Forest Serv.*,
   451 F.3d 1005 (9th Cir. 2006)...................................................................... 35

*ForestKeeper v. La Price*,
   270 F. Supp. 3d 1182 (E.D. Cal. 2017) ...................................................... 42

*Friends of Animals v. U.S. Bureau of Land,*
   *Mgtm.* 2017 WL 5247929 (D. Wyo. 2017) ................................................. 36

*Friends of Bitterroot, Inc. v. U.S. Forest Serv.*,
   900 F. Supp. 1368 (D. Mont. 1994) ........................................................... 42

*Friends of the Bow v. Thompson*,
   124 F.3d 1210 (10th Cir. 1997)............................................................. 41, 42

*G.W. v. Boulder Valley Sch. Dist.*,
   No. 16-cv-00374-PAB-SKC, 2019 WL 4464130 (D. Colo. Sept. 18, 2019)............... 14

*Gallatin Wildlife Ass'n v. U.S. Forest Service*,
   2015 WL 4528611 (D. Mont. 2015) ........................................................... 36

*Greater Yellowstone Coal. v. Flowers*,
   359 F.3d 1257 (10th Cir. 2004)............................................... 13, 29, 30, 31

*High Country Conservation Advocates v. U.S. Forest Serv.*,
   52 F. Supp. 3d 1174 (D. Colo. 2014).................................................... 25, 26

*Holy Cross Wilderness Fund v. Madigan,*
   960 F.2d 1515 (10th Cir.1992)...................................................................... 24

*Idaho Wool Growers Ass'n v. Vilsack,*
   816 F.3d 1095 (9th Cir. 2016)..................................... 15, 16, 20, 24, 32, 36

*Klamath Siskiyou Wildlands Ctr. v. U.S. Forest Serv.,*
   52 F. Supp. 3d 1089 (E.D. Cal. 2014) ................................................... 41, 42

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.,*
   314 F. App'x 17 (9th Cir. 2008)................................................................. 42

*Kleppe v. Sierra Club,*
   427 U.S. 390 (1976) ................................................................................. 27

*Kunaknana v. U.S. Army Corps of Eng'rs,*
   No. 3:13-CV-00044-SLG, 2015 WL 3397150 (D. Alaska May 26, 2015)................... 42

*Lee v. U.S. Air Force,*
   354 F.3d 1229 (10th Cir. 2004)............................................................. 24, 25

*Marsh v. Or. Natural Res. Council,*
   490 U.S. 360 (1989) ..................................................... 12, 13, 41, 42

*Middle Rio Grande Conservancy Dist. v. Norton,*
   294 F.3d 1220 (10th Cir. 2002)........................................... 30, 31, 32, 33, 34

*Monsanto Co. v. Geertson Seed Farms,*
   130 S. Ct. 2743 (2010) ............................................................................. 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ........................................................................... 13, 14

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
   241 F.3d 722 (9th Cir. 2001)............................................................... 31, 34

*Nat'l Parks Conserv. Ass'n v. United States,*
   177 F.Supp.3d 1 (D.C. Cir. 2016) .............................................................. 38

*Native Ecosystems Council v. U.S. Forest Serv.,*
   428 F.3d 1233 (9th Cir. 2005)............................................................... 31, 32

*Northwoods Wilderness Recovery, Inc. v. U.S. Dep't of Agric. Forest Serv.,*
   192 F. App'x 369 (6th Cir. 2006)............................................................... 41

*Oregon Wild v. U.S. Forest Serv.,*
   107 F.Supp.3d 1102 (D. Or. 2015) ............................................................ 37

*Rio Grande Silvery Minnow v. Bureau of Reclamation,*
   601 F.3d 1096 (10th Cir. 2010)................................................................. 45

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) ................................................................................. 12

*San Juan Citizens All. v. Stiles,*
   No. 08-CV-00144-RPM, 2010 WL 1780816 (D. Colo. May 3, 2010) ........................ 41

*San Luis Valley Ecosystem Counsel v. U.S. Forest Service,*
   No. 04-cv-01071-MSK, 2007 WL 1463855 (D. Colo. 2017)....................................... 34

*Sierra Club v. Lujan,*
   949 F.2d 362 (10th Cir. 1991)................................................................................... 30

*Surfrider Found.v. Dalton,*
   989 F. Supp. 1309 (S.D. Cal. 1998) ................................................................... 36, 38

*United States v. Walker,*
   918 F.3d 1134 (10th Cir. 2019)................................................................................. 14

*Utah Envtl. Cong. v. Bosworth,*
   443 F.3d 732 (10th Cir. 2006)................................................................................... 13

*Utah Envtl. Cong. v. Russell,*
   518 F.3d 817 (10th Cir. 2008)....................................................................... 13, 23, 25

*Utah Shared Access All. v. U.S. Forest Serv.,*
   288 F.3d 1205 (10th Cir. 2002)........................................................................... 12, 32

*Utahns for Better Transp.v. U.S. Dept. of Transp.,*
   305 F.3d 1152 (10th Cir. 2002)........................................................................... 28, 29

*Valley Cmty. Pres. Comm'n v. Mineta,*
   373 F.3d 1078 (10th Cir. 2004).................................................................................. 27

*Village of Bensenville v. FAA,*
   457 F.3d 52 (D.C. Cir. 2006) .................................................................................... 25

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
   435 U.S. 519 (1978) .................................................................................................. 44

*Wyoming v. U.S. Dep't of Agric.,*
   661 F.3d 1209 (10th Cir. 2011).............................................................................. 1, 28

## INTRODUCTION

The Forest Service manages National Forest System lands for multiple uses, including outdoor recreation, range, timber, watershed management, wildlife and fish. Ultimately, all management choices are simply a balancing of risks, not certainties, with other multiple-use priorities, and the Forest Service has broad discretion to regulate its lands for a wide variety of purposes. *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1268 (10th Cir. 2011). In carrying out its objectives for wildlife and range management, the Forest Service authorizes livestock grazing where appropriate on the Rio Grande National Forest. Livestock grazing has occurred on the Rio Grande National Forest since the 1920s.

In 2010, the Forest Service began analyzing the impacts of livestock grazing on existing domestic sheep allotments on the Rio Grande National Forest. These analyses focused on the risk of disease transmission from domestic sheep grazing on allotments to bighorn sheep. In 2015, the Forest Service determined the Snow Mesa, Table, and Miners allotments would not provide effective spatial and temporal separation between domestic sheep and bighorn sheep herds, thereby posing a high risk of disease transmission. In accordance with agency direction, the Forest Service considered other options for the domestic sheep that would be displaced by vacating these allotments. After much consideration, the Forest Service created the Wishbone allotment as a replacement to allow the permittees of the vacated allotments to continue grazing on the Rio Grande National Forest.

The Wishbone allotment has only a moderate risk of impacting bighorn sheep because mitigating factors provide effective spatial and temporal separation between

the two species.  In March 2018, the Forest Service issued a decision notice vacating the Snow Mesa, Table, and Miners allotments and authorizing domestic sheep grazing on the Wishbone allotment.

Petitioners challenge the creation of the Wishbone allotment but not the vacatur of the other allotments.  Petitioners allege the Forest Service did not comply with the National Environmental Policy Act in conducting its analysis of the Wishbone allotment's potential impacts.  Petitioners reject the Forest Service's consideration of specific local factors relevant to the risk of contact between domestic sheep and bighorn sheep, essentially seeking a one-size-fits-all approach for every allotment on every National Forest.  However, Petitioners fail to show the Forest Service's decision is arbitrary and capricious under the deferential standard of review applicable here.  The Court should deny their requested relief.

## FACTUAL BACKGROUND

In 2012, the Forest Service began analyzing the potential impacts of domestic sheep grazing on four existing allotments: Fisher-Ivy/Goose, Snow Mesa, Miners, and Table.  WA_05220; WA_05219.[1]  After determining the Fisher-Ivy/Goose allotment (the "FIG" allotment) was a higher priority for analysis, the Forest Service continued the analysis for the FIG allotment and deferred its analysis for the three other allotments.  *Id.*  The Forest Service decided to vacate the FIG allotment because achieving "effective separation" between bighorn and domestic sheep was unlikely.  WA_02101; WA_01789; *see also* WA_01931-32 (maps showing direct overlap of domestic sheep

---

[1] Citations to the Administrative Record are referenced as "WA_."  The Forest Service lodged the Administrative Record on June 18, 2019, and supplemented it on August 20, 2019 and September 17, 2019.  ECF No. 15, 23, 26.

suitable grazing acres and bighorn sheep summer habitat).  After issuing the Decision

Notice for the FIG allotment, the Forest Service turned its attention to the Snow Mesa,

Miners, Table, and Ouray Allotments (collectively, the "Snow Mesa" allotments) for

analysis in January 2014.  WA_02090; WA_05220.  The Forest Service proposed to not

reauthorize grazing on the Snow Mesa allotments because the allotments lacked spatial

and temporal separation between the bighorn and domestic sheep.  WA_02420-23; *see

also* WA_05351.

    Following public comment on the Snow Mesa draft Environmental Assessment

and its proposed action, the Forest Service considered other options available for the

current permittees if the Snow Mesa allotments were vacated.  *See* WA_01326

(directing the Forest Service to "identify and analyze potential replacement allotments

when developing management alternatives" and advising that the analysis for

"replacement allotments should be part of a single decision-making process"); *see also*

WA_05220; *Colorado Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1168 (10th Cir. 1999)

(acknowledging that the Forest Service "must incorporate multiple forest uses").

Through a collaborative effort with the permittees and the Colorado Parks and Wildlife

(the "State"), the Forest Service created the Wishbone allotment as a possible

replacement for the Snow Mesa allotments.  *See* WA_02657-58; WA_05662.  The

Wishbone allotment is southeast of Snow Mesa and covers approximately 10,480

acres—a much smaller amount than Snow Mesa's 30,558 acres.  WA_05223-25.  The

Wishbone allotment consists of seven pastures connected by designated routes for the

permittees to move the domestic sheep.  *See* WA_05357.  Timing and duration of

pasture use are determined by forage availability and utilized during the authorized

season of June 15 to September 1.  WA_03995-98.  In addition, there are specific time limitations sheep can graze a pasture.  *Id.*  The order in which pastures are used may be modified to increase separation between domestic and bighorn sheep.  WA_05245.

In March 2017, the Forest Service provided public notice of its proposed action to vacate the Snow Mesa allotments and authorize grazing on the Wishbone allotment as a replacement.  *See* WA_02675-92.  On March 23, 2018, the Forest Service issued its final decision creating a new domestic sheep grazing allotment—the Wishbone allotment—and vacated three of the Snow Mesa allotments.  In its final decision, the Forest Service found no significant impact for the Snow Mesa and Wishbone sheep allotments.  WA_05660; WA_05682.  Due to drought conditions, sheep grazing did not occur on the Wishbone allotment in 2018.  *See* WA_5692-93.  The Forest Service authorized sheep to enter the new Wishbone allotment in June 2019.  WA_05798; WA_05876.

### I.   Bighorn Sheep Herds

Rocky Mountain bighorn sheep were designated as a Forest Service Rocky Mountain Region Sensitive Species[2] on June 8, 2007.  WA_03966.  The State classifies populations into two tiers: Tier 1 populations are large, native populations (greater than 100 animals for more than 90% of the years since 1986) consisting of one or more interconnected herds that have received few, if any, supplemental releases of Rocky Mountain bighorn sheep in the past.  WA_04352.  Tier 2 populations are medium to large populations greater than 75 animals for more than 80% of the years since 1986 or

---

[2] Sensitive Species are species of concern "because of a suspected downward trend in their population, and/or their habitat is being lost."  WA_00604.

since becoming fully established.  WA03977.  Bighorn sheep populations consist of

interconnected herds, defined by Game Management Unit.  WA_04352.  The table

below summarizes the herds at issue in this case.

| Data Analysis Unit Name | Data Analysis Unit Code | Sub-Herd Name | Sub-Herd Code |
| --- | --- | --- | --- |
| Central San Juan | RBS-21 | San Luis Peak | S-22 |
| | | Bellows Creek | S-36 |
| | | Rock Creek | S-52 |
| | | Bristol Head | S-53 |
| Weminuche | RBS-20 | Sheep Mountain | S-15 |
| | | Cimarrona Peak | S-16 |
| | | Vallecito | S-28 |
| San Juan West | RBS-22 | Cow Creek | S-21 |
| | | Upper Lake Fork/Pole Creek Mountain | S-33 |

### A.  The Central San Juan population

The Central San Juan bighorn population, which the Forest Service identifies as

Data Analysis Unit RBS-22, is a Tier 2 herd.  WA_04138.  This herd consists of four

Game Management Units: San Luis Peak (S-22), Bellows Creek (S-36), Rock Creek (S-

52), and Bristol Head (S-53), which comprise the entire herd of approximately 260

animals.  WA_03977.  The Central San Juan population is located within less than a

mile of the Snow Mesa and Wishbone allotments.  WA_03963; WA_04035-39.  The

Forest Service and the State jointly identified the Core Herd Home Range (CHHR)[3]

using the State's mapped summer range, verified sightings, and surveys.  WA_04061;

---

[3] Core Herd Home Ranges are "[a]reas where most animals in each herd spend most of
their time."  WA_01804; *see also* WA_03978 ("The CHHR can be thought of as that
portion of the overall range where 90% of individual bighorn sheep are located between
spring green-up and the first heavy snowfall.").

WA_05738.  The bighorn sheep CHHR overlaps with the Snow Mesa allotments but not with the Wishbone allotment.  WA_03979-80.

### B.  The Weminuche Population

The Weminuche population, which the Forest Service identifies as Data Analysis Unit RBS-20, is a Tier 1 population.  WA_04250.  The designation is based on population size, population performance, and the lack of transplanted bighorns into the population.  *Id.*  RBS-20 consists of three Game Management Units.  *Id.*  2010 and 2018 post-hunt population estimates were approximately 460 animals.  WA_04250; WA_05758.  The single domestic sheep allotment within this Data Analysis Unit was vacated by the 2013 FIG decision.  WA_04251, WA_02099.  The Weminuche herd is located approximately four miles from the Wishbone allotment, one mile further north than the lowest risk pastures evaluated in the FIG analysis.  WA_05673-74.

### C.  The San Juan West Population

The San Juan West population, which the Forest Service identifies as Data Analysis Unit RBS-21, consists of two Game Management Units, S-21 and S-33.  WA_05881.  RBS-21 is a Tier 1 population.  WA_03831.  Population estimates were 100 animals in 1987.  WA_04427.  2018 population estimates were 340 animals.  WA_05758.  The San Juan West Population is located approximately 12 miles from the Wishbone allotment.  WA_05640.

### II.  The Forest Service's Assessment of Risk between Bighorn and Domestic Sheep

The potential for disease transmission may impact the number and potential distribution of bighorn sheep.  *See* WA_01206; WA_05347-48.  Temporal and spatial separation between the species at the forest level is the most prudent action to insure

viability of bighorn sheep. WA_01316. Since 2010, the Rio Grande National Forest has vacated a total of 20 domestic sheep allotments, which has created or improved separation between bighorn sheep and domestic sheep within the Forest. WA_05677. As a result, the Rio Grande National Forest meets the bighorn sheep population viability requirements required by the Forest Plan. WA_05894; WA_05895.

To assess the risk that domestic sheep may pose on the Wishbone allotment, the Forest Service used a four-step viability analysis process (qualitative assessment) that incorporated the Risk of Contact Tool (quantitative assessment). WA_01317; WA_04057-60; *see generally* WA_03872 (the Forest Service developed the Tool based on the Payette National Forest's method for calculating the probability and rates of contact between bighorn sheep and active allotments). The Risk of Contact Tool, a geospatial model based on peer-reviewed science, estimates the rate of contact of a foraying bighorn sheep with a domestic sheep *allotment*—not contact with *individual* domestic sheep. WA_03872 ("The Tool utilizes a core herd home range (CHHR), a summer habitat model, and active domestic sheep allotments to calculate the probability of ram and ewe forays outside the CHHR and the rate of contact with domestic sheep allotments."); WA_03948; WA_04467-77. Forays are short-term movements that an animal makes away from, then subsequently back to, its herd's CHHR. WA_04062.

The Risk of Contact Tool provides an initial quantitative calculation of an annual rate of contact with an allotment. WA_03872. The Forest Service used this rate to estimate the Wishbone allotment's risk of disease transmission to bighorn sheep by applying a probability of a contact resulting in disease transmission. WA_04000; WA_04002.

Once the Forest Service completed the quantitative assessment provided by the Risk of Contact Tool, the Forest Service validated the results by considering local factors that are not included in the model. WA_05662 ("[R]esults should be interpreted in light of local conditions and knowledge."). The Risk of Contact Tool's user guide directs the Forest Service to use "site specific information" to achieve accurate "site-specific results." WA_03948; *see also* WA_03988. Because the Tool's default parameters do not capture several key characteristics of the grazing system, the Forest Service applied known local facts pertaining to the allotments and the affected bighorn sheep herds. WA_05349; WA_05668; WA_03988-95.

The Wishbone allotment poses only a moderate risk because it will provide spatial and temporal separation between the domestic sheep and any nearby bighorn sheep. *See* WA_05662. A rating of 'Moderate' risk indicates that physical contact by bighorn sheep with allotments may still exist, but with local herd-specific information factored into the analysis, effective separation is likely to reduce the risk of disease transmission. WA_04002-03.

## III.   The Forest Service's Coordination with the Colorado Parks and Wildlife

In January 2016, the State began a study of bighorn sheep movements by collaring and monitoring particular herds. *See* WA_05880. The State anticipated completing its study and full analysis in 2019. WA_04245. Although the State disclosed some of its preliminary findings of interest regarding the bighorn sheep movements around the Snow Mesa and Wishbone allotments to the Forest Service, it did not release the raw data. *See* WA_03779-85.

Though the State considers the telemetry data[4] confidential, it released the data to Petitioners but not to the Forest Service.  *See, e.g.*, Compl. ¶ 54, Figure 2 (displaying the bighorn sheep observations collected by the State).  Prior to receipt of the petition, the Forest Service was unaware that the State had released telemetry data.  WA_05880.  Because the State had released the data to Petitioners, the Forest Service again requested the data from the State on February 7, 2019.  *Id.*  After protracted negotiations, the Forest Service and the State entered into a non-disclosure agreement in May 2019.  WA_05847-49; WA_05880.  On May 15, 2019, the State finally provided the Forest Service telemetry data collected between 2013 and 2018.  *Id.*

## IV.   The Forest Service's Supplemental Information Report

Following receipt of the telemetry data from the State, the Forest Service reviewed and analyzed the data and documented its findings in a Supplemental Information Report.  WA_05879.  Consistent with the Forest Service Handbook guidance, the Forest Service determined the new information or changed circumstances were within the scope and range of effects considered in the original analysis.  *See id.*; Forest Service Handbook, 1909.15_18.1.  The Forest Service fully explained its basis for determining that a supplemental analysis was not necessary.  *See id.*

The Forest Service used the State's species activity maps and observations to identify the CHHR for bighorn sheep.  WA_04061; WA_03875.  After receiving the State's telemetry data, the Forest Service refined the CHHR.  WA_05762-63.  To

---

[4] Telemetry is a technology that allows data measurements to be made at a distance.  WA_04642.

determine the effect of the telemetry data, the Forest Service re-ran the Risk of Contact Tool using the refined CHHR.  WA_05887.

The State's telemetry data supports the Forest Service's original conclusions contained in the EA and FONSI regarding the bighorn sheep movements in and around the Snow Mesa and Wishbone allotments.  WA_05890 ("The new information fully supports the 2017 analysis regarding foray timing and demonstrates that foray events have not occurred within the boundaries of the Wishbone Allotment."); *see also* WA_05896; WA_05891-91; WA_05893.  For instance, no bighorn sheep telemetry points occurred within the Wishbone pastures during the grazing season for seven consecutive years, as shown on the map below.  WA_05901.  Based on the available data, there is no evidence that any bighorn sheep entered the Wishbone allotment.



WA_05903 (map including all telemetry study years (2011 through 2018) and noting

that June 15 through September 1 is the Wishbone grazing season).

In addition to the State's telemetry data, the Forest Service received information

about a sighting of two bighorn sheep on the South River allotment.  WA_05882.  The

sighting occurred when there were no domestic sheep grazing in the pasture.  *Id.*  Thus,

the Forest Service determined that this single sighting was not significant and

insufficient to justify altering the CHHR boundaries.  WA_05896.

As the Supplemental Information Report explains, the Forest Service concluded

that no correction, supplement, or revision to its March 2018 decision is necessary

because the State's telemetry data is within the scope and range of effects considered

in the original analysis of the Snow Mesa and Wishbone allotments, and the data

supports and validates the local factors considered by the Forest Service to reduce the

risk of contact from high to moderate.  WA_05897.

## LEGAL BACKGROUND

The National Environmental Policy Act ("NEPA") serves the dual purpose of

informing agency decision-makers of the environmental effects of proposed federal

actions and ensuring that relevant information is made available to members of the

public so that they "may also play a role in both the decision making process and the

implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490

U.S. 332, 349 (1989).  NEPA does not mandate particular results or impose substantive

environmental obligations upon federal agencies.  *Id.* at 351-52; *Marsh v. Or. Natural

Res. Council*, 490 U.S. 360, 371 (1989).  The court must defer to the agency's informed

discretion.  *Utah Shared Access All. v. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002).

NEPA requires the preparation of an Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  To determine whether an EIS is required, an agency may prepare a less detailed Environmental Assessment (EA).  40 C.F.R. §§ 1501.4(b), 1508.9.  An EA is a concise public document that briefly describes the proposal, examines alternatives, considers environmental impacts, and provides a list of individuals and agencies consulted.  40 C.F.R. § 1508.9.  "If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a finding of no significant impact (FONSI) and forego the further step of preparing an EIS."  *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004) (citing 40 C.F.R. § 1501.4(e)).  "An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise."  *Id.*

## STANDARD OF REVIEW

NEPA does not provide a private right of action, so courts review an agency's approval of a final agency action under the Administrative Procedure Act.  *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006).  Under the APA, a court may only set aside an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

An agency's decision is arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Courts must "consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment." *Id.* at 30-31.  "Deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008) (citing *Marsh*, 490 U.S. at 378).

## ARGUMENT

Petitioners contend that the Forest Service's decision to authorize grazing on the Wishbone allotment was arbitrary and capricious because the Forest Service used assumptions that are allegedly unsupported, failed to use the best available science, and did not consider all of the allotment's indirect effects.  Petitioners also argue that the Forest Service violated NEPA by failing to prepare an EIS.  Finally, Petitioners assert that the Forest Service is required to conduct a supplemental environmental analysis to consider the State's telemetry data.   As explained below, the Forest Service complied with all applicable laws when it decided to vacate the three Snow Mesa allotments and authorize grazing on the Wishbone allotment. [5]

---

[5] The Complaint also alleges the Forest Service violated the National Forest Management Act (NFMA) by not providing for population viability.  Compl. ¶ 92 (Claim Two).  Petitioners do not raise this claim in their opening brief, and it is therefore waived.  *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) ("Ordinarily, a party's failure to address an issue in its opening brief results in that issue being deemed waived."); *G.W. v. Boulder Valley Sch. Dist.*, No. 16-cv-00374-PAB-SKC, 2019 WL 4464130, at *19 (D. Colo. Sept. 18, 2019) (finding waiver where party failed to raise arguments pertaining to claims).  Even if the Court were to consider the NFMA claim, the Snow Mesa and Wishbone allotments contribute to the population viability at the forest-level and thus are consistent with Forest Plan direction.  WA_05664-65; WA_05676-77.

**I.    The Forest Service's analysis of the grazing allotments was neither arbitrary nor capricious.**

Petitioners present three arguments to challenge the Forest Service's decision regarding the Snow Mesa and Wishbone allotments.  Pet'rs' Pet. for Review of Agency Action ("Pet."), 20, ECF No. 33.  First, Petitioners challenge the Forest Service's application of local factors to the Risk of Contact Tool's results.  *Id.* at 21-27.  Second, Petitioners suggest that the Forest Service failed to use the best available science because it did not obtain the State's telemetry data before issuing the Decision Notice. *Id.* at 27-29.  Third, Petitioners assert the Forest Service failed to consider all of the Wishbone allotment's impacts.  *Id.* at 30-31.  As explained below, all three arguments fail.  Petitioners have not met their burden to show the Forest Service's decision was arbitrary and capricious.

**A.  The Forest Service properly considered local factors in its analysis.**

The Forest Service assessed the risk of contact between bighorn and domestic sheep on the Snow Mesa and Wishbone allotments by using the four-step viability analysis process and the Risk of Contact Tool.  WA_01317; WA_03988.  The viability analysis requires the Forest Service to, among other things, assess the spatial and temporal overlap of bighorn sheep CHHR with domestic sheep allotments and identify management practices with the goal of separation between bighorn and domestic sheep where necessary to provide for Forest-wide bighorn sheep viability.  WA_04057-58. The Risk of Contact Tool is a geospatial desktop application used for evaluating the risk of physical contact between bighorn sheep and domestic sheep allotments. WA_03988; *see generally* WA_03872 ("In response to bighorn sheep population viability concerns, the Payette National Forest developed a methodology for calculating

the probability and rates of contact between bighorn sheep and active domestic sheep allotments.").  The Ninth Circuit has already upheld the Payette National Forest's use of the Risk of Contact model.  *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1108 (9th Cir. 2016).  The Risk of Contact Tool utilizes bighorn sheep CHHR information, a bighorn sheep habitat preference model, population size, domestic sheep allotment boundaries, and default foray rates and sex ratios to calculate probabilities that bighorn sheep may leave a CHHR and contact a specific domestic sheep allotment. WA_04061.  The Risk of Contact Tool does not directly assess the likelihood of physical interaction between domestic sheep and bighorn sheep or other aspects of the disease cycle needed to result in bighorn sheep population impacts.  WA_04475.

As part of the analysis, the Forest Service first used the Risk of Contact Tool to provide an objective evaluation of the risk of contact between bighorn sheep and domestic allotments across the analysis area.  *See generally* WA_05662 (summarizing the Forest Service's risk assessment approach).  Next, in accordance with the Risk of Contact Tool's instructions, the Forest Service applied local factors to the Tool's results to adjust for local conditions.  WA_05662; *see, e.g.*, WA_03891 ("Ideally, these data should be reviewed for site relevance and modified as necessary based on local conditions, coordination with state wildlife agencies, etc.").  After conducting its four-step viability analysis and considering the local factors in conjunction with the Risk of Contact Tool's quantitative results, the Forest Service determined that the Wishbone Allotment has a moderate risk of disease transmission.  *See* WA_05668.

Petitioners charge that the Forest Service did not act "in accordance" with the Risk of Contact Tool's results in assessing the Wishbone allotment's risk as moderate.

Pet. at 21-22.  Specifically, Petitioners contend that the Forest Service should not have accounted for local factors in its analysis and instead should have determined the Wishbone allotment poses a high risk to bighorn sheep based solely on the Risk of Contact Tool's numerical results alone.  *Id.*[6] However, to ignore the relevant local factors, as suggested by Petitioners, would result in an incomplete analysis.  *See* WA_03948 ("The model is an adaptation of the Payette-style analysis that will be executed using site-specific information derive site-specific results."); *see also Vilsack*, 816 F.3d at 1108 (recognizing that the Forest Service adjusts the risk of contact model to "fit local circumstances").  The Forest Service similarly included qualification factors, such as lack of temporal and spatial separation, when it determined the Snow Mesa allotments presented a high risk of contact.  *See* WA_04007-33 (summarizing factors in bullet points for each allotment alternative); WA_04035 ("Consideration of the Results from the Risk of Contact Model combined with Other Known Factors such as on-the-ground local specific and relevant information supports a rank of High Risk" for the Snow Mesa allotments.).  Interestingly, Petitioner's do not take issue with the Forest Service's consideration of these same or similar factors for the Snow Mesa allotments, where their consideration did not alter the risk assessment.

The Forest Service set forth five factors that contribute to lowering the risk of contact from high to moderate:

> [1] temporal separation due to domestic sheep grazing duration; [2] spatial separation through habitat fragmentation and landscape configuration; [3]

---

[6] Petitioners seem to mistakenly believe that a high risk rating automatically disqualifies an allotment to be used for grazing.  Pet. at 22.  The Forest Service is not prohibited from allowing domestic sheep to graze on an allotment that has been deemed high risk; rather, the correct standard is whether "the potential risk for contact, as identified through the four-step process, is at an unacceptable level . . . . "  WA_01326.

spatial separation due to limited overlap between bighorn summer source habitat and domestic sheep capable range; [4] spatial separation due to bighorn sheep seasonal movements; and [5] project design features.

WA_05668.  Petitioners challenge the use of all five factors.

### 1. Temporal Separation

The Wishbone allotment grazing season will occur between June 15 and September 1, and the grazing permits authorize a maximum of 78 days.  WA_05668. The Risk of Contact Tool is based on a 180-day grazing season, with a constant distribution of foray rate during the set timeframe.  *Id.*  The Wishbone allotment will be grazed—at a maximum—less than half the time the Risk of Contact Tool estimates.  *Id.* In addition, the Forest Service concluded that during the grazing season, bighorn sheep "tend to spend a significant amount of time" north of the Wishbone allotment. WA_04142; *see* WA_04143; WA_05928; *see also* WA_03990-91.  Because the domestic sheep are on the allotment for a much shorter period of time than the Tool estimated and a majority of the bighorn sheep move away from the Wishbone allotment, there is less opportunity for bighorn sheep and domestic sheep to come into contact with each other.  WA_05669.  Based on these observations and the short grazing season, the Forest Service reasonably considered the temporal separation factor in conjunction with the Risk of Contact Tool's quantitative results.  *See* WA_05668.

Petitioners argue that evidence in the record contradicts the Forest Service's temporal separation assumption.  Pet. at 24 ("[T]elemetry data showed bighorns making unpredictable and extensive movements in the spring and summer . . . . ").  However, the Forest Service accounted for the asserted "unpredictable and extensive movements" and still found a consistent temporal pattern in the bighorn sheep

movements.  *See, e.g.* WA_04031 (finding that bighorn sheep graze in "the lower country on early spring grass before moving up into the higher country for summer" based on the seasonal movements of collared bighorn sheep).

Indeed, Petitioners' cited materials support the Forest Service's findings about the bighorn sheep's seasonal movements.  *See* WA_03779 (supporting the Forest Service's conclusions that rams travel north of the Wishbone allotment during the summer because the collared ram was "back up" north in July 2017); WA_03757 (explaining that preliminary telemetry data documented a ram near the Wishbone allotment during the rut, i.e. fall season, and north of the Wishbone allotment during the summer season); WA_04246-47 ("Overlaying the GPS collar data on the current SAMs [Species Activity Maps, which the State produces, WA_05738] winter range polygons indicates a much larger wintering area [north of the Wishbone allotment] than currently documented."); *see also* WA_04142 (supporting the Forest Service's conclusion that "forays typically occur in October, outside the domestic sheep grazing season").  The record supports the Forest Service's application of the temporal separation factor.

2.  Spatial Separation through Habitat Fragmentation and Landscape
    Configuration

The Wishbone allotment features habitat fragmentations such as the Rio Grande River, Highway 149, and several subdivisions.  WA_05417.  The Forest Service determined that when summer source habitat[7] is fragmented, bighorn sheep are estimated to be 34 times less likely to disperse across the landscape.  WA_05669.  The

---

[7] Summer source habitat is suitable habitat.  WA_03994.  Bighorn sheep select habitat based on factors such as proximity of steep-sloped escape terrain, forage availability, and horizontal visibility.  WA_04470.

Forest Service recognized that it is possible for bighorn sheep to disperse across a fragmented landscape to encounter domestic sheep, but the agency's risk assessment considered this possibility in context of temporal separation. WA_05668-69. For example, a bighorn sheep may cross the Rio Grande River during low flows, but the low flows occur outside of the Wishbone allotment grazing season.[8] WA_05668 ("The grazing season will occur between June 15 and September 1.").

In contrast, Petitioners do not account for temporal separation in listing record cites that support bighorn sheep movements across fragmented habitat. *See* Pet. at 24. None of Petitioners' cited documents reveal bighorn sheep movements across fragmented habitat during the Wishbone allotment grazing season. *See id.* (citing WA_03726; WA_03750; WA_03756; WA_03781; WA_03985; WA_04017; WA_04137; WA_06063; WA_06079; WA_06187; WA_06245-48; WA_03781; WA_04247).

The timing of these movements is critical because the Forest Service based its risk assessment on both temporal and spatial separation. *See* WA_05688-69. Thus, the accuracy of the Forest Service's risk assessment is not discredited simply by focusing on any one factor. WA_05668 ("[T]he incremental factors [ ] act together to moderate the risk of contact . . . . "). Petitioners fail to establish this factor is unsupported because the Forest Service reasonably determined that the fragmented and discontinuous habitat contributes to a lower risk than contemplated by the Risk of Contact Tool's results.[9]

---

[8] Indeed, Petitioners' visit describing a low river level was outside the summer grazing season. *See* Decl. of Jonathan Ratner ¶ 18, ECF No. 35.

[9] Petitioners also argue that "it was inappropriate for the Forest Service to [ ] lower the risk rating for the allotment" based on this factor because the Risk of Contact Tool "accounted for the quality of bighorn habitat in determining the likelihood of a bighorn

3. <u>Spatial Separation due to Limited Overlap between Bighorn Summer Source Habitat and Domestic Sheep Capable Range</u>

The Wishbone allotment has only 34% overlap between bighorn sheep summer source habitat and domestic sheep capable range, which increases spatial separation between the two species.  WA_05663.  Petitioners do not challenge the veracity of this overlap calculation.  *See* Pet. at 22.  Instead, Petitioners compare the Wishbone allotment's *CHHR* overlap—not summer source habitat overlap—to the FIG and Snow Mesa allotments' CHHR overlap.  *Id.*  Petitioners' comparison fails to establish any inaccuracy with this spatial separation factor for two reasons.

First, the Forest Service did not base its moderate risk rating solely on "no direct overlap" between the Wishbone allotment and the bighorn CHHR.  *See* WA_05668 (listing the five factors that gave rise to a risk assessment of "moderate").  Accordingly, Petitioners' comparison is inapplicable to this factor.

Second, Petitioners incorrectly state that the FIG and Snow Mesa allotments "did not overlap bighorn core home range."  *Id.* (citing WA_01801; WA_01818; WA_04036).  Four of the seven pastures in the FIG allotment were in the bighorn CHHR, and two of the three allotments in the Snow Mesa analysis were in the bighorn CHHR.  WA_01801; WA_04035.  The record supports the Forest Service's consideration of this factor as well.

foraying onto an allotment."  Pet. at 24.  However, the Risk of Contact Tool does not take into account the Rio Grande National Forest's unique landscape features that create filters that influence the movement of bighorn between the different qualities of habitat.  *See* WA_03994 (noting that there are discrepancies between the mapped summer source habitat and actual on the ground conditions); WA_04062 (noting that the Forest Service used the tool's default values, which were derived from the dataset collected on the Payette National Forest).  Moreover, the Forest Service is owed "greater-than-average deference" in choosing the appropriate methodology for its analysis.  *Vilsack*, 816 F.3d at 1108.

4. <u>Spatial Separation Due to Bighorn Sheep Seasonal Movements</u>

The migration pattern for certain herds are "fairly predictable each season."

WA_05373.  The Decision Notice states, "[l]ocal knowledge of bighorn sheep seasonal

migration patterns within their core herd home range indicate that *most* animals migrate

to higher elevations during the summer."  WA_05670 (emphasis added).  In particular,

most bighorn sheep move closer to the Snow Mesa Allotments and further away from

the Wishbone allotment during the grazing season.  WA_05374.  The migration pattern

identified in the analysis was developed based on years of ground monitoring and

preliminary telemetry data.  WA_03651-59; WA_03770-78; WA_05729-35; WA_05767-

76; WA_03988-95; WA_04038-39.  The Forest Service also recognized in its analysis

that "the potential for contact between domestic and bighorn sheep remains while

domestics are grazed" in the Shallow and Crystal Pastures.  WA_03997-98.  To

minimize this risk, grazing on these pastures will be limited in duration (8 days for

Shallow Pasture and 35 days for Crystal Pasture), and project design features will be

implemented.  WA_03997-98; WA_05670.

Petitioners myopically focus on the elevation of the Shallow and Crystal Pastures

to argue that these pastures are at "high risk."  Pet. at 23.  But Petitioners ignore the

Forest Service's supported findings that during the grazing season, the majority of the

bighorn sheep move away from the Wishbone allotment and closer to the Snow Mesa

allotments—not simply to *higher elevation.  Id.*; WA_05670 ("The bighorn [herds] follow

this pattern, which put them in closer proximity to the Snow Mesa allotments during the

grazing season.").   And Petitioners point out that bighorn sheep have traveled *near* the

Shallow Pasture, they fail to address that "[t]here are no known instances of bighorn

documented *in* [Shallow] pasture."  Pet. at 23; WA_03997 (emphasis added).  Thus, the record supports the bighorn sheep migration pattern and the spatial separation.[10]

### 5.  Project Design Features

The final factor concerns project design features.  The Forest Service recognizes that it cannot rely on design features alone to provide effective separation between bighorn and domestic sheep.  WA_05670.  Rather, all of the factors "act together" to mitigate—not negate—the bighorn sheep's natural attraction to domestic sheep. WA_05668; WA_05670.

The Forest Service factored the design features into the Risk of Contact Tool's numerical results because the features are consistent with effective land management policy and because the trial grazing periods in 2016 and 2017 suggest that the features will work as designed.  WA_05671.  Notably, there were no documented noncompliance issues during the 2016 trial grazing period, but the 2017 trial period documented 56 strays.  *See* WA_05671 ("2016 saw zero strays while 2017 saw multiple."); WA_03595-97.  The Forest Service realized that "the success in implementing [the Wishbone allotment design features] relies heavily on having sufficient manpower to ensure that the domestic sheep are accounted for . . . . "  *Id.*  As a result, the Forest Service requires two herders as a design feature of the Wishbone allotment.  *Id.* ("[I]n 2016 the permittees used two herders whereas in 2017 they did not.").

---

[10] Petitioners also contend the State's preliminary telemetry data "undermined the Forest Service's generalization about seasonal movements."  Pet. at 23 (citing WA_04247; WA_03785).  To the contrary, the data supports the Forest Service's findings about seasonal migration habits.  *See* WA_03990 (describing the Bristol Head herd's seasonal movements based on "six ewes and three rams with radio collars in this herd"); WA_03991 (describing the Bellows Creek herd's movements based on "two ewes and three rams with radio collars in this herd").

Petitioners' litany of noncompliance incidents does not account for the adjustments in the design features that the Forest Service has made. *See* Pet. at 25-26. In addition, the permittees' objections stated that the terrain "becomes more of a problem" on only three of the seven pastures. WA_05461. Two of the more problematic pastures have limited grazing days within the grazing season, which Petitioners do not address. *See* WA_03997-98.

In sum, the Forest Service's qualitative assessment is based on well-supported local factors. As such, the Forest Service's moderate risk rating is owed great deference. *See Utah Envtl. Cong.*, 518 F.3d at 824. Given that the Forest Service's local factors are well supported by the record, and "in light of the deference owed to the agency when undertaking technical analysis within its purview," the Forest Service's reliance on the five local factors to qualify the Risk of Contact Tool's results was not arbitrary or capricious. *Vilsack*, 816 F.3d at 1108.

**B. The Forest Service used the best available scientific information in its analysis of the Wishbone allotment.**

Petitioners argue that the Forest Service "failed to examine and use key data" from the State's telemetry study, suggesting the data was available to the Forest Service in the first place. Pet. at 27-29.

NEPA requires an agency to obtain and include in its analysis information regarding reasonably foreseeable significant adverse impacts that are "essential to a reasoned choice among alternatives 'if the costs of obtaining such information are not exorbitant.'" *Lee v. U.S. Air Force*, 354 F.3d 1229, 1241 (10th Cir. 2004) (quoting *Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1523 (10th Cir.1992)); 40 C.F.R. § 1502.22 (acknowledging that "overall costs" of obtaining information can be exorbitant).

In this context, "overall costs" includes financial costs *and other costs such as costs in terms of time (delay)* and personnel."  Fed. Reg. 15618, 15622 (April 25, 1986) (emphasis added) (noting that agencies need not "perform a cost-benefit analysis" but instead only consider the costs "in light of overall program needs").

Petitioners suggest that all of the data were "available" to the Forest Service simply because it knew about the study and had received the State's preliminary findings about the data.  Pet. at 27.  However, the Forest Service was unable to obtain the data because the State considered the data confidential and sensitive, did not want it released to the public, and did not share it with the Forest Service until May 2019, after the State and Forest Service entered into a confidentiality agreement.  WA_05847; WA_05880.

Moreover, Petitioners fail to demonstrate any insufficiency in the State's preliminary data that the Forest Service used in its analysis.[11]  *See Colorado Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1172-73 (10th Cir. 1999) (finding the Forest Service used the best available information because petitioners failed to "show how additional, site-specific [ ] data is 'essential' to reasoned decision making"); *see also Village of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006) (acknowledging the desirability of

---

[11] Petitioners misinterpret the State's preliminary data by stating the data indicates bighorn sheep "make less predictable and more extensive movements than what was previously known."  Pet. at 28.  To the contrary, the Risk Assessment describes how the State's data supports the Forest Service's assumptions about the bighorn sheep movements.  *See, e.g.*, WA_04031 (noting the sub-herds' locations revealed by "recent telemetry data," which the Forest Service factored into its analysis).  And the Forest Service's scientific interpretations are afforded great weight.  *Utah Envtl. Cong.*, 518 F.3d at 824; *High Country Conservation Advocates v. United States Forest Serv.*, 52 F. Supp. 3d 1174, 1194 (D. Colo. 2014) (finding that "mathematical forecasting based on the old data" is "precisely the type of technical disagreement where deference to the agency is most important.").

using the most current and comprehensive data available but upholding the agency's "professional judgment that the later data would not alter its conclusions").  Accordingly, the Forest Service's analysis of the Wishbone allotment constitutes a reasonable, good faith presentation of the best information available under the circumstances.  *See Lee*, 354 F.3d at 1244 (agency's analysis included best available scientific information because the court had "no reason to believe that the studies' conclusions are inaccurate").

Petitioners further suggest that the Forest Service should have waited for the State to complete its study before issuing the Decision Notice.  *See* Pet. at 29.  While Petitioners may have preferred for the Forest Service to wait until the State completed its study and provided the full telemetry data—a preference they did not voice for the Snow Mesa allotments—the Forest Service was not required to obtain more information beyond what was analyzed.  *See High Country Conservation Advocates v. United States Forest Serv.*, 52 F. Supp. 3d 1174, 1194 (D. Colo. 2014) (declining to require agency to obtain additional information where agency determined it was unnecessary).

To the extent Petitioners claim the Forest Service violated 40 C.F.R. § 1502.22(b), Petitioners are misguided because the Forest Service complied with this NEPA regulation by providing information about the State's telemetry study.  *See Colo. Envtl. Coal.,* 185 F.3d at 1172-73 (courts are "unwilling to give a hyper-technical reading of [40 C.F.R. § 1502.22] to require the [agency] to include a separate, formal disclosure statement in the environmental impact statement to the effect that . . . data is incomplete or unavailable").  Namely, the Forest Service addressed the State's ongoing study and disclosed the fact that the State's telemetry study was incomplete at the time.

WA_05373 ("A temporal analysis of the proximity (to the Wishbone Allotment) will be conducted [by Colorado Parks and Wildlife] in the future after more GPS collar data is collected (Colorado Parks and Wildlife 2017).").

### C. The Forest Service considered all relevant effects on the relevant bighorn sheep herds.

Petitioners argue that the Forest Service failed to take a hard look at the effects of three neighboring bighorn herds. Pet. at 30. Petitioners also argue that the Forest Service should have considered the potential impacts *if* the herds increase in size. *Id.*

NEPA's implementing regulations require an agency to "determine the scope" of its environmental analysis by considering direct, indirect, and cumulative impacts. 40 C.F.R. § 1508.25(c). Establishing the proper scope of potential effects "requires a high level of agency expertise, and as such, the agency's determination is due a substantial amount of discretion." *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1091 (10th Cir. 2004); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) ("Resolving [scope of analysis] issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies."). "Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately." *Kleppe*, 427 U.S. at 412.

Here, Petitioners have not met their burden to show the Forest Service acted arbitrarily and capriciously in determining the proper scope of analysis. First, Petitioners mistakenly assert that the Forest Service "dismissed risks to the adjacent Weminuche, San Juan West, and Natural Arch bighorn meta-populations" on the basis that the populations were "too far" from the Wishbone Allotment. Pet. at 30. In fact, the Forest Service did analyze the Weminuche herd in its evaluation of the FIG Allotment and

determined there was a low likelihood of a foray from the Weminuche herd to the project area.  WA_05639; *see* WA_05672-75.  The Forest Service similarly found the San Juan West herd to be at low risk because "the distance between the [San Juan West] herds and the Wishbone allotment is similar to the distance between the Weminuche herd and the Wishbone allotment."  WA_05640.  Likewise, the Forest Service explained the "low risk of concern for contact between the [Natural Arch] herd and domestics while grazing . . . . "  WA_05640.  Specifically, the Natural Arch herd has a "low number of animals" and grazing on the Wishbone pasture nearest to the herd, which is 12 miles away, will be limited to only a week.  *Id.*  Thus, the Forest Service had a reasonable basis to forego further analysis of these particular herds.  *See* 40 C.F.R. § 1508.28 (allowing agencies to tier analysis to earlier related NEPA documents); *Colorado Envtl. Coal. v. Bureau of Land Mgmt.*, 932 F. Supp. 1247, 1254 (D. Colo. 1996) (approving agency's tiered analysis).

Second, Petitioners contend the Forest Service "ignored the risk that a bighorn from adjacent meta-populations could interact with a diseased bighorn from a Central San Juan herd."  Pet. at 30.  To the contrary, the Forest Service recognized this potential risk and expressed it as an uncertainty in the Risk Assessment.  *See* WA_04045; *see also* WA_05677-78 (acknowledging the "documented instances of connectivity between the Central San Juan and the San Juan West and Weminuche herds" and explaining that the Snow Mesa and Wishbone allotments provide "temporal and spatial separation that reduces the risk of contact and further supports this reduction with project design features").

Finally, Petitioners fault the Forest Service's analysis for not considering the potential of the herds increasing in size and range.  Pet. at 31.  Again, Petitioners are mistaken because the Forest Service considered this potential by outlining a plan of action should the herds' population reach the State's threshold for re-evaluating its management strategy, which is 350 sheep.  WA_05676; WA_04139.  "[I]t is well-established that "[a]gencies only have a duty to discuss . . . the [ ] impacts that are reasonably foreseeable."  *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1251 (10th Cir. 2011) (quoting *Utahns for Better Transp.,* 305 F.3d at 1176).  Given that the populations have remained steady or only slightly declined, it was reasonable for the Forest Service to anticipate the need for revisiting its analysis rather than considering the impacts of the unlikely possibility of the herds significantly increasing.  *See* WA_05758-59 (providing population estimates from 2016 through 2019).  Therefore, the Forest Service's decision was neither arbitrary nor capricious.

In sum, the Forest Service properly considered the local factors in conjunction with the Risk of Contact Tool to provide for a more accurate assessment.  The Forest Service also used the best *available* scientific information at the time.  And the Forest Service evaluated all of the relevant, reasonably foreseeable impacts of the Snow Mesa and Wishbone allotments.  Therefore, the Forest Service's decision was not arbitrary and capricious.

## II.   The Forest Service reasonably determined that an Environmental Impact Statement is not necessary.

Petitioners allege the Forest Service erroneously found that the Wishbone allotment does not have any significant impacts.  According to Petitioners, the Forest Service should have prepared an EIS rather than an EA.  Pet. at 14-25.

When reviewing a FONSI, a court must "determine whether the agency acted arbitrarily and capriciously in concluding that the proposed action will not have a significant effect on the human environment." *Greater Yellowstone Coal.*, 359 F.3d at 1274; *Comm. to Pres. Boomer Lake v. Dept. of Transp.*, 4. F.3d 1543, 1555 (10th Cir. 1993) ("An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review.") (citing *Vill. of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 972-73 (10th Cir. 1992) (en banc)). "By challenging the FONSI, it is the [petitioner's] burden to establish the agency's decision as arbitrary and capricious." *Id.*

Whether environmental impacts are significant depends on their context and intensity. 40 C.F.R. § 1508.27; *Greater Yellowstone Coal.*, 359 F.3d at 1274. "Context" captures the notion that "[s]ignificance varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a); *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 n.9 (10th Cir. 2002). The term "intensity" refers to the severity of the impact. 40 C.F.R. § 1508.27(b); *Middle Rio Grande*, 294 F.3d at 1229 n.9. In evaluating intensity, agencies should consider ten criteria, including the four raised by Petitioners in this litigation: the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about future consideration; and whether the action is related to other actions with individually insignificant but cumulatively significant

impacts.  40 C.F.R. § 1508.27)(b)(4), (b)(5), (b)(6), (b)(7).

### A.  The Wishbone allotment's effects are not highly controversial.

Petitioners first contend the Forest Service failed to consider whether the challenged action is "highly controversial."  Pet. at 16-18.  Specifically, Petitioners contend that there is controversy in the context of 40 C.F.R. § 1508.27(b)(4) as to the Wishbone allotment's impacts on bighorn sheep.  *Id.*

"Controversy in the NEPA context does not necessarily denote public opposition to a proposed action, but a substantial dispute as to the size, nature, or effect of the action."  *Middle Rio Grande*, 294 F.3d at 1229; *Cold Mountain v. Garber*, 375 F.3d 884, 893 (9th Cir. 2004) ("[T]he existence of opposition does not automatically render a project controversial.").  "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI, casts serious doubt upon the reasonableness of an agency's conclusions."  *Nat'l Parks & Conservation Ass'n v. Babbitt* ("*NPCA*"), 241 F.3d 722, 736 (9th Cir. 2001) (internal citations and quotations omitted), *abrograted on other grounds by Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743 (2010); *see Greater Yellowstone Coal.*, 359 F.3d at 1275 (citing *NPCA*, 241 F.3d at 736, for comments that provide evidence of a substantial dispute).

Under the NEPA regulations, the dispute as to the size, nature, or effect of the action must also be "highly" controversial.  40 C.F.R. § 1508.27(b)(4).  As the Ninth Circuit has explained, "[t]he use of the word "highly" in the NEPA regulations to modify "controversial" and "uncertain" means that information merely favorable to [plaintiff's] position in the NEPA documents does not necessarily raise a substantial question about the significance of the project's environmental effects."  *Native Ecosys. Council v. Forest Service* 428 F.3d 1233, 1240 (9th Cir. 2005) ("[S]imply because a challenger can

cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or highly uncertain.").

Petitioners allege that the Wishbone allotment's effects on bighorn sheep are highly controversial "due to substantial disputes about the impacts to bighorn sheep." Pet. at 16.  These alleged disputes, according to Petitioners, are evidenced by their criticism of the local factors and disagreement with the Forest Service's conclusion that the Wishbone allotment poses only a moderate risk.  *Id.*

Petitioners' argument is flawed because it attacks the Forest Service's method for evaluating the Wishbone allotment's risk.  Dissatisfaction with the Forest Service's *method* of assessing the impact does not equate to the impact itself being highly controversial.  *Utah Shared Access All.*, 288 F.3d at 1212 ("The fact that the Service did not employ a particular method of analysis in its study . . . does not render its Environmental Assessment inadequate."); *Middle Rio Grande*, 294 F.3d at 1229 (explaining "controversy" in the NEPA context encompasses disputes as to the size, nature, or effect of the action—not the agency's chosen methodology).  In other words, the *effect* of the agency action must be in dispute, not only the method of its assessment because "courts are not in a position to decide the propriety of competing methodologies, but should simply determine whether the challenged method had a rational basis and took into consideration the relevant factors."  *Utah Shared Access All.*, 288 F.3d at 1212 (10th Cir. 2002) (citing *Comm. to Pres. Boomer*, 4. F.3d at 1553.

Petitioners fail to raise substantial questions and instead rely on their critique of the local factors.  However, the local factors are well-reasoned and are based on the State's preliminary telemetry data and years of ground monitoring by the Forest Service.

WA_05880; *see Vilsack*, 816 F.3d at 1108 (upholding use of the Risk of Contact tool that was "predicated on data depicting actual big horn sheep movements" *and* data from on-the-ground observations); *Utah Shared Access All.*, 288 F.3d at 1211 (approving the Forest Service's adapted use of the model and giving weight to the model's admonishment that "[m]odels are simply tools to assist in decision-making").  The local factors result in a more accurate assessment because they better reflect the context within which the Forest Service took action.  *See supra* at 15-23.  This practice furthers the goals of NEPA by considering "the effects in the locale rather than the world as a whole" and observing that "[s]ignificance varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a).

Petitioners cite three cases to support their argument that the effects are highly controversial, but these cases arose under vastly different circumstances and are not applicable here.  First, Petitioners use *Middle Rio Grande* for the proposition that "a wide disparity in the estimates of the action's impact [i]s a substantial dispute about effects."  Pet. at 17.  However, in that case the range of estimated effects was much broader and involved the unique context of critical habitat designation.  *See* 294 F.3d at 1223-24, 1228.  Specifically, in the draft EA, estimates of loss of farmland resulting from the habitat designation ranged from 2,000 to 85,000 acres, and estimates of required water were from 26,000 to 188,000 acre-feet of water per year.  *Middle Rio Grande*, 294 F.3d at 1228.  In contrast, the range of estimated impacts to bighorn sheep is from moderate to high, with much of the difference stemming from the application of local factors used to make the assessment more precise.  Pet. at 16-17.  Additionally, *Middle Rio Grande* was decided within the context of the designation of critical habitat under

the Endangered Species Act—a situation in which "circumstances . . . which would relieve the Secretary of the Interior from the duty to prepare an EIS . . . will be unquestionably rare." *Middle Rio Grande Conservancy Dist.*, 294 F.3d at 1225.  The court stressed that "the decision to conduct an EIS is committed to the administrative agency in the first instance," but upheld the district court's order to conduct an EIS "[g]iven the *unique* circumstances of this case." *Id.* at 1231.  The factors giving rise to the unique situation do not exist here.  *Id.* at 1230-31 (listing the relevant circumstances).

Likewise, Petitioners' reliance on *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001), is also misguided.  In that case, the Park Service acknowledged that its action would have an effect but failed entirely to establish the intensity of the impact, and, in response to assertions that the effects were likely to be substantial, responded that the extent of the effects was unknown.  241 F.3d at 737.  Here, the Forest Service firmly established the degree to which the action could affect the environment based on the best science available.  WA_0398; WA_04031-33; WA_04039.

Lastly, Petitioners cite to *San Luis Valley Ecosystem Counsel v. U.S. Forest Service*, No. 04-cv-01071-MSK, 2007 WL 1463855 (D. Colo. 2017), for the proposition that effects are highly controversial if an agency does not address potential impacts raised by public comments.  Pet. at 18.  Petitioners contend that the Forest Service "did not properly analyze the risk the [Wishbone] allotment would pose to bighorn populations adjacent to the Central San Juan herds."  Pet. at 17.  However, *San Luis Valley* is inapplicable here because Petitioners ignore that the Forest Service did in fact

analyze the impacts to the Central San Juan herds, including potential impacts raised during the public comment period.  *See* WA_05362-71.

Petitioners have failed to show that the potential effects of the Wishbone allotment are "highly controversial" within the meaning of NEPA because they do not raise substantial questions.  Criticism regarding the agency's method of assessment does not equate to controversy over the effects of the action, and the Forest Service's determination was well-reasoned and based on the best available science.

### B.  The Wishbone allotment's effects are not unique or highly uncertain.

Petitioners next contend that authorization of the Wishbone allotment created a unique risk and that the result of the risk is highly uncertain.  Pet. at 18-19.  According to Petitioners, the possible effects involve unique risks because disease transmission to bighorn sheep is unique to domestic sheep grazing.  *Id.*  Petitioners contend further that the risk is highly uncertain "given the dispute about how often and how far the disease would spread" and because of the disparity between the risk assessment before and after the input of local factors into the initial results of the Risk of Contact Tool.  *Id.*

"[T]he [NEPA] regulations do not anticipate the need for an EIS anytime there is *some* uncertainty, but only if the effects of the project are highly uncertain."  *Envtl. Prot. Info. Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1011 (9th Cir. 2006).  The fact that updated estimates are not comparable to those made using other methods in the past does not support the conclusion that the estimates are highly uncertain.  *Friends of Animals v. U.S. Bureau of Land Mgmt.* 2017 WL 5247929, *7 (D. Wyo. 2017) ("If that were the case, an agency would be stuck using poor or outdated techniques and models simply for comparability.").

Contrary to Petitioner's contentions, the risks to bighorn sheep presented by domestic sheep grazing are neither unique to this specific situation nor unknown. These risks are sufficiently common to have spurred extensive scientific research and the development of recommendations for the management of domestic sheep and goats in wild sheep habitat, among other guidelines. WA_04064; WA_04672. Indeed, other courts have addressed these very same concerns. *See Gallatin Wildlife Ass'n v. U.S. Forest Service*, 2015 WL 4528611 (D. Mont. 2015) (deciding a challenge to the Forest Service's authorization of grazing allotments after the introduction of bighorn sheep); *Vilsak*, 816 F.3d at 1095 (assessing the Forest Service's decision to reduce domestic sheep grazing because of the allotment's proximity to bighorn sheep).

The Forest Service recognizes the potential for disease transmission from domestic to bighorn sheep and provided an in-depth analysis of the potential effects and risks to bighorn sheep. WA_03956; WA_04063. The Wishbone allotment's possible effects are not highly uncertain because the risks from domestic sheep are "hardly unusual" and the effects were "largely predictable." *Surfrider Found.* 989 F. Supp. 1309, 1325 (S.D. Cal. 1998); *see* WA_03651-59 (assessing strength and health of bighorn herds with consideration of the effects of domestic sheep grazing); WA_03770-78 (presenting results from ground observation studies in 2017); WA_04038-39 (concluding that the Risk of Contact Tool and local factors result in a moderate risk assessment). The environmental effects are largely predictable.

The effects of domestic sheep grazing are widely studied, and the tools used by the Forest Service are trusted to accurately assess the degree to which an allotment could affect bighorn sheep. The Forest Service applied the trusted tools to the

Wishbone allotment and defined the associated risk.  Thus, the Wishbone allotment's

effects or neither highly uncertain nor unique.

### C. The Wishbone allotment will not establish a precedent for future actions.

Petitioners contend that the action may establish precedent for future actions

because the Forest Service may use similar modeling techniques for calculating the risk

ratings of other proposed allotments.  Pet. at 19-20.  In particular, Petitioners contend

that the Forest Service used "unsupported assumptions" to determine the Wishbone

allotment poses a moderate risk.  *Id.*

The following characteristics of an agency action cut against the argument that it

will establish precedent for future action: an EA that is highly specific to the proposed

action and non-binding in nature; a lack of evidence in the record supporting a

conclusion that issuance of a FONSI would create irreversible pressure to approve a

future project without completing an EIS; an absence of an indication that a judicial

refusal to force the agency to complete an EIS in the action would enable the agency to

ratify future actions without complete adherence to NEPA.  *Oregon Wild v. U.S. Forest

Service*, 107 F.Supp.3d 1102, 1113 (D. Or. 2015) (concluding no EIS was required due

to the "highly specific, non-binding nature of the EA"); *Nat'l Parks Conserv. Ass'n v.

United States*, 177 F.Supp.3d 1, *32 (D.C. Cir. 2016) (approving the issuance of a

FONSI absent evidence in the administrative record that the Forest Service would "feel

bound" by their decision in future cases); *Surfrider Found. v. Dalton*, 989 F.Supp. 1309,

1325 (S.D. Cal. 1998) (concluding no EIS was required upon finding the EA was highly

site-specific and contained no indication that the agency would be able to act without full

compliance to NEPA in the future).

Contrary to Petitioners' assertion, the Forest Service's assumptions—the local factors—are supported by science.  *See* WA_03651-59; WA_03770-78; WA_03988-95; WA_04038-39.  Thus, there can be no precedent set for using "unsupported assumptions" in future agency actions.  Secondly, this action does not establish a precedent for future actions because site-specific analyses were conducted that would necessarily differ from site-specific analyses in future decisions.  WA_05681 ("[T]his decision is specific to the Wishbone Allotment and Divide District of the Rio Grande National Forest" and "[a]ny future actions' effects would be assessed through action-and-site-specific analysis").  Again, agencies are directed by NEPA regulations to consider the significance of an action in the context of the locality, and this method of analysis fulfills that responsibility.  40 C.F.R. § 1508.27(a).

In addition, Petitioners try to support their argument by pointing to the fact that the Forest Service has in the past eliminated domestic sheep grazing areas that the Risk of Contact Tool rated as high risk and that this is the first time the Forest Service has applied local factors to the Tool's results.  Pet. 19.  However, this assertion provides no evidence that the agency will not comply with NEPA and conduct an independent analysis of the risk of any future allotments.  To be sure, the agency may apply local factors to a risk assessment in a future action, but those local factors are necessarily dependent on the local conditions of the subject area.  *See* WA_03948.

In sum, the risk assessment of the Wishbone allotment will not establish a precedent for "unsupported assumptions" because the assessment was derived from a rigorous scientific analyses.  The Forest Service conducted a site-specific analyses that will necessarily differ when applied to future actions.

**D. The Wishbone allotment will not have cumulative significant effects.**

Lastly, Petitioners allege that authorization of the Wishbone allotment is related to other actions with individually insignificant but cumulatively significant impacts. Pet. at 20. Petitioners aver that the cumulative risk from other domestic sheep allotments, combined with the Wishbone allotment, could be significant. *Id.*

NEPA requires agencies to analyze "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." 40 C.F.R. § 1508.7.

Petitioners suggest that other domestic sheep allotments, combined with the Wishbone allotment, may add to the potential risk to bighorn herds, but they do not specifically identify any other allotments. In fact, the Forest Service has vacated 15 domestic sheep allotments in the last decade, not including the Snow Mesa allotments. WA_05677. An additional two allotments were vacated in 2019. WA_05821-23; WA_05895. The Forest Service decision to vacate the three Snow Mesa allotments provides additional security for the Forest's bighorn herds.

Petitioners also suggest that the bighorn herds' "connectivity" presents a risk that the Wishbone allotment's domestic sheep could come into contact with the Central San Juan, Weminuche, and San Juan West bighorn meta-populations. Pet. at 20. The Forest Service addressed the connectivity with adjacent herds in the EA and Risk Assessment. *See* WA_03981; WA_03984-86; WA04045. In addition, the Forest Service analyzed the bighorn foray rates from the Weminuche meta-population in the

FIG Allotment analysis and found the nearest Wishbone pasture (South River) fell in the lowest probability bands.  WA_05674.  The Forest Service therefore reasonably determined that the population viability would not be impacted.  WA_05678.

The Administrative Record clearly demonstrates that the Forest Service considered the potential risks caused by the connectivity of bighorn herds and took action specifically to mitigate them.  Therefore, Petitioners argument that the allotment could pose cumulatively significant effects because of the connectivity of bighorn herds is unsupported.

In sum, the Forest Service reviewed all of the intensity factors under NEPA's definition of significant.  *See, e.g.*, WA_05680-81.  The Administrative Record demonstrates that the Wishbone allotment will not have significant impacts.  Thus, Petitioners' claim fails.

### III.   The Forest Service reasonably determined that a supplemental NEPA analysis is not required.

Petitioners' final claim asserts that the Forest Service should have prepared a supplemental EA rather than issuing a Supplemental Information Report.  Pet. at 31-35.  NEPA's implementing regulations impose a continuing duty on federal agencies to supplement existing analysis in response to "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii); *Marsh*, 490 U.S. at 372 (NEPA's implementing regulations "make plain that at times supplementation is required").[12]  However, "an

---

[12] "The Forest Service applies these same principles with respect to [Environmental Assessments], even though the regulations speak only to [Environmental Impact Statements]."  *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218, n.3 (10th Cir. 1997) (citing Forest Service Handbook § 18.4, 57 Fed. Reg. 43,180, at 43,200 (1992)).

agency need not supplement [a NEPA document] every time new information comes to light" after the agency has issued its decision.  *Marsh*, 490 U.S. at 373.

Supplemental Information Reports are "the Forest Service's formal instruments for documenting whether new information is sufficiently significant to trigger the need for a [supplemental EIS]." *Klamath Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1089, 1097 (E.D. Cal. 2014) (alteration in original); *San Juan Citizens All. v. Stiles*, No. 08-CV-00144-RPM, 2010 WL 1780816, at *5 (D. Colo. May 3, 2010), *aff'd in part, remanded in part*, 654 F.3d 1038 (10th Cir. 2011) ("If the [Forest Service] concludes that new information or changed circumstances do not require the preparation of a supplemental EIS, a supplemental information report or 'SIR' may be used to document the [Forest Service's] environmental evaluation and conclusion."). "A Supplemental Information Report is not as detailed or thorough as an Impact Statement and the agency need not subject it to public comment." *Northwoods Wilderness Recovery, Inc. v. U.S. Dep't of Agric. Forest Serv.*, 192 F. App'x 369, 371 (6th Cir. 2006); *see also Marsh*, 490 U.S. at 373.

Including a Supplemental Information Report in an administrative record is a routine matter—even when the Forest Service issues the report after litigation begins. *See, e.g., Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 314 F. App'x 17, 19 (9th Cir. 2008) ("After this case was submitted, the Forest Service submitted—and we received—a Notice of Completion of Supplemental Information Report"); *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1216 (10th Cir. 1997) (amended complaint filed on April 25, 1995, and Supplemental Information Report issued on October 19, 1995);

*ForestKeeper v. La Price*, 270 F. Supp. 3d 1182, 1189 (E.D. Cal. 2017), *aff'd in part sub nom. Sequoia Forestkeeper v. La Price*, 723 F. App'x 481 (9th Cir. 2018) (complaint filed on June 1, 2016, and Supplemental Information Report issued on April 12, 2017); *Klamath Siskiyou Wildlands Ctr.*, 52 F. Supp. 3d at 1094-95 (complaint filed on June 2, 2012, and Supplemental Information Report issued in February 2013).

In general, courts accept an agency's Supplemental Information Report and do not find it as an improper "post hoc rationalization" for agency action as Petitioners claim.  *See, e.g., Kunaknana v. U.S. Army Corps of Eng'rs*, No. 3:13-CV-00044-SLG, 2015 WL 3397150, at *4 (D. Alaska May 26, 2015) ("[T]he rule disfavoring *post hoc* rationalizations . . . does not prohibit an agency from submitting an amplified articulation of the distinctions it sees."); *Friends of Bitterroot, Inc. v. U.S. Forest Serv.*, 900 F. Supp. 1368, 1372 (D. Mont. 1994) ("Plaintiffs maintain the [Supplemental Information Report] is simply a 'post-hoc rationalization' supporting the Forest Service's decision . . . The court is unpersuaded by plaintiffs' argument.").  If a SIR were presumptively improper, there would be no basis for a court to review whether the Forest Service had considered the express requirement in NEPA's implementing regulations to supplement analyses when new information that meets certain criteria (i.e., "significant" and "relevant to environmental concerns") becomes available.  40 C.F.R. § 1502.9(c)(1)(ii).

Petitioners assert that the Forest Service used the Supplemental Information Report to "fix a deficiency in the EA" because the State's telemetry data "was not 'truly new' information."  Pet. at 33.  However, Petitioners fail to address that the State's telemetry data was not available to the Forest Service at the time of its Decision because the State considered the bighorn movements confidential and the study

ongoing and incomplete.  WA_05880.  It was not until after Petitioners brought suit that

the Forest Service learned the State had released the telemetry data to Petitioners.  *Id.*

In their administrative objection to the Forest Service's decision, Petitioners

vaguely referred to "[t]elemetry data [that] has been collected from a small subset of the

area bighorns since early 2017, and additional locational information is known only from

incidental sightings and infrequent surveys."  WA_05478; *see also* WA_05479

("Telemetry collected during the single season since collars were installed on bighorn

sheep reveal movements outside of mapped Core Herd Home Range, and within 1.5

miles of a Wishbone pasture.").  However, Petitioners did not specify that the State had

released the confidential telemetry data to Petitioners.  *See* WA_05478.  Indeed,

*Petitioners did not submit any of the telemetry data they apparently obtained from the*

*State to the Forest Service*—even though Petitioners assert that the Forest Service

should have considered the data.  Petitioner's conduct during the objection period is

precisely that admonished in *Vermont Yankee Nuclear Power Corp. v. Natural*

*Resources Defense Council, Inc.*, 435 U.S. 519, 553-54 (1978), where the Supreme

Court held, "administrative proceedings should not be a game or a forum to engage in

unjustified obstructionism by making cryptic and obscure reference to matters that

'ought to be' considered and then, after failing to do more to bring the matter to the

agency's attention, seeking to have that agency determination vacated."  *See also Ark*

*Initiative v. Forest Serv.*, 660 F.3d 1256, 1262 (10th Cir. 2011) (quoting *Vt. Yankee*, 435

U.S. at 553-54).  The Tenth Circuit has similarly denied relief where the petitioner did

not submit data or analysis during the administrative objection process, although it

claimed to have documentation supporting a conclusion counter to the agency's

decision. *Ariz. Pub. Serv. Co. v. U.S. E.P.A.*, 562 F.3d 1116, 1128 (10th Cir. 2009).

As explained in the Supplemental Information Report, the Forest Service

evaluated the new telemetry data to determine whether the new information and

changed circumstances are within the scope and range of effects considered in the

original analysis or if a supplemental analysis is warranted under NEPA.  WA_05879.

The State provided telemetry data collected through July 2018.  WA_05758-59.  To

determine whether a supplemental analysis under NEPA was warranted, the Forest

Service had to assess the updated information by rerunning the Risk of Contact Tool

and evaluating the validity of the local factors as before.  *See* WA_05886-87.

The Forest Service reasonably determined that the scope of effects of the

original analysis encompasses the new information.  For example, the new information

revealed that the Wishbone allotment maintains no overlap with the bighorn sheep

CHHR.  WA_05888.  In addition, the Forest Service determined that the "27% increase

in modeled contact rate between bighorn sheep and the Wishbone allotment is not

significant because the local factors that qualify the risk of contact in the 2017 analysis

still apply."  WA_05889.  The Forest Service also explained the importance of foray

timing: contact between a bighorn sheep and the allotment would occur only during a

foray because the CHHR does not overlap with the Wishbone Allotment.   WA_05889.

And the Forest Service provided figures of the State's telemetry data, which support the

Forest Service's assumption that "forays do not typically occur during the grazing

season."  WA_05890; WA_05903.[13]

---

[13] The Forest Service objects to Petitioners' declarations and extra-record materials to
the extent Petitioners submit them as expert testimony, which is improper in this APA

Petitioners' attempt to rebut the Forest Service's findings fails because the Forest Service provided a rational basis for its conclusion that additional NEPA analysis was not necessary.[14]

**CONCLUSION**

The Forest Service extensively examined the Wishbone allotment's potential effects and provided well-reasoned explanations for its determinations, including the bases for its chosen methodologies.  Thus, the Forest Service's decision to authorize grazing on the Wishbone allotment was not arbitrary or capricious.  The Forest Service also reasonably determined that preparation of an EIS is not necessary because the Wishbone allotment will not significantly affect the environment, which is fully supported by the record.  And when the Forest Service was finally able to obtain the State's telemetry data, the Forest Service fully evaluated the new information and concluded a supplemental NEPA analysis is unnecessary because there were no significant new circumstances bearing on the impacts of the Wishbone allotment.  Petitioners fail to establish that the Forest Service violated NEPA in analyzing the impacts of authorizing domestic sheep grazing on the Wishbone allotment.  The Court should deny Petitioner's request for relief.

Respectfully submitted,

---

record-review case.  *Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007) ("Judicial review of agency action is normally restricted to the administrative record.").

[14] If the Court finds the agency erred, the Forest Service respectfully requests that the Court allow supplemental briefing on the appropriate scope of any remedy, including whether or not vacatur of the decision is appropriate.  Vacatur is a form of equitable relief, *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096 (10th Cir. 2010), and courts are not mechanically obligated to vacate an agency decision they find invalid.  *See Cal. Comms. Against Toxics v. EPA*, 688 F.3d 989, 992-94 (9th Cir. 2012).

DATED: June 22, 2020

PRERAK SHAH
Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ Krystal-Rose Perez*____
KRYSTAL-ROSE PEREZ, TX Bar No. 24105931
Natural Resources Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 305-0486
Krystal-rose.perez@usdoj.gov

*Attorney for Federal Respondent*

Tate Justesen, OR. Bar No. 083741
Caroline Lobdell, OR. Bar No. 021236
Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 119-327
Portland, OR 97219
Tel: (503) 768-8500
Fax: (503) 222-3255
Email: tjustesen@wrlegal.org
Email: clobdell@wrlegal.org

*Counsel for Respondent-Intervenors*
*(Wayne Brown, Jerry Brown, and Colorado Wool Growers Association)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-208 REB

WILDEARTH GUARDIANS and WESTERN WATERSHEDS PROJECT,

        Petitioners,

v.

U.S. FOREST SERVICE,

        Respondent,

and

WAYNE BROWN,
JERRY BROWN, and
THE COLORADO WOOL GROWERS ASSOCIATION;
J. PAUL BROWN, and
THE COLORADO FARM BUREAU FEDERATION,

        Respondent-Intervenors.

---

### OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

---

Page 1 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

I-App-186

# TABLE OF CONTENTS

I.     INTRODUCTION. ................................................................................. 4

       A.    Multiple-Use Management. ...................................................... 5

       B.    Creation of the Wishbone Allotment. ...................................... 6

       C.    Spatial Separation. ................................................................. 9

       D.    Temporal Separation. ........................................................... 11

       E.    Collaborative Process. .......................................................... 12

II.    ARGUMENT ...................................................................................... 13

       A.    The Forest Service's decision to establish the Wishbone allotment was not "highly controversial," and thus the agency appropriately prepared an EA/FONSI rather than an EIS. ................................................. 13

       B.    The Forest Service EA and FONSI were not arbitrary and capricious, as the agency properly relied on available data and adequately considered the effects of its decision. ........................................................... 16

             1. *The Forest Service relied on reasonable supported assumptions.* . 16

             2. *The Forest Service rationally utilized relevant information and comments from Colorado Parks and Wildlife (CPW).* ..................... 17

             3. *The Risk of Contact model alone does not adequately illustrate how bighorn sheep and domestic sheep interactions can be managed. The Forest Service reasonably took local factors into account to assess and mitigate risk of contact.* ................................................. 20

             4. *Forest Service directives required the agency to identify and analyze potential replacement allotments when developing management alternatives, including development of site-specific solutions.* ........ 21

       C.    The Forest Service reasonably relied on its Supplemental Information Report (SIR) and utilized its lawful discretion in choosing to forgo further NEPA analysis. ....................................................................... 22

III.   CONCLUSION. .................................................................................. 24

Page 2 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

**I-App-187**

# TABLE OF AUTHORITIES

**Cases**.............................................................................................................. **Page(s)**

*BioDiversity Conservation Alliance v. Bureau of Land Mgmt.*,
   608 F.3d 709 (10th Cir. 2010) ..................................................................... 14

*Bowman Transp., Inc. v. Ark-Best Freight System, Inc.*,
   419 U.S. 281 (1974)..................................................................................... 15

*Colo. Envtl. Coalition v. Dombeck*,
   185 F.3d 1162 (10th Cir. 1999) ..................................................................... 4

*Ctr. for Biological Diversity v. Ross*,
   4:19-cv-3135, 2019 WL 7020195 (N.D. Cal. Dec. 20, 2019).................................... 23

*Friends of the Bow v. Thompson*,
   124 F.3d 1210 (10th Cir. 1997) ................................................................... 23

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976)..................................................................................... 16

*Marsh v. Or. Natural Res. Council*,
   490 U.S. 360 (1989)..................................................................................... 22

*Middle Rio Grande Conservancy Dist. v. Norton*,
   294 F.3d 1220 (10th Cir. 2002) ................................................................... 14

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm*,
   463 U.S. 29 (1983)....................................................................................... 22

*Or. Natural Desert Ass'n et. al. v. USFS*,
   18-35514, 3:030-cv-00213-PK, ECF 76-2, 21 – 22 (9th Cir. 2020)........................... 7

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
   565 R.3d 683 (10th Cir. 2009) ..................................................................... 4

*Town of Superior v. U.S. Fish & Wildlife Serv.*,
   913 F. Supp. 2d 1087 (D. Colo. 2012) ....................................................... 14

*U.S. Postal Serv. v. Gregory*,
   534 U.S. 1 (2001)......................................................................................... 15

*United States v. Walker*,
   918 F.3d 1134 (10th Cir. 2019) ..................................................................... 4

*WildEarth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013)..................................................................... 23

Page 3 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET
AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

**I-App-188**

## I.   __INTRODUCTION__.

Respondent-Intervenors Wayne Brown, Jerry Brown ("Permittees"), and the

Colorado Wool Growers Association (collectively, "Intervenors") ask this Court to uphold

the U.S. Forest Service's ("Forest Service") 2018 decision establishing the Wishbone

allotment and authorizing its use for domestic sheep grazing.  The Forest Service's

National Environmental Policy Act ("NEPA") review reasonably determined that grazing

on the Wishbone allotment would have no significant impact on bighorn sheep and is

consistent with the Forest Plan for the Rio Grande National Forest.[1]  In addition to the

2018 grazing authorization, Petitioners also challenge the Forest Service's use of a

Supplemental Information Report ("SIR") to assess new telemetry data regarding the

movements of nearby bighorn sheep herds.  ECF 1 ("Pet. For Rev.") ¶ 1.

In challenging the Forest Service's conclusion that grazing would not impact

bighorn sheep, Petitioners flyspeck details from the record in an attempt to distract the

Court from the on-the-ground facts of this case and paint all sheep grazing cases as

"one size fits all."[2]  Petitioners wrongly perpetuate the incorrect notion that any contact

between domestic sheep and bighorn sheep automatically equates to respiratory

disease outbreaks in bighorn sheep.  The Wishbone allotment was created as a

---

[1] Petitioners do not raise in their opening brief, and therefore waive, their argument that the Forest Service violated the Forest Plan (and thus, the National Forest Management Act) by failing to provide for bighorn sheep viability. Compl. ¶ 92 (Claim Two).  *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019).

[2] "Mere flyspecking of purported deficiencies in NEPA processes are not grounds for reversal of agency decisionmaking."  *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 R.3d 683 (10th Cir. 2009); *see also Colo. Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1172 (10th Cir. 1999) (Court's objective is not to "fly speck" an agency's NEPA process).

Page 4 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET
    AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

replacement for the Snow Mesa allotments—where Permittees previously grazed domestic sheep—and was specifically intended to address the very risks Petitioners identify regarding potential contacts between domestic and bighorn sheep.  While Intervenors believe the risks to bighorn sheep in Colorado are overstated for a variety of reasons, the allotment's geography and management design features significantly reduce, if not eliminate, the likelihood of contact with bighorn sheep populations. Petitioners have not offered any evidence to rebut the Forest Service's conclusions on this matter, and instead rely on cases with no factual similarity or precedential value to inflate the risks to bighorn sheep.  Pets' Opening Brief at 3.[3]  These cited cases were decided on entirely different facts involving entirely different landscapes from those at issue here in the Rio Grande National Forest.

To avoid duplicative briefing, Respondent-Intervenors hereby incorporate by reference and join with the legal arguments of the Federal Respondent.

### A. <u>Multiple-Use Management.</u>

The Forest Service is not required to manage the Rio Grande National Forest for zero risk to bighorn sheep.  WA05664.  As an agency in charge of managing our public lands, the Forest Service is under a mandate to manage the Rio Grande National Forest for multiple uses pursuant to the Multiple-Use and Sustained Yield Act ("MUSYA")[4] of 1960.  Likewise, the National Forest Management Act ("NFMA") of 1976 requires the Forest Service to manage all National Forest System lands on a multiple-

---

[3] Petitioners repeatedly brandish citation to grazing cases from the District of Idaho that are neither persuasive nor precedential in this District.  Nor are those cited Idaho cases so factually similar to the Wishbone allotment matter that they are of utility to this Court.
[4] Multiple-Use Sustained Yield Act of 1960, 16 U.S.C. 528, *et seq.*

Page 5 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

use basis, including for both wildlife and range (i.e., livestock grazing).[5]  Petitioners ask this Court to ignore these mandates and to eliminate one use in favor of another, in contravention of the MUSYA and NFMA.  Yet, it is neither Petitioners' nor this Court's role to substitute its judgment for that of the Forest Service in determining how to balance these congressionally mandated uses.

**B.  Creation of the Wishbone Allotment.**

As discussed *supra*, Permittees previously lost use of the Snow Mesa allotments due to concerns over bighorn sheep and domestic sheep risk of contact.  WA05660.  The new Wishbone allotment served as a replacement to the Snow Mesa allotments and is now central to Permittees' domestic sheep production operations, given the limited (or non-existent) availability of alternative summer pastures in the area suitable for domestic sheep grazing.  ECF 12-2 ("W. Brown Decl."), ¶¶ 2, 5.  Permittees Jerry and Wayne Brown are long-time sheep producers and have grazed on public lands allotments for decades.  ECF 12-2, ¶ 2, 7; ECF 12-3, ¶ 2, 6.  However, their multigenerational businesses rely on continued access to public lands allotments.  Without access to the Wishbone allotment, Permittees must purchase replacement feed at elevated cost, threatening the viability of their businesses.  ECF 12-2, ¶ 5; ECF 12-3 ("J. Brown Decl."), ¶¶ 2, 7.

The Forest Service has already closed huge swathes of the Rio Grande National Forest highlands—including the Fisher-Ivy, Goose Lake, and Snow Mesa allotments—

---

[5] National Forest Management Act of 1976, 16 U.S.C. §1604 (e)(1) ("the Secretary shall assure that such plans . . . provide for multiple use and sustained yield . . . in accordance with the Multiple-Use Sustained Yield Act of 1960").

Page 6 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

I-App-191

totaling 53,420 acres of lands no longer available for domestic sheep grazing.

WA03976; WA02096.  Petitioners discount both allotment design and new prophylactic

requirements applicable to the Wishbone allotment that ensure spatial and temporal

separation from bighorn sheep and would have this Court enjoin grazing from the

remainder of the Rio Grande National Forest.[6]

The Forest Service has imposed significant constraints on grazing on the

Wishbone allotment, requiring Permittees to drastically alter their sheep grazing

operations.  When compared to the Snow Mesa allotments, Permittees' herder and feed

costs on the Wishbone allotment have already doubled due to differences in forage

quality and the limitations on when and how they may utilize the new Wishbone

allotment.  ECF 12-2, ¶ 6; ECF 12-3, ¶ 7; WA05664.  Nevertheless, this limited use of

the Wishbone allotment is vastly preferable to Permittees than the total loss of their

domestic sheep grazing operation in the Rio Grande National Forest.  ECF 12-2, ¶ 6.

Permittees must adhere to annual operating instructions ("AOIs") in order to

graze their sheep on federal grazing allotments.  36 C.F.R. § 222.4 (setting forth

penalties, including cancellation of grazing, for failure to follow the requirements of

Forest Service grazing permits).[7]  The AOIs for the Wishbone allotment include special

---

[6] Petitioners have stated they want domestic sheep grazing entirely discontinued in the area (WA02819).  The Forest Service previously undertook environmental review on a number of Forest Service allotments that resulted in closure of a number of domestic sheep grazing allotments due to alleged high risk of contact between bighorn sheep and domestic sheep.  WA02099; WA05660.

[7] Petitioners reference historic isolated noncompliance issues with Permittees; however, that is a red herring as the Forest Service has discretion in monitoring and permitting grazing use; *see Or. Natural Desert Ass'n et. al. v. USFS*, 18-35514, 3:030-cv-00213-PK, ECF 76-2, 21 – 22 (9th Cir. 2020) (Court defers to Forest Service expertise in

Page 7 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET
AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

project design features ("PDFs") tailored to prevent domestic sheep and bighorn sheep interaction.  WA05666-67.  In particular, the PDFs include monitoring requirements, modified seasons of use, and prescriptive instructions on trailing and herding—all of which ensure that domestic and bighorn sheep are separated both spatially (that is, physically by distance), and temporally (that is, they do not potentially occupy the same areas at the same time).  WA05668-71.  These PDFs are included in the Permittees' AOIs.  WA05666; WA05249.  Permittees' permits also are subject to adjustments based on site-specific conditions and monitoring to ensure compliance.  36 C.F.R. § 222.4. The Forest Service maintains a notification calling tree in case of strays or bighorn sheep sightings, to ensure such incidents are dealt with in a timely fashion.  WA05667.

Permittees' years of experience with public lands grazing have equipped them to operate within the parameters of the new AOIs.  Permittees have long employed best management practices, such as responsible grazing, bighorn sheep avoidance, use of herding dogs, and utilization of human herders to assist with proper use of the grazing allotments.  WA03542-68.  The fact that there have not been any known bighorn-domestic sheep disease transmission events in decades on the Snow Mesa allotments speaks to the effectiveness of the best management practices used by Permittees historically.  WA02658.  Permittees have grazed sheep on the newly established Wishbone allotment since 2016 without any known bighorn sheep-domestic sheep encounters noted in the record.

---

assessing whether instances of grazing exceedances rise to level of non-compliance with Forest Plan).

Page 8 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

I-App-193

C. **Spatial Separation.**

In establishing the boundaries of the Wishbone allotment, the Forest Service utilized preliminary bighorn sheep data from Colorado Parks and Wildlife ("CPW") to exclude grazing from areas of the Rio Grande National Forest where bighorn and domestic sheep would most likely come into physical contact. WA03988-98. Spatial separation is ensured by a combination of physical separation (actual physical distance) between the sheep species, as well as utilization of PDFs and best management practices. The PDFs help to ensure that, in the event a bighorn draws near to a domestic sheep herd, measures are in place to prevent contact between the two sheep species. WA05668-72 (referencing the nine design features designed to mitigate risk of contact between domestic and bighorn sheep); *see also* WA05799.

Under the Wishbone grazing permits, domestic sheep only will be present in the higher elevation pasture in the Summer, when localized data indicates that the bighorn sheep will be at even higher elevations (bighorn summer range). WA04038. In the Spring, when bighorn sheep are at lower elevations due to snowpack, domestic sheep are pastured in the lowest elevation pastures of the Wishbone allotment—where bighorn sheep do not normally disperse. WA05668-70. By tailoring the use of grazing pastures to when local bighorn populations are not expected to be present, the Forest Service has drastically reduced the risk of contact between the two species. *Id*.

The Forest Service also has imposed stringent safeguards when Permittees "trail" domestic sheep from one pasture to another within the allotment. WA05268-69. Permittees must employ additional herders to conduct hazing ahead of the sheep trailing route if bighorn sheep are present along the path as they are trailing. WA05666.

Page 9 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

I-App-194

Herders must control the sheep in a tight group to prevent straying.  WA05666.  Two additional herders conduct sweeps of pastures and trailing routes post-move. WA05666.  These extra safeguards address potential situations when bighorn sheep wander outside their normal territory into domestic sheep areas so that the bighorns will be spotted and chased away well ahead of the domestic sheep.  WA05666. Additionally, there is built-in separation due to the physical geographic placement of domestic sheep grazing in areas where bighorn sheep do not normally venture.

The Wagon Wheel Gap[8] is one area where Permittees must pay extra attention to trailing and herding practices.  The Forest Service allows Permittees limited time (6 to 8 hours) for trailing through the Wagon Wheel Gap, along with specific herding requirements.  WA05670.  The PDFs specific to the Wagon Wheel Gap are tailored to avoid contact with bighorns that occasionally are in proximity of the area.  WA 05670. The special herding requirements involve keeping herders out ahead of the moving domestic sheep herd to haze away bighorn sheep, should they be encountered. WA05670.  A successful hazing incident took place in 2016, when herders were able to avoid contact with a seemingly curious bighorn sheep.  WA03763.

The new Wishbone PDFs also include special instructions on how to handle and prevent stray domestic sheep.  WA05667.  Permittees and Forest Service staff must perform additional monitoring and keep written records of stray incidents (including the reason for occurrence and action taken in response).  WA05667.  Other measures to reduce straying include: a two human herder requirement; sweeps of the pastures and

---

[8] Wagon Wheel Gap is a narrow section along Highway 149 that creates a bottleneck when trailing sheep to and from pastures.  WA05371.

Page 10 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN,
           ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

I-App-195

trailing routes after sheep are moved; requiring herders to be with the sheep flock during the day and in camp at night; and requiring Permittees to count sheep as they come onto the forest, after they leave the Crystal Basin pasture, and at their final Forest Service pasture.  WA05667.  Furthermore, in the event of a reported stray, Permittees must respond within 24 hours of notification.  WA05667.

**D. <u>Temporal Separation.</u>**

According to the local, on-the-ground data analyzed by the Forest Service, the majority of bighorn herds typically move higher in elevation (away from the Wishbone allotment) during the domestic sheep grazing season.  WA04038.  These elevation movements have been observed over the course of many years and add to the local knowledge-base behind the decision to establish grazing on the Wishbone allotment. WA04038 (noting the Risk of Contact model output does not reflect localized data).  The Wishbone allotment alternative provided the best temporal separation out of any of the grazing alternatives analyzed.  WA04038.

The Risk of Contact Tool estimates the rate of contact of a foraying bighorn sheep with a domestic sheep allotment (not contact with individual sheep).  WA03872; WA03948; 04467-77.  The Forest Service uses this modeling as a baseline that must be interpreted in light of local conditions and knowledge using site-specific information. WA05662; WA03948.  Grazing management protocols significantly reduce the risk as predicted by the modeling in a number of ways.  For example, the model uses a 180-day grazing season as a baseline.  WA05668; WA04043.  Grazing permits on the Wishbone allotment are issued for a maximum of 78 days total, with the individual pastures within the allotment grazed for 5-30 days (that is, 43% of the grazing period

Page 11 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN,
    ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

anticipated as the default by the risk of contact modeling). WA05668. The Forest Service also has implemented a seasonal offset, where the grazing season only occurs from June 15 through September 1. WA05668. With local bighorn sheep ram forays occurring typically in October, the temporal separation between the domestic and wild sheep species is even further enhanced. WA05668-69.

E. **Collaborative Process.**

As discussed above, some of the new requirements to use the Wishbone allotment are onerous for the Permittees and require much more time and cost to maintain than under their prior permits. WA05664 (discussing concerns raised by Permittees regarding logistics of the new grazing scheme). However, the creation of the Wishbone allotment was the result of a collaborative process that allows for separation between domestic and bighorn sheep, while continuing to provide a public lands grazing opportunity for local livestock producers like the Permittees. WA02806. For the Forest Service, establishing the Wishbone allotment as a replacement for the Snow Mesa allotments was a rare "opportunity to do the right thing by all the resources we manage." WA02658-59. The agency noted an "uncommon" level of agreement between all parties (Permittees, CPW, and the Forest Service) to establish an alternative to the Snow Mesa allotments. WA02659. The extensive process involved local CPW District Wildlife Managers, Terrestrial Biologists, Forest Service staff, Colorado Division of Water Resources, Colorado Department of Transportation, and Coller State Wildlife Area. WA05662.

Permittees also remain committed to close cooperation with the Forest Service to adjust management on the Wishbone allotment, as necessary in any given year. For

Page 12 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

example, Permittees reacted quickly in 2019 when two bighorn sheep were reported present in a lower elevation pasture.  WA05820.  Permittees worked with Forest Service personnel to keep domestic sheep out of that pasture for the grazing season out of utmost caution to avoid any bighorn-domestic sheep contact.  WA05820; WA05837. Examples such as this (and the aforementioned lack of documented pathogen transmission and disease outbreaks in their allotments) show that Permittees are active participants in protecting bighorn sheep and can be expected to reasonably take action to prevent direct contact between wild and domestic sheep.[9]

Intervenors do not want to see the Wishbone allotment closed to sheep grazing, as the creation of the Wishbone allotment was a unique chance for multiple agencies and livestock grazers to come together to achieve preservation of both bighorn sheep and historic domestic sheep grazing on the Rio Grande National Forest.

## II.   **ARGUMENT**.

### A. **The Forest Service's decision to establish the Wishbone allotment was not "highly controversial," and thus the agency appropriately prepared an EA/FONSI rather than an EIS**.

To avoid duplicative briefing, Respondent-Intervenors incorporate by reference and join with the legal arguments of Federal Respondent supporting the Forest Service's use of an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI").  Intervenors will discuss only whether the Wishbone decision was highly controversial or uncertain pursuant to 40 C.F.R. § 1508.27(b)(4)-(5).  In

---

[9] *See* Permittees' 2019 AOIs documenting the many conditions Permittees agree to comply with in order to maintain their domestic sheep grazing permits on the Wishbone allotment. AR05782-803.

Page 13 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

assessing the significance of a proposed action [on the human environment], an agency must consider the extent to which the action is highly controversial, highly uncertain, or involves unique or unknown risks. *Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012) (citing *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002) ("Significance is determined by looking at both the context of the action and its intensity"). Petitioners here mis-apply the "highly controversial" test.

The Forest Service may reject alternative actions that do not meet the purpose and need of the action, such as no-grazing alternatives. *BioDiversity Conservation Alliance v. Bureau of Land Mgmt.*, 608 F.3d 709 (10th Cir. 2010) (agency "may eliminate alternatives that are 'too remote, speculative, impractical, or ineffective,' or that do not meet the purposes and needs of the project").

Petitioners' comments disputing the appropriateness of grazing on the Wishbone allotment do not give rise to a level of controversy contemplated by the case law. *Middle Rio Grande Conservancy Dist.*, 294 F.3d at 1229 (disagreement does not give rise to "highly controversial" circumstances requiring an EIS for every proposed action). Petitioners and Federal Respondent do not appear to have a disagreement over the basic science in this case – both agree that minimizing the potential risk of direct contact between bighorn and domestic sheep is the most prudent course of action to avoid possible pathogen transmission which might result in disease outbreaks.[10]   That

_____

[10] Intervenors dispute the validity and application of questionable studies about bighorn/domestic sheep pathogen transmission (and subsequent development of disease) and the Risk of Contact model that are relied upon by the Forest Service in making its decision in this case.  WA02586-88.  Intervenors also dispute that domestic

Page 14 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN,
    ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

is exactly what the Forest Service did here and Petitioners have not presented evidence showing the agency's conclusions were unreasonable. There have been no known bighorn-domestic sheep respiratory disease events on the Snow Mesa allotments in decades, showing the efficacy of historic and ongoing best management practices. WA02658.[11] Nor have there been any known cases on the Wishbone allotment.

Because Petitioners have not shown evidence that the risks are any greater than the Forest Service estimates, this case represents a disagreement about an agency's application of scientific data in making a decision, in which case deference flows to the agency. *Bowman Transp., Inc. v. Ark-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974) ("even an agency decision of less than ideal clarity" should be upheld "if the agency's path may reasonably be discerned"). This Court should look to whether the administrative record permitted the agency to make the decision it did, without substituting its judgment for that of the agency. *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 7 (2001). Because Petitioners have failed to demonstrate that the Wishbone decision was highly controversial, this Court should defer to Forest Service's determination to prepare an EA and FONSI instead of an EIS.

/ / /

/ / /

---

sheep are the sole source of respiratory disease-causing pathogens in bighorn sheep populations, given that the pathogens appear to be endemic in wild bighorn populations. WA06319. However, there is no question that the measures adopted on the Wishbone allotment significantly reduce the risk of contact between domestic and bighorn sheep.
[11] Intervenors are in disbelief that Petitioners continue to challenge establishment of the Wishbone allotment given the Wishbone allotment's much lower risk of contact assessment and the fact there have been no known disease transmission events in the supposedly higher risk Snow Mesa allotments.

Page 15 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

**B. The Forest Service EA and FONSI were not arbitrary and capricious, as the agency properly relied on available data and adequately considered the effects of its decision**.

"The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).  Before the Forest Service authorized domestic sheep grazing on the Wishbone allotment, it took the requisite "hard look" at the environmental consequences of its action.  *Id*.  The Administrative Record is replete with discussion of the various concerns raised by Petitioners during the NEPA review process, as well as explanation from the Forest Service regarding the validity of using local, on-the-ground design features/best management practices utilized to reach its decision.

Petitioners ask this Court to completely ignore how the bighorn data is used along with localized, on-the-ground information to ensure spatial and temporal separation between bighorn and domestic sheep.[12]  Using years of CPW data and the Forest Service's own bighorn sheep observations,[13] the Forest Service has crafted a unique management framework that keeps domestic sheep out of allotments when bighorn sheep may be there.

1.   *The Forest Service relied on reasonable supported assumptions*.

Reliance on project design features/best management practices is supported by the record and creates spatial and temporal separation of bighorn sheep and domestic

---

[12] *See generally* WA05660 – 05682 (DN & FONSI); WA05211 – 05339 (EA Vol. 1); WA03956 – 04063 (EA Vol. 2).
[13] WA05880.

Page 16 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN,
ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

sheep.  The Wishbone allotment does not contain any known bighorn sheep habitat, with the exception of some potential overlap on the upper elevation pastures, which will not be grazed until later in the summer when bighorn sheep have moved to higher elevations (and grazing occurs with contact-preventing design features, discussed in greater detail herein).  WA03798; WA05663.

The Forest Service Final Decision Notice and Finding of No Significant Impact ("DN & FONSI") (WA05660 – 05682) contain a detailed discussion of PDFs tailored to address local, site-specific, on-the-ground concerns regarding potential domestic sheep and bighorn sheep interactions.  WA04038.  Petitioners' Opening Brief completely ignores the dual separation (spatial **and** temporal) of bighorn sheep and domestic sheep that is accomplished by the PDF in the chosen Alternative 5, as detailed in the DN & FONSI. WA05665-72.[14]  The design features chosen by the Forest Service accomplish spatial separation and temporal separation of bighorn and domestic sheep on the Wishbone allotment, thus addressing the concerns of Petitioners and other concerned commenters.

>   2. *The Forest Service rationally utilized relevant information and comments from Colorado Parks and Wildlife (CPW).*

Colorado Parks & Wildlife supports the development and use of the Wishbone allotment.  WA02806 ("The development of the Wishbone Allotment … will help create effective separation between domestic and bighorn sheep, while continuing to provide

---

[14] Detailing the Forest Service's comprehensive consideration and application of specific on-the-ground facts pertaining to bighorn sheep allow the Forest Service to utilize project design features reasonably calculated to ensure spatial and temporal separation of bighorn sheep and domestic sheep.

Page 17 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

I-App-202

public land grazing opportunity for local livestock producers"). CPW's comments to the Forest Service stressed the need for spatial and temporal separation of domestic and bighorn sheep. WA02805. The Forest Service then adopted PDFs for the Wishbone allotment that would result in spatial and temporal separation of bighorn and domestic sheep. WA05668-78.

The Central San Juan bighorn herd central to Petitioners' concerns in this litigation is a high management priority for CPW. WA02805. It was reasonable for the Forest Service to consider information from CPW, as CPW is an independent state agency with responsibility for management of wildlife, including bighorn sheep at issue in this litigation. WA05675. CPW has institutional knowledge about bighorn sheep in Colorado, including bighorn herd movements and range in the area of the Wishbone allotment. WA05675. The CPW is fully supportive of the decision to create the Wishbone allotment for grazing of domestic sheep thereon. WA02805-06; WA05677.

CPW noted that "the proposed action [creation of the Wishbone allotment] will help to create effective separation between domestic and bighorn sheep" and that the creation of the Wishbone allotment "will help sustain the bighorns of the Central San Juan herd." WA02805; WA02806; WA05677. Contrary to Petitioners' allegations, it is glaringly apparent that the Forest Service considered the most relevant scientific opinion of the Colorado state wildlife management agency, CPW, in creating the Wishbone grazing allotment.

Petitioners appear to take the remarkable position that the Forest Service was unreasonable in considering the expert opinion of the CPW (the State agency in charge of managing the Colorado populations of bighorn sheep) in creating the Wishbone

Page 18 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN,
ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

I-App-203

allotment.  To the contrary, it was eminently reasonable for the Forest Service to rely heavily on information, and encouragement, from CPW, an expert agency in bighorn sheep management, in authorizing grazing on the newly created Wishbone allotment.

In addition to accepting input from CPW, the record shows the use of PDFs was given extensive and careful consideration by the Forest Service in reaching its decision to establish grazing on the Wishbone allotment.  WA05666-71.  The Forest Service reasonably relied on guidance/recommendations given to other land and wildlife management agencies regarding bighorn and domestic sheep management on federal lands.  WA05671.  That is, the Forest Service utilized management recommendations from the 2012 Western Association of Fish and Wildlife Management Agencies ("WAFWA") Recommendations for Domestic Sheep and Goat Management in Wild Sheep Habitat, which includes, but is not limited to, project design features used in creation of the Wishbone allotment, and are utilized by many federal agencies.  WA05671.  In rejecting the use of project design features, Petitioners (entities devoted purely to one-sided advocacy and litigation) claim that they know more about wildlife management than a multitude of agency experts from multiple land management agencies.[15]

Petitioners' argument that it was arbitrary and capricious for the Forest Service to rely on PDFs to achieve separation between bighorn and domestic sheep is without merit and should be disregarded.

/ / /

---

[15] See Pets' Opening Brief at 25.

Page 19 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

3. *The Risk of Contact model alone does not adequately illustrate how bighorn sheep and domestic sheep interactions can be managed. The Forest Service reasonably took local factors into account to assess and mitigate risk of contact*.

The Risk of Contact model specifically provides for localized discretion regarding exactly which models or assessments to use, depending on the specific location being analyzed. WA03988. Because of the limitations of the model and its development for use in the Payette National Forest in Idaho, the Forest Service uses a multiple-step method to fine-tune its risk assessments in other National Forests. WA03988.

Petitioners cite no authority for the proposition that the Forest Service must rely only on the Risk of Contact model to make decisions regarding grazing allotments. To the contrary, the Forest Service must take into account local factors. *Id*. Petitioners ask this Court to ignore these localized factors and years-long observations of bighorn dispersal patterns contrary to intended use of the model. WA05880 (the "local factors were based on years of observation by local [Forest Service] and [CPW] staff").[16]

Here, the Forest Service used local, on-the-ground information to craft a grazing regimen on the Wishbone allotment that will keep domestic sheep out of certain pastures during times when bighorns are most likely to make contact. WA00562-63. Years of observations indicate that bighorns move to higher elevations away from the Wishbone allotment during the summer grazing season. WA04038 (referencing years of local data on bighorn movements; temporal separation of domestic and bighorn sheep on Wishbone allotment). The bighorn "foray season" is known to typically occur

---

[16] Petitioners' Opening Brief (at ECF 33, p. 19) repeatedly cites cases from the Payette National Forest in Idaho as conclusive precedent for all National Forest grazing allotments; this is simply not how the Forest Service analyzes options and alternatives.

Page 20 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

in October, after the domestic sheep grazing season, prompting the Forest Service to end the grazing season on September 1 (rather than September 15) to further ensure separation.[17]  This means that domestic sheep are removed from the Wishbone allotment well before local bighorn sheep forays typically occur.

While the Risk of Contact model calculates the risk of contact between bighorn sheep and the allotment as a whole, it does not take into account the actual use of the allotment by domestic sheep.  WA05662-63.  To adapt the model to the Wishbone allotment, the Forest Service appropriately considered local factors, including grazing season duration, the amount of overlap between domestic sheep range and bighorn sheep habitat outside core home range, and known bighorn sheep seasonal migration patterns (based on local radio-telemetry data).  *Id.*

> 4. *Forest Service directives required the agency to identify and analyze potential replacement allotments when developing management alternatives, including development of site-specific solutions.*

National-level directives require the Forest Service to identify, analyze, and establish, if possible, replacement grazing allotments when existing allotments pose an unacceptable risk of contact between bighorn and domestic sheep, using analysis of site-specific solutions.  WA05219 (Snow Mesa and Wishbone EA); WA02656-57.  Rather than engaging in some extraordinary analysis, as insinuated by Petitioners, the Forest Service, in establishing the Wishbone allotment, has done exactly what it was

---

[17] A "foray" is when a bighorn sheep, typically male, goes on a journey outside its normal habitat area.  The administrative record references a single ram that went on lengthy foray of nearly 25 miles, traveling outside known bighorn habitat – however, this ram stayed in high elevation, rugged mountain areas and the foray apparently occurred in winter months when domestic sheep are not on the range.  WA03841.

Page 21 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

instructed to do by national leadership.  WA05219 ("The Snow Mesa and Wishbone sheep allotments project embodies this direction.").

After viewing comments to the draft EA for the Snow Mesa allotments, the Divide District realized it had an opportunity to "identify and analyze replacement allotments as part of a single decision when the risk for contact was unacceptable."  WA05220.  The Divide District then worked with an interdisciplinary team, Snow Mesa allotment permittees, and CPW to develop a replacement allotment, the Wishbone.  WA05221.  The Wishbone allotment is precisely the type of collaborative, unique, and creative solution to balancing wildlife concerns with resource mandates that NEPA envisions.

### C. The Forest Service reasonably relied on its Supplemental Information Report (SIR) and utilized its lawful discretion in choosing to forgo further NEPA analysis.

To avoid duplicative briefing, Respondent-Intervenors incorporate by reference and join with the legal arguments of Federal Respondent supporting the Forest Service's use of a SIR, rather than a supplemental EIS.  Here, the Forest Service was not required to conduct further NEPA analysis beyond the publication of a SIR.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375 (1989).  In relying on the SIR, the Forest Service was only required to conduct a "reasoned evaluation of the relevant information."  *Id*. at 385.  The Forest Service may reach a decision that is "perhaps disputable" without being considered "arbitrary and capricious."  *Id*.  Here, the Forest Service examined the relevant data and articulated "a satisfactory explanation" of its analysis.  *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm*, 463 U.S. 29, 30 (1983).  Furthermore, "[t]he NEPA process involves an almost endless series of judgment calls… and the line-drawing decisions necessitated by the [NEPA process] are vested in

Page 22 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

I-App-207

the agencies, not the courts. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 312 (D.C. Cir. 2013) (*citing Duncan's Point Lot Owner's Ass'n v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008).[18]

The Tenth Circuit is even more forceful in allowing agency deference in deciding whether supplemental NEPA analysis is required. *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218 (10th Cir. 1997) ("[D]ecisions not to supplement an EIS or EA will only be reversed if the agency decision is found to have been arbitrary and capricious."). The Forest Service decision here should be given the broad deference allowed under the relevant Supreme Court and Tenth Circuit precedent.

Tellingly, CPW allegedly possessed additional bighorn telemetry data at the time of the Forest Service's Wishbone decision in 2018, and CPW fully supported the Wishbone decision.[19] Furthermore, the Forest Service thoroughly explained why the new CPW telemetry data did not change its decision when it finally did receive the telemetry data. The agency's analysis indicated the new data did not change the assumptions about the impact of the Wishbone allotment and potential risk of contact between bighorn sheep and domestic sheep. WA05892 ("the new information is within the scope of effects considered in the original analysis"); WA05889 ("these factors [used in the 2017 analysis] still apply [to support a moderate risk of contact finding]"; "there is no overlap between the 2019 CHHR and the Wishbone allotments").

---

[18] The D.C. Circuit's reasoning has been adopted in other circuits (*see Ctr. for Biological Diversity v. Ross*, 4:19-cv-3135, 2019 WL 7020195, at *2 (N.D. Cal. Dec. 20, 2019).
[19] CPW, as the agency responsible for management of the Rio Grande National Forest bighorn sheep, supports domestic sheep grazing on the Wishbone allotment. WA02806; WA05677.

Page 23 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN, ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

Petitioners improperly filed with the Court objections to the SIR; this Court should disregard those documents in their entirety as they are not part of the administrative record.  The SIR is not a NEPA document and was never open for public comment.[20]

The Forest Service ultimately published a comprehensive SIR and rationally explained its decision-making process using the new CPW information.  WA05879-97 (SIR).  While Petitioners disagree with the result, they have failed to demonstrate that the new telemetry data from CPW indicates a significantly greater risk to bighorn sheep, much less that the risk is so great that an entirely new supplemental NEPA analysis is required.  In short, this Court should defer to the Forest Service's scientific analysis of the new data and the agency's conclusion that supplemental NEPA was not required.[21]

## III.   __CONCLUSION.__

The establishment of the Wishbone allotment was not arbitrary and capricious.  No amount of NEPA review process can satisfy these Petitioners when their ultimate goal is to eliminate domestic sheep grazing in the National Forest.  Petitioners ask this Court to ignore the expertise of multiple management agencies, and to ignore the extensive environmental review leading to the establishment of the Wishbone allotment.

/ / /

/ / /

---

[20] Forest Service Handbook 1909.15_18.1 ("Review and Documentation of New Information Received After Decision Has Been Made")

[21] If the Court finds the agency erred, Respondent-Intervenor respectfully requests that the Court allow supplemental briefing on the appropriate scope of any remedy, including whether or not vacatur of the decision is appropriate.  Respondent-Intervenor incorporates by reference and joins the legal argument in footnote 14 of Federal Respondent's Opposition to Petitioner's Petition for Review of Agency Action.

Page 24 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN,
         ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

The Court should deny Petitioners' requests for relief as the Forest Service complied with NEPA in establishing the Wishbone grazing allotment.

Respectfully submitted this 29th day of June, 2020.

/s/ Tate Justesen
Tate Justesen, OR. Bar No. 083741

/s/ Caroline Lobdell
Caroline Lobdell, OR. Bar No. 021236

Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 119-327
Portland, OR 97219
(503) 768-8500
tjustesen@wrlegal.org
clobdell@wrlegal.org
*Counsel for Respondent-Intervenors*

Page 25 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN,
ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

**I-App-210**

## <u>CERTIFICATE OF SERVICE</u>

I, Tate Justesen, hereby certify that on June 29, 2020, I caused the foregoing

**OPENING BRIEF OF RESPONDENT-INTERVENORS IN RESPONSE TO PETITION**

**FOR REVIEW OF AGENCY ACTION** to be served upon counsel of record through the

Court's electronic service system

Dated this 29th day of June, 2020.

<u>/s/ Tate Justesen</u>
Tate Justesen

Page 26 – OPENING BRIEF OF RESPONDENT-INTERVENORS WAYNE BROWN,
ET AL. IN OPPOSITION TO PETITION FOR REVIEW OF AGENCY ACTION

**I-App-211**

Brian E. Gregg
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO  80227
Phone: (303) 292-2021
Facsimile: (303) 292-1980
brian@mslegal.org

*Attorney for Respondent-Intervenors*
*Colorado Farm Bureau Federation and*
*J. Paul Brown*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 1:19-cv-00208-REB

WILDEARTH GUARDIANS and
WESTERN WATERSHEDS PROJECT,

     Petitioners,

v.

U.S. FOREST SERVICE, a federal agency of the U.S. Department of Agriculture,

     Respondent,

and

WAYNE BROWN,
JERRY BROWN,
THE COLORADO WOOL GROWERS ASSOCIATION,
J. PAUL BROWN, and
THE COLORADO FARM BUREAU FEDERATION,

     Respondent-Intervenors.

---

**RESPONDENT-INTERVENORS J. PAUL BROWN AND THE COLORADO FARM
BUREAU FEDERATION'S RESPONSE BRIEF**

---

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|

TABLE OF AUTHORITIES ............................................................ iii

INTRODUCTION AND BACKGROUND ....................................... 1

FACTUAL AND LEGAL BACKGROUND ................................... 4

STANDARD OF REVIEW ............................................................ 4

ARGUMENT ................................................................................ 5

I.   THE FOREST SERVICE PERFORMED THE APPROPRIATE
     LEVEL OF NEPA ANALYSIS ............................................ 5

     A.   The Forest Service was Not Obligated to Prepare a Full
          EIS ............................................................................. 6

     B.   The Forest Service was Not Obligated to Perform a
          Supplemental NEPA Analysis Because it Properly
          Considered the Telemetry Data in the Supplemental
          Information Report .................................................... 11

II.  THE WISHBONE EA COMPLIED WITH THE REQUIREMENTS
     OF NEPA ........................................................................ 13

     A.   The Forest Service's Assumptions were Appropriately
          Supported by Record Evidence ................................ 13

     B.   The Forest Service Examined CPW's Telemetry Data in
          the SIR ....................................................................... 16

     C.   The Forest Service Considered all Relevant Effects of the
          Action ......................................................................... 16

CONCLUSION ............................................................................ 18

## TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

*Anderson v. Evans*,
371 F.3d 475 (9th Cir. 2004) .................................................................... 9

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council*,
462 U.S. 87 (1983)..................................................................................... 9

*Biodiversity Conservation Alliance v. United States Forest Serv.*,
765 F.3d 1264 (10th Cir. 2014) ................................................................. 6

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971).................................................................................. 11

*Coal. of Concerned Citizens to Make Art Smart v. Fed. Transit Admin. of
U.S. Dep't of Transp.*,
843 F.3d 886 (10th Cir. 2016) ................................................................... 5

*Colo. Envtl. Coalition v. Dombeck*,
185 F.3d 1162 (10th Cir. 1999) ................................................... 19, 18, 19

*Custer County Action Ass'n v. Garvey*,
256 F.3d 1024 (10th Cir. 2001) ............................................................... 10

*Dep't of Transp. v. Public Citizen*,
541 U.S. 752 (2004)................................................................................. 11

*Friends of the Bow v. Thompson*,
124 F.3d 1210 (10th Cir. 2007) ........................................................... 12, 13

*Friends of the Clearwater v. McAllister*,
214 F. Supp. 2d 1083 (D. Mont. 2002)..................................................... 13

*High Country Conservation Advocates v. U.S. Forest Serv.*,
52 F. Supp. 3d 1174 (D. Colo. 2014) ........................................................ 9

*Hillsdale Envtl. Loss Prevention, Inc. v. United States Army Corps of
Eng'rs*,
702 F.3d 1156 (10th Cir. 2012) .............................................................. 6-7

*Holy Cross Wilderness Fund v. Madigan*,
960 F.2d 1515 (10th Cir. 1992) ............................................................ 9-10

*Idaho Sporting Congress, Inc. v. Alexander*,
222 F.3d 562 (9th Cir. 2000) ............................................................... 12, 13

*Lee v. U.S. Air Force,*
        354 F.3d 1229 (10th Cir. 2004) ................................................. 9, 10

*Marsh v. Or. Natural Res. Council,*
        490 U.S. 360 (1989) ................................................. 5, 11, 12, 13

*Middle Rio Grande Conservancy Dist. v. Norton,*
        294 F.3d 1220, 1229 (10th Cir. 2002) ........................................ 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
        463 U.S. 29 (1983) ................................................................... 5

*National Parks & Conservation Ass'n v. Babbitt,*
        241 F.3d 722 (9th Cir. 2001) ....................................................... 8

*Native Ecosystems Council v. Dombeck,*
        304 F.3d 886 (9th Cir. 2002) ..................................................... 17

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,*
        565 F.3d 683 (10th Cir. 2009) .................................................. 4, 6

*San Juan Citizens Alliance v. Stiles,*
        2010 WL 178016 (D. Colo. 2010) .............................................. 12

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,*
        449 F.3d 1016 (9th Cir. 2006) .................................................. 11-12

*San Luis Valley Ecosystem Counsel v. U.S. Fish and Wildlife Serv.,* 657 F.
        Supp. 2d 1233 (D. Colo. 2009) ................................................... 8

*San Luis Valley Ecosystem Counsel v. U.S. Forest Serv.,*
        No. 04-cv-1071-MSK, 2007 WL 1463855 (D. Colo. May 17, 2007) .......... 7

*Sierra Club v. U.S. DOT,*
        753 F.2d 120 (D.C. Cir. 1985) ................................................... 10

*Utahns for Better Transp. v. U.S. Dep't of Transp.,*
        305 F.3d 1152 (10th Cir. 2002) .................................................. 6

*Utahns for Better Transp. v. U.S. Dep't of Transp.,*
        319 F.3d 1207 (10th Cir. 2003) .................................................. 6

*W. Watersheds Proj. v. Bureau of Land Mgmt.,*
        No. 4:09-cv-507-BLW, 2009 WL 3335365 (D. Idaho, Oct. 14, 2009) ....... 15

*W. Watersheds Proj. v. U.S. Forest Serv.,*
        No. 4:07-cv-151-E-BLW, 2007 WL 1729734  (D. Idaho June 13, 2007) .. 14, 15

*W. Watersheds Proj. v. U.S. Forest Serv.*,
　　No. 4:07-cv-151-E-BLW, 2007 WL 3407679 (D. Idaho Nov. 13, 2007)....　　15

*Western Watersheds Project v. U.S. Forest Service*,
　　No. 1:17-cv-434-CWD, 2017 WL 5571574 (D. Idaho, Nov. 20, 2017)......　　16, 17

*Wyoming Farm Bureau Fed'n v. Babbitt*,
　　199 F.3d 1224 (10th Cir. 2000) ...............................................1　　10

*Wyoming v. U.S. Dep't of Agric.*,
　　661 F.3d 1209 (10th Cir. 2011) ...............................................　　18

**Statutes**

5 U.S.C. § 706(2)(A)........................................................　　4

**Regulations**

40 C.F.R § 1502.9(c)........................................................　　13

43 C.F.R. § 4100.0-5........................................................　　2

## INTRODUCTION AND BACKGROUND

Domestic sheep have grazed Colorado's Southern Rockies for more than a hundred years—indeed, sheep grazing on what is now the Rio Grande National Forest is as old as the Forest itself, if not older.  WA03499;[1] WA03502; WA03506.  The federal authorizations permitting domestic sheep grazing subject to this action have been used by wool growers since at least the 1920s, though the boundaries of what are now the Ouray, Miners, Snow Mesa, and Table Allotments have shifted over time based upon varying needs and resource management concerns, with the current boundaries being set around 1990.  WA03502.  According to the U.S. Forest Service's ("Forest Service") records:

> Historic use consisted of individual bands with varied numbers, with each permittee assigned a separate area for the grazing season. Each band typically consisted of 800 to 1,000 sheep, with an occasional band of 2,000 ewe/lambs from July 1 to September 30. The same bed grounds were used repeatedly with very little open herding. Permanent bed grounds, camps, and lambing grounds on the allotments were common.

WA03502.  In addition, multiple bands of sheep were historically trailed through the Miners and Snow Mesa Allotments on the La Garita Stock Driveway twice each grazing season and then returned to their home pastures.  WA03502.  In response, the Forest Service modified its management plans in the 1960s to prevent overuse of areas that had previously seen heavy concentrations of domestic sheep.  WA03502.  Combined with the stewardship of grazing permittees, these changes have led to an overall upward trend in rangeland status at the present.  WA03505.  In fact, "[c]urrent rangeland conditions within

---

[1] References to "WA#####" are to the Administrative Record, as supplemented, lodged by the Forest Service at ECF Nos. 22 and 23, where "#####" indicates the specific Bates-numbered page of the record cited.

the analysis area have improved over the years.  Livestock management and sheep herder practices have greatly improved since the 1960s." *Id*.

Today, current Forest Service range management relies upon a three-year pasture rotation system to alleviate pressure on the forage resource and provide management assistance.  WA03502; WA03504.  Since 1998, the current permittees have been authorized to graze one band of sheep (consisting of 1,000 ewes plus their lambs) between July 11 and September 15, though full stocking rates were only reached on the allotments during the 2011 to 2014 grazing seasons.  WA03502; WA03504.  Full carrying capacity is estimated to be 2,485 sheep (ewes with lambs) or 8,286 animal-unit-months ("AUM"),[2] which makes the current stocking rate of 1,000 ewes/lambs "conservative" even by the agency's reckoning.  WA03507.

For a number of reasons, including to ensure that domestic and wild sheep remain separated, to ensure that the range is not overutilized, and to limit other domestic sheep-wildlife conflicts, sheepherders stay with the domestic flock throughout the grazing season, and the herders' camps are moved every 7–10 days when the permittees resupply the camps' provisions.  WA03504.  Due to "significant changes in management" and proactive efforts by permittees, the Forest Service found that there are presently "no obvious signs of current rangeland degradation" and concluded that "current rangeland condition is classified as satisfactory."  WA03505.  In fact, aside from some programmatic changes to livestock management directed by the Forest Service, the positive conditions

---

[2] "Animal unit month (AUM) means the amount of forage necessary for the sustenance of one cow or its equivalent for a period of 1 month." 43 C.F.R. § 4100.0-5

of rangeland management are largely due to the best management practices ("BMPs") adhered to by sheep grazers such as the permittees.  WA05667.

To limit the interactions between domestic and wild sheep, these BMPs include "requiring two herders; requiring a sweep of the pasture and trailing route post-move; requiring herders to be with the flock during the day and in camp at night; requiring permittees to count sheep as they come on to the forest, after they leave Crystal Basin pasture, and at their final NFS pasture; and requiring permittees to respond to strays within 24 hours of notification."  WA05667. To borrow from current events, domestic and wild sheep are subject to extreme social distancing measures and are held separate by "discontinuity and fragmentation created by non-habitat, including the Rio Grande River, subdivisions, and the Silver Thread Scenic Byway (CO 149)."  WA05669.  The Forest Service, as the expert agency tasked with managing sheep grazing in the Rio Grande National Forest, has determined that these measures are sufficient to prevent the transmission of a respiratory disease, *M. opivneumoniae*, between domestic and wild sheep.  WA04057—60.

Nonetheless, on January 24, 2019, Petitioners sought judicial review of the Forest Service's decision to issue an Environmental Assessment ("EA") and a Finding of No Significant Impact ("DN/FONSI") rather than perform an Environmental Impact Statement ("EIS") for the Wishbone Allotment.  ECF No. 1 ¶ 1.  In their Petition, Petitioners ask this Court to set aside the Forest Service's decision based upon purported defects in the environmental analyses performed.  ECF No. 1 ¶ 9.  Specifically, Petitioners argue three things: (1) that "the Forest Service violated NEPA by failing to prepare an EIS before authorizing the Wishbone allotment because grazing domestic sheep on the allotment

may have significant effects[;]" (2) that "the Forest Service's analysis in the EA and DN/FONSI regarding the threat to bighorn sheep was flawed in numerous ways[;]" and (3) that "the Forest Service is violating NEPA by failing to complete a supplemental NEPA analysis that considers telemetry data and analysis for the Central San Juan bighorn herds that post-dates the DN/FONSI."  ECF No. 1 ¶ 83—88.

On May 31, 2019, Respondent-Intervenors, J. Paul Brown and the Colorado Farm Bureau Federation (collectively, "Farm Bureau") moved to intervene to defend their respective interests in domestic sheep grazing in the Rio Grande National Forest and adjoining areas.  ECF No. 13.  On March 30, 2020, this Court granted the Farm Bureau's motion.  ECF No. 30.  On May 20, 2020, Petitioners filed their Opening Brief ("Pet'rs Br."), and on June 22, 2020, the Forest Service filed its Response Brief ("Fed. Br.").  ECF Nos. 33, 36.  Here, the Farm Bureau files this Response Brief in opposition to Petitioners' Opening Brief.

## FACTUAL AND LEGAL BACKGROUND

In the interest of brevity, Respondent-Intervenors expressly adopt the remainder of the factual and legal background provided by the Forest Service in its response brief. *See* Fed. Br. at 2–12.

## STANDARD OF REVIEW

Judicial review of agency actions under the National Environmental Policy Act ("NEPA) is governed by the Administrative Procedure Act ("APA").  *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009).  Under section 706(2)(A) of the APA, an agency action must be set aside "if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A)).

Judicial review under this provision is generally deferential.  As long as the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made," the agency's action should be affirmed.  *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983).  Particular deference is afforded to agency discretion that is exercised in an area where the agency has special technical expertise.  *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989).

Nevertheless, agency action must be set aside if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or rendered a decision "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  When such deficiencies exist, the Court may not attempt to make up for them by supplying "a reasoned basis for the agency's action that the agency itself has not given."  *Id*. (internal quotation marks omitted).

## ARGUMENT

### I.    THE FOREST SERVICE PERFORMED THE APPROPRIATE LEVEL OF NEPA ANALYSIS.

The conclusions of the Wishbone Environmental Assessment ("EA") and the associated Decision Notice/Finding of No Significant Impact ("DN/FONSI") are entitled to significant deference.  The task of a court reviewing the sufficiency of an EA is simply to "ensure that the agency has adequately considered and disclosed the environmental impact of its actions."  *Coal. of Concerned Citizens to Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transp.*, 843 F.3d 886, 902 (10th Cir. 2016).  Agency action is

presumed to be valid and a challenger bears the burden to prove otherwise. *New Mexico*, 565 F.3d at 704. "So long as the record demonstrates that the agencies in question followed the NEPA procedures . . . the court will not second-guess the wisdom of the ultimate decision." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003). Here, Petitioners cannot shoulder their heavy burden because they cannot show that supplemental NEPA analysis was necessary, nor can they show that the circumstances of this case warranted a full EIS.

### A.   The Forest Service was Not Obligated to Prepare a Full EIS.

Petitioners argue that the Forest Service was required to complete a full EIS because domestic sheep grazing was "highly controversial," would create uncertain risks, and would establish an inappropriate precedent. Pet'rs Br. at 16–20. However, Petitioners' arguments are without merit and must be rejected because, among other things, the case law they rely upon bears no analogy to the case at hand.

Petitioners first focus on the purported "highly controversial" nature of domestic sheep grazing. Pet'rs Br. at 16–18. Petitioners, however, misapply relevant precedent describing when an action is "highly controversial." Public opposition, such as that of Petitioners, is insufficient to make an action controversial. *See Biodiversity Conservation Alliance v. U.S. Forest Serv.*, 765 F.3d 1264, 1274 (10th Cir. 2014) ("Controversy in the NEPA context does not necessarily denote public opposition to a proposed action, but a substantial dispute as to the size, nature or effect of the action.") (quoting *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002)); *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir.

2012) ("When analyzing whether a proposal is controversial, we consider the substance of the comments, not the number for or against the project. Even if 90% of the comments to the environmental assessment were negative, this merely demonstrates public opposition, not a substantial dispute about the 'size, nature, or effect' of the intermodal facility."). Here, there is no such controversy.  The Wishbone EA clearly describes the size and nature of the action: 7,096 sheep are authorized to graze 10,487 defined acres within the Rio Grande National Forest.  WA04030.  Further, the effects are self-evident, domestic sheep will forage within the allotments, and be managed pursuant to the requirements of the relevant permit.  WA05660.  That Petitioners, and other members of the public, dislike public lands grazing does not create a "highly controversial" action mandating a full EIS.

Next, Petitioners argue that grazing domestic sheep will present uncertain risks to wild bighorn sheep populations.  Pet'rs Br. at 18–19.  Again, Petitioners misapply relevant caselaw.  To begin with, there is no analogy to the first *San Luis Valley* case cited by Petitioners, which they assert shows that "uncertainty" about an area's scenery alone is sufficient to qualify as "significant" for NEPA purposes.  *San Luis Valley Ecosystem Counsel v. U.S. Forest Serv*., No. 04-cv-1071-MSK, 2007 WL 1463855 (D. Colo. May 17, 2007).  But this peculiar holding is isolated to the peculiar facts of that case.  The first *San Luis Valley* case concerned a geological anomaly—"an extremely rare [rock] formation" called the Creede formation, of which "[t]here are perhaps fewer than five such formations in the United States."  *Id*. at *10.  Bighorn sheep herds, in contrast, range across the entirety of the western half of the North American continent, numbering close to 70,000 in total population, making them nowhere near as rare and fragile as the Creed Formation.

The second *San Luis Valley* case is also inapplicable. *San Luis Valley Ecosystem Counsel v. U.S. Fish and Wildlife Serv.,* 657 F. Supp. 2d 1233 (D. Colo. 2009). Procedurally, unlike the merits brief under consideration here, the second *San Luis Valley* case concerned a preliminary injunction, meaning the NEPA deficiency was simply considered as one factor weighing in favor of an injunction. *Id.* at 1246. Substantively, the second *San Luis Valley* case concerned a categorically different situation—namely, the federal government's failure to analyze the potential impacts to a watershed caused by oil and gas drilling, the effects of which would be essentially impossible to mitigate or adjust. *Id.* at 1246. This is markedly different from the situation here given that livestock management is by nature inherently adaptive, being subject to annual changes in response to resource conditions and ecosystem concerns.

Similarly, *National Parks and Conservation Association v. Babbitt* case is distinguishable based on the scope of the NEPA analysis in question. 241 F.3d 722 (9th Cir. 2001). *National Parks* dealt with the Parks Service's analysis of its decision to increase the number of cruise ships that were allowed to enter Glacier Bay in Alaska. *Id.* at 728—729. This analysis required consideration of a huge variety of animal species (including humpback whales, sea lions, bald eagles, and various species of murrelets) as well as assessing the probably of events such as oil spills. *Id.* The enormity of the scale of the analysis as well as the wide variety of different factual scenarios presented by the presence of large cruise ships entering a delicate ecosystem presented far greater uncertainty than a small-scale grazing authorization on a single allotment in the Southern Rockies. Rather than assessing wide-scale impacts across an entire ecosystem full of a

diverse variety of wildlife, the NEPA analysis here is limited to a single species in an isolated portion of a much larger biological community.

Finally, *Anderson v. Evans* is likewise inapplicable here.  371 F.3d 475 (9th Cir. 2004).   The controversy in *Anderson* concerned a dispute over whether a Native American Tribe could annually hunt California gray whales.  *Id.* at 489.  The gray whale had at one point been listed under the Endangered Species Act, and the species' wellbeing was in direct contrast to what the tribe asserted were ancestral rights protected by a treaty.  *Id.* at 489—492.  The situation here is hardly as contentious given that the agency and permittees are not proposing to directly kill bighorn sheep, nor are treaty rights of a Native American tribe at issue here.  Instead, the debate is simply over the best means to isolate bighorns from domestic sheep.

Moreover, Petitioners' cases aside, "'NEPA does not require an agency to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or [] impractical or ineffective.'"   *High Country Conservation Advocates v. U.S. Forest Serv*., 52 F. Supp. 3d 1174, 1200 (D. Colo. 2014) (quoting *Lee v. U.S. Air Force*, 354 F.3d 1229, 1238 (10th Cir. 2004)).  "There are natural limits to the amount of forecasting that can be done, . . . and agencies are required only to make 'a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making.'"   *Id.* at 1189 (quoting *Colo. Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1177 (10th Cir. 1999)).  "An agency 'must obtain and include in the EIS information on reasonably foreseeable significant adverse impacts' that are essential to a reasoned choice among alternatives 'if the costs of obtaining such information are not exorbitant.'"   *Lee*, 354 F.3d at 1241 (quoting *Holy Cross Wilderness*

*Fund v. Madigan*, 960 F.2d 1515, 1523 (10th Cir. 1992)). Although Petitioners criticize the Forest Service for not including the most recent telemetry data in its EA and FONSI, "the Forest Service was unable to obtain the data because the State considered the data confidential and sensitive, did not want it released to the public, and did not share it with the Forest Service until May 2019 after the State and Forest Service entered into a confidentiality agreement." Fed. Br. at 24; WA05847; WA05880—81. The "reasonably foreseeable significant adverse impacts" the Petitioners claim the Forest Service ignored by not analyzing the telemetry data is merely a disagreement in what "best available science" is.

"As so often is the case in disputes concerning the potential environmental impacts of a project, Petitioner's claim boils down to a disagreement over scientific opinions and conclusions. While . . . contradictory evidence and data may well exist, 'the mere presence of contradictory evidence does not invalidate the agencies' actions or decisions.'" *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1036 (10th Cir. 2001) (citing *Wyoming Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1241 (10th Cir. 2000)). The Tenth Circuit gives a reminder that "'agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious.'" *Lee v. U.S. Air Force*, 354 F.3d 1229, 1243 (10th Cir. 2004) (citing *Custer County Action Ass'n*, 256 F.3d at 1036). It is the agency, "not a reviewing court . . . [nor the Petitioners, who are] entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances." *Custer County Action Ass'n*, 256 F.3d at 1036 (quoting *Sierra Club v. U.S. Dept. of Transp.*, 753 F.2d 120, 129 (D.C. Cir. 1985)). The dispute between the Petitioners and the Forest Service is merely one of

competing scientific opinions and does not amount to an invalidation of actions taken by the Forest Service.

Finally, Petitioners argue that to reauthorize sheep grazing in the Rio Grande National Forest would create an inappropriate precedent. Pet'rs Br. at 19—20. This argument is spurious. As noted above, domestic sheep grazing has been authorized in this area for over 100 years. If a precedent were set, it was set generations ago. Nonetheless, Petitioners' arguments that the Forest Service's use of the Risk Contact Model in this case present an improper attempt to substitute Petitioners' judgment for the scientific expertise of the Forest Service. As the expert land manager, the Forest Service is entitled to rely upon its own expert opinions, and neither Petitioners nor this Court may substitute their judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

### B. The Forest Service was Not Obligated to Perform a Supplemental NEPA Analysis Because it Properly Considered the Telemetry Data in the Supplemental Information Report.

The overall purpose of an agency's duty to perform supplemental NEPA analysis is to "ensure[] that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh*, 490 U.S. at 369. However, "an agency need not supplement [a NEPA analysis] every time new information comes to light . . . [t]o require otherwise would render agency decision making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Id.* at 373. Accordingly, the duty to perform supplemental NEPA analysis is guided by a "rule of reason." *Id.*; *see also Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767–68 (2004) ("rule of reason" requires that the information being evaluated be useful to the agency's decision-making process); *see also San Luis Obispo Mothers for*

*Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1030 (9th Cir. 2006) (an EIS need not discuss remote and highly speculative consequences).  NEPA, however, is silent as to how an agency is to determine the significance of new information.  *See Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000); *see also San Juan Citizens Alliance v. Stiles*, No. 08-CV-00144-RPM, 2010 WL 178016 at *5 (D. Colo. May 3, 2010).

To assess new information, and the potential need for a supplemental NEPA analysis, agencies frequently produce what are termed supplemental information reports ("SIR").

> Supplemental Information Reports are nowhere mentioned in NEPA or in the regulations implementing NEPA promulgated by the Council on Environmental Quality ("CEQ"). . . . Courts nonetheless have recognized a limited role within NEPA's procedural framework for SIRs and similar "non-NEPA" environmental evaluation procedures. Specifically, courts have upheld agency use of SIRs and similar procedures for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS.

*Idaho Sporting Congress,* 222 F.3d at 565–66; *see Marsh*, 490 U.S. at 383–85 (upholding the Army Corps of Engineers' use of SIR to analyze significance of new reports questioning the environmental impact of a dam project); *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218–19 (10th Cir. 2007) (upholding use of SIR to evaluate significance of new survey of area to be logged); *see also San Juan Citizens Alliance v. Stiles*, 2010 WL 178016, *5 (D. Colo. 2010) ("If the FS [Forest Service] concludes that new information or changed circumstances do not require the preparation of a supplemental EIS, a supplemental information report or 'SIR' may be used to document the FS's environmental evaluation and conclusion.").  Thus, if an SIR reveals no significant information questioning the propriety of an agency's original conclusion to select a

particular alternative, courts will uphold the use of an SIR instead of requiring additional NEPA analysis. *See Friends of the Bow*, 124 F.3d at 1219.

Here, the relief sought by Petitioners would entangle the Forest Service in the type of intractable decision-making process warned of in *Marsh*. The Forest Service did not receive telemetry data from the Colorado Parks and Wildlife ("CPW") until after it had already completed the EA for the Wishbone Allotment. WA05880—81 (DN/FONSI was issued March 23, 2018 and the telemetry data was released to the Forest Service in May 2019). In the SIR, the Forest Service documented its review and analysis of the newly available telemetry data and did not find these data compelling or significant enough to constitute the preparation of a supplemental NEPA analysis. WA05879, WA05896—97; *see also* 40 C.F.R § 1502.9(c) (describing when a supplemental analysis is required). Far from being an "impermissible post-hoc justification," Pet'rs Br. at 33, the Forest Service acted properly by preparing the SIR. WA05879. No additional NEPA analysis was required.

Relatedly, Petitioners also contend that the agency's reliance on the SIR deprived them an opportunity for public comment which they felt entitled to. Pet'rs Br. at 33 (citing *Friends of the Clearwater v. McAllister*, 214 F. Supp. 2d 1083, 1089 (D. Mont. 2002)). But this argument falsely assumes that an SIR is equivalent to an EA or an EIS. The Forest Service's NEPA Handbook provides that an "SIR is not a NEPA document and therefore cannot be used to fulfill the requirements for a revised or supplemental EA or EIS." Forest Service NEPA Handbook at *45 (2012); *see also Idaho Sporting Congress*, 222 F.3d at 565–66. NEPA's public disclosure requirements cannot be foisted onto non-NEPA documents. *Id.* If additional NEPA analysis was not required, then neither

was additional public input or disclosure. As such, Petitioners cannot complain about a remedy that they are not entitled to.

## II. THE WISHBONE EA COMPLIED WITH THE REQUIREMENTS OF NEPA.

### A. The Forest Service's Assumptions were Appropriately Supported by Record Evidence.

In the interest of brevity, the Farm Bureau adopts and incorporates by reference the arguments made by the Forest Service defending its modelling assumptions. *See* Fed. Br. at 14–23. However, the Farm Bureau adds that Petitioners' out-of-hand dismissal of the BMPs is erroneous, as there is not a one-size-fits-all approach to domestic sheep management.

Petitioners are attempting to bootstrap the Wishbone Allotment to sheep grazing cases they have litigated in other jurisdictions. Each of these cases, however, concerned preliminary relief, and are accordingly inapposite to the case before this Court. Moreover, each allotment is like a fingerprint; unique in its characteristics and simply incomparable. Below, in sequential order, all four *Western Watersheds Project* cases that Petitioners rely upon are distinguished.

In the first case cited, Western Watersheds Project brought a lawsuit in Idaho against the Forest Service. *See* Pet'rs Br. at 3 (citing *W. Watersheds Proj. v. U.S. Forest Serv.*, No. 4:07-cv-151-E-BLW at *2, 2007 WL 1729734 (D. Idaho June 13, 2007) ("*WWP I*")). There, the Forest Service consented to modify the grazing authorization, and closed a grazing allotment held by Shirts Brothers Sheep. Shirt Brothers Sheep sought to enjoin the Forest Service's decision. In denying the injunction, the district court heavily relied on the data of radio-collared bighorns in making its determination. Those data demonstrated 319 occasions of bighorn sheep within the challenged allotment itself over

a seven-year period.  *Id.* at *2.  Here, however, the telemetry data show no presence of bighorns within the allotment in question.  WA05928; *See* also Ratner Decl. Figure 2. Accordingly, *WWP I* is distinguishable on its facts and procedural posture because it was focused only on preliminary relief and because the telemetry data demonstrates that bighorns were never been present in the Wishbone allotment, contrary to the Idaho case.

In Petitioners' second case, *see* Pet'rs Br. at 3, they sued the Forest Service for granting grazing permits on six allotments, including the Shirts Brothers Sheep allotment from *WWP I*.  *W. Watersheds Proj. v. U.S. Forest Serv.*, No. 4:07-cv-151-E-BLW at *1, 2007 WL 3407679 (D. Idaho Nov. 13, 2007) ("*WWP II*").  There, the Forest Service consented to modify the grazing authorization and closed five of the six challenged allotments.  With the sixth, the Forest Service consented to modify the grazing season to ensure that domestic and wild sheep would not be present at the same time in the allotment.  Shirts Brothers Sheep sought to stay the Forest Service's decision, and Western Watersheds Project sought a preliminary injunction, which the district court granted.  Accordingly, *WWP II* is distinguishable on its procedural posture because it concerned injunctive relief and administrative stays requested by both parties, whereas the case at hand deals with the merits of the Forest Service's NEPA analysis and is challenged solely by the Petitioners.

Third, in *Western Watersheds Project v. Bureau of Land Management*, WWP challenged the grazing of 833 domestic sheep on a Bureau of Land Management allotment in Idaho. *W. Watersheds Proj. v. Bureau of Land Mgmt.*, No. 4:09-cv-507-BLW at *1, 2009 WL 3335365 (D. Idaho, Oct. 14, 2009) ("*WWP III*").  In reviewing a motion for a temporary restraining order, the district court "weigh[ed] the equities" to compare the

harm to the Carlson Livestock Company's economic bottom line. *Id.* at *6. The court reasoned that the Company would not "be forced out of business but merely that [it would] be forced to consider other options like more intensive grazing of [] private ground or real estate development of [] river-front property." *Id.* at *6. Since the Company would not become obsolete by the discontinued grazing permit on BLM land, the court was less inclined to rule in its favor. Thus, the court granted the injunctive relief. To begin with, a case considering injunctive relief is inapposite to the case before this Court, as noted above. Rather than balancing equities, the Court here is tasked with assessing the reasonableness of the Forest Service's NEPA analysis. Because the agency has articulated a rational basis for its grazing authorization, and because this reasoning was set forth in the applicable NEPA documents, the Court is obliged to defer to the agency's expertise on this matter.

Finally, in *Western Watersheds Project v. U.S. Forest Service*, No. 1:17-cv-434-CWD, 2017 WL 5571574 (D. Idaho, Nov. 20, 2017) ("*WWP IV*"), Western Watersheds Project sought a preliminary injunction to halt a Forest Service authorization to graze domestic sheep, this time in the Snakey and Kelly Canyon within the Caribou-Targhee National Forest. There, the district court held that the grazing allotments posed a "risk to the nearby South Beaverhead bighorn sheep population." *Id.* at *3. The court found that "irreparable injury to the bighorn population . . . [would be likely] if grazing [was] allowed during the six-week grazing season." *Id.* at 15. The rationale behind this was that "[t]he Snakey and Kelly Canyon allotments are contiguous—there is no dividing line such as a river or mountain range, just a division drawn on a map." *Id.* at *8. The permit that was denied had previously authorized grazing "on the Kelly Canyon allotment from November

20, 2017 through January 3, 2018 . . . and on the Snakey Canyon allotment from November 6, 2017 through January 2, 2017." *Id.* at *8. These facts are starkly different from the Wishbone Allotment, given that multiple physical barriers exist to separate bighorns from domestic sheep (in addition to 24/7 management by the herders).

In sum, Petitioners rely on procedural victories in factually distinct cases in different jurisdictions in a vain attempt to make a substantive claim against the Forest Service's unique analysis of grazing authorization on the Wishbone Allotment. Petitioners' efforts are not persuasive because the unique factual and procedural situations of each case discussed above make them inapplicable to the question of agency expertise at issue here.

### B.     The Forest Service Examined CPW's Telemetry Data in the SIR.

Petitioners argue that the Forest Service failed to analyze the bighorn telemetry data collected by Colorado Parks and Wildlife. Pet'rs Br. at 27–29. This argument is factually incorrect. As noted above, and conceded to by Petitioners, the Forest Service prepared a detailed SIR to analyze just those data. Pet'rs Br. at 12—14. With the SIR, the Forest Service concluded that those data did not change the environmental analysis underlaying the Wishbone EA and determined that no additional NEPA analysis was warranted. This determination is entitled to deference, and Petitioners' arguments must be rejected.

### C.     The Forest Service Considered all Relevant Effects of the Action.

Petitioners finally challenge the scope of the analysis area considered in the EA. Pet'rs Br. at 30–31. Agencies, however, are given "considerable discretion" in determining the scope of the action area to be considered in a NEPA analysis. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir. 2002). Thus, Petitioners'

argument that "the Forest Service ignored the risk that a bighorn from adjacent metapopulations *could* interact with a diseased bighorn from a Central San Juan herd" is unavailing. Pet'rs' Br. at 30 (emphasis added). This is because "NEPA does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1244 (10th Cir. 2011) (internal quotations omitted). Such is the case here as Petitioners' hypothetical injury is too speculative to be "reasonably foreseeable" within the meaning of NEPA. The agency had to draw the line of its analysis somewhere, and its choice was to stop short of conjectures based on isolated, sporadic forays of a single bighorn sheep.

Moreover, Petitioners' argument misses the bigger picture: there *is* concurrent NEPA analysis occurring on neighboring National Forest land that assesses the impact to neighboring bighorn sheep populations, including the meta-populations identified at pages 30—31 of Petitioners' Brief. *See J. Paul Brown Decl.* ¶ 9 (ECF No. 133) (discussing preparation of EIS for the neighboring Weimenuche Allotment). Seeing as Petitioners' argument that the Forest Service failed to consider all relevant effects dovetails with their claim that a full EIS was necessary, it must be noted that "NEPA does *not* require that federal agencies always evaluate the feasibility of separate proposed projects in a single, comprehensive EIS." *Dombeck*, 304 F.3d at 895 (emphasis added). Instead, in the cases where multiple competing projects or actions "would have taken place with or without the other, each has 'independent utility' and the two are not considered connected actions.*" Id.* at 894. Here, grazing authorization on neighboring allotments that are not subject to the Wishbone EA may or may not take place regardless of the Forest Service's actions

on the Wishbone Allotment.   Thus, the scope of the Forest Service's analysis in the Wishbone EA satisfied the "independent utility" test stated in *Dombeck*.

## CONCLUSION

For the foregoing reasons, and those provided by the Forest Service and other Respondent-Intervenors, the decision of the Forest Service to authorize continued grazing in the Wishbone Allotment should be upheld.

DATED this the 29th day of June 2020.

Respectfully Submitted,

MOUNTAIN STATES LEGAL FOUNDATION

*/s/ Brian E. Gregg*
Brian E. Gregg
2596 S. Lewis Way
Lakewood, CO  80227
Phone: (303) 292-2021
Facsimile: (303) 292-1980
brian@mslegal.org

*Attorney for Respondent-Intervenors*
*Colorado Farm Bureau Federation*
*and J. Paul Brown*

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 29, 2020, I electronically filed the foregoing with the Clerk of Court using this Court's CM/ECF system, which will send notification to all counsel of record pursuant to Fed. R. Civ. P. 5 and D.C.COLO.LCivR 5.1(d).

*/s/ Brian E. Gregg*
Brian E. Gregg

Lauren M. Rule
Advocates for the West
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

Maya L. Kane
Southwest Water and Property Law LLC
10 Town Plaza, #422
Durango, CO 81301
(970) 946-5419
mkane@swpropertylaw.com

Attorneys for Petitioners

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**


Civil Action No. 1:19-cv-00208-REB

WILDEARTH GUARDIANS and
WESTERN WATERSHEDS PROJECT,

      Petitioners,

v.

U.S. FOREST SERVICE, a federal agency of the U.S. Department of Agriculture,

      Respondent,

and

WAYNE BROWN,
JERRY BROWN,
THE COLORADO WOOL GROWERS ASSOCIATION,
J. PAUL BROWN, and
THE COLORADO FARM BUREAU FEDERATION,

      Respondent-Intervenors.

---

**REPLY BRIEF IN SUPPORT OF PETITION FOR REVIEW OF AGENCY ACTION**

---

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

ARGUMENT .................................................................................................... 2

I.    THE WISHBONE ANALYSIS AND DECISION VIOLATED NEPA...................... 2

      A.  The Forest Service Failed to Explain Why it Acted Inconsistently
          with Prior Risk Analyses ............................................................... 2

      B.  The Forest Service's Reliance on Local Factors Was Irrational. .............. 6

      C.  The Forest Service Should Have Obtained and Analyzed All Existing
          Telemetry Data Before Issuing the Wishbone Decision. ........................ 15

      D.  The Wishbone EA Failed to Evaluate Indirect Effects.............................. 18

II.   THE FOREST SERVICE NEEDED TO PREPARE AN EIS  ............................. 21

      A.  Highly Controversial and Uncertain............................................... 21

      B.  Precedential Impact and Cumulative Impacts ........................... 24

III.  THE SIR IMPROPERLY AVOIDED A VALID SUPPLEMENTAL
      ANALYSIS ........................................................................... 26

IV.   VACATUR IS THE PROPER REMEDY  ......................................... 30

CONCLUSION ............................................................................... 30

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004) ............................................................ 24

*Baltimore Gas & Elec. Co. v. Nat. Resources Def. Council, Inc.*,
462 U.S. 87 (1983) ........................................................................................................ 18

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020) .................................. 21, 23, 26

*Biodiversity Conservation Alliance v. U.S. Forest Serv.*,
765 F.3d 1264 (10th Cir. 2014) .................................................................................... 22

*Colorado Envtl. Coalition v. Dombeck*, 185 F.3d 1162 (10th Cir. 1999) ...................... 15

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002) ........................................................... 18

*Dep't of Comm. v. New York*, 139 S.Ct. 2551 (2019) .................................................... 16

*Dine Citizens Against Ruining Our Env't v. Bernhardt*,
923 F.3d 831 (10th Cir. 2019) ...................................................................................... 30

*Ecology Ctr., Inc. v. U.S. Forest Serv.*, 451 F.3d 1183 (10th Cir. 2006) ...................... 15

*Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117 (2016) ............................................ 2

*Friends of the Bitterroot, Inc. v. U.S. Forest Serv.*,
900 F. Supp. 1368 (D. Mont. Dec. 29, 1994) ............................................................... 27

*Friends of the Clearwater v. McAllister*, 214 F. Supp. 2d 1083
(D. Mont. 2002), *aff'd* 58 Fed. Appx. 686 (9th Cir. 2003) ............................................ 27

*High Country Conservation Advoc. v. U.S. Forest Serv.*,
52 F. Supp. 3d 1174 (D. Colo. 2014) ........................................................................... 15

*High Country Conservation Advoc. v. U.S. Forest Serv.*,
951 F.3d 1217 (10th Cir. 2020) .................................................................................... 30

*Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562 (9th Cir. 2000) .................. 27, 30

*Kunaknana v. U.S. Army Corps of Eng'rs*, No. 3:13-cv-00044-SLG,
2015 WL 3397150 (D. Alaska, May 26, 2015) .............................................................. 27

*Lee v. U.S. Air Force,* 354 F.3d 1229 (10th Cir. 2004) ............................................ 15, 16

*Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220
(10th Cir. 2002) ................................................................................. 21, 23

*Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722 (9th Cir. 2001) ............. 21, 23

*New Mexico ex rel. Richardson v. Bureau of Land Management*,
565 F.3d 683 (10th Cir. 2009) ....................................................... 15

*San Luis Valley Ecosystem Couns. v. U.S. Forest Serv.*,
2007 WL 1463855, No. 04-cv-1071-MSK (D. Colo. May 17, 2007) ............................. 23

*Sorenson Communications, Inc. v. FCC*,
567 F.3d 1215 (10th Cir. 2009) ................................................. 2-3, 6

*Utah Envtl. Cong. v. Bosworth*, 439 F.3d 1184 (10th Cir. 2006) .................................. 16

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
305 F.3d 1152 (10th Cir. 2002) ................................................. 2, 18

*Utah Shared Access Alliance v. U.S. Forest Serv.*,
288 F.3d 1205 (10th Cir. 2002) ................................................. 21, 22

*WildEarth Guardians v. U.S. Bureau of Land Management,*
870 F.3d 1222 (10th Cir. 2017) ................................................. 15

*WildEarth Guardians v. U.S. Off. of Surface Mining, Reclamation &
Enforcement,* 104 F. Supp. 3d 1208 (D. Colo. 2015) ................................................. 18, 21

*WildEarth Guardians v. U.S. E.P.A.*, 770 F.3d 919 (10th Cir. 2014) ................................. 3

*ZZYYM v. Pompeo*, 958 F.3d 1014 (10th Cir. 2020) ....................................................... 6

## STATUTES

5 U.S.C. § 706(2)(A) ....................................................... 30

## REGULATIONS

40 C.F.R. § 1500.1 ....................................................... 18

40 C.F.R. § 1508.25(c) ....................................................... 18, 25

iii

## INTRODUCTION

The Wishbone domestic sheep allotment presents a High Risk of disease transmission to nearby bighorn sheep herds—a much higher risk than that posed by other domestic sheep allotments that have been closed to domestic sheep grazing. Despite this risk, the Forest Service authorized use of the allotment by asserting that "local factors" showed the risk to bighorn sheep was only Moderate. The agency claims this Court must defer to its methods and therefore uphold the analysis and decision for the Wishbone allotment. Such deference is not due, however, when the application of those methods is irrational and inconsistent with prior actions, such as occurred here.

Contrary to Defendants' assertions, the administrative record does not support the agency's "local factors" to show the Wishbone allotment poses only a Moderate Risk to bighorn sheep. Instead, the record shows that the best available science supports the conclusion that this allotment—particularly the three largest pastures—poses a very high risk to bighorn sheep, and the Forest Service has not demonstrated how its local factors reduce that risk. Thus, the agency's analysis and decision to authorize use of the Wishbone allotment are arbitrary and capricious.

Furthermore, Defendants' response arguments concerning the risk of this allotment and use of "local factors" to downplay that risk only reinforce the substantial dispute and uncertainty about the allotment's potential effect on multiple bighorn populations. The *potential* for significant effects to not only the Central San Juan bighorn herds but also bighorn populations adjacent to the Central San Juan herds requires preparation of an Environmental Impact Statement (EIS).

Finally, the Forest Service cannot excuse its improper use of a Supplemental

1

Information Report (SIR) by pointing the finger at Petitioners.   Rather than admit that the agency should have fully analyzed the existing telemetry data in its NEPA analysis, Federal Defendant blames Petitioners for not giving it the data.  Yet Petitioners did not obtain the data until months after the Wishbone decision was issued.  The data provide significant information that must be incorporated into a new analysis that complies with NEPA's public disclosure and participation requirements.

**ARGUMENT**

**I.     THE WISHBONE ANALYSIS AND DECISION VIOLATED NEPA.**

Defendants' responses rely heavily on the principle that the Court should simply defer to the Forest Service's conclusions about the risk of the Wishbone allotment to bighorn sheep because they are scientific determinations.  Yet an agency's decisions do not warrant deference when they are inconsistent with prior practices or are irrational and unsupported by the record.  In those instances, the agency's action is arbitrary and capricious.  As explained below, the Forest Service points to nothing in the record that provides the necessary explanation and support for its Wishbone decision.

**A.     The Forest Service Failed to Explain Why it Acted Inconsistently with Prior Risk Analyses.**

When an agency changes its policy and practices without acknowledging and explaining that change in position, such a change is arbitrary and capricious.  *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125-26 (2016).  "Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departure."  *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002) (quoting *Big Horn Coal Co. v. Temple*, 793 F.2d 1165, 1169 (10th Cir. 1986)); *see also Sorenson Communications, Inc. v.*

2

*FCC,* 567 F.3d 1215, 1223 (10th Cir. 2009) (agency must provide a rational explanation when it departs from an existing regulation or position).  "An unexplained deviation from past practice can render an agency's decision arbitrary and capricious. . . ."  *WildEarth Guardians v. U.S. E.P.A.*, 770 F.3d 919, 941 (10th Cir. 2014).

As Petitioners' opening brief noted, the Forest Service's actions regarding the Wishbone allotment are inconsistent with its prior practices analyzing the risk of domestic sheep allotments, particularly its use of the Risk of Contact Model, and it offered no explanation for the departures.  Pet. Opening Br. at 8-11, 21-22 (ECF No. 33).  The agency first used the Risk of Contact Model on the Payette National Forest, where it determined that a rate of .08 bighorn contacts per year or less, with a disease interval of at least 46 years, was the appropriate risk level to ensure bighorn population viability.  WA06001; Payette ROD at 10, 14, found at: https://www.fs.usda.gov/payette. The Payette decision closed allotments even when they were miles away from bighorn core home range and had no bighorn locations on them.  WA05962-63, 05967, 06003.

When the Rio Grande National Forest first used the Risk of Contact Model for the Fisher/Ivy/Goose (FIG) allotment, it determined the risk of contact and expected disease interval for each of the seven pastures in the allotment.  WA01811. Three of the pastures were 1-2.5 miles from bighorn core home range, while the other four pastures overlapped core home range.  WA1801.  The three non-overlapping pastures had bighorn herd contact rates of .18 or more contacts per year, and expected disease intervals of 22 years or less.  WA01818.  These three pastures were rated as High Risk because "[e]ven without direct overlap, high contact rates exist from the short foray distance to each pasture."  *Id.*  The Forest Service stated: "The Risk of Contact Analysis

3

I-App-243

accurately quantifies in great detail, the degree of risk the allotment poses to bighorn sheep.  The analysis goes above and beyond just the allotment analysis and examines the degree of risk on a pasture specific basis.  The allotment and each pasture within the allotment is given a risk rating quantifying the degree of risk . . . The Risk of Contact determined that the degree of risk on the FIG Allotment is High."  WA02101.  The Forest Service converted the entire allotment to vacant status.  WA02099.

When initially assessing the Snow Mesa allotments, the Forest Service likewise used the Risk of Contact Model to determine the risk of contact and disease interval for each allotment under two alternative actions (these allotments were not separated into pastures).  WA02420-36.  Based on those results, the agency determined each allotment was High Risk under both alternatives.  *Id.*  The Forest Service did not use "local factors" to change the risk rating.  *Id.*  Notably, allotments that did not overlap any bighorn core home range but had annual herd contact rates of .47 to .59 and disease intervals of 6.8 to 8.4 years were rated as High Risk with "low probability of long-term herd persistence."  WA02422-27, 02430-36.  The agency proposed to discontinue domestic sheep grazing on the allotments.  WA02284.

For Wishbone, the Forest Service changed tactics in two key respects.  First, although this allotment consists of seven distinct pastures, the agency did not evaluate the risk of each pasture, as it did for the FIG allotment.  *Cf.* WA01811 *with* WA04030.  Nor did the agency provide any explanation for why it did not assess the risk of each pasture when the pastures vary in size, location, and habitat—and thus undoubtedly would vary in risk of contact with bighorn sheep.  WA03970-72, 03995-98, 04030-33.

Second, after completing the Risk of Contact analysis and finding High Risk for

4

the Wishbone allotment, with a contact rate of .98 and a 4-year disease interval, the

Forest Service did not base its decision on that quantitative analysis, as it did for the

Payette, FIG, and Snow Mesa allotments.  WA04030.  Instead, it created "local factors"

to subjectively reduce the risk rating to Moderate without explaining why it was changing

its practice or pointing to any scientific support for this approach.  WA04032-33, 04038-

39.  The agency claims it used similar factors for the Snow Mesa allotments, Fed. Def.

Br. at 16 (ECF No. 36), but the only "local factors" mentioned for those allotments are

that bighorns use habitat on or adjacent to them and that project design criteria have not

been successfully implemented there.  WA04035-37.[1]  No discussion occurred about

seasonal movements of bighorn sheep, overlap of bighorn habitat and domestic sheep

range, length of grazing season, or habitat barriers and fragmentation to "validate" or

"invalidate" the Snow Mesa risk ratings.  *Cf. id. with* WA04038-39; Fed. Def. Br. at 8.

　　　In its response brief, the Forest Service offers a post-hoc explanation for its

introduction of the "local factors" by claiming that the Risk of Contact Model guidance

allows for use of local, site-specific data as part of the analysis process.  Fed. Def. Br. at

8, 15-16.  But the guidance refers to using local data to refine the *inputs* to the model,

not to adjust the *output* (results) of the model.  For instance, habitat information used in

the model "should be reviewed for site relevance and modified as necessary based on

local conditions. . . ."  WA03891.  In addition, default values in the model for the foray

analysis can be altered if site-specific, scientifically derived data are available.

WA03886, 03891, 03895.  *See also* WA03944-45 (discussing use of local data on

---

[1] The statement that project design features have not been successfully implemented directly contradicts Intervenor Colorado Wool Growers Association's (CWGA) assertion about the effectiveness of such measures.  CWGA Br. at 8. (ECF No. 37).

5

habitat, herd size, and herd sex ratio to adjust default values used as inputs to model).
Even the length of grazing season can be adjusted when running the model.  WA03945.
As Federal Defendants admit, the model is *executed* using site-specific information to
derive site-specific results.  Fed. Def. Br. at 16; WA03948.  The model guidance clearly
allows for use of local, site-specific information to refine the data put into the model; it
does not suggest using such information to adjust the results of the model.

Finally, the local factors would not apply to all seven Wishbone pastures equally
given the distinct differences in pasture sizes, locations, remoteness, and habitat value.
In fact, as discussed below, most of the factors would not apply to the largest pastures
on the allotment—Crystal and Shallow—which account for almost half of the grazing
season.  *See infra* pp. 8-15. Yet because the Forest Service did not conduct a pasture-
specific analysis for Wishbone like it did for FIG, it did not assess to what extent these
local factors would reduce the risk of each pasture, instead using a generalized
allotment-wide approach to hide pasture-specific details.  WA04032-33, 04038-39.  The
lack of a rational explanation for the Forest Service's inconsistent practices undercuts
Defendants' claims of deference.

**B.  The Forest Service's Reliance on Local Factors Was Irrational.**

The agency asserts that its local factors were well-supported by the record, Fed.
Def. Br. at 23, but a close look at the record shows the opposite.  Although review under
the arbitrary and capricious standard is narrow in scope, it is still a "probing, in-depth
review."  *Sorenson Communications*, 567 F.3d at 1221.  A court will not "accept
conclusory statements in lieu of a meaningful explanation."  *ZZYYM v. Pompeo*, 958
F.3d 1014, 1030 (10th Cir. 2020).  Petitioners show below that use of each local factor

6

was flawed.

    1.  <u>Spatial Separation</u>

Defendants' response briefs and the Wishbone Risk Assessment state that there is "spatial separation" between domestic sheep on the Wishbone allotment and bighorn sheep, but that conclusion is based on a flawed calculation of bighorn home ranges. *See, e.g.,* Fed. Def. Br. at 8, 14, 20, 22; CWGA Br. at 9; WA04032, 04038.

When calculating the bighorn core herd home ranges for use in the Risk of Contact Model, the agency used 90% of bighorn locations to determine the home ranges. Fed. Def. Br. at 5, n.3; WA03978, 04061, 05887. But the Risk of Contact Model states that home ranges should be based on 95% of bighorn locations. WA03887. The model's foray analysis will be incorrect if the core home ranges are based on a different percent of locations. *Id.* The User Guide states that "[t]he rationale for any change to this value (95%) should be documented. Additional changes to other portions of the model will be required to account for changes" to the percent of bighorn locations determining the core home ranges. *Id.* The Wishbone Risk Assessments did not document the rationale for using 90% of bighorn locations rather than 95%, nor even acknowledge that 95% is the value normally used. WA03978, 05887.

This difference is important because, as the User Guide states, a larger percent of locations will lead to a larger home range, which ultimately affects the risk of contact estimate. *Id.* The core home ranges of the Bristol Head and Bellows Creek herds are very close to many of the Wishbone pastures, and using 95% of bighorn locations to determine the home ranges could very well have shown overlap of home ranges with these pastures, eliminating the "spatial separation" the agency repeatedly touts.

7

WA04056, 05899-900.  Such overlap "indicates interspecies contact is already likely

occurring," and automatically designates an allotment as High Risk.  WA03896, 04063.

The unexplained use of 90% of bighorn locations rather than 95% to determine home

ranges undermined the entire Risk of Contact analysis and skewed the results.  *See*

ECF No. 28-1 at 3-6; ECF No. 29-2 at 2-3 (comments on SIR discussing this issue).

      2.   <u>Temporal Separation</u>

Defendants' "temporal separation" argument suffers two flaws.  First, they claim

that a shorter grazing season than the default season used in the Risk of Contact Model

justified lowering the risk.  Fed. Def. Br. at 17; CWGA Br. at 11-12.  Yet the model

guidance specifically stated that a different season length could and should be factored

into the model.  WA03945.  The guidance acknowledged that length of grazing season

could affect the model results and therefore this parameter should be adjusted *when*

*running the model*.  *Id.*  The Forest Service did not explain why it did not follow that

guidance and account for the shorter grazing season within the Risk of Contact Model.

Second, the Forest Service argues that the record supports its claim of a

"consistent temporal pattern" of bighorns moving away from the allotment to higher

elevations during the summer.  Fed. Def. Br. at 17-18.  But the cited materials do not

support this pattern.  Federal Defendants' first two citations refer to a bighorn ram from

the Bristol Head herd moving north in July 2017.  *Id.* at 18 (citing WA04031, 03779).

This ram did move north in the summer, *toward the Crystal and Shallow pastures*,

ending up only a half-mile from the Shallow pasture—which was "concerning" to a

Colorado Parks and Wildlife (CPW) biologist.  WA03779-80.  This ram certainly did not

support the "consistent pattern" of bighorns moving away from the allotment in summer.

8

The Forest Service also cites the CPW preliminary report on the telemetry data to argue the data showed a larger wintering area north of the allotment than currently documented.  Fed. Def. Br. at 18 (citing WA04246-47).  It is unclear how that fact relates to bighorn summer movements.  The key point of the report was that the movement of these animals is less predictable and more extensive than previously thought, with elevational movements "occurring in winter, spring, and summer." WA04246-47.  Federal Defendants' citations do not support the proposition that bighorns move in a consistent pattern away from the Wishbone pastures in summer.

       3.    <u>Habitat Barriers and Fragmentation</u>

The Forest Service again offers a post-hoc explanation to try to bolster its use of this factor.  It now argues the Rio Grande River, Highway 149 and subdivisions act as barriers to bighorn movement only during the grazing season.  Fed. Def. Br. at 18-19. Unsurprisingly, the agency offers no support for this contention.

It claims that low river flows that allow bighorns to cross the Rio Grande River occur outside the grazing season, but only cites to Petitioners' standing declaration, which showed the river during "peak spring runoff."  Fed. Def. Br. at 19 & n. 8 (citing Ratner Decl. ¶ 18).  Furthermore, the Forest Service cites nothing to establish that bighorns cannot cross the river during high flows.  Fed. Def. Br. at 19.  Given that bighorn sheep regularly cross the Salmon and Snake Rivers in Idaho, which are far larger than the Rio Grande River any time of year, it is irrational to assume bighorn cannot cross the Rio Grande River during summer.  *See* Pet. Opening Br. at 24 (citing cases noting bighorns crossing Snake and Salmon Rivers).  The Forest Service's attempt to refute Petitioners' evidence of bighorns on or crossing Highway 149 and

9

moving through subdivisions is equally weak.  The agency cites nothing to show these documented movements do not occur during the grazing season and offers no reason why bighorns would not make such movements in summer.  Fed. Def. Br. at 19.[2]

The Forest Service barely addresses Petitioners' argument that the Risk of Contact Model already accounted for habitat fragmentation, responding only in a footnote.  Fed. Def. Br. at 19-20, n.9.  This is a critical point, however, that severely undercuts use of this factor.  The model incorporates habitat suitability into the foray analysis (model input) to determine the likelihood of a bighorn making a foray onto an allotment.  The User Guide for the model noted specifically that bighorn suitable habitat, connecting habitat, and non-habitat should be reviewed and modified as necessary based on local conditions before inputting them into the model.  WA03891.

Here, the Forest Service used habitat mapping "developed and tested" by CPW to identify bighorn suitable habitat, connectivity areas, and non-habitat for the model.  WA04061.  The model assumed that bighorn sheep are 34 times more likely to be in source habitat than non-habitat, and six times more likely to be in source habitat than connectivity areas.  WA04061-62.   Based on the "known bighorn sheep preferences for each of the three habitat classes," the model estimated how frequently and how far bighorns will travel outside their home ranges, and used this to calculate the probability of a bighorn reaching an allotment.  WA04062.  Therefore, based on the site-specific habitat mapping from CPW, the model already accounted for habitat fragmentation when determining the risk of contact for the allotment.  The Forest Service's use of this

---

[2] Notably, none of the three "barriers" occur between the Crystal/Shallow pastures and the Bristol Head or San Luis Peak bighorn herd home ranges and thus, this factor would have little application to those pastures.  WA03970, 04056.

same parameter to lower the risk rating after the model was run double-counts this factor and thus was unreasonable. *See* WA05669 (Decision Notice discussing factor).

      4.    <u>Overlap of Bighorn Habitat and Domestic Sheep Range</u>

      The Forest Service's response to this factor again highlights the problem with the agency's allotment-wide analysis. It may be true that there is only 34% overlap between bighorn summer source habitat and domestic sheep range on the allotment as a whole, Fed. Def. Br. at 20, but individual pastures on the allotment have different levels of overlap. The Crystal and Shallow pastures have more overlap than the other Wishbone pastures, but the Forest Service did not assess each pasture. WA03971-72. In fact, the Crystal and Shallow pastures appear to have about as much bighorn habitat/domestic sheep range overlap as allotments or pastures rated as High Risk. *See* WA03968-69, 04035-37 (Table, Miners, and Ouray allotments under Alternatives 3 and 4), WA01800-01, 01818 (Ivy Creek and Fisher Creek pastures). If the agency had conducted a pasture-specific analysis for Wishbone as it did for FIG, it likely could not have used this factor to reduce the risk of the Crystal and Shallow pastures.

      5.    <u>Bighorn Seasonal Movements</u>

      For this factor, the Forest Service reiterates the point about these herds making predictable movements away from the Wishbone allotment in summer. Fed. Def. Br. at 21-22. It claims this pattern was based on years of monitoring and preliminary telemetry data, but the citations provided do not support this statement. The first citation discusses a herd from the Weminuche population, not one of the herds closest to Wishbone, and the next two citations are to data collected *after* the Wishbone decision. WA03651-59, 05729-35, 05767-76. Two other citations, WA03988-95 and

11

WA04038-39, refer to the Wishbone Risk Assessment, which included the same conclusory statements about seasonal movements but did not contain the underlying data to support those statements. The final citation is to a 2017 survey, but a single year of data is not sufficient to show a predictable pattern. WA03770-78.

The preliminary telemetry data also undercut this factor. Data from just a small sample of animals showed unexpected and lengthy movements in various seasons. WA03779-85, 04245-47. One ram from the Bristol Head herd moved north to higher elevations in summer, as the Forest Service states, but that movement took him *toward* the Crystal and Shallow pastures, thus contradicting the assumption that bighorns move away from the Wishbone allotment in summer. WA03779-81. In fact, Intervenor CWGA acknowledges that domestic sheep will be in the higher-elevation pastures in summer when bighorns are at higher elevations, and domestics will be in the lower-elevation pastures in spring when bighorns are also at lower elevations. CWGA Br. at 9.

The Forest Service acknowledges that the Crystal and Shallow pastures create a potential for contact between the species but claims that grazing in those pastures would be "limited in duration." Fed. Def. Br. at 21. However, those two pastures account for almost half of the grazing season, with the Crystal pasture providing the most days of grazing on the allotment and the Shallow pasture used just before and after. WA03997-98.[3] The summer movement of Bristol Head bighorns toward these two pastures creates a high risk of contact given that domestic sheep will be grazing nearby for more than a month and given the attraction between the two species.

_____

[3] The Forest Service's brief states that Crystal will be used for 35 days but it appears the Decision Notice reduced that to 30 days. WA05668. The 30 days on Crystal combined with 8 days on Shallow would account for 49% of the 78-day grazing season. *Id.*

12

**I-App-252**

6.      Project Design Features

The final "local factor" to lower the risk rating was use of "project design features" to reduce the likelihood of stray domestic sheep and attraction of bighorn sheep.  The Forest Service claims that the permittees fully complied with the Wishbone project design features in 2016, but that is incorrect.  Fed. Def. Br. at 22.  The record noted several violations in 2016, including grazing on private property, failure to move dead domestic sheep, and leaving salt blocks behind.  WA02798-99, 03558-61, 05567.

The agency also asserts the significant problems with stray sheep that occurred in 2017 will not recur because it now requires the permittees to use two herders.  Fed. Def. Br. at 22.  But the 2016 and 2017 annual operating instructions for the Wishbone allotment *also* required two herders.  WA03558, 03563 (both stating that one herder will get supplies while the other stays with the sheep).  The fact that the permittees used only one herder in 2017 despite the requirement to have two herders just reinforces their history of noncompliance and undermines the Forest Service's reliance on project design features.  *See* Pet. Opening Br. at 25 (discussing history of noncompliance).

The Forest Service barely addresses the damning comments made by the permittees and CWGA concerning the difficulty managing sheep on the Wishbone allotment and the likelihood of stray sheep.  Fed. Def. Br. at 23; WA05461, 05469.  The agency simply notes that the problems are greater on just three of the pastures, but those three pastures are Crystal, Shallow, and South River—the largest and highest-risk pastures that account for 2/3 of the grazing season.  Fed. Def. Br. at 23; WA05461, 03563.  Even the Forest Service admitted that compliance with the project design

13

features was less likely on the more remote Crystal and Shallow pastures.  WA05667.[4]

      7.    <u>Combination of Factors</u>

Finally, the Forest Service failed to explain or provide data showing how these "local factors" reduced the risk of the allotment down to Moderate when the Risk of Contact Model showed extreme High Risk.  The Wishbone Risk Assessment reported the model's results as: (1) bighorns contacting the allotment once a year, (2) a disease interval of 4 years, and (3) 1 mile between the allotment and bighorn core home range.  WA04030.  In contrast, the Assessment defined Moderate Risk as: (1) bighorn contact with an allotment once every 8-10 years, (2) a disease interval of 32-40 years, and (3) 10-15 miles between the allotment and bighorn core home range.  WA04030, 04002.  The Forest Service failed to explain how the local factors reduced the risk so significantly to achieve a Moderate Risk rating.  WA04031-33, 04038-39.  Tellingly, Federal Defendants' brief does not address this issue despite Petitioners pointing it out.  Pet. Opening Br. at 21-22, 26; Fed. Def. Br. at 14-23.  This explanation was particularly important because, as explained above, most of the "local factors" did not apply to the Crystal and Shallow pastures that account for almost half of the grazing season.

Intervenor CWGA states that CPW supported creation of the Wishbone allotment, citing to CPW's comments on the Proposed Action.  CWGA Br. at 17-18 (citing WA02805-06).  Those comments did not claim the allotment was only Low or Moderate Risk, just that it would help create separation of the species compared to the

---

[4] CWGA repeatedly relies on the project design features in its brief, CWGA Br. at 8, 9-11, 16-17, 19, but those features will only assist with separation of the species if the permittees fully comply with them.  Past noncompliance, including in 2016 and 2017, undermines this reliance.  Moreover, experts have repeatedly stated such measures are ineffective at keeping the species separate.  *See* Pet. Opening Br. at 4.

Snow Mesa allotments.  WA02805-06.  Notably, these comments were written before

the Wishbone Risk Assessment was completed and before telemetry data showed a

Bristol Head bighorn ram moving into close range of the Crystal and Shallow pastures in

July 2017.  *Id.*; WA03956, WA003779.  Even without that information, CPW recognized

that the Crystal and Shallow pastures created a risk of contact with bighorn sheep.

WA02806.  CPW's comments do nothing to establish that the Forest Service's

Moderate Risk rating for the allotment was reasonable.

      The lack of explanations and data in the record to support the agency's decision

renders the Wishbone NEPA analysis arbitrary and capricious.  *New Mexico ex rel.*

*Richardson v. BLM,* 565 F.3d 683, 713-15 (10th Cir. 2009); *WildEarth Guardians v.*

*BLM,* 870 F.3d 1222, 1235-37 (10th Cir. 2017); *High Country Conservation Advoc. v.*

*U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1196-99 (D. Colo. 2014) (all overturning NEPA

decisions that were irrational and not supported by the record).

      **C.**    **The Forest Service Should Have Obtained and Analyzed All Existing Telemetry Data Before Issuing the Wishbone Decision.**

      The agency had an obligation to use the "best available science." *Lee v. U.S. Air*

*Force*, 354 F.3d 1229, 1244 (10th Cir. 2004); *Colorado Envtl. Coalition v. Dombeck*, 185

F.3d 1162, 1171-72 (10th Cir. 1999).  To fulfil this duty, the agency "should 'seek out

and consider all existing scientific evidence relevant to the decision' and 'cannot ignore

existing data.'" *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 451 F.3d 1183, 1194 n.4 (10th

Cir. 2006) (citing *Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 436 (8th Cir.

2004)).  Here, the Forest Service knew CPW's telemetry data existed and could inform

the Wishbone analysis.  *See* WA03779-85, 04245-48.  The Forest Service admits it did

not obtain the telemetry data for its decision-making process, but it contends now that

15

**I-App-255**

the data were unavailable.  Fed. Def. Br. at 23-24. This position is belied by the record and the ability of both Petitioners and the Forest Service to later get the data.

The Forest Service asserts that CPW considered the data confidential, did not want it released to the public, and did not share it with the Forest Service until 2019. Fed. Def. Br. at 24.  Yet nowhere does the Forest Service state it affirmatively requested the data from CPW and CPW denied that request, nor is there any such request and denial documented in the record.  *Id.*; ECF No. 15-2 at 11-12 (AR Index for External Communications).  The agency cannot ask this court to base its review on merely insinuated actions.  *Dep't of Comm. v. New York*, 139 S.Ct. 2551, 2573 (2019) (courts are "limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record"); *Utah Envtl. Cong. v. Bosworth*, 439 F.3d 1184, 1193 (10th Cir. 2006) (courts must examine agency decision based on information in the administrative record).  When the Forest Service finally did ask CPW for the data, well after issuing the Wishbone decision, the agencies negotiated an agreement that put the data in the Forest Service's hands. *See* WA05838 (data request), 05847 (agreement). Petitioners were also able to obtain the data from CPW.  *See* Ratner Decl. ¶ 25.  The record does not support the Forest Service's claim that the data were unavailable.[5]

The agency's suggestion that the data were too costly to obtain makes no sense when the data already existed and the Forest Service simply had to request it.  Fed. Def. Br. at 23-24.  This was not a situation that involved expensive *new research*.  *See Lee*, 354 F.3d at 1244 (declining to require new livestock studies to replace existing

---

[5] The Forest Service's claim of unavailability is even more suspect given that the two agencies worked together during the analysis process.  WA03978, 04041, 04057.

research); *Colo. Envtl. Coalition*, 185 F.3d at 1172-73 (declining to require new lynx studies).  Likewise, the agency's claim that the data were unnecessary, Fed. Def. Br. at 25, does not square with the record and its own practice. CPW stated that telemetry data were important to better understand bighorns' habitat use in summer. WA04167. The Forest Service itself recognized the telemetry data would inform its Risk Assessment, particularly seasonal habitat use and movements of bighorns in relation to the Wishbone pastures.  WA03989.  The agency never deemed the data unnecessary and in fact, for the nearby Weminuche allotments, it delayed the EIS to wait for data of this very nature.  *See* Pet. Opening Br. at 28 (citing Weminuche EIS).  At a minimum, the Forest Service should have obtained the data that existed at the time of its analysis.

Finally, the agency asserts that reports from CPW with preliminary findings from the data were sufficient for the Wishbone analysis.   Fed. Def. Br. at 24-25.  Although the Risk Assessment briefly acknowledged some of the early data, it did not discuss whether the data validated the local factors. WA03989-91, 04031-33, 04038-39.  As described in Part I.B above, CPW's preliminary information showed *holes* in some of those assumptions and thus called into question the Forest Service's conclusions.  Given the relevance of the data to the local factors, the agency should have analyzed all the existing data to verify if its assumptions were valid.  Unlike the cases cited by the agency, obtaining the data here was important for the decision-making process and could have influenced the Forest Service's conclusions.  Fed. Def. Br. at 24-25.

By not seeking out and considering existing relevant data for the Wishbone EA, the agency not only failed to use the best available science but also violated its duty to disclose to the public all information relevant to government decision-making and

17

environmental analysis. *Baltimore Gas & Elec. Co. v. Nat. Resources Def. Council, Inc.*, 462 U.S. 87, 100 (1983); *see also* 40 C.F.R. § 1500.1 (requiring high-quality information, accurate scientific analysis and public scrutiny in NEPA analyses).

### D.   The Wishbone EA Failed to Evaluate Indirect Effects.

Federal Defendants and Intervenor Colorado Farm Bureau (CFB) assert that the Forest Service has wide discretion to determine the scope of effects and the action area analyzed under NEPA.  Fed. Def. Br. at 26; CFB Br. at 17 (ECF No. 38).  While this may be true, the agency has a duty to consider all direct, indirect, and cumulative effects of a proposed action.  40 C.F.R. § 1508.25(c).  "Indirect effects are effects that 'are caused by the action and are later in time or farther removed in distance [than direct impacts], but are still reasonably foreseeable.'" *WildEarth Guardians v. U.S. Off. of Surface Mining, Reclamation & Enforcement*, 104 F. Supp. 3d 1208, 1229 (D. Colo. 2015) (finding NEPA violation where agency failed to consider indirect effects from coal combustion when approving a coal mining plan).  "Agencies need not have perfect foresight when considering indirect effects . . . . When the *nature* of the effect is reasonably foreseeable but its *extent* is not, the agency may not simply ignore the effect."  *Id.* at 1230 (internal quotation omitted, emphasis in original); *see also Utahns for Better Transp.*, 305 F.3d at 1179-80 (failure to address indirect impacts to birds outside immediate vicinity of project); *Davis v. Mineta*, 302 F.3d 1104, 1123 (10th Cir. 2002), *abrogated on other grounds by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1104, 1276 (10th Cir. 2016) (failure to consider indirect impacts of highway construction that would occur later in time).

Here, the Forest Service failed to assess in the Wishbone Risk Assessment and

18

EA two reasonably foreseeable indirect effects of authorizing the Wishbone allotment: disease transmission to bighorn herds adjacent to the Central San Juan herds, and future increased risk to the Central San Juan herds if they grow in size.

First, disease transmission to herds that are farther from the Wishbone allotment is reasonably foreseeable.  As Petitioners explained previously, three additional bighorn herds are within predicted foray distance of the Wishbone allotment.  Pet. Opening Br. at 30 (noting herds are within 12 miles of allotment).  The Forest Service dismissed considering effects to the Weminuche herd based on the FIG analysis, but that analysis supports Petitioners' argument. Fed. Def. Br. at 26-27.  The agency claimed that the Ivy Creek pasture of FIG, which is almost adjacent to the South River pasture of Wishbone, was the "lowest risk" of the FIG pastures, but that statement is misleading as the FIG Risk Assessment rated *every* pasture as *High Risk* to the Weminuche herd.  WA05639, 05672-73, 01818.  Given how close the Wishbone South River pasture is to the FIG Ivy Creek pasture, the risk would be similar.  A San Juan West bighorn herd is equally close to the Wishbone allotment.  Fed. Def. Br. at 27.  The Risk of Contact Model analyzes forays out to 21 miles based on known foray distances, WA04062, and thus all three adjacent bighorn populations should have been modelled for risk.

Additionally, the Forest Service asserts that it recognized the risk of Central San Juan bighorns passing disease to neighboring herds, but simply mentioning this risk as an "uncertainty" in the Risk Assessment and briefly noting the possibility of interaction between herds in the Decision Notice does not fulfill NEPA's duty to take a hard look at indirect effects of the action.  Fed. Def. Br. at 27 (citing WA04045, 05677-78).  The record contains ample evidence of historical and current interaction between Central

19

San Juan bighorn herds and herds from other populations.  *See* Pet. Opening Br. at 30-31.  Indeed, bighorns from one of the San Juan West herds (S33) were seen from a monitoring location for the Bristol Head bighorn herd.  WA05735.  If a person can see animals from both herds from one location, those animals are certainly close enough to interact.  Even the Natural Arch bighorn population is at risk from interactions, and it is suspected that a bighorn from the Bellows Creek herd passed disease to that population in the past.  WA01816.  The record shows it is reasonably foreseeable a bighorn from a Central San Juan herd could pass disease to a bighorn from an adjacent herd, and the Wishbone Risk Assessment should have considered and disclosed the potential impacts to those neighboring herds from that event.

Second, it is reasonably foreseeable that the Central San Juan herds will increase in size, thereby increasing the risk of contact with domestic sheep using the Wishbone allotment.  WA04139.  The Forest Service claims it is unlikely the herds will significantly increase, Fed. Def. Br. at 28, but the whole point of the Forest Service's Wishbone decision was to reduce the risk of disease transmission to these herds by closing the Snow Mesa allotments and using a lower-risk Wishbone allotment.  Under the agency's own reasoning, these herds should rebound from the past effects of disease and poor lamb recruitment and expand into the unoccupied suitable habitat that exists.  *See* WA04140 (habitat capable of supporting considerably larger population of bighorn).  In fact, the agency acknowledged in the FIG analysis that it expected the Weminuche bighorn population to grow and expand into unoccupied habitat.  WA01788.  "[O]utlining a plan of action" to take in the future if the herds grow in size does not constitute a hard look at the indirect effects (later in time) of authorizing the Wishbone

**I-App-260**

allotment.  Fed. Def. Br. at 28 (citing WA05676, 04139).  *WildEarth Guardians*, 104 F.

Supp. 3d at 1230 (cannot ignore indirect effects where the type of the effect is

reasonably foreseeable even if the extent of effect is speculative).

## II.   THE FOREST SERVICE NEEDED TO PREPARE AN EIS.

An EIS is required where there are substantial questions about whether an

agency action will have a significant effect on the environment.  *Bark v. U.S. Forest

Serv.*, 958 F.3d 865, 868 (9th Cir. 2020).  To avoid completing an EIS, an agency must

provide within the FONSI "a convincing statement of reasons" as to why an action's

impacts are insignificant.  *Id.* at 869.  The Forest Service has not met that burden here.

### A.   Highly Controversial and Uncertain

Defendants point to various cases for the propositions that public opposition

alone or dissatisfaction with an agency's methods is not sufficient to show an action is

highly controversial.  Fed. Def. Br. at 30-31; CFB Br. at 6-7.  Petitioners do not rely on

such contentions.  Instead, Petitioners cited the applicable standard that controversy

exists when there is a substantial dispute as to the size, nature, or *effect* of the action.

*Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002).

As noted by the Forest Service, a substantial dispute exists when evidence in the record

"casts serious doubt upon the reasonableness of an agency's conclusions."  Fed. Def.

Br. at 30 (citing *Nat'l Parks & Conservation Ass'n v Babbitt*, 241 F.3d 722, 736 (9th Cir.

2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 130 S.

Ct. 2743 (2010)).  A court must determine whether an agency's challenged method had

a rational basis and took into consideration the relevant factors.  *Utah Shared Access

Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1212-13 (10th Cir. 2002); *see also*

*Biodiversity Conservation Alliance v. U.S. Forest Serv.*, 765 F.3d 1264, 1275 (10th Cir. 2014) (substantial dispute occurs when the record casts substantial doubt on the adequacy of agency's methodology and data).  Notably, to determine whether an EIS is required, an agency must consider all direct *and* indirect effects of its action.  *Utah Shared Access All.*, 288 F.3d at 1214.

Here, the record casts serious doubt on the adequacy of the agency's analysis and data, and the reasonableness of its conclusions, regarding the key effect from authorizing the Wishbone allotment: risk of disease transmission to bighorn sheep.  *See* WA02294-95, 05236-37 (risk of contact between species was one of two key issues analyzed in the EA).  As discussed above, the Forest Service's subjective conclusion that the allotment was only Moderate Risk was based on use of "local factors" that were highly disputed individually and lacked any scientific basis to support the conclusion that the combination of these factors would lower the risk enough to meet the contact-rate and disease-interval criteria for Moderate Risk.  The agency also failed to incorporate relevant data and to consider all reasonably foreseeable indirect effects.

Public comments and objections pointed out many of these flaws and attached relevant science, court decisions, and expert opinions to dispute the Moderate Risk rating for the Wishbone allotment.   WA02810-25, 02832-37, 05448-50, 05476-85, 05565-70.  WA02598-602, 02605-49, 02652-53, 05451-54, 05494-564, 05575-605.  In sum, the record evidence casts serious doubt on the reasonableness of the agency's analysis and conclusions regarding effects of authorizing the Wishbone allotment.

Defendants go to great length to distinguish the facts of the cases Petitioners cited, but the holdings of those cases are on point.  Fed. Def. Br. at 32-34; CFB Br. at 7-

9.  An action is highly controversial where the record shows a significant dispute about the extent of potential impacts due to varying, inadequate, or incomplete analyses. *Middle Rio Grande Conservancy Dist.,* 294 F.3d at 1229; *Babbitt*, 241 F.3d at 736-37; *San Luis Valley Ecosystem Couns. v. U.S. Forest Serv.,* 2007 WL 1463855, at *10, No. 04-cv-1071-MSK (D. Colo. May 17, 2007).  A recent case is even more on point, finding a timber project "highly controversial" where Plaintiffs had provided scientific information disputing the agency's assertions and conclusions about the effects of the proposed forest thinning activities, similar to the scientific dispute at issue here.  *Bark*, 958 F.3d at 870-71.  This dispute is of "substantial consequence" because the Forest Service concluded the allotment's risk to bighorn sheep was "acceptable" *only* because it reduced the risk to Moderate.  *Bark*, 958 F.3d at 871; WA05660, 05664-65, 05678.

The Forest Service's argument that the effects of its action are not highly uncertain is similarly unavailing.  The risk to bighorn sheep from domestic sheep is indeed well-known and scientifically-supported.  Fed. Def. Br. at 35.  And while disease transmission to bighorn sheep leads to predicable results—pneumonia die-offs and poor lamb survival—the likelihood, frequency, and extent of such transmission is highly uncertain under the facts here.  The "trusted" tool used by the Forest Service to "accurately assess the degree to which an allotment could affect bighorn sheep" is the Risk of Contact Model, which showed the Wishbone allotment was High Risk.  Fed. Def. Br. at 35; WA04030.  Instead of relying on this trusted tool, however, the Forest Service created new local factors to subjectively reduce the risk of the allotment to Moderate. The questionable use of these factors creates substantial uncertainty about the Forest Service's Moderate Risk conclusion.

23

Moreover, the Forest Service did not even consider the risk to neighboring bighorn populations, creating further uncertainty about the allotment's full impacts.  The Wishbone Risk Assessment itself contained more than ten pages discussing all of the uncertainties inherent in the analysis.  WA03965-66, 03988-95, 04041-45. These uncertainties were not minor points but went to the heart of the analysis, showing the effects of authorizing the Wishbone allotment were "highly uncertain."  *Anderson v. Evans*, 371 F.3d 475, 489-92 (9th Cir. 2004).

As Petitioners pointed out, the FONSI admitted that controversies and uncertainties existed with regard to the effects of its proposed action but provided no explanation as to why those controversies and uncertainties were not sufficient to warrant an EIS.  Pet. Opening Br. at 17, 18 (citing WA05680-81).  The Forest Service does not even address this deficiency in its response.  Fed. Def. Br. at 30-36.  The lack of a rational explanation as to why those factors did not show potentially significant effects renders the FONSI arbitrary and capricious.   Petitioners have shown that the key issue assessed by the agency—the degree of risk the Wishbone allotment poses to bighorn sheep—was highly controversial and highly uncertain, warranting an EIS.

### B.    Precedential Impact and Cumulative Impacts

Two additional significance factors weigh in favor of completing an EIS.  First, this action may set a precedent for future actions.  Petitioners do not contest the Forest Service's point that the agency would conduct separate site-specific NEPA analyses for future grazing authorizations. Fed. Def. Br. at 37, WA5681.  The precedent set by the Wishbone decision is not the *authorization* but the *tactic* the agency used to contradict the results of the Risk of Contact Model and subjectively lower the risk rating for the

24

allotment.  Prior to Wishbone, the Forest Service used the Risk of Contact Model as its basis for determining the risk of an allotment to bighorn sheep.  *See supra* pp. 3-5.  The Forest Service diverted from this practice for Wishbone by incorporating unsupported "local factors" to lower the risk, and will likely continue to use the new tactic in the future—including for the Weminuche allotments grazed by Intervenor J. Paul Brown.

Indeed, CFB Intervenors sought intervention due to the Wishbone decision's precedential impact on other allotments.  They noted the Wishbone decision would influence the decision on J. Paul Brown's allotments, and would affect other allotments in the region.  ECF No. 13-1 at 4, 7-8; ECF No. 19 at 2, 5, 7.  This Court agreed that "there is a reasonable possibility that analysis and decisions applicable to the Wishbone Allotment will be applied to other allotments."  ECF No. 30 at 9.  These statements belie the Forest Service's assertion that the Wishbone decision will not set a precedent.

Second, domestic sheep grazing on other lands could pose additional risk to the same bighorn herds threatened by the Wishbone allotment, but the Forest Service failed to consider that potentially significant cumulative impact.  WA05286, 05322-23, 05681.  The agency suggests that Petitioners must identify other grazing allotments, but it is the agency's duty to consider all direct, indirect, *and cumulative* effects of its action. Fed. Def. Br. at 38; 40 C.F.R. § 1508.25(c).  At a minimum, the Weminuche allotments add to the risk posed by Wishbone, and other Forest Service, BLM, or private land domestic sheep grazing likely also adds to that risk.  *See* CFB Br. at 18 (discussing Weminuche allotment analysis assessing risk to same bighorn populations); WA03946, 06016-22 (cumulative effects discussion in Payette EIS considered effects of BLM allotments and private flocks).  The Forest Service claims it has vacated a number of domestic sheep

I-App-265

allotments in the past decade, but it fails to disclose how many allotments remain on the forest.  Fed. Def. Br. at 38.  The Forest Service failed to "identify and meaningfully analyze" the cumulative risk to bighorn sheep populations from other domestic sheep grazing combined with the risk from the Wishbone allotment, which creates "substantial questions about whether the action will have a cumulatively significant environmental impact," necessitating an EIS.  *Bark*, 958 F.3d at 871-73.

Four of the intensity factors apply here and mandate preparation of an EIS.  The Forest Service recognized the need for an EIS to assess the risk of the neighboring Weminuche allotments.  *See* ECF No. 19 at 9 (noting that agency reversed its initial plan of issuing a FONSI for Weminuche allotments and instead stated it would prepare an EIS).  The Forest Service violated NEPA by failing to take the same action here.

## III.   THE SIR IMPROPERLY AVOIDED A VALID SUPPLEMENTAL ANALYSIS.

Defendants claim the Forest Service's use of the SIR was proper, but in reality, it was an end run around the agency's flawed EA that violates NEPA.  Acknowledging the deficiency in its initial Risk Assessment and EA by not incorporating the CPW telemetry data, the Forest Service re-ran the Risk of Contact Model and conducted a new assessment with the data.  But rather than disclose this to the public, as it did for the first assessment, it used the SIR to hide the model's results showing a 27% *increase* in risk over the original results for Wishbone and then make an unreasonable determination that the "new" information did not warrant supplemental NEPA analysis.

As discussed in Petitioners' opening brief, the key problem with the SIR is that the agency is using it to plug a hole in the EA, which is improper.  Pet. Opening Br. at 32-33.  The Forest Service claims the SIR was not an improper post-hoc rationalization,

**I-App-266**

but the two cases it cites are inapposite. Fed. Def. Br. at 41. In the first, the court held that the SIR provided additional explanation and articulation of an analysis the agency had already completed; it was not a new analysis using data the agency had not previously considered. *Kunaknana v. U.S. Army Corps of Eng'rs*, No. 3:13-cv-00044-SLG, 2015 WL 3397150, at *4 (D. Alaska May 26, 2015). The second case was distinct as well, where the SIR was used only to address public comments that arose for the first time after the decision was issued, and the court held the SIR was not an improper post-hoc rationalization "under the facts and circumstances of this case." *Friends of the Bitterroot, Inc. v. U.S. Forest Serv.,* 900 F. Supp. 1368, 1372 (D. Mont. 1994).

The use of the SIR here to analyze information that the agency should have incorporated into the initial Risk Assessment and EA is an improper attempt to cure that deficiency without undertaking proper decision-making and public participation procedures that are the heart of NEPA. *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 566-68 (9th Cir. 2000); *Friends of the Clearwater v. McAllister*, 214 F. Supp. 2d 1083, 1087-89 (D. Mont. 2002), *aff'd* 58 Fed. Appx. 686 (9th Cir. 2003).

The Forest Service takes aim at Petitioners for not submitting the data to the agency during the administrative process, Fed. Def. Br. at 42, but Petitioners did not receive the data from CPW until October 2018, eight months *after* the agency issued the Wishbone decision. Ratner Decl. ¶ 25; WA05682. Indeed, the data covered telemetry locations collected through July 4, 2018, so Petitioners could not possibly have obtained it prior to the March 2018 decision as the Forest Service claims. Ratner Decl. ¶ 25. Petitioners knew of the data during the analysis process due to references in the Wishbone Risk Assessment. WA03967, 03989-91, 04031, 04045. When they

27

surprisingly learned through a Freedom of Information Act request that the Forest Service did not actually have the data, Petitioner WWP requested and obtained it from CPW—well after the Wishbone decision was final.

Additionally, the SIR violated NEPA because the agency's conclusion that the new information was not significant, and therefore did not require supplemental NEPA analysis, was arbitrary and capricious.  Defendants all claim that the Forest Service reasonably determined the new data did not change the conclusions in the prior Risk Assessment.  Fed. Def. Br. at 43; CWGA Br. at 23-24; CFB Br. at 13.  As explained above, however, the conclusions in the prior assessment were unsupported and irrational, and the new data only makes those conclusions more arbitrary.

Defendants rely heavily on assertions that the updated data still show bighorn core home range does not overlap any pastures, and seasonal movements reduce the risk further, but those assertions are flawed.  Fed. Def. Br. at 43; CWGA Br. at 23.  First, as explained above, the Forest Service improperly based the core home range designation on only 90% of bighorn locations, rather than 95% as required by the Risk of Contact Model.  *Supra*, pp. 7-8; WA03887, 05887.  Even using just 90% of locations, the data created larger bighorn core home range that was now directly adjacent to the Crystal and Shallow pastures; using 95% of locations would likely show overlap with those and possibly other pastures.  WA05900; ECF No. 28-1 at 3-6; ECF No. 29-2 at 2-3.  The data also confirmed that Bristol Head bighorn rams moved toward the Crystal and Shallow pastures in summer and remained very close to those pastures during the grazing period.  WA05909-22.  Because those two pastures account for a large portion of the grazing season and are the hardest to manage, with project design features being

**I-App-268**

least effective, there is a high risk of contact between domestic sheep grazing those pastures and bighorns in very close proximity.  *See supra* pp. 13-14.

The SIR also failed to explain how, even though the data showed a substantially higher risk to bighorn sheep, the same local factors were still sufficient to reduce that risk all the way down to Moderate.  With the new core home range and updated bighorn herd population estimates, the Risk of Contact Model showed a contact rate of 1.26 contacts per year, compared to .98 in the 2017 Risk Assessment, an increase of 27%.  WA05889.  Notably, the SIR did not identify the corresponding disease interval, but it would have been more frequent than the 4-year interval that resulted from .98 contacts per year.  *Id.*; WA04030.[6]  The SIR relied on the same flawed local factors discussed above and again failed to explain how those factors were now sufficient to reduce the risk even further to meet the Moderate Risk criteria of one contact every 8-10 years and a 32-40 year disease interval.  WA05889-93, 05896; WA04002.

Finally, dismissing as insignificant the sighting of two bighorn sheep on the South River pasture in July 2019 was also irrational.  WA05895-96.  The SIR repeatedly states that the telemetry data did not show any bighorns on Wishbone pastures, but only 10-15% of each herd had telemetry collars.  WA05888, 05890, 05892, 04245.  Bighorns observed on the South River pasture prove that the animals entered a Wishbone pasture, and very likely others have too given that several pastures are adjacent to bighorn core home range.  This sighting also contradicts several of the Forest Service's local factors, including that bighorns move away from that pasture in summer, that the

---

[6] The Payette EIS identified a contact rate of 1.28 contacts per year as having a disease interval of 3.7 years under the moderate probability of outbreak scenario (.25) used in the Wishbone Assessment.  WA05989, 06013 (data for Alternatives 3,4,6); WA04030.

Rio Grande River and roads are barriers to bighorn sheep, and that bighorns will not use the pasture because it has little suitable habitat.  WA03971, 3973.  This sighting shows uncollared bighorns are using more area and at different times than what is documented by the 10-15% of bighorns with collars, which is significant information.

Comments pointed out these and other flaws with the SIR analysis, and the High Risk posed particularly by the Crystal, Shallow, and South River pastures, but the Forest Service avoided considering these comments by using the SIR.  ECF Nos. 28-1, 28-2, 29-1, 29-2, 29-3.  Because the telemetry data confirmed that use of the Wishbone allotment could have potentially significant effects to bighorn sheep, the Forest Service must properly supplement its NEPA analysis and cannot use the SIR as a substitute. *Idaho Sporting Cong.*, 222 F.3d at 566-68.

## IV.    VACATUR IS THE PROPER REMEDY.

If the Court finds the Wishbone EA and DN/FONSI violated NEPA, the proper remedy is remand to the agency and vacatur of the decision.  5 U.S.C. § 706(2)(A) (courts shall set aside agency action found to be arbitrary and capricious); *High Country Conservation Advoc. v. U.S. Forest Serv.*, 951 F.3d 1217, 1228 (10th Cir. 2020) (typical remedy for a NEPA violation is "remand to the district court with instructions to vacate the agency action"); *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019) (remanding and vacating EAs and FONSIs).

### CONCLUSION

For the foregoing reasons, Petitioners respectfully request the Court grant their petition for review, set aside the Wishbone EA and DN/FONSI, and order the Forest Service to complete an EIS before authorizing use of the Wishbone Allotment.

Dated:  July 20, 2020

Respectfully submitted,

/s/ Lauren M. Rule
Lauren M. Rule
Advocates for the West
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

/s/ Maya L. Kane
Maya L. Kane
Southwest Water and Property Law LLC
10 Town Plaza, #422
Durango, CO 81301
(970) 946-5419
mkane@swpropertylaw.com

Attorneys for Petitioners

31

**I-App-271**

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) the required hard copies sent to the court are an exact copy of the ECF submission;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender Antivirus, version 1.417.241.0, last updated August 21, 2024, and according to the program are free of viruses.

Date:  August 22, 2024


 s/ Lauren M. Rule
Lauren M. Rule
Advocates for the West
3701 SE Milwaukie Ave., Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

*Attorney for Petitioners-Appellants*